## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL, INC.; and | ) ) ) |
| NATIONAL WILDLIFE FEDERATION, | ) ) |
| *Plaintiffs,* | ) ) |
| v. | ) ) |
| U.S. DEPARTMENT OF THE INTERIOR; | ) ) ) |
| U.S. FISH AND WILDLIFE SERVICE; and | ) ) ) |
| DANIEL JORJANI, in his official capacity as the person exercising the authority of the Solicitor of the Interior, | ) ) ) ) |
| *Defendants.* | ) ) |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Civil Action No. 1:18-cv-4596

## INTRODUCTION

1.    The Migratory Bird Treaty Act of 1918 (the Act or MBTA) is a bedrock environmental law, enacted 100 years ago with the singular statutory purpose of protecting migratory birds. The Act broadly prohibits—in clear and expansive terms—the unauthorized taking or killing of migratory birds. Specifically, the Act makes it unlawful, unless permitted by regulation, to "take" or "kill" any migratory bird "at any time, by any means or in any manner." 16 U.S.C. § 703(a).

2.    For more than four decades, Defendants U.S. Department of the Interior (Interior) and U.S. Fish and Wildlife Service (the Service) (collectively, the

agencies) recognized that this expansive language in the Act encompasses activities that foreseeably kill migratory birds, whether or not that is the activities' specific purpose.

3.      The agencies' recognition that the Act applies to such "incidental take" provided important protections for millions of birds that otherwise would have been killed by activities and infrastructure like oil and gas development, communication towers, power lines, and commercial fishing. The threat of enforcement under the Act incentivized industry actors to take reasonable, low-cost measures to reduce their impacts on birds—e.g., by covering oil waste pits with nets, installing flashing lights on towers, and siting infrastructure appropriately. The agencies and U.S. Department of Justice also held industries liable under the Act for egregious acts that incidentally killed large numbers of migratory birds, such as the Exxon Valdez and Deepwater Horizon oil spills.

4.      In December 2017, Defendants Interior and Daniel Jorjani issued a legal opinion reversing the agencies' longstanding interpretation of the Act. *See* Memorandum from Daniel H. Jorjani, Principal Deputy Solicitor, to Sec'y of the Interior et al., Opinion M-37050, *The Migratory Bird Treaty Act Does Not Prohibit Incidental Take* (Dec. 22, 2017) (the Jorjani Opinion). The Jorjani Opinion reinterprets the Act as applying only to activities that "have as their purpose the taking or killing of migratory birds," such as hunting or poaching. *Id.* at 2, 41. This new interpretation strips the agencies of any authority to regulate or enforce the

Act against companies that foreseeably—as well as knowingly and needlessly—kill migratory birds.

5.    Because Defendant Jorjani signed the legal opinion as the person exercising the authority of the Solicitor of the Interior, the new interpretation is final and binding on the agencies. The Jorjani Opinion thus immediately forecloses a broad suite of migratory bird protections and eliminates the primary industry incentive to take reasonable measures to avoid unnecessary bird deaths. Indeed, the Service has already cited the Jorjani Opinion as the basis for allowing industry to engage in previously prohibited activities that kill migratory birds—e.g., clearing trees to construct a natural gas pipeline during birds' active nesting season.

6.    Former high-ranking Interior officials—including five Directors of the Service dating back to the Nixon administration—have sharply criticized the Jorjani Opinion. In January 2018, seventeen officials sent Secretary of the Interior Ryan Zinke a letter condemning the Jorjani Opinion as "contrary to the long-standing interpretation [of] every administration (Republican and Democrat) since at least the 1970's." Letter from Lynn Scarlett, former Deputy Sec'y of the Interior, et al., to Ryan K. Zinke, Sec'y of the Interior (Jan. 10, 2018). These officials explained that the Jorjani Opinion's "new, contrived legal standard . . . creates a huge loophole in the MBTA" and "needlessly undermines" past administrations' successes working cooperatively with industries to "reasonably address unintended take." *Id.*

7.     The Jorjani Opinion is unlawful because it misconstrues the Act. Its interpretation stripping the agencies of authority to regulate incidental take violates the Act's plain text, which broadly encompasses the killing of migratory birds "by any means or in any manner." 16 U.S.C. § 703(a). It contravenes the Act's protective purpose and statutory history, including international commitments to conserve migratory birds. It allows companies to knowingly and recklessly kill birds, undermining reasonable efforts to prevent unnecessary deaths. And it eliminates the Act's application in egregious cases of mass slaughter of migratory birds, such as large-scale oil spills.

8.     The Jorjani Opinion is also contrary to longstanding, settled precedent of the Second Circuit. *See United States v. FMC Corp.*, 572 F.2d 902, 906-08 (2d Cir. 1978) (rejecting argument that the MBTA applies only to affirmative acts that intentionally harm birds).

9.     This Court should declare the Jorjani Opinion unlawful, set it aside, and reinstate the agencies' prior interpretation of the Act.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331. The Jorjani Opinion is subject to judicial review under the Administrative Procedure Act as final agency action for which there is no other adequate remedy. 5 U.S.C. § 704. The relief sought is authorized by 28 U.S.C. § 2201(a), 28 U.S.C. § 2202, and 5 U.S.C. § 706.

11.     Venue is proper in the Southern District of New York under 28 U.S.C. § 1391(e)(1)(C) because this is a civil action brought against agencies of the United

States and officers of the United States acting in their official capacities, and because Plaintiff Natural Resources Defense Council (NRDC) maintains its principal place of business in New York City, 28 U.S.C. § 1391(c)(2).

## PARTIES

<u>Plaintiffs</u>

12.     Plaintiff NRDC is a national environmental advocacy group organized as a New York not-for-profit membership corporation. NRDC has offices in New York, Chicago, the District of Columbia, San Francisco, and Santa Monica, and has hundreds of thousands of members. NRDC's mission is to safeguard the Earth: its people, its plants and animals, and the natural systems on which all life depends. NRDC has a longstanding interest in defending bedrock environmental laws and protecting wildlife from the threats of industrial development and pollution. NRDC has worked for many years to protect migratory birds and their habitats through litigation, science, and advocacy, including efforts to bolster regulatory protections and to work with industry and the agencies in developing guidelines and best management practices to avoid unnecessary harm to birds.

13.     Plaintiff National Wildlife Federation (NWF) is a national not-for-profit membership organization dedicated to the protection of the environment and natural resources. Founded in 1936, NWF has more than six million members, partners, and supporters nationwide, and has affiliate organizations in fifty-one states and territories. NWF's mission is to educate, mobilize, and advocate to preserve and strengthen protection for wildlife and wild places. Among other things, this includes advocating for the protection of migratory birds from harm from oil

spills, oil and gas development, pipeline projects, improperly sited or operated wind farms, and other direct industrial threats.

14.     Plaintiffs and their members benefit from the Act's application to incidental take of migratory birds and thus, as described in greater detail below, are injured by the Jorjani Opinion and would benefit from an order setting it aside.

Defendants

15.     Defendant Interior is an agency of the U.S. government and is responsible for administering and enforcing the Act.

16.     Defendant Service is also an agency of the U.S. government and is the bureau within Interior responsible for administering and enforcing the Act.

17.     Defendant Jorjani is the Principal Deputy Solicitor of the Interior. He signed the challenged legal opinion as the person exercising the authority of the Solicitor of the Interior. Plaintiffs sue Jorjani in that official capacity.

## BACKGROUND

The Act Protects Migratory Birds in Clear and Expansive Terms

18.     The MBTA is a bedrock environmental statute and one of the nation's oldest conservation laws.

19.     Congress enacted the MBTA one hundred years ago, in 1918, to implement a treaty between the United States and Great Britain, on behalf of Canada. *See* Migratory Bird Treaty Act, ch. 128, Pub. L. No. 65-186, 40 Stat. 755 (1918) (codified as amended at 16 U.S.C. §§ 703-712). The treaty recognized that many bird species were in danger of extinction and sought to save birds from "indiscriminate slaughter" while "insuring the preservation of such migratory

birds." Convention Between the United States and Great Britain for the Protection of Migratory Birds, 39 Stat. 1702 (Aug. 16, 1916) (Canada Convention). The two countries agreed to establish a "uniform system of protection" for migratory birds that would accomplish these goals. *Id.*

20.     As a result, the Act broadly prohibits, among other things, the "take" or "kill" of migratory birds, unless permitted by regulations. Pub. L. No. 65-186, § 2, 40 Stat. at 755 (codified as amended at 16 U.S.C. § 703(a)).

21.     Consistent with the underlying treaty, the Act's singular purpose is to protect and conserve migratory birds. The U.S. Supreme Court described this purpose as "a national interest of very nearly the first magnitude." *Missouri v. Holland*, 252 U.S. 416, 435 (1920).

22.     The United States subsequently entered into similar migratory bird treaties with Mexico, Japan, and Russia. *See* Convention for the Protection of Migratory Birds and Game Mammals, art. I, 50 Stat. 1311 (Feb. 7, 1936) (Mexico Convention); Convention Between the Government of the United States of America and the Government of Japan for the Protection of Migratory Birds and Birds in Danger of Extinction, and Their Environment, 25 U.S.T. 3329 (Mar. 4, 1972) (Japan Convention); Convention Between the United States of America and the Union of Soviet Socialist Republics Concerning the Conservation of Migratory Birds and Their Environment, 29 U.S.T. 4647 (Nov. 19, 1976) (Russia Convention). Congress implemented these treaties by incorporating them into the Act. *See* 16 U.S.C. § 703(a).

23.     The treaties protect both game and non-game birds. *E.g.*, Canada Convention, art. I; Mexico Convention, art. IV. The Act now covers more than 1,000 bird species found throughout the United States. *See* 50 C.F.R. § 10.13.

24.     Emphasizing the breadth of the Act's protections, Congress in 1936 moved the expansive phrases "by any means," "at any time," and "in any manner" to the beginning of the Act's list of regulated or prohibited activities. *See* Pub. L. No. 74-728, § 3, 49 Stat. 1555, 1556 (1936).

25.     The Act now provides, in relevant part:

Unless and except as permitted by regulations made as hereinafter provided . . ., it shall be unlawful at any time, by any means or in any manner, to pursue, hunt, take, capture [or] kill . . . any migratory bird . . . .

16 U.S.C. § 703(a).

26.     The Supreme Court has described this "comprehensive statutory prohibition" as "expansive." *Andrus v. Allard*, 444 U.S. 51, 59-60 (1979).

The Agencies Long Recognize that the Act Applies to Incidental Take

27.     The Service and Interior—as well as the Department of Justice—long recognized that the Act's expansive text encompasses activities that foreseeably kill migratory birds, including activities that did not have killing birds as their purpose.

28.     Beginning in the early 1970s, the agencies and Department of Justice brought enforcement actions against companies that killed migratory birds with activities and infrastructure like oil sump pits, wastewater ponds, and pesticide applications. *E.g.*, *United States v. Stuarco Oil Co.*, No. 73-CR-129 (D. Colo. Aug. 17, 1973); *United States v. FMC Corp.*, 572 F.2d 902 (2d Cir. 1978); *United States v.*

*Corbin Farm Servs.*, 444 F. Supp. 510 (E.D. Cal.), *aff'd*, 578 F.2d 259 (9th Cir. 1978).

29.     In one of these cases, a pesticide manufacturer argued that it "should not be held liable under the Act" for poisoning dozens of migratory birds in an uncovered wastewater pond because it "had no intention to kill birds [and] took no affirmative act to do so." *FMC Corp.*, 572 F.2d at 905-06. The Second Circuit expressly rejected that argument. The Act "does not include [intent] as an element of the offense," the court observed, and "Congress recognized the important public policy behind protecting migratory birds." *Id.* at 908. Thus, the Second Circuit held, it was "sufficient to impose strict liability" under the Act where the defendant company manufactured a toxic chemical and "failed to prevent this chemical from escaping into the pond and killing birds." *Id.*

30.     The Act's application to incidental take has resulted in over $100 million in penalties paid as part of plea deals involving MBTA violations, including in major environmental disasters like the Deepwater Horizon and Exxon Valdez oil spills that together killed over a million migratory birds.

31.     Many penalties for MBTA violations go directly into the North American Wetlands Conservation Fund to restore habitat for waterfowl and other wildlife. *See* 16 U.S.C. § 4406(a); *see also, e.g.*, Press Release, U.S. Fish & Wildlife Serv., *BP Deepwater Horizon Oil Spill Settlement Funds Migrate North* (Apr. 27, 2015), https://www.fws.gov/news/ShowNews.cfm?ID=FC61EB52-BF8A-45AA-C04D802711C4EF55 (describing wetland restoration projects funded by Deepwater

Horizon MBTA penalties); Press Release, U.S. Dep't of Justice, *Exxon-Mobil Pleads Guilty to Killing Migratory Birds in Five States* (Aug. 13, 2009), https://www.justice.gov/opa/pr/exxon-mobil-pleads-guilty-killing-migratory-birds-five-states (describing plea deal that included $400,000 in MBTA fines that would fund waterfowl rehabilitation and preservation work).

32.     The Service has signed memoranda of understanding with other federal agencies that include specific responsibilities for addressing incidental take of migratory birds. *See, e.g.*, Memorandum of Understanding Between U.S. Dep't of Agric. Forest Serv. & U.S. Fish & Wildlife Serv. to Promote the Conservation of Migratory Birds, FS Agreement MU-1113-2400-264 (Dec. 8, 2008).

33.     In 2001, President Clinton issued an executive order, *Responsibilities of Federal Agencies to Protect Migratory Birds*, that applies expressly to unintentional take and recognizes that the Service's wildlife regulations do as well. Exec. Order 13186, § 2(a)-(c), 66 Fed. Reg. 3853 (Jan. 10, 2001) (construing the Service's regulatory definition of "take," 50 C.F.R. § 10.12, to include "take that results from, but is not the purpose of, the activity in question").

34.     The U.S. State Department has exchanged formal diplomatic notes with Canada affirming the countries' common interpretation that their migratory bird treaty applies to incidental take. And Canada, like the United States, has enacted implementing legislation that regulates incidental take. *See, e.g.*, Migratory Birds Convention Act, S.C. 1994, c. 22, s. 5.1 (Can.) (prohibiting the deposit of harmful substances in waters or areas frequented by migratory birds); *R. v.*

*Syncrude Canada Ltd.*, 2010 ABPC 229 (Can.) (tar sands company violated Migratory Birds Convention Act by depositing viscous petroleum liquid in a wastewater pond that killed several hundred migratory birds); *R. v. J.D. Irving, Ltd.*, 2008 CarswellNB 322 (Can.) (WL) (affirming Migratory Birds Convention Act's application to incidental take).

Congress Reaffirms the Service's Interpretation

35.     Consistent with the Executive Branch's longstanding interpretation of the MBTA, Congress has also enacted further legislation in recent decades that reaffirms the Act's broad application to incidental take.

36.     After several courts had held that the Act's general misdemeanor provision encompasses incidental take, *see, e.g.*, *FMC Corp.*, 572 F.2d at 906-08; *Corbin Farm Servs.*, 444 F. Supp. at 532-36, Congress amended the Act to include scienter requirements for *other* provisions in the Act, while deliberately leaving the general misdemeanor provision as a strict liability offense. Specifically, Congress added a "knowing" requirement to the Act's felony commercial provision, Pub. L. No. 99-645, § 501, 100 Stat. 3582, 3590 (1986) (codified as amended at 16 U.S.C. § 707(b)), and a negligence standard to a provision involving baiting, Pub. L. No. 105-312, § 102, 112 Stat. 2956, 2956 (1998) (codified as amended at 16 U.S.C. § 704(b)). But Congress left the general misdemeanor provision as is. *See* S. Rep. No. 99-445 at 16 (1986) ("Nothing in this amendment is intended to alter the 'strict liability' standard for misdemeanor prosecutions . . . ."); S. Rep. No. 105-366, at 2-3 (1998) (describing strict liability as "a hallmark of the law").

37.     In 2002, Congress also expressly required that the Service exercise its rulemaking authority under the MBTA to regulate incidental take of migratory birds by U.S. military training activities. Pub. L. No. 107-314, § 315, 116 Stat. 2458, 2509 (2002).

38.     Earlier that year, a district court had enjoined military live-fire training exercises in the Northern Mariana Islands that incidentally killed migratory birds without a permit, in violation of the MBTA. *See Ctr. for Biological Diversity v. Pirie*, 201 F. Supp. 2d 113 (D.D.C. 2002), *vacated as moot sub nom. Ctr. for Biological Diversity v. England*, 2003 WL 179848 (D.C. Cir. Jan. 23, 2003). In response, Congress temporarily exempted military readiness activities from the MBTA's prohibition of unauthorized incidental take, directed the Secretary of Defense to identify measures to minimize impacts on migratory birds, and required Interior to prescribe regulations under 16 U.S.C. § 704(a) that would authorize incidental take from military readiness activities. Pub. L. No. 107-314, § 315(a)-(d).

39.     This legislation confirms that the MBTA applies to incidental take. If the MBTA did not apply to incidental take, Congress would not have directed Interior to exercise its regulatory power under 16 U.S.C. § 704 to authorize it. The legislation also confirms that—even in the military readiness context—Congress did not want to leave incidental take of migratory birds unregulated.

40.     Pursuant to this legislation, the Service in 2007 published regulations that authorized incidental take resulting from military readiness activities. *See* Migratory Bird Permits; Take of Migratory Birds by the Armed Forces, 72 Fed. Reg.

8931 (Feb. 28, 2007) (codified at 50 C.F.R. § 21.15). However, the authorization
came with important limitations. For example, the regulations require the military,
if it determines that an activity may result in a significant adverse effect on a
migratory bird population, to confer and cooperate with the Service to develop
appropriate and reasonable conservation measures to minimize such effects. 50
C.F.R. § 21.15(a)(1). The regulations also retain Interior's power to withdraw or
suspend the authorization of incidental take in appropriate circumstances. *Id.*
§ 21.15(b).

The Service Begins Developing a Comprehensive Regulatory Program

    41.    Interior has exercised its regulatory authority to permit incidental
take under the Act outside of the military-readiness context as well. *See* 16 U.S.C.
§ 704(a). Any take permitted by such regulations is exempt from liability under the
Act. *Id.* § 703(a).

    42.    For example, the Service has issued special purpose permits under 50
C.F.R. § 21.27 for certain activities that result in incidental take. *See, e.g.*, Special
Purpose Permit Application, 77 Fed. Reg. 50,153 (Aug. 20, 2012) (discussing special
purpose permit for incidental take of migratory seabirds by longline fishery in
Hawaii); U.S. Fish & Wildlife Serv., *Record of Decision: Palmyra Atoll National
Wildlife Refuge Rat Eradication Project* 7 (2011) (discussing special purpose permit
for incidental take of migratory birds during invasive-species removal project in
Palmyra Atoll National Wildlife Refuge); Memorandum from Steve Williams, Dir.,
U.S. Fish & Wildlife Serv., *Migratory Bird Permit Memorandum* (Apr. 15, 2003)

(discussing permits for incidental take that may occur when bird nests are destroyed).

43.     Beginning in 1996, the Service also included regulatory take authorization under the MBTA when it issued incidental take permits for threatened or endangered birds under § 10 of the Endangered Species Act. *See* Memorandum from Dir., U.S. Fish & Wildlife Serv., to Reg'l Dirs., *Incidental Take of Migratory Birds and Bald Eagles* (Feb. 9, 1996); Memorandum from Pete Raynor, Assistant Solicitor, Fish & Wildlife Branch, to John Rogers, Deputy Dir., U.S. Fish & Wildlife Serv., *Permitted Incidental Take of Migratory Birds Listed Under the Endangered Species Act* (Feb. 5, 1996).

44.     The Service also has worked cooperatively with industries to develop voluntary guidelines and best management practices that minimize impacts on migratory birds. *See, e.g.*, U.S. Fish & Wildlife Serv., *U.S. Fish and Wildlife Service Land-Based Wind Energy Guidelines* (Mar. 2012); Avian Power Line Interaction Comm. & U.S. Fish & Wildlife Serv., *Avian Protection Plan Guidelines* (Apr. 2005). The Service factored compliance with the guidelines and practices into its MBTA enforcement decisions, which helped incentivize companies to take reasonable measures to protect birds before any harm occurred.

45.     In May 2015, the Service announced its intent to develop a comprehensive program for regulating and authorizing incidental take under the Act. *See* Migratory Bird Permits; Notice of Intent, 80 Fed. Reg. 30,032 (May 26, 2015). The Service explained that an incidental take authorization program would

build on the voluntary guidelines and practices to protect migratory birds, and provide greater certainty for industry actors that comply with such measures to reduce incidental take. *Id.* at 30,033-34. Specifically, the Service announced that it was considering promulgating regulations under 16 U.S.C.§ 704(a) that would establish a general conditional authorization for incidental take by certain industry sectors, so long as companies in those sectors adhere to best practices for protecting birds—e.g., maintaining protective netting over oil, gas, and wastewater disposal pits, and using recommended siting practices and flashing lights for communication towers. *Id.* at 30,035.

46.   In furtherance of that rulemaking, Solicitor of the Interior Hilary Tompkins issued a legal opinion in January 2017 reviewing and reaffirming the Service's longstanding interpretation of the Act. *See* Memorandum from Hilary C. Tompkins, Solicitor of the Interior, to Director, U.S. Fish & Wildlife Serv., Opinion M-37041, *Incidental Take Prohibited Under the Migratory Bird Treaty Act* (Jan. 10, 2017) (the Tompkins Opinion). The Tompkins Opinion comprehensively analyzed the Act's text, legislative history, and purpose; the underlying treaties; past agency practice; and the relevant caselaw. The opinion concluded that "the MBTA's broad prohibition on taking and killing migratory birds by any means and in any manner includes incidental taking and killing," and that "the government need not show that a defendant willfully or intentionally took or killed birds to prove a violation of the MBTA." *Id.* at 2.

The Oil and Gas Industry Lobbies Interior to Alter Its Interpretation

47.     Shortly after President Trump took office, the Acting Interior Secretary suspended the Tompkins Opinion because it was "written in part to support regulations . . . that are currently under review by the new Administration." Memorandum from K. Jack Haugrud, Acting Sec'y of the Interior, to Acting Solicitor, *Temporary Suspension of Certain Solicitor M-Opinions Pending Review* (Feb. 6, 2017).

48.     In March 2017, President Trump issued an executive order, *Promoting Energy Independence and Economic Growth*, directing federal agencies to review their policies that burden the development and use of oil and natural gas. Exec. Order 13783, § 2(a), 82 Fed. Reg. 16,093 (Mar. 28, 2017). In its report responding to the order, Interior identified reevaluating the MBTA's application to incidental take as one policy that would relieve regulatory burdens on the oil and gas industry. *See* Report of the Sec'y of the Interior, *Review of the Department of the Interior Actions that Potentially Burden Domestic Energy* 32-33 (Oct. 24, 2017).

49.     Representatives of the oil and gas industry lobbied Interior during this time to reverse the Service's longstanding interpretation of the Act. For example, on August 31, 2017, the oil and gas trade association Western Energy Alliance sent Secretary Zinke a letter "suggesting statutory changes" to the MBTA. Letter from Tripp Parks, Manager of Gov't Affairs, W. Energy Alliance, to Ryan Zinke, Sec'y of the Interior 1 (Aug. 31, 2017). The letter complained that "enforcement of incidental take of migratory birds . . . is inhibiting oil and natural gas development," and

urged Interior to "replace [the Tompkins Opinion] with guidance that MBTA does *not* give [the Service] authority to regulate incidental take for migratory birds." *Id.* at 8 (emphasis in original).

50.     On November 3, 2017, the director of government relations for the Independent Petroleum Association of America—another oil and gas trade association—sent an email to an Interior political appointee with the subject line "MBTA," asking: "Any word on the solicitor's opinion yet?" Email from Samantha McDonald, Dir. of Gov't Relations, Indep. Petroleum Ass'n of Am., to Timothy Williams, Deputy Dir., Dep't of the Interior (Nov. 3, 2017).

The Jorjani Opinion Reverses the Agencies' Interpretation

51.     On December 22, 2017, Defendant Jorjani issued a new legal opinion reversing the agencies' longstanding interpretation and concluding that the Act does not apply to incidental take. The Jorjani Opinion highlighted the deterrent effect that the agencies' prior interpretation had on industries whose activities directly and foreseeably kill migratory birds. It described potential MBTA liability as a "sword of Damocles" that "inhibits" productive development. Jorjani Opinion at 1-2. To eliminate this deterrent effect—and based on its purported "further analysis" of the MBTA and relevant case law—the Jorjani Opinion concluded that the Act "appl[ies] only to affirmative actions that have as their purpose the taking or killing of migratory birds," such as "hunting and poaching." *Id.* at 1-2, 41.

52.     The same day Interior issued the Jorjani Opinion, Western Energy Alliance and the Independent Petroleum Association of America issued separate

press releases applauding the opinion for lifting regulatory restrictions on the oil and gas industry.

53.    Defendant Jorjani signed the opinion as the person exercising the authority of the Solicitor of the Interior. *See* Ryan K. Zinke, *Temporary Redelegation of Authority for Certain Vacant Non-Career Senate-Confirmed Positions,* Secretarial Order No. 3345A12 (Nov. 14, 2017). He is exercising that authority because President Trump's Solicitor nominee was never confirmed by the Senate.

54.    As a legal opinion ostensibly signed by the Solicitor, the Jorjani Opinion represents a "final legal interpretation[]" of the Act that "shall be binding" on all Interior offices and officials. U.S. Dep't of the Interior, *Departmental Manual*, 209 DM 3.2(11) (Mar. 16, 1992). The opinion asserted that it "permanently withdraws and replaces [the Tompkins] Opinion." Jorjani Opinion at 1.

The Service Implements the Jorjani Opinion Resulting in Direct Impacts to Birds

55.    The Service confirmed the final, binding nature of the Jorjani Opinion in an April 11, 2018 guidance memorandum. The guidance memo explained that, as a result of the Jorjani Opinion, "the Service will ensure that [its actions] are not based on, nor imply, authority under the MBTA to regulate incidental take of migratory birds." Memorandum from Principal Deputy Dir., Fish & Wildlife Serv., to Serv. Directorate, *Guidance on the Recent M-Opinion Affecting the Migratory Bird Treaty Act* (Apr. 11, 2018). For example, "the Service will not withhold a

permit, request, or require mitigation based upon incidental take concerns under the MBTA." *Id.*

56.     The Service also attached to the guidance memo a list of frequently asked questions regarding the Jorjani Opinion's new interpretation of the Act. For example, demolishing a structure with known nesting owls inside is no longer considered an MBTA violation because the "purpose" of the act is to remove the structure, rather than to kill the owls. "The landowner's knowledge . . . that destroying the [structure] would kill the owls is not relevant" under the Jorjani Opinion, the Service explained. *Id.*, attachment. "All that is relevant is that the landowner undertook an action that did not have the killing of . . . owls as its purpose." *Id.*

57.     The Service also explained that incidental take statements and permits under the Endangered Species Act will no longer include restrictions or mitigation measures for incidental take of migratory birds under the MBTA. *Id.*

58.     And the Service acknowledged that, although Interior had previously "pursued MBTA claims against companies responsible for oil spills that incidentally killed or injured migratory birds," under the Jorjani Opinion "[t]hat avenue is no longer available." *Id.*

59.     The Service also has cited the Jorjani Opinion as the basis for allowing companies to engage in activities that were prohibited under its prior interpretation. For example, before the Jorjani Opinion, the Service recommended that the natural gas company DTE Midstream Appalachia limit its vegetative

clearing for the Birdsboro Pipeline project in Pennsylvania to between September 1

and March 31, to avoid any incidental take of migratory birds during the nesting

season. However, after the Jorjani Opinion, the Service expressed no objection to

the company expanding its clearing activities into the months of April and August,

when it would likely affect actively nesting birds. *See* Letter from Robert M.

Anderson, Fish & Wildlife Serv., Acting Field Office Supervisor, to Angela M. Lundy

(Mar. 12, 2018).

60.    The Jorjani Opinion also caused the Service to stop collecting

information about incidental take of migratory birds. For example, pursuant to the

Service's special purpose permit regulations, permittees are generally required to

file annual reports that describe the "numbers and species of migratory birds

acquired and disposed of" pursuant to the permit. 50 C.F.R. § 21.27(c)(1). However,

as a result of the Jorjani Opinion, the Service has informed utility permittees that

they no longer need to report migratory birds found dead on utility property or

structures.

61.    The Service also announced that, as a result of the Jorjani Opinion, it

will no longer consider promulgating regulations to address incidental take of

migratory birds, as it had previously intended. *See* Migratory Bird Permits;

Announcement, 83 Fed. Reg. 24,080 (May 24, 2018). The Service explained that

such regulations would have "provided protection for entities that had taken efforts

to reduce incidental take by [implementing] appropriate conservation measures to

avoid or reduce avian mortality." *Id*. "Due to the issuance of the [Jorjani] Opinion,"

however, "the actions contemplated are superseded," and the Service is "no longer pursuing" them. *Id.*

62.     On January 10, 2018, seventeen former high-ranking Interior and Service officials sent Secretary Zinke a letter sharply criticizing the Jorjani Opinion and expressing their concern about the adverse effects it will have on migratory birds. "Birds are, quite literally, the proverbial 'canary in the coal mine,'" the officials wrote. "How birds fare in the world indicates how all wildlife and habitat, and by extension human populations, will fare." Letter from Lynn Scarlett, *supra*.

63.     The officials observed that the opinion's "new, contrived legal standard . . . creates a huge loophole in the MBTA, allowing companies to engage in activities that routinely kill migratory birds." *Id.* The officials also noted that the Jorjani Opinion was "contrary to the long-standing interpretation [of] every administration (Republican and Democrat) since at least the 1970's," and that "several district and circuit courts have soundly rejected the narrow reading of the law that your Department is now embracing." *Id.*

64.     The officials explained that the Jorjani Opinion jeopardized the Service's prior work cooperating with industry to minimize incidental take. "All the past administrations for which we have worked have struck a balance and worked diligently and in good faith with industries that had significant impacts on birds, such as oil and gas, coal, electric utilities, commercial fishing, communications, transportation, national defense, and others to reasonably address unintended take," the officials wrote. *Id.* "Your new interpretation needlessly undermines a

history of great progress, undermines the effectiveness of the migratory bird treaties, and diminishes U.S. leadership." *Id.*

The Jorjani Opinion Harms Plaintiffs' Interests by Eliminating Protections for Migratory Birds

65. The Jorjani Opinion adversely affects the recreational, aesthetic, educational, and scientific interests of Plaintiffs and their members.

66. Plaintiffs have worked for many decades to protect migratory birds from incidental take, and to educate the public and their members about these threats. Plaintiffs' members include numerous individuals who enjoy viewing, protecting, and studying migratory birds.

67. Plaintiffs and their members benefitted from the agencies' prior, longstanding interpretation of the Act. Potential MBTA liability for incidental take caused many companies and industries to take reasonable measures to avoid killing birds. The Service also imposed mitigation measures and other restrictions on certain activities to reduce harm to birds. And when the Service enforced the Act against companies that directly and foreseeably killed migratory birds, the penalties for these MBTA violations funded habitat restoration projects that benefitted Plaintiffs and their members' interests.

68. The Jorjani Opinion injures Plaintiffs' and their members' interests by reversing the agencies' prior interpretation and thereby eliminating these benefits.

69. For example, because the Jorjani Opinion now prohibits the Service from enforcing the Act against incidental take, it eliminates companies' incentives to take reasonable measures to avoid killing birds. Companies' failure to take such

measures because of the Jorjani Opinion will therefore result in the death of many birds that otherwise would have been avoided, and it will subject certain species to greater risk of becoming threatened or endangered.

70.     Plaintiffs' members reside and recreate in areas where these impacts occur, and where the affected birds would have migrated or otherwise used as habitat for activities like foraging, roosting, and nesting.

71.     The Jorjani Opinion also injures Plaintiffs and their members by depriving them of information about bird deaths that the Service had previously collected, but no longer does as a result of the opinion. This information aided in the understanding and quantification of industrial threats to various bird species. The absence of such information harms Plaintiffs' and their members' ability to prioritize conservation actions towards those species most at risk, as well as those industrial uses with the greatest negative impacts to birds.

72.     Additionally, the Jorjani Opinion injures Plaintiffs by impairing their organizational activities to protect migratory birds. For example, the Jorjani Opinion has undermined previous efforts by Plaintiffs, the Service, and industry to develop and revise voluntary guidelines and best management practices to reduce incidental take of migratory birds.

73.     As a result, Plaintiffs have had to devote significant resources toward finding new mechanisms for engaging industries in bird conservation efforts. Instead of building on previous collaborative efforts to reduce impacts to birds, Plaintiffs are now devoting significant resources to justify voluntary guidelines and

other conservation measures that—under the agencies' prior interpretation of the Act— had been widely accepted.

74.    The Jorjani Opinion has also forced Plaintiffs to alter their bird-conservation work by focusing on more resource-intensive advocacy at the state and local levels.

75.    Declaring the Jorjani Opinion unlawful and setting it aside will redress these injuries to Plaintiffs' and their members' interests.

## CLAIM FOR RELIEF

76.    Plaintiffs reallege and incorporate by reference the allegations contained in all preceding paragraphs of the Complaint.

77.    The MBTA makes it unlawful, unless permitted by regulation, to "take" or "kill" any migratory bird "by any means or in any manner." 16 U.S.C. § 703(a). This expansive language of the Act applies to activities that foreseeably kill migratory birds, whether or not that is the activities' purpose.

78.    The Act's protective purpose, statutory history, and decades of Executive Branch practice confirm that the Act applies to incidental take.

79.    The Jorjani Opinion misconstrues the Act by limiting its application to only those activities that "have as their purpose" the taking or killing of migratory birds.

80.    The Jorjani Opinion's construction contravenes the Act's plain text and clear purpose to protect migratory birds. It also fails to account for the Service's delegated authority to regulate incidental take under the Act, as confirmed by

24

Congress in subsequent legislation. And it directly contravenes settled, longstanding precedent of the Second Circuit.

81.   As a result, the Jorjani Opinion is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

**PRAYER FOR RELIEF**

Plaintiffs respectfully request that this Court enter judgment:

A.   Declaring that Defendants are in violation of the Administrative Procedure Act, as described above;

B.   Vacating the legal opinion titled "Solicitor's Opinion M-37050, The Migratory Bird Treaty Act Does Not Prohibit Incidental Take";

C.   Granting Plaintiffs their costs of suit including reasonable attorney fees to the extent permitted by law; and

D.   Granting such further relief as the Court deems just and proper.

Dated:      May 24, 2018                    Respectfully submitted,

                                            */s/ Mitchell S. Bernard*
                                            Mitchell S. Bernard (MB 5823)
                                            Natural Resources Defense Council
                                            40 West 20th Street, 11th Floor
                                            New York, NY 10011
                                            T: (212) 727-4469
                                            F: (415) 795-4799
                                            mbernard@nrdc.org

Ian Fein (*pro hac vice* applicant)
Mary Katherine Umekubo
(*pro hac vice* applicant)
Natural Resources Defense Council
111 Sutter Street, 21st Floor
San Francisco, CA 94104
T: (415) 875-6147
F: (415) 795-4799
ifein@nrdc.org
kumekubo@nrdc.org

*Counsel for Plaintiffs*