UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:___7/31/2019___
```

-----------------------------------------------------------X
NATURAL RESOURCES DEFENSE COUNCIL, :
INC.; NATIONAL WILDLIFE FEDERATION, :
:
                         Plaintiffs, :          18-CV-4596 (VEC)
:
          -against- :          <u>OPINION AND ORDER</u>
:
U.S. DEPARTMENT OF THE INTERIOR; U.S. :
FISH AND WILDLIFE SERVICE; DANIEL :
JORJANI, in his official capacity as the person :
exercising authority of the Solicitor of the Interior, :
:
                     Defendants. :
-----------------------------------------------------------X
-----------------------------------------------------------X
NATIONAL AUDUBON SOCIETY; AMERICAN :
BIRD CONSERVANCY; CENTER FOR :
BIOLOGICAL DIVERSITY; DEFENDERS OF :
WILDLIFE, :          18-CV-4601 (VEC)
:
                     Plaintiffs, :
:
          -against- :
:
U.S. DEPARTMENT OF THE INTERIOR; U.S. :
FISH AND WILDLIFE SERVICE; DANIEL :
JORJANI, :
:
                     Defendants. :
-----------------------------------------------------------X
-----------------------------------------------------------X
STATE OF NEW YORK; STATE OF :
CALIFORNIA; STATE OF ILLINOIS; STATE :
OF MARYLAND; COMMONWEALTH OF :
MASSACHUSETTS; STATE OF NEW JERSEY; :    18-CV-8084 (VEC)
STATE OF NEW MEXICO; STATE OF :
OREGON, :
:
                     Plaintiffs, :
:
          -against- :
:
:

U.S. DEPARTMENT OF THE INTERIOR; U.S.  :
FISH AND WILDLIFE SERVICE; DANIEL  :
JORJANI, in his official capacity as Principal  :
Deputy Solicitor exercising the authority of the  :
Solicitor of the Interior,  :
                                            :
                              Defendants.  :
---------------------------------------------------------------X

VALERIE CAPRONI, United States District Judge:

Environmental interest groups and various States brought these three actions to vacate a December 2017 memorandum by Daniel Jorjani, Principal Deputy Solicitor of the United States Department of the Interior ("DOI"), that interprets the Migratory Bird Treaty Act ("MBTA") to permit the "incidental" taking, or killing, of migratory birds. *See* 18-CV-4596 Dkt. 1 (Compl.); 18-CV-4601 Dkt. 1 (Compl.); 18-CV-8084 Dkt. 6 (Compl.). Defendants—Principal Deputy Solicitor Jorjani, DOI, and the United States Fish and Wildlife Service ("FWS")—have moved to dismiss all three actions for lack of Article III standing and for failure to state claims under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, among other grounds. *See* 18-CV-4596 Dkts. 26-28; 18-CV-4601 Dkts. 29-31; 18-CV-8084 Dkts. 44-46. The Court, meanwhile, has directed the parties to show cause why the cases should not be consolidated pursuant to Fed. R. Civ. P. 42(a)(2). *See* 18-CV-4596 Dkt. 51; 18-CV-4601 Dkt. 44; 18-CV-8084 Dkt. 64. For the following reasons, these cases are CONSOLIDATED, and Defendants' motions to dismiss are GRANTED IN PART and DENIED IN PART.

## BACKGROUND[1]

Because Defendants' motions largely concern procedural matters; because the briefs submitted by the parties and by several former DOI officials as *amici curiae* (*see* 18-CV-4596

---

[1] Throughout this opinion, the Court accepts Plaintiffs' factual allegations as true. *See, e.g.*, *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56-57 (2d Cir. 2016) (facial motions under Fed. R. Civ. P. 12(b)(1)); *Gibbons v. Malone*, 703 F.3d 595, 599 (2d Cir. 2013) (motions under Fed. R. Civ. P. 12(b)(6)). Most of the background information related in this section, however, is undisputed or subject to judicial notice.

Dkt. 44 ex. 1) so thoroughly address the topic; and because the Court will provide further details

throughout this opinion, only a brief description of the MBTA and the agency activities giving

rise to this litigation is necessary.

In 1916, the United States and Great Britain, acting on Canada's behalf, entered into a

treaty to protect migratory birds. *See* Convention Between the United States and Great Britain

for the Protection of Migratory Birds, Gr. Brit.-U.S., Aug. 16, 1916, 39 Stat. 1702. In 1918, the

United States enacted the MBTA to implement the treaty and similar treaties with other

countries.[2] The MBTA generally provides that

> it shall be unlawful at any time, by any means or in any manner, to pursue,
> hunt, take, capture, kill, attempt to take, capture, or kill, possess, offer for
> sale, sell, offer to barter, barter, offer to purchase, purchase, deliver for
> shipment, ship, export, import, cause to be shipped, exported, or imported,
> deliver for transportation, transport or cause to be transported, carry or cause
> to be carried, or receive for shipment, transportation, carriage, or export,
> any migratory bird, any part, nest, or egg of any such bird, or any product,
> whether or not manufactured, which consists, or is composed in whole or
> part, of any such bird or any part, nest, or egg thereof.

16 U.S.C. § 703(a). In its current form, the MBTA makes any violation of its provisions a

misdemeanor punishable by a fine of up to $15,000 and imprisonment for up to six months. *Id.*

§ 707(a). Any knowing "take" of any migratory bird "by any manner whatsoever" with intent to

sell it is a felony punishable by a fine of up to $2,000 and imprisonment for up to two years. *Id.*

§ 707(b). Although the statute does not define "take," it is colloquially understood in the wildlife

context to refer to an act by which a person achieves possession or control over an animal. An

FWS regulation generally defines the term to mean "to pursue, hunt, shoot, wound, kill, trap,

---

[2]    Throughout the twentieth century, the United States entered into similar treaties with Mexico, Japan, and
the Soviet Union. *See* Convention Between the United States of America and the Union of Soviet Socialist
Republics Concerning the Conservation of Migratory Birds and Their Environment, U.S.-U.S.S.R, Nov. 19, 1976,
29 U.S.T. 4647; Convention Between the Government of the United States of America and the Government of Japan
for the Protection of Migratory Birds and Birds in Danger of Extinction, and Their Environment, Japan-U.S., Mar. 4,
1972, 25 U.S.T. 3329; Convention Between the United States of America and Mexico for the Protection of
Migratory Birds and Game Mammals, Mex.-U.S., Feb. 7, 1936, 50 Stat. 1311.

capture, or collect, or attempt to pursue, hunt, shoot, wound, kill, trap, capture, or collect." 50 C.F.R. § 10.12.

For decades, DOI had interpreted the MBTA as making any "incidental" take of a migratory bird—that is, a take that results from a human activity when taking the bird is not the purpose of the activity—a misdemeanor. *See* 18-CV-8084 Dkt. 6 app. A (Tompkins Op.) at 1-2, 12-15. Indeed, in early January 2017, DOI's Solicitor—the Department's chief lawyer and the DOI official charged with, among other things, issuing opinions setting forth DOI's interpretation of federal statutes—issued a memorandum that reaffirmed DOI's "long-standing interpretation that the MBTA prohibits incidental take." *Id.* at 2. That memorandum, officially known as M-37041, will be referred to in this opinion as the "Tompkins Opinion," named for the DOI Solicitor by whom it was issued.

In December 2017, following a change in administrations and Solicitor Tompkins's departure, DOI's Principal Deputy Solicitor, Daniel Jorjani—exercising the authority of the DOI Solicitor in the absence of a confirmed appointee to that office[3]—issued a new memorandum permanently withdrawing and replacing the Tompkins Opinion. *See* Dkt. 28 ex. A (Jorjani Op.) at 1.[4] This new memorandum, officially known as M-37050, will be referred to in this opinion as the "Jorjani Opinion."

The Jorjani Opinion reverses the Tompkins Opinion. It concludes that, "consistent with the text, history, and purpose of the MBTA, the statute's prohibitions on pursuing, hunting, taking, capturing, killing, or attempting to do the same apply only to affirmative actions that have

---

[3]     Mr. Jorjani has since been nominated to be DOI Solicitor but has not been confirmed. *See PN552—Daniel Habib Jorjani—Department of the Interior*, Congress.gov, https://www.congress.gov/nomination/116th-congress/552?q=%7B%22search%22%3A%5B%22jorjani%22%5D%7D&s=1&r=1 (last visited July 28, 2019).

[4]     Because Defendants have filed the Jorjani Opinion in identical format in all three cases, the Court cites to it according to its docket entry in 18-CV-4596 only.

as their purpose the taking or killing of migratory birds, their nests, or their eggs." Dkt. 28 ex. A (Jorjani Op.) at 2. Acknowledging that "this interpretation is contrary" to DOI's "prior practice," the Opinion states that "[i]nterpreting the MBTA to apply to incidental or accidental actions hangs the sword of Damocles over a host of otherwise lawful and productive actions, threatening up to six months in jail and a $15,000 penalty for each and every bird injured or killed." *Id.* at 1-2 & n.4.

In April 11, 2018, the Principal Deputy Director of FWS—an agency within DOI—issued a memorandum and a "frequently asked questions" document to "provide[] guidance to clarify what constitutes prohibited take" under the MBTA in light of the Jorjani Opinion. *See* 18-CV-8084 Dkt. 6 app. B (FWS Guidance) at 1. That memorandum notes that FWS "is modifying some policies and practices within its programs" to "[e]nsure consistency with the recently issued" Jorjani Opinion and directs FWS personnel to "ensure that [the agency's] comments, recommendations, or requirements are not based on, nor imply, authority under the MBTA to regulate incidental take of migratory birds." *Id.* at 1-2. It also provides that FWS "will not withhold a permit, request, or require mitigation based upon incidental take concerns under the MBTA."[5] *Id.* at 2.

In May 2018, the NRDC and Audubon Plaintiffs filed lawsuits challenging the Jorjani Opinion; in September 2018, the States filed a similar lawsuit. *See* 18-CV-4596 Dkt. 1 (NRDC Compl.); 18-CV-4601 Dkt. 1 (Audubon Compl.); 18-CV-8084 Dkt. 6 (States Compl.). All of the actions assert that the Jorjani Opinion's interpretation of the MBTA is "arbitrary, capricious, an

---

[5]     In disposing of these motions, the Court considers the Tompkins Opinion and the FWS memorandum because they are appended to the States' Complaint. *See, e.g.*, *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991) (permitting a court to consider "documents attached to the complaint as exhibits or incorporated in the complaint by reference" in "resolving a motion to dismiss"). The Court also considers the Jorjani Opinion because it is "integral" to all three Complaints. *See, e.g.*, *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004) ("A complaint is deemed to include . . . documents that, although not incorporated by reference, are integral to the complaint . . . ." (internal quotation marks omitted)).

abuse of discretion, or otherwise not in accordance with law" in violation of the APA, 5 U.S.C.

§ 706(2)(A).  *See* 18-CV-4596 Dkt. 1 (NRDC Compl.) ¶¶ 76-81; 18-CV-4601 Dkt. 1 (Audubon

Compl.) ¶¶ 72-79; 18-CV-8084 Dkt. 6 (States Compl.) ¶¶ 42-46.  The Audubon Complaint also

contends that the Opinion was issued without notice and opportunity for comment in violation of

5 U.S.C. § 553 and without compliance with the National Environmental Policy Act ("NEPA"),

42 U.S.C. § 4332(C).  *See* 18-CV-4601 Dkt. 1 (Audubon Compl.) ¶¶ 80-87.  All three actions

principally seek vacatur of the Opinion; the Audubon Complaint also requests that the Court

"[r]einstate Defendants' prior interpretation and policy regarding MBTA coverage and

implementation."  *See* 18-CV-4596 Dkt. 1 (NRDC Compl.) at 25; 18-CV-4601 Dkt. 1 (Audubon

Compl.) at 34; 18-CV-8084 Dkt. 6 (States Compl.) at 22.

 On November 20, 2018, in an omnibus brief, Defendants moved to dismiss all three

actions under Fed. R. Civ. P. 12(b)(1) and 12(b)(6).  *See* 18-CV-4596 Dkts. 26-28; 18-CV-4601

Dkts. 29-31; 18-CV-8084 Dkts. 44-46.[6]  On July 8, 2019, the Court directed the parties to show

cause why these three cases should not be consolidated pursuant to Fed. R. Civ. P. 42(a)(2).  *See*

18-CV-4596 Dkt. 51; 18-CV-4601 Dkt. 44; 18-CV-8084 Dkt. 64.  The parties consented to

consolidation, subject only to (a) the Audubon Plaintiffs' "understanding that it would not

prejudice their ability to litigate the NEPA and notice and comment claims asserted in their

complaint but not in the NRDC Action or the States' Action," and (b) Plaintiffs' request "that

they be permitted to continue to file separate briefs if there is further motion practice in the

consolidated proceeding."  18-CV-4596 Dkt. 52; 18-CV-4601 Dkt. 46; 18-CV-8084 Dkt. 65.

---

[6] Because Defendants' memorandum and reply in support of their motions to dismiss are identical across all three cases, further citations to those documents in this order will reference their respective docket entries in 18-CV-4596.

# DISCUSSION

## I.    Consolidation

Because these cases involve common questions of law and fact, and because the parties do not oppose consolidation, the Court consolidates the actions pursuant to Rule 42(a)(2). This consolidation is without prejudice to the Audubon Plaintiffs' ability to press their separate NEPA claim.[7] The Court denies without prejudice Plaintiffs' request that they be allowed to submit separate briefs in connection with further motion practice in the consolidated case. Whether separate briefs will be appropriate will depend on the type of briefing at issue, the degree to which Plaintiffs' positions vary, and the extent to which Plaintiffs' concerns regarding consolidated briefing can be alleviated through other accommodations—for instance, by allowing Plaintiffs to file a longer, consolidated brief.

## II.    Article III Standing

Article III of the Constitution limits the jurisdiction of the federal courts to "Cases" and "Controversies." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2565 (2019). "For a legal dispute to qualify as a genuine case or controversy, at least one plaintiff must have standing to sue." *Id.* In considering a facial motion to dismiss for lack of standing under Rule 12(b)(1), the Court must "determine whether the [complaint] alleges facts that affirmatively and plausibly suggest that the plaintiff has standing to sue." *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56-57 (2d Cir. 2016) (citations and alterations omitted). The Court must "accept . . . as true all material factual allegations of the complaint . . . and draw . . . all reasonable inferences in favor of the plaintiff." *Id.* at 57 (citations and alterations omitted). The party invoking federal jurisdiction—here, Plaintiffs—must plausibly plead (1) an "injury in fact"—that is, "an invasion

---

[7]        As this opinion will explain, *see infra* Pt. V, the Audubon Plaintiffs' notice-and-comment claim is dismissed with prejudice.

of a legally protected interest [that] is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical"; (2) "a causal connection between the injury and the conduct complained of"—that is, the injury must be "fairly . . . traceable to the challenged action of the defendant, and not . . . the result of the independent action of some third party not before the court"; and (3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (citations, internal quotation marks, and alterations omitted). "An allegation of future injury may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur."[8] *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (internal quotation marks omitted).

Contrary to Defendants' argument, at least one Plaintiff in this now-consolidated action has plausibly alleged Article III standing for each claim asserted and form of relief requested, thereby supplying the Court with jurisdiction over this case (at least insofar as the Constitution is concerned). *See, e.g.*, *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650-51 (2017) ("[A] plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought. . . . The same principle applies when there are multiple plaintiffs. At least one plaintiff must have standing to seek each form of relief requested in the complaint." (citations and internal quotation marks omitted)); *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 109 (2d Cir. 2017) ("It is well settled that where, as

---

[8]     Because Defendants' standing challenge is a "facial" one—that is, "based solely on the allegations of the complaint[s] or the complaint[s] and exhibits attached to [them]"—Plaintiffs bear "no evidentiary burden" at this stage. *Carter*, 822 F.3d at 56 (citations and alterations omitted). Plaintiffs will, of course, bear an evidentiary burden with respect to standing at later phases of this litigation. *See Lujan*, 504 U.S. at 561 ("In response to a summary judgment motion . . . the plaintiff can no longer rest on . . . mere allegations, but must set forth by affidavit or other evidence specific facts . . . which for purposes of the summary judgment motion will be taken to be true. And at the final stage, those facts (if controverted) must be supported adequately by the evidence adduced at trial." (citations and internal quotation marks omitted)).

here, multiple parties seek the same relief, the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." (internal quotation marks omitted)).  All Plaintiffs seek vacatur of the Jorjani Opinion under Section 706(2)(A) on the ground that the Opinion is contrary to the text of the MBTA.  The Audubon Plaintiffs additionally seek vacatur under Section 706(2)(A) and (D) on the ground that the Opinion was issued without notice and comment under 5 U.S.C. § 553 and in violation of NEPA.  The Court therefore addresses Plaintiffs' standing in two parts, first addressing whether any Plaintiff has standing to seek vacatur under Section 706(2)(A) and then addressing whether any of the Audubon Plaintiffs has standing to seek vacatur for failure to comply with Section 553 and NEPA.

A.  Plaintiffs' Standing to Seek Vacatur of the Jorjani Opinion Under Section 706(2)(A)

Taking all of the States' allegations as true and drawing all inferences in their favor, *Carter*, 822 F.3d at 56-57, the Court is satisfied that at least one of the States has adequately alleged Article III standing to seek vacatur of the Jorjani Opinion under Section 706(2)(A).

Although the States advance several theories of injury, *see* 18-CV-8084 Dkt. 54 (States' Mem. in Opp. to MTD) at 5-10, the most obvious of them suffices for present purposes: the Jorjani Opinion creates substantial risk that migratory birds owned by the States will be killed by private actors.  Under New York State law, for example, the State "owns all . . . game [and] wildlife . . . in the state" not held by private interests.  N.Y. Envtl. Conserv. Law § 11-0105.  According to the States' Complaint, this includes "well over 300 species of migratory birds protected under the [MBTA] that nest in or regularly migrate through New York."  18-CV-8084 Dkt. 6 (States' Compl.) ¶ 13.  As the States allege in detail, *see id.* ¶¶ 30-37, by barring FWS from criminally prosecuting private industrial behavior that incidentally kills birds owned by the State of New York, the Jorjani Opinion has eliminated the primary incentive private actors had to

take precautionary measures to minimize or prevent bird deaths or to avoid altogether certain industrial activities that create a risk of such deaths. The Opinion therefore creates a "substantial risk," *Driehaus*, 573 U.S. at 158, that private actors will incidentally kill at least one migratory bird—and probably many more—owned by the State of New York. This "substantial risk that . . . harm will occur" to the State's property constitutes injury in fact. *Driehaus*, 573 U.S. at 158; *see also, e.g.*, *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601-02 (1982) ("[L]ike other associations and private parties, a State is bound to have a variety of proprietary interests. A State may, for example, own land or participate in a business venture. As a proprietor, it is likely to have the same interests as other similarly situated proprietors. And like other such proprietors it may at times need to pursue those interests in court.").

Defendants' response—that Plaintiffs' theory of injury "depends on [speculative] assumptions about how potential violators of the MBTA will alter their behavior in response to the [O]pinion, and further assumptions about how that change in behavior will affect migratory birds," Dkt. 27 (Mem. in Supp. of MTD) at 17; *see also id.* at 19-20 (reasserting same argument against the States)—runs counter to the Opinion they are defending. In his Opinion, Principal Deputy Solicitor Jorjani asserted that changing DOI's interpretation of the MBTA to permit incidental take was justified in part because the Department's longstanding contrary interpretation, and its accompanying threat of prison time and a $15,000-per-bird fine, "h[ung] the sword of Damocles" over private actors, creating a "threat of prosecution" that inhibited "a host of otherwise lawful and productive actions." Dkt. 28 ex. A (Jorjani Op.) at 1-2. Now that the shoe is on the other foot, Defendants cannot credibly dismiss as speculative the logic underlying the States' theory of injury: potential MBTA liability for incidental takes has historically caused companies to take reasonable measures to avoid such takes; the Jorjani

Opinion, by eliminating that threat of criminal liability, has eliminated companies' incentives to take such measures; therefore, the Jorjani Opinion creates a substantial risk that there will be an increase in the number of incidental bird deaths.  18-CV-8084 Dkt. 6 (States' Compl.) ¶¶ 34-37.  Indeed, common sense supports the States' logic: the lower the potential cost of incidentally killing a migratory bird, the more likely private actors are to weigh the pros and cons of activities in which they wish to engage that incidentally kill migratory birds in favor of engaging in those activities.  It follows that eliminating the threat of federal criminal prosecution under the MBTA substantially increases the risk that migratory birds owned by the Plaintiff States will be killed.  That substantial risk of injury to a State's proprietary interest constitutes injury in fact.  *See, e.g.*, *Nat. Res. Def. Council v. EPA*, 755 F.3d 1010, 1017 (D.C. Cir. 2014) ("It is well-established that standing will lie where a plaintiff demonstrates that the challenged agency action authorizes the conduct that allegedly caused the plaintiff's injuries, if that conduct would allegedly be illegal otherwise. . . . This is precisely the case here.  Once [the defendant agency] promulgated the [action at issue], it was a hardly-speculative exercise in naked capitalism to predict that facilities would take advantage of it to burn hazardous-waste-derived fuels rather than more expensive fossil fuels." (internal quotation marks, alterations, and citations omitted)).

    This reasoning disposes of Defendants' arguments on causation and redressability as well.  As an initial matter, Defendants misstate the causation inquiry when they assert that "Plaintiffs cannot satisfy the traceability requirement" because "the potential injuries alleged in the complaints would only result from the conduct of parties potentially subject to regulation under the MBTA."  Dkt. 27 (Mem. in Supp. of MTD) at 21.  "This wrongly equates injury 'fairly traceable' to the defendant with injury as to which the defendant's actions are the very last step in the chain of causation."  *Bennett v. Spear*, 520 U.S. 154, 168-69 (1997).  The fact that a

plaintiff's causation theory rests ultimately on the choices of third parties does not by itself preclude standing. Because Article III requires only *de facto* causality, at the pleading stage, Plaintiffs' burden is to allege facts "showing that third parties will likely react in predictable ways" to the Jorjani Opinion and that their predictable reaction will cause the injuries about which Plaintiffs complain. *Commerce*, 139 S. Ct. at 2566 (citing *Block v. Meese*, 793 F.2d 1303, 1309 (D.C. Cir. 1986) (Scalia, J.)); *see also Lujan*, 504 U.S. at 562.

The States have carried that burden. Taking the States' allegations as true, there is a "substantial likelihood" that by eliminating the threat of federal criminal prosecution under the MBTA, the Jorjani Opinion has substantially reduced the potential cost of activities that incidentally kill migratory birds, making it more likely that third parties will undertake such activities and kill at least one migratory bird owned by one of the Plaintiff States. *Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 104 (2d Cir. 2018). Further, it is plausible that vacating the Jorjani Opinion because it contravenes the text of the MBTA, as Plaintiffs request, would reduce that risk. *See id.* at 104-05 ("The notion that financial incentives deter environmental misconduct is hardly novel." (brackets omitted) (quoting *In re Idaho Conservation League*, 811 F.3d 502, 510 (D.C. Cir. 2016)). That is all that the redressability inquiry requires. *See, e.g.*, *Chevron Corp. v. Donziger*, 833 F.3d 74, 121 (2d Cir. 2016) ("A plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself. He need not show that a favorable decision will relieve his every injury." (citation omitted)); *see also Massachusetts v. EPA*, 549 U.S. 497, 526 (2007) (finding redressability where "risk of catastrophic harm" due to climate change "would be reduced *to some extent* if petitioners received the relief they seek" (emphasis added)). Because the States' theories of causation and redressability rest "on the predictable effect of Government

action on the decisions of third parties," *Commerce*, 139 S. Ct. at 2566, the Court is satisfied that

the States have adequately pleaded Article III standing to seek vacatur of the Jorjani Opinion

under Section 706(2)(A).[9]

Stomping their feet and growling "you can't make me," Defendants next contend that

vacatur of the Jorjani Opinion would not actually redress Plaintiffs' alleged injuries because,

even if the Opinion is vacated, Defendants' enforcement priorities and decisions with respect to

incidental take would not return to the "pre-Opinion . . . *status quo*." Dkt. 27 (Mem. in Supp. of

MTD) at 23-24. This argument is a red herring. Article III's redressability element does not,

first of all, require that the judicial relief a plaintiff requests achieve the pre-decision status quo.

The prevention of even *one* injury fairly traceable to an agency's challenged conduct—here, the

incidental take of *one* migratory bird owned by *one* of the Plaintiff States—suffices. *See, e.g.*,

*Donziger*, 833 F.3d at 121 ("A plaintiff satisfies the redressability requirement when he shows

that a favorable decision will relieve a discrete injury to himself. He need not show that a

favorable decision will relieve his <u>every</u> injury." (citation omitted)). Moreover, the Supreme

Court long ago rejected the notion that an agency's allegedly unlawful decision to suspend a rule

---

[9]     Further confirming the Court's conclusion, Principal Deputy Solicitor Jorjani jettisoned DOI's prior
interpretation of the MBTA precisely because the specter of prosecution inhibited industry activities that
incidentally kill migratory birds. *See* Dkt. 28 ex. A (Jorjani Op.) at 1-2. Unless it is now Defendants' position that
Jorjani's stated reason for altering DOI's interpretation of the MBTA was specious, it is hardly speculative that a
court order repudiating that interpretation and vacating the Jorjani Opinion would restore the "sword of Damocles"
that, in Principal Deputy Solicitor Jorjani's own view, historically inhibited "a host" of private activities that
incidentally kill migratory birds, *id.*

The well-understood deterrent value of criminal environmental regulations sets this case apart from *Burton
v. Central Interstate Low-Level Radioactive Waste Compact Commission*, 23 F.3d 208, 210 (8th Cir. 1994), *Town of
Babylon v. Federal Housing Finance Agency*, 699 F.3d 221, 229-30 (2d Cir. 2012), and *Simon v. Eastern Kentucky
Welfare Rights Organization*, 426 U.S. 26, 42-44 (1976). *See* Dkt. 27 (Mem. in Opp. to MTD) at 24, 26-27 (citing
these cases). In those cases, the third-party conduct that was the immediate cause of the plaintiffs' injury would
have been lawful even in the absence of the government regulation being challenged. Not so here. *See, e.g.*,
*Bennett*, 520 U.S. at 169 ("While . . . it does not suffice if the injury complained of is the result of the *independent*
action of some third party not before the court, . . . that does not exclude injury produced by determinative or
coercive effect upon the action of someone else." (internal quotation marks, alterations, and citations omitted)).

is not redressable for Article III purposes merely because the agency would have discretion to abstain from enforcing the rule even if its decision suspending the rule was vacated. In *Federal Election Commission v. Akins*, 524 U.S. 11, 25 (1998), the Supreme Court held that a decision by the Federal Election Commission that a particular political organization was exempt from federal reporting requirements was redressable even though, were the Commission's decision vacated and the case remanded, the Commission could nonetheless decide "in the exercise of its discretion not to require [the committee] to produce the information." As the Court explained, "[a]gencies often have discretion about whether or not to take a particular action," "[y]et those adversely affected by a discretionary agency decision generally have standing to complain that the agency based its decision upon an improper legal ground." *Id.* Other courts have read *Akins* to reject the argument that "the redressability element of constitutional standing requires a plaintiff to establish that the defendant agency will actually enforce any new binding regulations against [a] regulated third party." *Animal Legal Def. Fund, Inc. v. Glickman*, 154 F.3d 426, 443-44 (D.C. Cir. 1998) (en banc); *see also, e.g.*, *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 940-41 (D.C. Cir. 2004) ("[A] federal court may find that a party has standing to challenge government action that permits or authorizes third-party conduct that would otherwise be illegal in the absence of the Government's action."), *abrogated in part on other grounds as recognized in Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 620 (D.C. Cir. 2017); *Marouf v. Azar*, No. 18-CV-378, 2019 WL 2452315, at *8 (D.D.C. June 12, 2019) (same); *Kwong v. Bloomberg*, 876 F. Supp. 2d 246, 251-53 (S.D.N.Y. 2012) (same).

That reasoning applies here. There is no dispute that before the Jorjani Opinion, the official position of DOI and FWS was that incidental takes of migratory birds were illegal and subject to criminal prosecution pursuant to the MBTA. 18-CV-8084 Dkt. 6 app. A (Tompkins

Op.) at 2; *see also Citizens Against Casino Gambling in Erie Cty. v. Chaudhuri*, 802 F.3d 267,

277 n.8 (2d Cir. 2015) ("The Solicitor's M-Opinions are binding on the DOI as a whole. After

an M-Opinion is completed, the DOI will take action consistent with the legal interpretation

explained by the Solicitor." (citation and alterations omitted)). Nor is there any dispute that the

Jorjani Opinion "permanently with[drew]" the Tompkins Opinion "and replace[d]" it with the

official position that the MBTA prohibits only purposeful takes. Dkt. 27 (Mem. in Supp. of

MTD) at 7; *see also* Dkt. 28 ex. A (Jorjani Op.) at 1 ("[T]his memorandum permanently

withdraws and replaces Opinion M-37041."). An order vacating the Jorjani Opinion would,

therefore, (1) reinstate the Tompkins Opinion's conclusion that incidental takes are unlawful as

DOI and FWS's official interpretation of the MBTA; and (2) thereby restore the metaphorical

sword of Damocles over the heads of private industry.[10] Plaintiffs are not required to establish

that DOI or FWS "will actually enforce" the MBTA against third parties, *Glickman*, 154 F.3d at

443-44, or disprove the possibility that private actors might continue "their injurious conduct in

violation of the law" after vacatur, *Nat'l Wrestling Coaches Ass'n*, 366 F.3d at 941. *Akins* and

its progeny make clear that Article III's redressability requirement is satisfied because, were the

---

[10]     For these reasons, the Court rejects Defendants' contention that the Tompkins Opinion "would still be
suspended and withdrawn following the resolution of these matters." Dkt. 27 (Mem. in Supp. of MTD) at 23 n.10.
The permanent withdrawal of the Tompkins Opinion was accomplished by, and was part and parcel of, the Jorjani
Opinion. *See* Dkt. 28 ex. A (Jorjani Op.) at 1 ("[T]his memorandum permanently withdraws and replaces Opinion
M-37041."). Vacating the Jorjani Opinion would therefore nullify the withdrawal of the Tompkins Opinion—or, to
avoid the double negative, reinstate it.

       On the topic of remedies, the Court notes that it need not concern itself at this stage with Defendants'
contention that "the only appropriate remedy" if Plaintiffs succeed on their APA claims "would be a remand to DOI
to consider any issues the Court deem[s] necessary, *without vacatur*." Dkt. 27 (Mem. in Supp. of MTD) at 22 n.9.
As Defendants recognize, "detailed consideration of potential remedies is unnecessary in [resolving] this motion,"
*id.*, and in conducting the Article III standing inquiry, the Court must assume that Plaintiffs will succeed on the
merits of their claims—including their request for vacatur of the Jorjani Opinion, *see, e.g.*, *Scenic Am., Inc. v. U.S.
Dep't of Transp.*, 836 F.3d 42, 55 (D.C. Cir. 2016). This is without prejudice, of course, to Defendants' litigating
the appropriate remedy should Plaintiffs prevail on the merits.

Jorjani Opinion vacated, Defendants would once again be empowered to prosecute incidental takes under the MBTA.[11]

The Court is also unpersuaded by Defendants' argument that, given their "clear expression of their interpretation of the [MBTA] and their intent to pursue rulemaking to codify that interpretation," private behavior vis-à-vis incidental takes will not change even if the Jorjani Opinion is vacated and the "sword of Damocles" restored. Dkt. 27 (Mem. in Supp. of MTD) at 26-27; *see also* Dkt. 50 (Reply in Supp. of MTD) at 8-9. As far as this Court is aware, Defendants' "intent to pursue rulemaking to codify" the Jorjani Opinion remains inchoate. And the Court cannot at this juncture accept as gospel Defendants' theory that a nod is as good as a wink as far as private interests potentially subject to criminal prosecution and fines under the MBTA are concerned. After all, as Principal Deputy Solicitor Jorjani himself colorfully explained, "the value of a sword of Damocles is that it hangs—not that it drops." Dkt. 28 ex. A (Jorjani Op.) at 1 (quoting *Arnett v. Kennedy*, 416 U.S. 134, 231 (1974) (Marshall, J., dissenting)).[12]

---

[11]    Defendants misread *National Wrestling* when they suggest that it requires Plaintiffs to "offer 'formidable evidence,' such that there is 'little doubt as to causation and the likelihood of redress.'" Dkt. 27 (Mem. in Supp. of MTD) at 25-26 (quoting *Nat'l Wrestling Coaches Ass'n*, 366 F.3d at 941-42). *National Wrestling* described two theories of redressability involving the conduct of third parties. Under the first theory, a "party has standing to challenge government action that permits or authorizes third-party conduct that would otherwise be illegal in the absence of the Government's action." 366 F.3d at 941. Under the second theory, a plaintiff has "standing to challenge government action on the basis of injuries caused by regulated third parties where the record present[s] substantial evidence of a causal relationship between the government policy and the third-party conduct, leaving little doubt as to causation and the likelihood of redress." *Id. National Wrestling* applied its formidable-evidence-leaving-little-doubt standard to cases resting on the second theory. *Id.* at 940-42. Because the States' standing in this case rests on the first theory, that standard is inapplicable here (even assuming the standard is not entirely irrelevant because it is inconsistent with the Second Circuit's admonition that Plaintiffs bear "no evidentiary burden" at the Rule 12(b)(1) stage, *Carter*, 822 F.3d at 56).

[12]    In the absence of the Jorjani Opinion, only a gutsy (bordering on reckless) attorney would advise his or her client to proceed with an industrial project that poses a non-negligible risk of incidental take, particularly one that is expensive or requires substantial lead time to execute. As this litigation demonstrates, agency attitudes towards the enforcement of certain federal statutes can shift as dramatically and quickly as the political winds; industrial decision-making is rarely so agile.

For all of these reasons, the Court concludes that the States have adequately alleged Article III standing to seek vacatur of the Jorjani Opinion under Section 706(2)(A).

B. Standing to Seek Vacatur of the Jorjani Opinion for Failure to Comply With Section 553 and NEPA

At the very least, the National Audubon Society has adequately alleged associational standing, also known as representational standing, to press the claims that the Jorjani Opinion was issued without notice and comment in violation of Section 553 and NEPA. An organization "has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Nat. Res. Def. Council*, 894 F.3d at 104 (citation omitted).

Taking the Audubon Plaintiffs' allegations as true, the Court is satisfied that the National Audubon Society's members would have standing to challenge the Jorjani Opinion in their own right. The Society has over 1.2 million members nationwide, with 64,719 members in New York alone. 18-CV-4601 Dkt. 1 (Audubon Compl.) ¶ 15. Many of those members "regularly observe, study, photograph, and otherwise enjoy migratory birds in the wild." *Id.* ¶ 20. As discussed at length above, *see supra* Pt. II.A., it is plausible that eliminating the threat of federal criminal prosecution for incidental takes has increased the risk that the migratory birds the National Audubon Society's members enjoy will be killed incident to private industrial activities. Those takes infringe upon those members' "desire to . . . observe an animal species, even for purely esthetic purposes," a desire which is "undeniably a cognizable interest for purpose of standing." *Lujan*, 504 U.S. at 562-63.

Defendants argue, not entirely without basis, that the organizational Plaintiffs have failed to allege injury in fact because they "do not even attempt to specify where these harms are likely

to occur or how those particular harms will affect their members' [esthetic] interests." Dkt. 27 (Mem. in Supp. of MTD) at 18. The Audubon Complaint's most specific allegations on this point—that some of the Audubon Plaintiffs' members "reside and/or recreate in specific locations" where "FWS field offices, relying on [the Jorjani Opinion], have told one or more companies constructing natural gas pipelines that they may cut down trees with nesting birds during the breeding season," 18-CV-4601 Dkt. 1 ¶ 22—are admittedly rather general. But the enormity and distribution of the National Audubon Society's membership, along with the national scope of the Jorjani Opinion, make it "easy" in this case "to presume specific facts under which [the Society's members] will be injured," *Bennett*, 520 U.S. at 168. At later stages of this litigation it will be necessary for the Society and its fellow organizational Plaintiffs to adduce specific evidence that migratory birds are being or will be harmed as a result of the Jorjani Opinion and that those harms will directly affect one or more of their members, separate and apart from their special interest in the subject. *See Lujan*, 504 U.S. at 563. But at this stage, the Court is satisfied that the Society's "general factual allegations of injury resulting from [Defendants'] conduct . . . suffice" to plead injury in fact. *Id.* at 561 ("[O]n a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." (alteration and internal quotation marks omitted); *see also, e.g.*, *Fin. Guar. Ins. Co. v. Putnam Advisory Co.*, 783 F.3d 395, 401-02 (2d Cir. 2015) (articulating same principle).[13]

---

[13] Although wary at this stage of engaging with materials not obviously incorporated into or integral to the Complaints, the Court notes that one document Defendants attached to their opening brief, a March 2018 letter from FWS to an engineering firm, seems to confirm Plaintiffs' position that the Jorjani Opinion has already incentivized, and will continue to incentivize, private actors to engage in industrial activities that kill migratory birds in which they would not have engaged absent the Opinion. The letter appears to (a) give FWS's blessing to the private tree-clearing project referenced in Paragraph 22 of the Audubon Plaintiffs' Complaint and (b) express FWS's view that, in light of the scope and nature of the project, "there may be impacts to some birds even if all reasonable measures are taken to avoid such impacts." 18-CV-4596 Dkt. 28 ex. C (Anderson Letter) at 2. If that interpretation of the letter is accurate, then it only bolsters Plaintiffs' theory that, with the threat of prosecution under the MBTA gone, private industry is, in fact, engaging in conduct that endangers migratory birds. It also dramatically undercuts Defendants' suggestion that because "bird conservation measures still can be incorporated into industry projects,"

For substantially the same reasons discussed above, *see supra* Pt. II.A, it is plausible that the threatened injuries to the National Audubon Society's members' esthetic interests are fairly traceable to the Jorjani Opinion and are redressable by a court order vacating the Opinion for failure to comply with Section 553, NEPA, or both. "When a litigant is vested with a procedural right, that litigant has standing if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *Massachusetts*, 549 U.S. at 518. The litigant "never has to prove that if he had received the procedure"—here, notice-and-comment rulemaking or compliance with NEPA—"the substantive result would have been altered." *Id.* (quoting *Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 94-95 (D.C. Cir. 2002)). "All that is necessary is to show that the procedural step was connected to the substantive result." *Id.* There is no real dispute that the two procedural defects about which the Society complains are connected to the Jorjani Opinion or that vacatur and remand to cure one or both of those alleged defects will require Defendants to reconsider the Opinion—even if, in the end, they come to the same conclusion.

Moreover, to the extent the Audubon Plaintiffs "must satisfy the normal standard for redressability" because the "redressability obstacle" they face is "uncertainty over what" a third party will do, *St. John's United Church of Christ v. FAA*, 520 F.3d 460, 463 (D.C. Cir. 2008), the National Audubon Society has alleged sufficient facts to satisfy that standard. To borrow from *St. John's United*'s phrasing (which in turn borrowed from *Lujan*), for the same reasons that the States have shown that their allegedly threatened injuries are redressable by an order vacating the Jorjani Opinion, *see supra* Pt. II.A, the National Audubon Society has plausibly pleaded that the

---

the Jorjani Opinion has not made incidental bird takes substantially more likely. Dkt. 27 (Mem. in Supp. of MTD) at 17-18. To be clear, however, the Court's resolution of these motions does not rest on the March 2018 FWS letter. *See Carter*, 822 F.3d at 56.

industrial activities that incidentally kill migratory birds and affect its member's esthetic interests "will be altered or affected by the agency activity"—the Tompkins Opinion—that "they seek to [reinstate]." *St. John's United*, 520 F.3d at 463 (quoting *Lujan*, 504 U.S. at 570)).

Finally, regarding the second and third elements of associational standing, there can be no serious dispute that the esthetic interests of the National Audubon Society's members in migratory birds are "germane to the organization's purpose." *Nat. Res. Def. Council*, 894 F.3d at 104 (citation omitted). The Society exists to protect birds for ecological, academic, and esthetic purposes. 18-CV-4601 Dkt. 1 (Audubon Compl.) ¶¶ 15, 20. And neither the claims the Society asserts nor the relief it requests requires the participation of its individual members in this lawsuit. *See Nat. Res. Def. Council*, 894 F.3d at 104.

For these reasons, the Court concludes that, at the very least, the National Audubon Society has adequately alleged Article III standing to seek vacatur of the Jorjani Opinion because it was issued without notice and comment in violation of Section 553 and NEPA. And because at least one Plaintiff in this consolidated action has "demonstrate[d] standing for each claim . . . and for each form of relief that is sought," the Court has subject-matter jurisdiction over the whole case insofar as Article III is concerned.[14] *Town of Chester*, 137 S. Ct. at 1650-51 (internal quotation marks omitted).

## III. "Final Agency Action"

Defendants contend that, even if some Plaintiffs have Article III standing, the Court nonetheless lacks jurisdiction because the Jorjani Opinion is not a "final agency action" under 5

---

[14] Because the Court holds that the States have plausibly pleaded Article III standing to seek vacatur of the Jorjani Opinion under Section 706(2)(A) and that the National Audubon Society has plausibly pleaded Article III standing to seek vacatur of the Opinion for failure to comply with Section 553 and NEPA, the Court need not and does not address Plaintiffs' other asserted theories of standing or Defendants' critiques of those theories. Those other theories may, however, become relevant at later stages depending on how the factual record develops.

U.S.C. § 704.  *See* Dkt. 27 (Mem. in Supp. of MTD) at 27-34.  The Court disagrees.  The APA permits judicial review of "[a]gency action made reviewable by statute" and "final agency action for which there is no other adequate remedy in a court."  5 U.S.C. § 704.  No one contends that any statute renders the Jorjani Opinion reviewable even if it is not final, so this Court has jurisdiction to review the Opinion only if it is a "final agency action."

Although many different formulations have been used to describe when an agency action is final within the meaning of Section 704, *DRG Funding Corp. v. Sec'y of Hous. & Urban Dev.*, 76 F.3d 1212, 1214 (D.C. Cir. 1996) (collecting cases), the Supreme Court recently made clear that the formulation it first articulated in *Bennett v. Spear*, 520 U.S. at 177-78, controls: "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature.  And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow."  *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1813 (2016) (internal quotation marks and footnote omitted).  This inquiry is, fundamentally, a "pragmatic" one.  *Id.* at 1815 (internal quotation marks omitted).

As to the first prong, there is nothing tentative or interlocutory about the Jorjani Opinion.  To the contrary, by its terms, the Opinion's withdrawal and replacement of the Tompkins Opinion is "permanent."  Dkt. 28 ex. A (Jorjani Op.) at 1.  It acknowledges no limitation on the degree to which it now represents DOI's (and, by extension, FWS's) formal position vis-à-vis incidental takes under the MBTA, *see id.*, and Defendants concede that it is "binding on the DOI as a whole," including on FWS, Dkt. 27 (Mem. in Supp. of MTD) at 28-29 (internal quotation marks omitted).  Nor does it have the kind of qualification-laden, guideline-offering, advice-giving, recommendation-making, or discretion-preserving language that courts have held

signifies a lack of finality.[15]  To the contrary, the Opinion's language is definitive: at both ends, it unambiguously proclaims "that, consistent with the text, history, and purpose of the MBTA, the statute's prohibitions on pursuing, hunting, taking, capturing, killing, or attempting to do the same apply only to affirmative actions that have as their purpose the taking or killing of migratory birds, their nests, or their eggs."  Dkt. 28 ex. A (Jorjani Op.) at 2; *see also id.* at 41. Further, Defendant FWS has treated the Opinion as DOI's final word on the subject.  To that end, FWS has issued a guidance document that "modif[ies] some policies and practices within its programs" to "ensure consistency with the recently issued M Opinion"—including by prohibiting FWS personnel from making "comments, recommendations, or requirements" that are "based on" or "imply" any "authority under the MBTA to regulate incidental take of migratory birds."  18-CV-8084 Dkt. 6 app. B (FWS Guidance) at 1-2; *see also, e.g.*, *Sw. Airlines Co. v. U.S. Dep't of Transp.*, 832 F.3d 270, 275 (D.C. Cir. 2016) ("In assessing whether a particular agency action qualifies as final for purposes of judicial review, this court and the Supreme Court have looked to the way in which the agency subsequently treats the challenged action.").  Under these circumstances, the Court is satisfied that the Jorjani Opinion "mark[s] the consummation of [DOI's] decisionmaking process" insofar as MBTA-regulation of incidental takes is concerned.[16]  *Bennett*, 520 U.S. at 177-78 (internal quotation marks omitted).

---

[15]  *See, e.g.*, *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 808-09 (D.C. Cir. 2006) (holding that NHTSA policy guidelines were not "final" agency action in part because their language was general and conditional, making them "read as *guidelines*, not binding regulations"); *Chem. Mfrs. Ass'n v. Env't Prot. Agency*, 26 F. Supp. 2d 180, 183 (D.D.C. 1998) (holding that EPA policy establishing principles for settling municipal waste-cleanup liability was not final agency action because it "assert[ed] that it [was] intended to guide future settlements, not bind them"; "repeatedly invoke[d] situations in which the principles articulated in the policy [would] not be applied to particular sites and parties"; and "grant[ed] EPA considerable discretion to deviate from the policy[]").

[16]  *McMaster v. United States*, 731 F.3d 881 (9th Cir. 2013), and *Center for Biological Diversity v. Jewell*, 248 F. Supp. 3d 946 (D. Ariz. 2017), do not, contrary to Defendants' suggestion, hold or support the notion that M-Opinions are categorically not "final agency actions" for Section 704 purposes.  *See* Dkt. 27 (Mem. in Supp. of MTD) at 29.  *McMaster* held only that a particular M-Opinion interpreting the Wilderness Act was not entitled to *Chevron* deference because it was not issued pursuant to statutes giving DOI authority to issue regulations regarding

Defendants' principal argument on the first prong is that the Jorjani Opinion is not the consummation of any decision-making process "because, standing alone, it is not DOI's final determination on any matter." Dkt. 27 (Mem. in Supp. of MTD) at 28-32. That kind of "final determination," Defendants say, "will occur only in any forthcoming individual decisions regarding criminal enforcement of the MBTA or other agency actions premised on the application of" the Opinion. *Id.* at 29-30. The Court disagrees. First, "[t]he APA does not require that the challenged agency action be the agency's final word on the matter for it to be 'final' for the purposes of judicial review." *Salazar v. King*, 822 F.3d 61, 83-84 (2d Cir. 2016); *see also, e.g.*, *CSI Aviation Servs., Inc. v. U.S. Dep't of Transp.*, 637 F.3d 408, 413 (D.C. Cir. 2011) (rejecting as "mistaken" the argument "that final agency action in a case like this one requires the completion of a full enforcement action"); *Sharkey v. Quarantillo*, 541 F.3d 75, 88-89 (2d Cir. 2008) ("[I]f an agency has issued a definitive statement of its position, determining the rights and obligations of the parties, the agency's action is final notwithstanding the possibility of further proceedings in the agency on related issues, so long as judicial review at the time would not disrupt the administrative process." (internal quotation marks and alterations omitted) (quoting *Bell v. New Jersey*, 461 U.S. 773, 779-80 (1983))). Second, for all practical purposes, the Jorjani Opinion *will be* DOI's final word on the MBTA's application to incidental takes. Because the Opinion definitively concludes that the MBTA does not prohibit incidental takes, and because that conclusion is binding on DOI and FWS, any "forthcoming individual decisions regarding criminal enforcement of the MBTA" or "other agency actions premised on" the Opinion, Dkt. 27 (Mem. in Supp. of MTD) at 29-30, are but a fait accompli: DOI and FWS

---

public lands. *See McMaster*, 731 F.3d at 891. And *Jewell* queried only whether an FWS policy interpreting the Endangered Species Act was unreasonable at *Chevron*'s second step. *See Jewell*, 248 F. Supp. 3d at 958. Both issues are far afield from the Section 704 finality inquiry.

cannot make prosecutorial decisions or take other actions that are inconsistent with the Opinion's interpretation of the MBTA.[17]  Because the Opinion definitively decides that the MBTA does not prohibit incidental takes, *Hawkes Co.*, 136 S. Ct. at 1814, it is the consummation of the agency's decision-making.[18]

The Jorjani Opinion satisfies *Bennett*'s second prong as well.  The Opinion "gives rise to 'direct and appreciable legal consequences,'" *Hawkes Co.*, 136 S. Ct. at 1814 (quoting *Bennett*, 520 U.S. at 178): it bars DOI and FWS personnel from instituting enforcement proceedings under the MBTA for incidental takes, thereby effectively immunizing industry actors from criminal liability for such takes.  In this respect, the Jorjani Opinion is like the agency action the D.C. Circuit confronted (and ultimately vacated) in *Clean Air Council v. Pruitt*, 862 F.3d 1 (D.C. Cir. 2017) (per curiam).  In that case, a group of environmental organizations challenged the EPA's decision to stay the implementation of certain provisions of a final rule regarding greenhouse-gas emissions.  *See* 862 F.3d at 4.  Rejecting the agency's argument that the stay was not a final agency action, the court held that the stay "affect[ed] regulated parties' rights or obligations," as *Bennett*'s second prong requires, because it indefinitely extended oil and gas companies' deadline to comply with the provisions, thereby "eliminat[ing]" the "threat" of "civil penalties, citizens' suits, fines, and imprisonment" for noncompliance with those provisions and

---

[17]	Theoretically, it is possible that the Secretary or Deputy Secretary of the Interior could overrule Principal Deputy Solicitor Jorjani's Opinion or ratify an agency action that is contrary to it.  "That possibility, however, is a common characteristic of agency action, and does not make an otherwise definitive decision nonfinal."  *Hawkes Co.*, 136 S. Ct. at 1814.

[18]	Any decision "not to prosecute or enforce" the MBTA vis-à-vis incidental takes, "whether through civil or criminal process," will likely be one "committed to [DOI or FWS's] absolute discretion" and thus one for which "judicial review is not available" under 5 U.S.C. § 701(a)(2).  *Heckler v. Chaney*, 470 U.S. 821, 830 (1985).  Indeed, Defendants would probably argue just that were any non-prosecution decision challenged in court.  That being the case, one of the two primary vehicles that Defendants argue is available for challenging the Jorjani Opinion's interpretation of the MBTA—"challenges by particular defendants to the Government's enforcement decisions," Dkt. 27 (Mem. in Supp. of MTD) at 30—is not a vehicle at all.  (To be clear, the Court need not and does not decide whether a non-prosecution decision based on the Jorjani Opinion is, in fact, the type of action that "is committed to agency discretion by law," 5 U.S.C. § 701(a)(2).)

"reliev[ing] regulated parties of liability they would otherwise face." *Id.* at 7. The Jorjani

Opinion works essentially the same change. In its absence, industry actors would have been

subject to criminal prosecution for incidental takes. The Opinion "eliminates that threat . . . and

thus relieves regulated parties of liability they would otherwise face." *Id.*

    *Clean Air Council* also refutes Defendants' arguments (1) that, for an agency action to be

final, it must "impose . . . new legal obligations" on or "have a direct and immediate effect on the

day-to-day business" of the plaintiffs challenging the action, Dkt. 27 (Mem. in Supp. of MTD) at

30, 32-34, and (2) that "the possibility that [an action] could alter the conduct of potentially

regulated parties, which in turn could potentially affect the interests of the Plaintiffs, is not

sufficient to satisfy the second prong of *Bennett*," Dkt. 50 (Reply in Supp. of MTD) at 13-14.

The EPA's stay in *Clean Air Council* satisfied *Bennett*'s second prong because it affected the

obligations of third-party oil and gas producers; neither the majority nor the dissent had any

concern that the stay did not directly affect any obligations of the plaintiffs or that the plaintiffs'

finality theory rested on the stay's impact on third parties. *See* 862 F.3d at 4, 6; *see also id.* at 17

(Brown, J., dissenting). And in this regard, *Clean Air Council* is hardly unique. In *Natural*

*Resources Defense Council v. Environmental Protection Agency*, 643 F.3d 311, 320 (D.C. Cir.

2011), and *Scenic America, Inc. v. U.S. Department of Transportation*, 836 F.3d 42, 56 (D.C.

Cir. 2016), for example, the D.C. Circuit held that agency actions—in the first case, an EPA

guidance document regarding air-quality standards; in the second, a Federal Highway

Administration guidance memorandum regarding billboard lighting—were final even though the

actions affected the rights and obligations of agency personnel or regulated entities rather than

those of the plaintiff nonprofit organizations. In *Natural Resources Defense Council*, the EPA

guidance document satisfied *Bennett*'s second prong because it "b[ound] EPA regional directors"

and authorized them to approve air-quality implementation plans that did not include collection of certain penalties from polluters. *See Nat'l Res. Def. Council*, 643 F.3d at 313-17, 320. In *Scenic America*, the FHWA guidance satisfied *Bennett*'s second prong because it set forth criteria for the agency's Division Offices to use in approving or rejecting state regulations of billboard lighting, thereby "withdraw[ing] some of the discretion concerning billboard permitting [that] the Division Offices and states previously held." 836 F.3d at 45-47, 56. In neither case was it material to the finality analysis that the challenged agency action did not directly affect the legal obligations or day-to-day business of the plaintiffs.[19]

Even setting *Clean Air Council*, *Natural Resources Defense Council*, and *Scenic America* to one side, tying the finality inquiry to whether an agency action imposes new legal obligations or has a direct, day-to-day effect on the plaintiff unmoors the finality inquiry from its functional foundations. The finality requirement is designed to allow an agency the opportunity to correct its own mistakes, to avoid judicial disruption of the agency's processes, and to prevent piecemeal judicial review which may become moot when the agency completes its procedures. *See DRG Funding Corp.*, 76 F.3d at 1214. Defendants' approach would undermine these purposes by

---

[19]    Defendants misread *DRG Funding Corp.*, 76 F.3d at 1214, and *Fund for Animals, Inc. v. U.S. Bureau of Land Management*, 460 F.3d 13, 22 (D.C. Cir. 2006). In expressing an unwillingness "to review agency orders 'that do not themselves adversely affect complainant but only affect his rights adversely on the contingency of future administrative action,'" *Fund for Animals, Inc.*, 460 F.3d at 22 (alterations omitted) (quoting *DRG Funding Corp.*, 76 F.3d at 1214), the D.C. Circuit did not exclude the possibility that an agency action could satisfy *Bennett*'s second prong because it affects the legal rights or obligations of an agency or of a third party rather than those of the plaintiff. The plaintiff in *DRG Funding Corp.* appears to have rested its finality theory on effects of the agency's action on the plaintiff's own rights and obligations; that being the case, the court had no occasion to opine on the viability of a theory premised on the effects of an agency's action on third parties' rights and obligations. *See* 76 F.3d at 1215-16. And in *Fund for Animals*, the court specifically left open the possibility that an agency action could satisfy the second finality element if it "command[s] anyone"—*anyone*, not just the plaintiff—"to do anything or to refrain from doing anything" or "grant[s], withhold[s], or modif[ies] any formal legal license, power, or authority." 460 F.3d at 22 (quoting *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733 (1998)). That is, of course, exactly what the challenged agency actions did in *Clean Air Council*, *Natural Resources Defense Council*, and *Scenic America*, and what the Jorjani Opinion does here.

focusing the finality inquiry on the particular circumstances of the plaintiff who happens to challenge an agency action rather than the character and effect of the action itself.

Finally, in what can only be viewed as a Hail Mary pass, Defendants contend that their "announced intention to pursue a formal rulemaking to codify the legal analysis" in the Jorjani Opinion is evidence that "the M-Opinion on its own does not alter the applicable legal regime." Dkt. 27 (Mem. in Supp. of MTD) at 34. As far as this Court is aware, Defendants have not followed through on their intent to initiate rulemaking. Nor did the Opinion itself note any such intention. Quite the opposite: it stated that that its withdrawal and replacement of the Tompkins Opinion was permanent. Dkt. 28 ex. A (Jorjani Op.) at 1. It appears that Defendants' desire to initiate a rulemaking bubbled up for the first time in November 2018, *see* Dkt. 27 (Mem. in Supp. of MTD) at 9-10—almost a year after the Opinion was issued and nearly six months after the NRDC and Audubon Plaintiffs filed their complaints. Although the Court hesitates to be cynical, this timeline suggests that Defendants are attempting "to avoid judicial review through disingenuous claims that the agency is in the process of amending a final rule through additional rulemaking."[20] *Sabella v. United States*, 863 F. Supp. 1, 5 (D.D.C. 1994).

In short, the Jorjani Opinion is a "final agency action" under Section 704.

## IV.    Ripeness

"Ripeness is a justiciability doctrine designed to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the

---

[20]    Defendants' assertion that any rulemaking would simply "codify" the Jorjani Opinion's conclusion, Dkt. 27 (Mem. in Supp. of MTD) at 34, further confirms this Court's view that the Opinion was, in fact, the consummation of DOI's decision-making on the topic and further undercuts Defendants' arguments on *Bennett's* first prong.

challenging parties." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807-08 (2003) (internal quotation marks omitted). "Determining whether administrative action is ripe for judicial review requires [a court] to evaluate (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Id.* (citation omitted); *see also, e.g.*, *Sharkey*, 541 F.3d at 89 (same).

This case is fit for judicial decision. Defendants kick up dust on this point, contending that "judicial review of [the Jorjani Opinion] would interfere inappropriately with internal agency decision-making processes" and that the Court "would benefit from further factual development of the issues presented." Dkt. 27 (Mem. in Supp. of MTD) at 36 (internal quotation marks omitted). But, as discussed in Part III above, it is entirely unclear what further "internal agency decision-making processes" Defendants anticipate inasmuch as the Opinion has definitively resolved for DOI and FWS the question whether the MBTA prohibits to incidental takes. Even more peculiar is Defendants' argument that judicial review of the Jorjani Opinion might "interfere with the relationship between agency officials and counsel" and thereby "inhibit the agency's exercise of its discretion." *Id.* One of the Opinion's stated purposes was to eliminate altogether agency discretion with respect to incidental takes. *See* Dkt. 28 ex. A (Jorjani Op.) at 32-41 (arguing that the MBTA's incidental-take provisions are potentially unconstitutionally vague, that prosecutorial discretion is insufficient to cure that vagueness, and that an interpretation "that limits [the statute's] application to affirmative and purposeful conduct is necessary to avoid grave constitutional infirmities"). Because exposure to incidental-take liability under the MBTA is, to borrow a phrase from Defendant Jorjani, "an all-or-nothing proposition," *id.* at 38—the MBTA prohibits incidental takes or it does not—it is unclear what discretionary agency judgments could be affected by judicial review of a binding Opinion

concluding that the MBTA does *not* prohibit incidental takes. Those "judgments" will hardly be judgments at all.

Defendants' factual-development argument is a throwaway. Defendants do not explain what facts need to be developed, and the only facts that the Court can foresee requiring evidentiary support—those relating to Plaintiffs' standing—should pose no obstacle to judicial review. Whether the Jorjani Opinion is consistent with the MBTA's text, complied with Section 553, and comported with NEPA are purely legal questions. *See, e.g.*, *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 479 (2001) ("The question before us here is purely one of statutory interpretation that would not benefit from further factual development of the issues presented." (internal quotation marks omitted)); *see also, e.g.*, *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 737 (1998) ("[A] person with standing who is injured by a failure to comply with the NEPA procedure may complain of that failure at the time the failure takes place, for the claim can never get riper.").[21]

Nor is the Court persuaded that it should delay review because doing so "would not cause hardship to any of the Plaintiffs." Dkt. 27 (Mem. in Supp. of MTD) at 35. A "federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014) (internal quotation marks omitted). In light of this obligation, and because this case is otherwise fit for judicial review, the question is not whether abstaining from judicial review would work any hardship on Plaintiffs, but rather whether litigating the case now would work any hardship on Defendants. Defendants make no argument that it would, other than those the Court has already rejected.

---

[21]     Defendants appear to concede that the Audubon Plaintiffs' NEPA claim is ripe for review. *See* Dkt. 50 (Reply in Supp. of MTD) at 16 n.8 ("Defendants' argument with respect to ripeness does not encompass the Audubon Plaintiffs' NEPA claim.").

Thus, the Court is satisfied that this case is ripe for judicial review.[22]

**V.    The Audubon Plaintiffs' Notice-and-Comment Claim**

Section 553 establishes the procedure agencies must follow when making rules.  The

procedure begins with the agency publishing a "[g]eneral notice of proposed rule making,"

typically in the Federal Register.  5 U.S.C. § 553(b).  After publication, the agency must "give

interested persons an opportunity" to comment—that is, "to participate in the rule making

through submission of written data, views, or arguments."  *Id.* § 553(c).  The dual purposes of

the "notice and comment" procedure are "to reintroduce public participation and fairness to

affected parties after governmental authority has been delegated to unrepresentative

agencies, . . . and to assure that the agency is presented with all information and suggestions

relevant to the problem at issue."  *White v. Shalala*, 7 F.3d 296, 303 (2d Cir. 1993) (citations and

internal quotation marks omitted).  If an agency engages in rule-making without the notice and

comment Section 553 requires, the rule-making is subject to vacatur under Section 706(2)(D) on

the ground that it was issued "without observance of procedure required by law."  5 U.S.C.

§ 706(2)(D).

There is no dispute that the Jorjani Opinion was issued without notice and comment.

Defendants point, however, to Section 553(b), which provides that the notice-and-comment

procedure "does not apply" to, among other things, "interpretative rules."  5 U.S.C. § 553(b).

---

[22]    Because it finds both ripeness factors satisfied, the Court need not and does not express any opinion whether the prudential-ripeness doctrine survives *Lexmark International*, 572 U.S. at 126-28—a question neither the Supreme Court nor the Second Circuit has resolved.  *See Driehaus*, 573 U.S. at 167 ("[W]e need not resolve the continuing vitality of the prudential ripeness doctrine in this case because the 'fitness' and 'hardship' factors are easily satisfied here.").  But in light of *Lexmark*'s reminder that a federal court is generally duty-bound to decide cases over which it has jurisdiction, the Court is not persuaded that the lack of hardship to the party seeking judicial review is sufficient—without at least some hardship to the defendant or reason to think that the case is unfit for judicial review—to render an APA challenge prudentially unripe.

Defendants contend that the Jorjani Opinion is an "interpretative rule" that is exempt from Section 553. The Court agrees.

The touchstone for distinguishing an interpretive rule from one subject to notice and comment is whether the rule clarifies an existing statute or regulation, on the one hand, or creates new law, rights, or duties "in what amounts to a legislative act," on the other. *White*, 7 F.3d at 303. "If the rule is an interpretation of a statute rather than an extra-statutory imposition of rights, duties or obligations, it remains interpretive even if the rule embodies the [agency's] changed interpretation of the statute." *Id.* at 304.

The Jorjani Opinion is quintessentially interpretive. After tracing the evolution of the MBTA and describing judicial decisions construing it, *see* Dkt. 28 ex. A (Jorjani Op.) at 2-17, the Opinion turns to an "Analysis of Incidental Take Under the MBTA," marshaling the Act's text, its legislative history, and various canons of statutory construction to reach its conclusion that the Act prohibits only direct and purposeful takes, *see id.* at 18-41. Because the Opinion "determines only how [incidental takes] will be treated under an existing statutory provision" rather than imposing or modifying "an extra-statutory requirement," it is a "paradigmatic example of an interpretive rule" that is not subject to notice and comment under Section 553. *White*, 7 F.3d at 304.

The Audubon Plaintiffs contend that the Jorjani Opinion "creates new law, rights, or duties" because it "insulates from liability any form of incidental take" and thereby "obligat[es] agency personnel to refrain from applying the Act as they have for decades." 18-CV-4601 Dkt. 34 (Audubon Mem. in Opp. to MTD) at 30. Although the Court agrees with the Audubon Plaintiffs that the Opinion prevents DOI and FWS personnel from criminally prosecuting incidental takes and thereby effectively "insulates" private actors from MBTA liability for such

conduct, *see supra* Pts. II.A, III, its purported authority for doing so is not "extra-statutory," *White*, 7 F.3d at 304.  The Opinion bases its conclusion on the MBTA's text, its legislative history, and on judicial decisions interpreting the Act.  The Opinion's conclusion may prove to be contrary to the Act's text and therefore "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  But the fact that the Opinion may have reached the wrong legal conclusion does not transform it from being an "interpretation of a statute" into being an "extra-statutory" creation or modification "of rights, duties or obligations." *White*, 7 F.3d at 304.  Neither does the fact that it reverses DOI's prior and longstanding understanding of the statute.  *See id.* ("[A]n interpretive rule changing an agency's interpretation of a statute is not magically transformed into a legislative rule.").

Therefore, the Court dismisses the Audubon Plaintiffs' notice-and-comment claim. Because the Jorjani Opinion is not subject to Section 553's notice-and-comment procedure as a matter of law, leave to amend is denied.  *See, e.g.*, *AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 726 (2d Cir. 2010) ("Leave to amend may be denied on grounds of futility . . . .").

## VI.     The Audubon Plaintiffs' NEPA Claim

"NEPA is a procedural statute that mandates a process rather than a particular result." *Nat. Res. Def. Council, Inc. v. FAA*, 564 F.3d 549, 556 (2d Cir. 2009) (internal quotation marks omitted).  It requires a federal agency to prepare an "environmental impact statement," or "EIS," before taking any "major Federal action[] significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  If an agency is uncertain whether a contemplated action requires an EIS, it must prepare an "environmental assessment," or "EA," that provides "sufficient evidence and analysis for determining whether to prepare an" EIS.  40 C.F.R.

§ 1508.9.  If the agency determines that its contemplated action "will not have a significant effect on the human environment," and thus that an EIS is unnecessary, then it must issue a "finding of no significant impact" that "briefly present[s] the reasons" for that conclusion.  *Id.* § 1508.13. Defendants contend that the Jorjani Opinion did not trigger NEPA's procedures because the Opinion was not a "major Federal action" under 42 U.S.C. § 4332(2)(C).  *See* Dkt. 27 (Mem. in Supp. of MTD) at 39-40.  The Court disagrees.

Defendants seek refuge in regulations issued by the Council on Environmental Quality ("CEQ"), a NEPA-created body within the Executive Office of the President that is tasked with promulgating rules "applicable to and binding on all Federal agencies for implementing" NEPA's "procedural provisions."  40 C.F.R. § 1500.3; *see also* 42 U.S.C. §§ 4342, 4344 (creating CEQ and its duties and functions); Exec. Order No. 11,514, 35 Fed. Reg. 4247 (Mar. 5. 1970), *as amended by* Exec. Order No. 11,991, 42 Fed. Reg. 26967 (May 24, 1977) (directing CEQ to "[i]ssue regulations to Federal agencies for the implementation of the procedural provisions of the Act").  Those regulations are entitled to "substantial deference."  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 355 (1989).  Attempting to shed light on the meaning of the term "major Federal action," one of CEQ's regulations states that "Federal actions tend to fall within one of [four] categories," only one of which is potentially relevant to the Jorjani Opinion:

> Adoption of official policy, such as rules, regulations, and interpretations adopted pursuant to the Administrative Procedure Act, 5 U.S.C. 551 *et seq.*; treaties and international conventions or agreements; formal documents establishing an agency's policies which will result in or substantially alter agency programs.

40 C.F.R. § 1508.18(b)(1).  Defendants contend that because the Jorjani Opinion "is neither a rule nor a regulation," and because "the legal interpretation of the MBTA offered in the

[O]pinion was not adopted pursuant to the requirements of the APA," it does not qualify as a "major Federal Action" as the CEQ has authoritatively interpreted the term.  Dkt. 27 (Mem. in Supp. of MTD) at 39-40.

Even if Section 1508.18(b)'s listing of "Federal actions" were intended to be exhaustive, the Court is not persuaded that the Jorjani Opinion fails to qualify under Section 1508.18(b)(1). The Court agrees with Defendants that the Opinion was not adopted "pursuant to" the APA procedural requirements codified at 5 U.S.C. § 553.  *See supra* Pt. V.  But Defendants offer no reason to conclude that the Opinion does not qualify as a "formal document[] establishing an agency's policies which will result in or substantially alter agency programs."  40 C.F.R. § 1508.18(b)(1).  It is certainly "formal."  *See Chaudhuri*, 802 F.3d at 277 n.8 ("An M-Opinion is a formal legal opinion signed by the Solicitor.").  It "permanently" establishes DOI's policy that the MBTA does not apply to incidental takes.  Dkt. 28 ex. A (Jorjani Op.) at 1.  And, because the Opinion effectively precludes DOI and FWS personnel from prosecuting incidental takes under the MBTA, it is at least plausible that it will "substantially alter agency programs," 40 C.F.R. § 1508.18(b)(1), to the extent it has not already done so.[23]

---

[23]     *See* 18-CV-8084 Dkt. 6 app. B (FWS Guidance) at 1-2 (noting that FWS "is modifying some policies and practices within its programs" to "[e]nsure consistency with the recently issued" Jorjani Opinion; directing FWS personnel to "ensure that [the agency's] comments, recommendations, or requirements are not based on, nor imply, authority under the MBTA to regulate incidental take of migratory birds"; and ordering FWS personnel not to "withhold a permit, request, or require mitigation based upon incidental take concerns under the MBTA").

Because the Jorjani Opinion plausibly qualifies as a "major Federal action" as Section 1508.18(b)(1) interprets the term,[24] the Court denies Defendants' motion to dismiss the Audubon Plaintiffs' NEPA claim.[25]

## CONCLUSION

For the foregoing reasons, these cases are consolidated pursuant to Fed. R. Civ. P. 42(a)(2) under Docket No. 18-CV-4596, and Defendants' motions to dismiss are GRANTED IN PART and DENIED IN PART. The Audubon Plaintiffs' claim that the Jorjani Opinion was

---

[24] Section 1508.18(b) interprets the term "Federal action" rather than "major Federal action," the key statutory phrase in 42 U.S.C. § 4332(2)(C). Another part of Section 1508.18(b) clarifies that, as used in 42 U.S.C. § 4332(2)(C), the word "major" "reinforces but does not have a meaning independent of" the word "significantly," as in "significantly affecting the quality of the human environment." The upshot is that an agency action that falls into one of Section 1508.18(b)'s four categories of "Federal action" is a "major Federal action" under NEPA so long as it "significantly affect[s] the quality of the human environment." Because Defendants do not contest whether the Jorjani Opinion significantly affects the quality of the human environment, and because the Opinion qualifies as a "Federal action" under Section 1508.18(b), the Court is satisfied—at least at this phase of this litigation—that the Opinion is a "major Federal action" under 42 U.S.C. § 4332(2)(C).

The Court notes that Defendants' reading of Section 1508.18(b)(1) appears to be at odds with DOI's own regulations interpreting NEPA. One of those regulations provides that a DOI-proposed action "is subject to the procedural requirements of NEPA if it would cause effects on the human environment . . . and is subject to bureau control and responsibility." 43 C.F.R. § 46.100(a). A subsequent regulation excludes "legal opinions," among other actions, from NEPA coverage. *Id.* § 46.210(d). Yet another regulation provides, however, that an agency action that ordinarily would be categorically excluded from NEPA coverage nonetheless is covered if it has "significant impacts on such natural resources" as "migratory birds." *Id.* § 46.215(b). As Defendants acknowledge, *see* Dkt. 50 (Reply in Supp. of MTD) at 18 n.9, the fact that DOI's regulations purport to categorically exclude "legal opinions" from NEPA coverage indicates that legal opinions *can*, even in DOI's view, qualify as "major Federal actions" that are subject to NEPA under the right circumstances. Defendants may be right that not *every* legal opinion so qualifies, but it appears the Jorjani Opinion may: the Audubon Plaintiffs have plausibly pleaded that the Opinion "cause[s] effects on the human environment," 40 C.F.R. § 46.100(a); *see also supra* Pt. II.B; the Opinion is undisputedly "subject to bureau control and responsibility," *id.*; and it appears to "[h]ave significant impacts on . . . migratory birds," 40 C.F.R. § 46.215(b); *see also supra* Pt. II. The Court reserves a definitive decision on this issue until the parties more thoroughly brief it.

[25] Because it has already held that the Jorjani Opinion was a final agency action, *see supra* Pt. III, the Court rejects Defendants' argument that the NEPA claim must be dismissed because a claim that an agency action was issued without NEPA compliance is really a claim under 5 U.S.C. § 706, which requires final agency action. *See* Dkt. 27 (Mem. in Supp. of MTD) at 39. And because the Court denies Defendants' motion to dismiss the NEPA claim on the ground that, at least at this stage, the Jorjani Opinion appears to be a major federal action, it need not and does not address the Audubon Plaintiffs' contention that, even if the Jorjani Opinion does not itself qualify as a major federal action, it and FWS's guidance regarding the Opinion together so qualify. *See* 18-CV-4601 Dkt. 34 (Audubon Mem. in Opp. to MTD) at 28-29.

issued without notice and comment in violation of 5 U.S.C. § 553 is dismissed with prejudice. The motions are denied as to all other claims.

The Clerk of Court is respectfully directed to (a) terminate the open motions at Dkt. 26 in 18-CV-4596, Dkt. 29 in 18-CV-4601, and Dkt. 44 in 18-CV-8084; (b) consolidate these three cases under docket number 18-CV-4596; and (c) close 18-CV-4601 and 18-CV-8084. All further submissions in this now-consolidated case must be filed under docket number 18-CV-4596.

The parties must appear for a status conference on **August 16, 2019, at 10:00 A.M.** No later than **August 9, 2019**, they must submit a joint letter (a) setting forth their views on whether a status conference is necessary or will be beneficial; (b) proposing a schedule for the production of the administrative record; (c) proposing a schedule for briefing cross-motions for summary judgment; and (d) discussing any other matters they believe pertinent to expeditiously litigating this case.

**SO ORDERED.**

Date: **July 31, 2019**
      **New York, New York**

**VALERIE CAPRONI**
**United States District Judge**