# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL, INC., et al., | ) ) ) ) | |
| *Plaintiffs*, | ) ) | |
| v. | ) | 18-CV-4596 (VEC) |
| U.S. DEPARTMENT OF THE INTERIOR, et al., | ) ) ) | |
| *Defendants*. | ) ) ) | |
| NATIONAL AUDUBON SOCIETY, et al., | ) ) ) | |
| *Plaintiffs*, | ) ) | |
| v. | ) | 18-CV-4601 (VEC) |
| U.S. DEPARTMENT OF THE INTERIOR, et al., | ) ) ) | |
| *Defendants*. | ) ) ) | |
| STATE OF NEW YORK, et al., | ) ) ) | |
| *Plaintiffs*, | ) ) | |
| v. | ) | 18-CV-8084 (VEC) |
| U.S. DEPARTMENT OF THE INTERIOR, et al., | ) ) ) | |
| *Defendants*. | ) ) ) ) | |

## MEMORANDUM OF LAW IN SUPPORT OF
## ENVIRONMENTAL PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... ii

INTRODUCTION ................................................................................................... 1

BACKGROUND ..................................................................................................... 2

1.  Congress enacted the MBTA to protect migratory birds................................... 2

2.  For decades, Defendants applied the MBTA to industrial activities
    that directly and foreseeably kill migratory birds, and worked
    cooperatively with industry to avoid or minimize those impacts .................... 4

3.  Defendants abruptly reversed their position on the MBTA's scope ................. 8

4.  Plaintiffs challenged Defendants' reversal in this Court ............................... 11

STANDARD OF REVIEW ................................................................................... 12

ARGUMENT ......................................................................................................... 13

I.   Plaintiffs have standing.................................................................................. 14

II.  The Jorjani Opinion misconstrues the MBTA ................................................ 18

     A.  Second Circuit precedent controls the outcome of this case ..................... 18

     B.  The Act's plain language applies to killing birds "by any means
         and in any manner," and is not limited to purposeful killings................. 19

     C.  Related statutes confirm the Act's broad reach ......................................... 25

     D.  The Jorjani Opinion contravenes the Act's protective purpose ................ 30

     E.  Proximate cause and the agency's regulatory authority
         resolve any purported concerns about the Act's scope ............................. 34

III. Defendants violated NEPA............................................................................. 37

CONCLUSION...................................................................................................... 40

# TABLE OF AUTHORITIES

## Cases

*Ali v. Fed. Bureau of Prisons,*
    552 U.S. 214 (2008) ................................................................. 20, 25

*Am. Bird Conservancy, Inc. v. FCC,*
    516 F.3d 1027 (D.C. Cir. 2008) ........................................... 15

*Am. Trucking Ass'n v. Fed. Motor Carrier Safety Admin.,*
    724 F.3d 243 (D.C. Cir. 2013)) ........................................... 17

*Andrus v. Allard,*
    444 U.S. 51 (1979) ...................................2, 3, 13, 21, 22, 25, 30, 33, 35

*Andrus v. Shell Oil Co.,*
    446 U.S. 657 (1980) .............................................................. 27

*Babbitt v. Sweet Home Chapter of Cmtys.,*
    515 U.S. 687 (1995) ........................................... 24, 27, 34, 35

*Balt. Gas & Elec. Co. v. NRDC,*
    462 U.S. 87 (1983) ................................................................ 38

*Causse Mfg. Co. v. United States,*
    151 F. 4 (2d Cir. 1906) ........................................................ 25

*Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay,*
    868 F.3d 104 (2d Cir. 2017) ............................................... 17

*CFTC v. Schor,*
    478 U.S. 833 (1986) .............................................................. 23

*Citizens Against Casino Gambling in Erie Cty. v. Chaudhuri,*
    802 F.3d 267 (2d Cir. 2015) ................................................. 9

*City Club of N.Y. v. U.S. Army Corps of Eng'rs,*
    246 F. Supp. 3d 860 (S.D.N.Y. 2017) ................................. 13

*Constitution Pipeline Co., LLC v. N.Y. State Dep't of Envtl. Conservation,*
    868 F.3d 87 (2d Cir. 2017) ................................................. 38

*Ctr. for Biological Diversity v. England,*
    2003 WL 179848 (D.C. Cir. Jan. 23, 2003)....................................................... 26

*Ctr. for Biological Diversity v. Pirie,*
    191 F. Supp. 2d 161 (D.D.C. 2002) .................................................................... 26

*Ctr. for Biological Diversity v. Pirie,*
    201 F. Supp. 2d 113 (D.D.C. 2002) .................................................................... 26

*Dep't of Commerce v. New York,*
    139 S. Ct. 2551 (2019) ........................................................................ 14, 15, 16

*EEOC v. Abercrombie & Fitch Stores, Inc.,*
    135 S. Ct. 2028 (2015) ....................................................................................... 21

*FDA v. Brown & Williamson Tobacco Corp.,*
    529 U.S. 120 (2000) ...................................................................... 22, 26, 28, 30

*Fund for Animals v. Kempthorne,*
    538 F.3d 124 (2d Cir. 2008) ........................................................................ 3, 36

*Fund for Animals v. Norton,*
    365 F. Supp. 2d 394 (S.D.N.Y. 2005)....................................................... 4, 20, 21

*Graham Cty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson,*
    559 U.S. 280 (2010) ........................................................................................... 25

*Humane Soc'y v. Glickman,*
    217 F.3d 882 (D.C. Cir. 2000) .................................................. 13, 19, 22, 33, 35

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ..................................................................................... 16, 17

*Massachusetts v. EPA,*
    549 U.S. 497 (2007) ........................................................................................... 32

*Mhany Mgmt., Inc. v. Cty. of Nassau,*
    819 F.3d 581 (2d Cir. 2016) .............................................................................. 18

*Missouri v. Holland,*
    252 U.S. 416 (1920) ..................................................................................... 3, 30

*Monsanto Co. v. Geerston Seed Farms,*
    561 U.S. 139 (2013) ........................................................................................... 38

iii

*Nat'l Audubon Soc'y v. Hoffman,*
    132 F.3d 7 (2d Cir. 1997) ........................................................................ 39

*N. Slope Borough v. Andrus,*
    486 F. Supp. 332 (D.D.C. 1980) ............................................................ 20

*N. Slope Borough v. Andrus,*
    642 F.2d 589 (D.C. Cir. 1980) ............................................................... 20

*NLRB v. Bell Aerospace Co.,*
    416 U.S. 267 (1974) ................................................................................ 23

*NRDC v. Dep't of Interior,*
    -- F. Supp. 3d --, 2019 WL 4601722 (S.D.N.Y. Sept. 23, 2019) ........................ 17

*NRDC v. EPA,*
    755 F.3d 1010 (D.C. Cir. 2014) ............................................................. 17

*NRDC v. NHTSA,*
    894 F.3d 95 (2d Cir. 2018) ........................................... 12, 13, 15, 17

*Oncale v. Sundowner Offshore Servs.,*
    523 U.S. 75 (1998) .................................................................................. 32

*Paroline v. United States,*
    572 U.S. 434 (2014) ................................................................................ 34

*Penn. Dep't of Corr. v. Yeskey,*
    524 U.S. 206 (1998) ................................................................................ 32

*Protect Our Cmtys. Found. v. Jewell,*
    825 F.3d 571 (9th Cir. 2016) ................................................................. 19

*Robertson v. Methow Valley Citizens Council,*
    490 U.S. 332 (1989) ................................................................................ 38

*Rotkiske v. Klemm,*
    140 S. Ct. 355 (2019) ............................................................................. 21

*Russell Motor Car Co. v. United States,*
    261 U.S. 514 (1923) ................................................................................ 24

*Seattle Audubon Soc'y v. Evans,*
    952 F.2d 297 (9th Cir. 1991) ........................................................................ 19

*Sierra Club v. U.S. Army Corps of Eng'rs,*
    701 F.2d 1011 (2d Cir. 1983) ...................................................................... 38

*Stewart Park & Reserve Coal., Inc. v. Slater,*
    352 F.3d 545 (2d Cir. 2003) ................................................................ 37, 38

*Turtle Island Restoration Network v. Dep't of Commerce,*
    878 F.3d 725 (9th Cir. 2017) ............................................... 19, 20, 36

*United States v. Aluminum Co.,*
    148 F.2d 416 (2d Cir. 1945) ........................................................................ 25

*United States v. Apollo Energies, Inc.,*
    611 F.3d 679 (10th Cir. 2010) ...................................................... 20, 34, 35

*United States v. Boynton,*
    63 F.3d 337 (4th Cir. 1995) ........................................................... 20, 24

*United States v. CITGO Petroleum Corp.,*
    801 F.3d 477 (5th Cir. 2015) ..................................................................... 18

*United States v. Corbin Farm Serv.,*
    444 F. Supp. 510 (E.D. Cal. 1978) ..................................... 19, 20, 32

*United States v. Corbin Farm Serv.,*
    578 F.2d 259 (9th Cir. 1978) ...................................................................... 19

*United States v. Diaz,*
    122 F. Supp. 3d 165 (S.D.N.Y. 2015) .............................................. 19

*United States v. Diaz,*
    854 F.3d 197 (2d Cir. 2017) ....................................................................... 19

*United States v. Fausto,*
    484 U.S. 439 (1988) ........................................................................................ 28

*United States v. FMC Corp.,*
    572 F.2d 902 (2d Cir. 1978) .......................................... 5, 18, 21, 23

*United States v. Moon Lake Elec. Ass'n,*
    45 F. Supp. 2d 1070 (D. Colo. 1999) ............................. 20, 25, 32, 34, 37

v

*United States v. Schultze,*
    28 F. Supp. 234 (W.D. Ky. 1939) ....................................................... 4

*United States v. Smith,*
    29 F.3d 270 (7th Cir. 1994) ............................................................... 34

*United States v. Stevens,*
    559 U.S. 460 (2010) .......................................................................... 25

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,*
    455 U.S. 489 (1982) ..................................................................... 34, 35

*Wilderness Soc'y v. U.S. Fish & Wildlife Serv.,*
    353 F.3d 1051 (9th Cir. 2003) ........................................................... 13

*Wilderness Soc'y v. U.S. Fish & Wildlife Serv.,*
    360 F.3d 1374 (9th Cir. 2004) ........................................................... 13

*World Wrestling Entm't, Inc. v. Jakks Pac., Inc.,*
    425 F. Supp. 2d 484 (S.D.N.Y. 2006) ............................................... 18

## Statutes

Administrative Procedure Act

    5 U.S.C. § 553 .................................................................................... 12
    5 U.S.C. § 704 .................................................................................... 12
    5 U.S.C. § 706 .................................................................. 11, 13, 14, 37, 40

Migratory Bird Treaty Act

    Act of July 3, 1918, ch. 128, 40 Stat. 755 ..................................... 2, 30
    Pub. L. No. 74-728, 49 Stat. 1555 (1936) ........................................ 20
    Pub. L. No. 99-645, 100 Stat. 3582 (1986) ................................. 4, 22
    Pub. L. No. 105-312, 112 Stat. 2956 (1998)............................... 4, 22
    16 U.S.C. § 703 ........................................................ 3, 4, 13, 19, 25, 35
    16 U.S.C. § 704(a)...................................................... 4, 6, 27, 36
    16 U.S.C. § 704(b)...................................................... 4, 21, 22
    16 U.S.C. § 707 ........................................................................... 4, 22

16 U.S.C. § 742j-l ................................................................................... 21

16 U.S.C. § 4401 ..................................................................................... 29

16 U.S.C. § 4406 ................................................................................ 6, 29

42 U.S.C. § 4332 .............................................................................. 38, 39

Pub. L. No. 100-653, 102 Stat. 3825 (1988) ...................................... 29

Pub. L. No. 101-233, 103 Stat. 1968 (1989) ...................................... 29

Pub. L. No. 107-314, § 315, 116 Stat. 2458 (2002) ..................... 6, 26, 27, 37

Pub. L. No. 114-94, § 1439, 129 Stat. 1312 (2015) ...................... 27

## Regulations

40 C.F.R. § 1508.4 ............................................................................. 38

40 C.F.R. § 1508.9 ............................................................................. 38

40 C.F.R. § 1508.18 ........................................................................... 39

43 C.F.R. § 46.205 ............................................................................. 40

43 C.F.R. § 46.210 ............................................................................. 40

43 C.F.R. § 46.215 ............................................................................. 40

50 C.F.R. § 10.12 ............................................................................... 24

50 C.F.R. § 10.13 ............................................................................... 3

50 C.F.R. § 21.15 ......................................................................... 7, 26, 28

50 C.F.R. § 21.27 ............................................................................... 7

72 Fed. Reg. 8931 (Feb. 28, 2007) ............................... 26, 28, 32, 33, 36

80 Fed. Reg. 30,032 (May 26, 2015) ................................... 7, 31, 36

83 Fed. Reg. 24,080 (May 24, 2018) ........................................ 36

## Treaties

Convention Concerning the Conservation of Migratory Birds and Their
    Environment, 29 U.S.T. 4647 (Nov. 19, 1976) (Russia Convention) ................ 3

Convention for the Protection of Migratory Birds,
39 Stat. 1702 (Aug. 16, 1916) (Canada Convention) .............................. 2, 3, 30

Convention for the Protection of Migratory Birds and Birds in Danger of
Extinction, 25 U.S.T. 3329 (Mar. 4, 1972) (Japan Convention) ....................... 3

Protocol Amending the 1916 Convention for the Protection of Migratory Birds,
1995 WL 877199 (Dec. 14, 1995), *reprinted in* S. Treaty Doc. No. 104-28 ....... 3

## Other Authorities

135 Cong. Rec. S4014-02, 101st Cong., 1st Sess. (1989) ........................................... 29

Black's Law Dictionary (6th ed. 1990) ...................................................................... 35

Exec. Order 13186, 66 Fed. Reg. 3853 (Jan. 10, 2001) ............................................. 24

Larry Martin Corcoran & Elinor Colbourn, *Shocked, Crushed and Poisoned:
Criminal Enforcement in Non-Hunting Cases Under the Migratory Bird
Treaties*, 77 Denv. U. L. Rev. 359 (1999)................................................... 32, 36

Migratory Birds Convention Act, S.C. 1994, c. 22 (Can.)........................................... 33

Plea Agreement, *United States v. BP Expl. & Prod., Inc.*,
No. 2:12-cr-00292-SSV-DEK (E.D. La. Nov. 15, 2012) ..................................... 6

Plea Agreement, *United States v. Exxon Corp.*,
No. A90-015 CR (HRH) (D. Alaska Sept. 30, 1991) ..................................... 6, 29

*R. v. J.D. Irving, Ltd.*,
2008 CarswellNB 322 (Can.) (WL) .................................................................... 33

*R. v. Syncrude Canada Ltd.*,
2010 ABPC 229 (Can.) ........................................................................................ 33

S. Rep. No. 99-445 (1986) ......................................................................................... 22

S. Rep. No. 105-366 (1998) ....................................................................................... 22

Wayne R. LaFave, Substantive Crim. L. (3d ed.)................................................. 23, 35

**INTRODUCTION**

For decades, the federal government recognized that the Migratory Bird Treaty Act (the Act or MBTA) protects migratory bird populations from foreseeable "incidental" killing or "take" caused by industrial activities, like oil and gas development, mining, or pesticide manufacturing. These activities may not be specifically directed at birds, but they nevertheless predictably kill them in large numbers. The government's longstanding interpretation of the Act's plain language protected migratory birds in a manner that furthered the overriding purpose of the statute and benefited millions of members of the Plaintiff organizations who have deeply held personal and professional interests in migratory birds.

That abruptly changed on December 22, 2017, when the Department of the Interior responded to industry lobbying by issuing a legal opinion that—for the first time—exempts all incidental take from the MBTA's reach. Breaking sharply with past practice, the opinion reinterprets the Act as applying *only* to activities specifically designed to kill migratory birds, such as hunting or poaching. This drastic narrowing of one of the nation's bedrock wildlife conservation laws binds all agencies within Interior, including the U.S. Fish and Wildlife Service (the Service or FWS), which is charged with the day-to-day responsibility for implementing the Act. The Service has since issued guidance instructing its law enforcement and other personnel that they are now forbidden from applying the MBTA's safeguards to industrial activities, no matter how devastating to bird populations, unless the specific "purpose" of the activity is to kill birds.

1

In these consolidated cases, eight states and six of the nation's leading organizations dedicated to protecting migratory birds challenge Defendants' unlawful rewriting of the statute. As discussed below, Defendants' new construction contravenes the Act's plain language, which applies broadly to the killing of migratory birds "by any means or in any manner." Defendants' construction also flouts the MBTA's protective purpose, Congress's related enactments, and settled Second Circuit precedent. For these reasons, and because Defendants also adopted the legal opinion and subsequent guidance without complying with the National Environmental Policy Act (NEPA)[1], the Court should set aside Defendants' actions and restore the longstanding protections of the MBTA.

## BACKGROUND

### 1.    Congress enacted the MBTA to protect migratory birds

The MBTA is a "conservation statute[] designed to prevent the destruction of certain species of birds." *Andrus v. Allard*, 444 U.S. 51, 52-53 (1979). Congress enacted the MBTA in 1918 to implement a treaty between the United States and Great Britain (on behalf of Canada) "for the protection of migratory birds." Act of July 3, 1918, ch. 128, 40 Stat. 755. The underlying treaty observed that many bird species that traversed the United States during their annual migrations were in danger of extinction due to a "lack of adequate protection." Convention for the Protection of Migratory Birds, 39 Stat. 1702 (Aug. 16, 1916) (Canada Convention). The treaty therefore sought to "insur[e] the preservation of such migratory birds" by

---

[1] The NEPA claim is raised only by the Audubon Plaintiffs in case No. 18-CV-4601.

establishing a "uniform system of protection." *Id.* The Supreme Court has described this purpose of protecting migratory birds as "a national interest of very nearly the first magnitude." *Missouri v. Holland*, 252 U.S. 416, 435 (1920).

Congress subsequently amended the MBTA to implement additional migratory bird treaties between the United States and Mexico in 1936, Japan in 1972, and the former Soviet Union (now Russia) in 1976. *See Fund for Animals v. Kempthorne*, 538 F.3d 124, 126-27 (2d Cir. 2008) (citing treaties). The latter two treaties were expressly designed to address pollution and other threats to birds beyond purposeful killing.[2] The Canada Convention was also amended in 1995 to strengthen the countries' commitment to protecting migratory birds from pollution.[3]

The MBTA, as amended, implements these treaties through an "expansive" statutory provision. *Allard*, 444 U.S. at 59. The Act provides, in relevant part, that:

> [u]nless and except as permitted by regulations … it shall be unlawful at any time, by any means or in any manner, to pursue, hunt, take, capture, [or] kill … any migratory bird … included in the terms of the conventions ….

16 U.S.C. § 703(a). The Act covers more than 1,000 bird species found throughout the United States. *See* 50 C.F.R. § 10.13. The MBTA authorizes the Interior Secretary "to determine when, to what extent, if at all, and by what means, it is compatible with the terms of the conventions to allow hunting, taking, capture,

---

[2] *See* Convention for the Protection of Migratory Birds and Birds in Danger of Extinction, and Their Environment, art. VI, 25 U.S.T. 3329 (Mar. 4, 1972) (Japan Convention); Convention Concerning the Conservation of Migratory Birds and Their Environment, art. IV, 29 U.S.T. 4647 (Nov. 19, 1976) (Russia Convention).

[3] *See* Protocol Amending the 1916 Convention for the Protection of Migratory Birds, art. IV, 1995 WL 877199 (Dec. 14, 1995), *reprinted in* S. Treaty Doc. No. 104-28.

killing, [or] possession … of any such bird … and to adopt suitable regulations permitting and governing the same." 16 U.S.C. § 704(a).

The MBTA also prescribes criminal penalties for the unauthorized killing or taking of migratory birds. *Id.* § 707. In 1986, Congress restricted the statute's felony provision to only "knowing" violations. *See* Pub. L. No. 99-645, § 501, 100 Stat. 3582, 3590 (1986) (codified at 16 U.S.C. § 707(b)). And in 1998, Congress eliminated strict liability for the prohibition on take in baited areas. *See* Pub. L. No. 105-312, § 102, 112 Stat. 2956 (1998) (codified at 16 U.S.C. § 704(b)). On both occasions, however, Congress left untouched the MBTA's general prohibition on unauthorized killings, 16 U.S.C. § 703, as well as its misdemeanor penalty provision, which applies to "any person, association, partnership, or corporation who shall violate any provisions of [the Act]," *id.* § 707(a). It has therefore long been understood that the MBTA "establishes strict liability for individuals responsible for the death of protected birds." *Fund for Animals v. Norton*, 365 F. Supp. 2d 394, 408 (S.D.N.Y. 2005), *aff'd* 538 F.3d 124 (2d Cir. 2008); *see also, e.g.*, *United States v. Schultze*, 28 F. Supp. 234, 236 (W.D. Ky. 1939) ("In view of the broad wording of the act, and the evident purpose behind the treaty and the [A]ct, … it was not the intention of Congress to require any guilty knowledge or intent to complete the commission of the offense.").

2.   **For decades, Defendants applied the MBTA to industrial activities that directly and foreseeably kill migratory birds, and worked cooperatively with industry to avoid or minimize those impacts**

Defendants (as well as the Department of Justice) "long recognized" that the MBTA's expansive text applies to activities that directly and foreseeably kill migratory birds—such as oil and gas development, mining, or pesticide

4

manufacturing—irrespective of whether that is the actor's specific purpose. AR43;
*see, e.g.*, AR54-57, 78, 369-70, 614. Since at least the early 1970s, the agencies have
brought enforcement cases against entities whose actions incidentally kill birds.
AR55, 900. The majority of these cases were successful. AR55, 900. "[M]ost
courts"—including the Second Circuit—agreed that the "broad language" of the
MBTA "encompasses [the] incidental taking and killing of birds" that is a
foreseeable consequence of industrial activity. AR901; *see United States v. FMC
Corp.*, 572 F.2d 902, 906-08 (2d Cir. 1978) (affirming MBTA liability for pesticide
manufacturer that killed dozens of migratory birds in a toxic wastewater pond).

The Service, however, has been "judicious in exercising its enforcement
authority over incidental take." AR55, 78, 902. It has focused its investigative
efforts on "individuals or companies that fail to utilize conservation measures or
otherwise minimize negative impacts on migratory birds," AR97, and it has begun
enforcement proceedings "only after notifying the industry of the problem, working
with it to find solutions, and proactively educating each industry about ways to
avoid or eliminate the take of migratory birds," AR55, 902. The Service has resorted
to criminal prosecutions in only "limited circumstances, such as when an entity has
been repeatedly warned of the take[] and has refused to take available measures to
minimize it, or when large numbers of birds are killed." AR901.

Consistent with the MBTA's overriding purpose of protecting migratory birds,
the Act's application to incidental killings has provided enormous conservation
benefits, in particular by prompting companies to implement reasonable measures

that avoid killing large numbers of birds. *See* AR614-15, 900-05. For example, the Service "worked with oil producers to ensure that exposed crude oil waste pits were covered with nets to keep birds from landing in them"; with "commercial fishing [interests] to reduce the drowning of seabirds in fishing lines and nets"; and with "wind energy companies to improve the siting of turbines to avoid and minimize the killing of birds." AR615. Potential MBTA liability has incentivized companies to implement these measures and "employ 'best practices' aimed at minimizing and avoiding the unpermitted take of protected birds." AR97; *see, e.g.*, AR203, 295, 901.

When the Service has resorted to enforcement, MBTA liability has resulted in over $100 million in penalties paid for incidental killings, including for egregious incidents of bird mortality, such as the Exxon Valdez and Deepwater Horizon oil spills. *See* Plea Agreement ¶ III.E, *United States v. Exxon Corp.*, No. A90-015 CR (HRH) (D. Alaska Sept. 30, 1991); Plea Agreement ¶ 4(b)(i)(C), *United States v. BP Expl. & Prod., Inc.*, No. 2:12-cr-00292-SSV-DEK (E.D. La. Nov. 15, 2012). Under federal law, these MBTA fines have been deposited in a congressionally created fund for wetlands restoration projects. *See* 16 U.S.C. § 4406(b).

As noted above, the MBTA authorizes Interior to promulgate regulations permitting the take or killing of migratory birds. *See id*. § 704(a). Congress confirmed that this authority encompasses incidental killings when, in 2002, it directed Interior to promulgate regulations under the MBTA that would authorize incidental take by the U.S. Armed Forces during military-readiness activities. *See* Pub. L. No. 107-314, § 315, 116 Stat. 2458, 2509 (2002). The regulations issued by

the Service require that the military "must confer and cooperate with the Service to develop and implement appropriate conservation measures to minimize or mitigate [any] significant adverse effects" on migratory bird populations. 50 C.F.R. § 21.15(a)(1). Pursuant to its MBTA regulatory authority, the Service also administers a "Special Purpose Permit" system for activities that fall outside the scope of other permits. *See id.* § 21.27. The Service has authorized incidental killings under the MBTA under such Special Purpose Permits on a number of occasions, such as when issuing incidental take permits for threatened or endangered birds under the Endangered Species Act. *See* AR56, 79, 369-77.

In May 2015, the Service announced its intent to develop a comprehensive program for regulating incidental take under the MBTA and sought public input on the design of a regulatory system covering incidental take by industry sources. *See* 80 Fed. Reg. 30,032 (May 26, 2015). The Service explained that an incidental take authorization program would build on voluntary guidelines and practices to protect migratory birds and would provide greater certainty for industry actors that comply with such measures to reduce incidental take. *Id.* at 30,033-34. The Service announced that it was considering, among other things, promulgating regulations that would establish a general conditional authorization for incidental take by certain industry sectors, so long as companies in those sectors adhere to best practices for protecting birds—e.g., maintaining protective netting over oil, gas, and wastewater disposal pits, and using recommended siting practices and flashing lights for communication towers. *Id.* at 30,035.

In furtherance of that rulemaking, the Solicitor of the Interior issued a legal opinion in January 2017 reviewing and reaffirming the Department's "longstanding view"—with which "courts have generally agreed"—that the MBTA applies to industrial activities that predictably kill migratory birds. *See* Memorandum from Hilary C. Tompkins, Solicitor of the Interior, to Director, U.S. Fish & Wildlife Serv., Opinion M-37041, *Incidental Take Prohibited Under the Migratory Bird Treaty Act* (Jan 10, 2017) (AR43-72). "In many cases," the opinion noted, "relatively low-cost methods have proven effective in reducing the impacts of these activities on migratory birds," such as "fencing and netting waste pits"; "updating mining operations to eliminate the use of tailing ponds"; or "replacing non-flashing warning lights on communication towers with flashing lights." AR43.

**3.     Defendants abruptly reversed their position on the MBTA's scope**

In February 2017, after a change in administration, the Acting Interior Secretary suspended the Solicitor's opinion "[p]ending [r]eview." AR42. Oil and gas industry representatives lobbied Interior to reverse its longstanding MBTA interpretation—which, they complained, "is inhibiting oil and natural gas development"—and to issue a new directive asserting that the Act "does *not* give FWS the authority to regulate incidental take [of] migratory birds." AR640; *see also* AR641-51 (similar request from electric utility industry). Interior announced that it was reconsidering the issue as part of its efforts to relieve regulatory burdens on the industry. AR410-11. Oil and gas industry representatives closely monitored Interior's preparation of a new Solicitor's opinion on the topic, AR622-24, and were tipped off by Interior officials about the opinion's imminent release, AR618-21.

On December 22, 2017, Defendants issued a new Solicitor's opinion reversing their longstanding interpretation of the Act. *See* Memorandum from Daniel H. Jorjani, Principal Deputy Solicitor, to Sec'y of the Interior et al., Opinion M-37050, *The Migratory Bird Treaty Act Does Not Prohibit Incidental Take* (Dec. 22, 2017) (Jorjani Opinion) (AR1-41). The Jorjani Opinion reinterpreted the MBTA as "apply[ing] only to affirmative actions that have as their purpose the taking or killing of migratory birds," such as "hunting and poaching." AR2, 41.

The Jorjani Opinion was "binding, when signed, on all other Departmental offices and officials." AR100; *see* AR73-75, 104; *Citizens Against Casino Gambling in Erie Cty. v. Chaudhuri*, 802 F.3d 267, 277 n.8 (2d Cir. 2015). It thus immediately altered the MBTA legal regime by providing companies with a safe harbor to engage in practices that directly and foreseeably kill birds. Interior enforcement officials observed that, because the Jorjani Opinion "makes the MBTA a hunting statute only," the agency now has "no authority to investigate or charge incidental take" under the MBTA. AR899. "Going forward," the Solicitor explained, "the Department and its offices will no longer pursue incidental take prosecutions under the MBTA, and … incidental take concerns under the MBTA will no longer serve as the basis for opening or pursuing an investigation, withholding a permit or other approval, or requesting or requiring mitigation." AR910; *see* AR906. Moreover, any ongoing "incidental take investigations under the MBTA will be discontinued." AR910.

The Jorjani Opinion was met with strenuous objections from conservation professionals responsible for implementing the MBTA. *See* AR609-12. For example,

on January 10, 2018, seventeen former high-ranking Interior and Service officials—
including political appointees of both parties—wrote to then-Secretary of the
Interior Ryan Zinke "request[ing] that [he] suspend this ill-conceived opinion,"
which was "contrary to the long-standing interpretation [of] every administration
(Republican and Democrat) since at least the 1970's." AR614. The officials explained
that the Jorjani Opinion's "new, contrived legal standard … creates a huge loophole
in the MBTA," and "needlessly undermines" the agencies' past successes in working
cooperatively with industry to prevent avoidable bird deaths. AR614-15. They
observed that "[o]nly a few years ago, the U.S. exchanged formal diplomatic notes
with Canada reaffirming our countries' common interpretation that incidental
killing of birds was prohibited by the treaty." AR615. And the former officials
stressed that "[a]ll the past administrations for which we have worked have struck
a balance and worked diligently and in good faith with industries that had
significant impacts on birds … to reasonably address unintended take." AR615. "It
can be done," they explained; "[i]n fact, it has been done." AR615.

    These entreaties fell on deaf ears. Rather than withdraw or suspend the
Jorjani Opinion, Defendants took additional steps to implement it. *See* AR87-90. In
April 2018, the Service issued new guidance reaffirming its understanding that it
was required to "modify[]" its "policies and practices within its programs" to
implement the Jorjani Opinion. *See* Memorandum from Principal Deputy Dir., Fish
& Wildlife Serv., to Serv. Directorate, *Guidance on the Recent M-Opinion Affecting
the Migratory Bird Treaty Act* (Apr. 11, 2018) (FWS Guidance) (AR80). The FWS

10

Guidance confirmed that, under the Jorjani Opinion, the MBTA's prohibition on unauthorized killing applies only "when the *purpose* of an action is to take migratory birds," so that the actor's "subjective" intent now controls. AR80, 82. The FWS Guidance further specified that the MBTA "is no longer available" to hold "companies responsible for oil spills that incidentally killed or injured migratory birds," and may not be used to encourage companies to implement "best management practices to avoid or reduce incidental take of migratory birds" in connection with "industrial activities" that are known to kill birds. AR85.

Before issuing either the Jorjani Opinion or FWS Guidance, Defendants did not conduct any environmental analysis under NEPA to evaluate the environmental consequences of these major changes in agency practice and policy.

### 4. Plaintiffs challenged Defendants' reversal in this Court

In May 2018, six organizations dedicated to protecting migratory birds (collectively, Environmental Plaintiffs) brought suit challenging the Jorjani Opinion in this Court. In September 2018, eight states filed a similar lawsuit. All Plaintiffs claim that the Jorjani Opinion misconstrues the MBTA and should be set aside as unlawful because it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see NRDC v. U.S. Dep't of the Interior*, No. 18-CV-4596, Dkt. 1 ¶¶ 76-81; *Nat'l Audubon Soc'y v. U.S. Dep't of the Interior*, No. 18-CV-4601, Dkt. 1 ¶¶ 72-79; *New York v. U.S. Dep't of the Interior*, No. 18-CV-8084, Dkt. 6 ¶¶ 42-46. The Audubon Plaintiffs further claim that the Jorjani Opinion and FWS Guidance are "without observance of procedure required by law," 5 U.S.C. § 706(2)(D), because Defendants failed to comply with NEPA before

11

adopting them. *See* No. 18-CV-4601, Dkt. 1 ¶¶ 84-87. Defendants moved to dismiss Plaintiffs' claims in November 2018. *See, e.g.*, 18-CV-4596, Dkts. 26-28.

In July 2019, the Court consolidated the lawsuits and denied Defendants' motion in relevant part. *See* 18-CV-4596, Dkt. 53.[4] The Court held that at least one Plaintiff had adequately alleged Article III standing to seek vacatur of the Jorjani Opinion because it eliminates the primary industry incentive to minimize or prevent bird deaths, and thus creates a substantial risk that birds will be killed (thereby harming Plaintiffs' interests). *Id.* at 9-12, 17-19. The Court further ruled that Plaintiffs' injuries were redressable because, "were the Jorjani Opinion vacated, Defendants would once again be empowered to prosecute incidental take[]." *Id.* at 15-16. The Court also held that the Jorjani Opinion was "final agency action" under the APA, 5 U.S.C. § 704, and otherwise ripe for judicial review. Dkt. 53 at 20-30. Finally, the Court concluded that the Jorjani Opinion is plausibly a "major Federal action" subject to NEPA review, and thus allowed the Audubon Plaintiffs' NEPA claim to proceed. *Id.* at 32-35. Plaintiffs now move for summary judgment.

## STANDARD OF REVIEW

"The APA directs courts to 'hold unlawful and set aside' agency actions that are 'arbitrary, capricious, … otherwise not in accordance with law,' … or 'without observance of procedure as required by law.'" *NRDC v. NHTSA*, 894 F.3d 95, 107

---

[4] The Court dismissed the Audubon Plaintiffs' claim that the Administrative Procedure Act (APA), 5 U.S.C. § 553, required notice and an opportunity to comment on the Jorjani Opinion. *See* 18-CV-4596, Dkt. 53 at 30-32. Further citations to the Court's opinion will reference the docket entry in 18-CV-4596.

(2d Cir. 2018) (quoting 5 U.S.C. § 706(2)(A), (D)). "Where, as here, a court is called upon to review agency action under the [APA], the question presented is a legal one which the district court can resolve … on a motion for summary judgment." *City Club of N.Y. v. U.S. Army Corps of Eng'rs*, 246 F. Supp. 3d 860, 864 (S.D.N.Y. 2017) (quotation omitted). Interpretations of statutes in agency Solicitor's opinions are not entitled to any particular deference because they "do not in their formulation involve procedural protections comparable to an agency's rulemaking procedures." *See Wilderness Soc'y v. U.S. Fish & Wildlife Serv.*, 353 F.3d 1051, 1068 n.16 (9th Cir. 2003) (en banc), *amended in part*, 360 F.3d 1374 (9th Cir. 2004).

## ARGUMENT

The MBTA provides that "[u]nless and except as permitted by regulations … , it shall be unlawful at any time, by any means or in any manner, to pursue, hunt, take, capture, [or] kill … any migratory bird." 16 U.S.C. § 703(a). "As legislation goes," the provision "contains broad and unqualified language." *Humane Soc'y v. Glickman*, 217 F.3d 882, 885 (D.C. Cir. 2000). For more than four decades, Defendants properly recognized that this "expansive" and "comprehensive statutory prohibition," *Allard*, 444 U.S. at 59-60, applies to industry practices and infrastructure that directly and foreseeably kill migratory birds—such as oil waste pits, pesticide applications, and power lines. *See supra* at 4-8. This longstanding, consistent interpretation properly motivated companies to implement reasonable measures to avoid unnecessary bird deaths. *See id*.

Turning its back on the Department's conservation successes implementing the MBTA, the Jorjani Opinion reinterprets the Act as applying only to affirmative acts that "have as their purpose" the taking or killing of migratory birds, such as hunting or poaching. AR18, 41. The intended effects of this Opinion were, and are, to allow companies to indiscriminately kill birds, and to eliminate their incentive to implement protective measures. The many bird deaths that result from the Jorjani Opinion will directly harm Plaintiffs' members who have deeply held aesthetic, recreational, and scientific interests in watching and studying migratory birds.

The Jorjani Opinion should be set aside because it unlawfully misconstrues the MBTA. Binding precedent, the Act's broad language, its protective purpose, and Congress's later enactments all confirm that the Act applies to more than just purposeful killings. Moreover, the doctrine of proximate cause and Interior's regulatory authority under the MBTA resolve the Jorjani Opinion's purported constitutional concerns. In addition, Defendants failed to comply with NEPA before adopting the Jorjani Opinion and subsequent FWS Guidance. This Court should therefore vacate Defendants' actions as arbitrary, capricious, and otherwise not in accordance with law or procedure. *See* 5 U.S.C. § 706(A), (D).

## I.    **Plaintiffs have standing**

The Environmental Plaintiffs have standing because they "present an injury that is concrete, particularized, and actual or imminent; fairly traceable to the defendant's challenged behavior; and likely to be redressed by a favorable ruling." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2565 (2019) (quotation omitted).

Defendants' actions were expressly intended to lift regulatory restrictions on activities that regularly kill migratory birds; indeed, the Jorjani Opinion justified its interpretation in part on this effect. *See* Dkt. 53 at 10-11 (discussing AR1-2); *see also supra* at 8 (discussing industry lobbying efforts). Former high-ranking Service officials and industry consultants further confirm—based on their decades of experience with the MBTA—that companies "will likely react in predictable ways" to the Jorjani Opinion by reducing (or eliminating) their prior efforts to prevent avoidable bird deaths. *Dep't of Commerce*, 139 S. Ct. at 2566; *see* Mowad Decl. ¶¶ 23-46; Manville Decl. ¶¶ 11-26; Hengel Decl. ¶¶ 13-16. In fact, some companies have already reacted as Plaintiffs predicted (and Defendants intended) by failing to maintain birdproof netting that would otherwise prevent birds from drowning or being poisoned in oil waste pits. *See* Mowad Decl. ¶¶ 42-44. This evidence, combined with agency records that show the Service has stopped requiring companies to protect birds, *see, e.g.*, AR906-11, demonstrates at least a "substantial likelihood" that many migratory birds are being harmed as a result of the Jorjani Opinion (and the FWS Guidance implementing it). *NRDC v. NHTSA*, 894 F.3d at 104.

These avoidable migratory bird deaths injure Plaintiffs' members who "engage in recreational birdwatching and research on birds." *Am. Bird Conservancy, Inc. v. FCC*, 516 F.3d 1027, 1031 (D.C. Cir. 2008) (petitioners had standing to challenge agency action that failed to protect migratory birds from collision with communication towers). Many of these members reside or recreate near gas pipelines, electrical power lines, and construction sites where—as a result of

15

Defendants' actions—the Service has refused to require companies to avoid the foreseeable killing of migratory birds. *See, e.g.*, Kachmar Decl. ¶¶ 7-12; Ingram Decl. ¶¶ 8-16; Weber Decl. ¶¶ 10-16; Cottrell Decl. ¶¶ 8-14; Wise Decl. ¶¶ 8-18; Hartl Decl. ¶¶ 8-12. Other members reside and recreate in areas where active oil and gas production facilities are killing birds in uncovered waste ponds; one member even recently found an oiled bird on his property. *See, e.g.*, Culp Decl. ¶¶ 9-12; Neal Decl. ¶¶ 7-13; Hengel Decl. ¶¶ 13-15. And still other members are avid birdwatchers, ornithologists, or volunteers at avian rehabilitation centers whose personal and professional interests are harmed by the increased bird mortality that has been, and will be, caused by Defendants' actions. *See, e.g.*, Greenwald Decl. ¶¶ 9-11; Poole Decl. ¶¶ 3-11; Wilcove Decl. ¶¶ 5-14; Bohigian Decl. ¶¶ 3-11; Warnock Decl. ¶¶ 2-19; Wolf Decl. ¶¶ 3-14; Bartlett Decl. ¶¶ 2-10. Taken together, this evidence establishes a sufficient likelihood that the challenged actions will "directly affect[]" one or more of Plaintiffs' members, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 563 (1992) (quotation omitted), or, at the very least, that there is a "substantial risk that [such] harm will occur," *Dep't of Commerce*, 139 S. Ct. at 2565 (quotation omitted). Further, neither the claims asserted nor the relief requested requires the participation of these individual members, and there is "no serious dispute" that the interests at stake are germane to the Environmental Plaintiffs' purposes. Dkt. 53 at

20 (citing *NRDC v. NHTSA*, 894 F.3d at 104); O'Neill Decl. ¶ 2; Trujillo Decl. ¶¶ 6-7; Greenwald Decl. ¶ 2; Parr Decl. ¶ 2; Leahy Decl. ¶¶ 2-5; Rylander Decl. ¶ 2.[5]

Finally, it is "well-established" that traceability and redressability are satisfied where, as here, the "challenged agency action authorizes [harmful] conduct" that "would allegedly be illegal otherwise." *NRDC v. EPA*, 755 F.3d 1010, 1017 (D.C. Cir. 2014) (quoting *Am. Trucking Ass'n v. Fed. Motor Carrier Safety Admin.*, 724 F.3d 243, 248 (D.C. Cir. 2013)). As this Court has previously observed, "were the Jorjani Opinion vacated, Defendants would once again be empowered to prosecute incidental takes under the MBTA." Dkt. 53 at 15-16. A favorable decision would thus likely reduce Plaintiffs' harms by reinstating industry's legal incentive to avoid killing birds. *See NRDC v. NHTSA*, 894 F.3d at 104 (relying on "[c]ommon sense and basic economics" to conclude that "the increased cost of unlawful conduct will make that conduct less common" (quotation omitted)). In addition, because the Audubon Plaintiffs and their members have "concrete interests" that are harmed by Defendants' actions, they have standing to pursue their procedural claim under NEPA "without meeting all the normal standards of redressability and immediacy." *Lujan*, 504 U.S. at 572 n.7.

---

[5] In addition to associational standing, some Plaintiffs also have organizational standing because the Jorjani Opinion has "perceptibly impaired" their conservation activities, *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 110 (2d Cir. 2017), by, among other things, forcing them to "divert[] resources" to other efforts, *NRDC v. Dep't of Interior*, -- F. Supp. 3d --, 2019 WL 4601722, at *5 (S.D.N.Y. Sept. 23, 2019); *see, e.g.*, O'Neill Decl. ¶¶ 6-8; O'Shea Decl. ¶¶ 12-16; Greenwald Decl. ¶¶ 5-8; Parr Decl. ¶¶ 3-15; Page Decl. ¶¶ 17-22.

## II.     The Jorjani Opinion misconstrues the MBTA

### A.      Second Circuit precedent controls the outcome of this case

First and foremost, the Jorjani Opinion must be set aside because it "runs headlong into Circuit precedent." *Mhany Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581, 616 (2d Cir. 2016). The Second Circuit held in *FMC Corp.*, 572 F.2d at 906-08, that the MBTA applies to non-purposeful killing of migratory birds. In that case, a pesticide manufacturer stored toxic wastewater in a pond that resulted in the deaths of dozens of birds. *Id.* at 904-05. The Second Circuit specifically rejected the argument—echoed by the Jorjani Opinion here—that the company was not liable because it "had no intention to kill birds" and "took no affirmative act to do so." *Id.* at 906. The court explained that the MBTA's text applies to more than intentional killings; the Act furthered the "important public policy" of "protecting migratory birds"; the company "did perform an affirmative act" by "engag[ing] in the manufacture of a pesticide known to be highly toxic"; and it then "failed to prevent this chemical from escaping into the pond and killing birds." *Id.* at 907-08. "This," the court held, was "sufficient to impose strict liability" under the MBTA. *Id.* at 908.

The Jorjani Opinion makes no attempt to reconcile its interpretation of the MBTA with the Second Circuit's holding. Nor could it. Defendants might now prefer to rely on decisions of other courts, *e.g., United States v. CITGO Petroleum Corp.*, 801 F.3d 477, 489-94 (5th Cir. 2015), but those decisions do not alter the binding nature of the Second Circuit's settled precedent here. *See World Wrestling Entm't, Inc. v. Jakks Pac., Inc.*, 425 F. Supp. 2d 484, 499 (S.D.N.Y. 2006) (stating that "this

18

Court cannot ignore binding Second Circuit precedent").[6] This should be the end of the matter because "the Second Circuit has spoken directly to the issue presented by this case, and this Court is required to follow that decision." *United States v. Diaz*, 122 F. Supp. 3d 165, 179 (S.D.N.Y. 2015), *aff'd*, 854 F.3d 197 (2d Cir. 2017).

### B.   The Act's plain language applies to killing birds "by any means and in any manner," and is not limited to purposeful killings

Even were it not foreclosed by binding precedent, the Jorjani Opinion's construction of the MBTA is mistaken. The Act's "broad and unqualified language," *Humane Soc'y*, 217 F.3d at 885, encompasses more than just purposeful killings.

"Paring the language of section 703 down to its essentials," *United States v. Corbin Farm Serv.*, 444 F. Supp. 510, 532 (E.D. Cal.), *aff'd,* 578 F.2d 259 (9th Cir. 1978), the MBTA applies broadly to the killing of "any migratory bird," "at any time," and "*by any means or in any manner*," 16 U.S.C. § 703(a) (emphasis added). The Act's "use of the broad language 'by any means or in any manner' belies the [Jorjani Opinion's] contention that Congress intended to limit the [Act's reach only] to those who hunted or captured migratory birds." *Corbin Farm*, 444 F. Supp. at

---

[6] Although it has no bearing on the outcome here, the Jorjani Opinion mistakenly suggests the Ninth Circuit has limited the MBTA's application to only purposeful killings. That is not so. *See, e.g.*, *Protect Our Cmtys. Found. v. Jewell*, 825 F.3d 571, 585-87 (9th Cir. 2016) (holding that, while the unauthorized incidental killing of birds by a private company is "contrary to the MBTA," a federal agency could not be sued for failing to prevent the company from engaging in such "unlawful action"); *Turtle Island Restoration Network v. Dep't of Commerce*, 878 F.3d 725, 733-35 (9th Cir. 2017) (analyzing MBTA incidental take permit, without suggesting such take is not covered by the Act). An earlier Ninth Circuit ruling held only that the MBTA does not prohibit the *indirect* take of migratory birds caused by habitat modification alone. *See Seattle Audubon Soc'y v. Evans*, 952 F.2d 297, 303 (9th Cir. 1991); *see also* AR44, 60, 66. The Jorjani Opinion, by contrast, unlawfully exempts the *direct* and foreseeable killing of birds, such as in toxic wastewater ponds.

19

532. Indeed, Congress emphasized the importance of this language when, in 1936, it added "by any means" to the phrase and moved it from later in the provision (where it arguably could have referred only to prohibited "export") to its current location, where it introduces and thus clearly applies to the entire list of prohibited acts. *See* Pub. L. No. 74-728, § 3, 49 Stat. 1555, 1556 (1936); *see also, e.g.*, *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 219-20 (2008) (highlighting the "expansive meaning" of "any," especially when repeated in a statutory provision). The Act's "expansive language," *Turtle Island*, 878 F.3d at 733, therefore encompasses the killing of migratory birds by industrial activities, such as oil and gas development, "even if the killing was not intentional," *N. Slope Borough v. Andrus*, 486 F. Supp. 332, 361-62 (D.D.C.), *rev'd in part on other grounds,* 642 F.2d 589 (D.C. Cir. 1980).

The Act's application to more than only purposeful killings is also clear from the notable omission of any "purpose" requirement in section 703. *See United States v. Apollo Energies, Inc.*, 611 F.3d 679, 684-86 (10th Cir. 2010) ("[A] plain reading of § 703's text [does] not require any particular state of mind or scienter."). That is, "in drafting the MBTA, Congress did not include any language that would suggest it intended to punish only those who act with specific motives." *United States v. Moon Lake Elec. Ass'n*, 45 F. Supp. 2d 1070, 1075 (D. Colo. 1999). Numerous courts have therefore recognized that it is a "basic feature of the MBTA that no evidence of intent is required to prove a misdemeanor violation of the Act." *United States v. Boynton*, 63 F.3d 337, 344 (4th Cir. 1995); *see also, e.g.*, *Fund for Animals*, 365 F.

Supp. 2d at 408 (noting that the MBTA "establishes strict liability for individuals responsible for the death of protected birds" (citing *FMC Corp.*, 572 F.2d at 907-08)).

By contrast, when Congress has meant to limit wildlife provisions to only purposeful activity, it has done so expressly. *See Allard*, 444 U.S. at 62 (consulting "[o]ther conservation legislation enacted by Congress" to help construe the MBTA). Such provisions include the MBTA's own baiting prohibition, *see* 16 U.S.C. § 704(b)(2) (making it unlawful to bait an area "*for the purpose of* causing, inducing, or allowing any person to take or attempt to take any migratory game bird" (emphasis added)); as well as provisions of other statutes, like the Airborne Hunting Act, *see* 16 U.S.C. § 742j-l(a)(1) (prohibiting person from shooting from an aircraft "*for the purpose of* capturing or killing any bird, fish, or other animal" (emphasis added)). The Jorjani Opinion's attempt to insert a purposeful killing or take requirement into the text of section 703 is thus "particularly inappropriate when, as here, Congress has shown that it knows how to adopt the omitted language or provision," yet has declined to do so in the statutory provision at issue. *Rotkiske v. Klemm*, 140 S. Ct. 355, 361 (2019); *see also EEOC v. Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. 2028, 2032-33 (2015) (finding it "significant" that Title VII "does not impose a knowledge requirement," while other antidiscrimination statutes do).

Indeed, Congress has not limited the MBTA's general prohibition or misdemeanor penalty provision to only purposeful killings "even though it has amended the statute on several occasions." *Allard*, 444 U.S. at 62. As Defendants have previously acknowledged, these amendments "strongly support the

interpretation that the MBTA's prohibitions apply to incidental take." AR53. In 1986 and 1998, Congress added specific *mens rea* requirements to the Act's felony provision and baiting prohibition. *See* Pub. L. No. 99-645, § 501, 100 Stat. at 3590 (codified at 16 U.S.C. § 707(b)); Pub. L. No. 105-312, § 102, 112 Stat. at 2956 (codified at 16 U.S.C. § 704(b)). But on both occasions, Congress deliberately left the scope of the Act's general prohibition and misdemeanor penalty provision as is. A Senate Report accompanying the 1986 amendment made clear that "[n]othing in th[at] amendment [wa]s intended to alter the 'strict liability' standard for misdemeanor" violations, which, the Report noted, had "been upheld in many Federal court decisions." S. Rep. No. 99-445, at 16 (1986); *see also* S. Rep. No. 105-366, at 2-3 (1998) (describing strict liability as a "hallmark of the law").

It is therefore "particularly relevant that Congress has twice reviewed and amended the statute without rejecting the Department's view"—consistently held at those times—that the MBTA applied to non-purposeful killings. *Allard*, 444 U.S. at 57 (construing MBTA's prohibition on commercial transaction in bird parts); *see Humane Soc'y*, 217 F.3d at 887 (looking to the prior, "longstanding conclusion of the Department of the Interior" when interpreting the MBTA, notwithstanding that the agency had since "changed its mind"). The "consistency of the [Interior's] prior position" provides "important context" to Congress's MBTA amendments, and "bolsters the conclusion" that the Act extends beyond purposeful killings. *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 157 (2000). That Congress did not limit the MBTA's general prohibition to only purposeful killings when adding

*mens rea* requirements to other provisions is "persuasive evidence that [Interior's prior] interpretation is the one intended by Congress." *CFTC v. Schor*, 478 U.S. 833, 846 (1986) (quoting *NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 274-75 (1974)).

The Jorjani Opinion tries to avoid the import of these MBTA amendments by asserting that the purposeful killing requirement it reads into the statute derives from the "*actus rea* [sic]." AR22-23. But the Jorjani Opinion's attempt to conflate the *actus reus* and *mens rea* elements is incorrect. As the Second Circuit has explained, non-purposeful killings can and do involve "an affirmative act"—for example, the pesticide manufacturer in *FMC Corp.* "engaged in the manufacture of a pesticide known to be highly toxic." 572 F.2d at 907. It then also "failed to prevent this chemical from escaping into the pond and killing birds." *Id.* at 908. And this was "sufficient to impose strict liability" under the MBTA. *Id.* Thus, while some "voluntary" act may generally be required for criminal liability, AR22-23, "it does not follow that every act up to the moment that the harm is caused must be voluntary" as well, Wayne R. LaFave, Substantive Crim. L. § 6.1(c) (3d ed.).

In any event, the Jorjani Opinion's interpretation *does* turn on *mens rea*, rather than the *actus reus*, because it makes liability for the very same activity (e.g., pressure-washing swallow nests off a bridge, or lighting a fire that kills chimney swifts) turn solely on the actor's "subjective purpose"—that is, the actor's mental state. AR82. Thus, under the Jorjani Opinion, a painting company that knowingly kills swallows by pressure-washing nests off a bridge *is* subject to the Act if the company's "intent" was to remove the nests prior to painting, but *not* if the

company's "intent" was to paint the bridge. AR82. The Jorjani Opinion therefore "requir[es] proof of the subjective intent" of the company, a mental-statement requirement that "would stymie enforcement of the MBTA," *Boynton*, 63 F.3d at 344—just as the Jorjani Opinion itself apparently intended. *See supra* at 15.

The Jorjani Opinion also tries to narrow the MBTA's expansive language by relying primarily on a dissent that interpreted a different statute (the Endangered Species Act) and discussed the common-law meaning of "take." *See* AR20-22. But the Jorjani Opinion's focus on "take" ignores the plain meaning of the term "kill," which—as Defendants previously recognized—"lacks any connotation in common law as being restricted to hunting or intentional conduct." AR50; *see* AR19 (noting that "kill" "may refer to active or passive conduct"), 1403 (dictionary defining "kill"), 1706 (same). Indeed, the *majority* opinion in the case on which the Jorjani Opinion relies explained that a developer might "kill" an animal (and thereby violate the Endangered Species Act), irrespective of its motives or the common law meaning of "take." *Babbitt v. Sweet Home Chapter of Cmtys.*, 515 U.S. 687, 701 n.15 (1995).[7]

Finally, invoking the canon of *noscitur a sociis*—the notion that "a word may be known by the company it keeps," *Russell Motor Car Co. v. United States*, 261 U.S. 514, 519 (1923)—the Jorjani Opinion contends that "kill" must refer only to

---

[7] That majority also rejected importing any "requirement of intent or purpose into the words used to define 'take'" under the Endangered Species Act. *Sweet Home*, 515 U.S. at 701. Under the MBTA, too, Interior's regulatory definition of "take," 50 C.F.R. § 10.12, has been read to encompass "both 'intentional' and 'unintentional' take," including "take that results from, but is not the purpose of, the activity in question," Exec. Order 13186, § 2(a)-(c), 66 Fed. Reg. 3853 (Jan. 10, 2001).

24

affirmative and purposeful action because of other verbs that Congress used in the provision, such as "hunt" and "capture." AR19-20. But, as the Supreme Court has instructed, the canon should not be invoked to "rob any [term] of its independent and ordinary significance." *Graham Cty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 288 (2010) (quotations omitted). The term at issue here "contains little ambiguity"—"to 'kill' is 'to deprive of life'"—and thus "should be read according to [its] ordinary meaning." *United States v. Stevens*, 559 U.S. 460, 474-75 (2010). This is especially so given that Congress introduced the expansive list of verbs in section 703 with the extraordinarily broad phrase "by any means or in any manner," 16 U.S.C. § 703(a), which indicates that the MBTA "sweeps as broadly as its language suggests," *Ali*, 552 U.S. at 226 (rejecting use of *noscitur a sociis* canon); *see Causse Mfg. Co. v. United States*, 151 F. 4, 6 (2d Cir. 1906) (noting the court was "not impressed with the argument that the words '… in any manner' are to be limited upon the rule *noscitur a sociis*" (italics added)). Thus, by encompassing "the act of 'killing' in addition to the acts of hunting [and] capturing," the Act's plain language illustrates "that Congress intended to prohibit conduct beyond that normally exhibited by hunters and poachers." *Moon Lake*, 45 F. Supp. 2d at 107.

## C.    Related statutes confirm the Act's broad reach

As the Supreme Court has explained in construing the MBTA, "[r]elated statutes may sometimes shed light upon a previous enactment." *Allard*, 444 U.S. at 62 (citing *United States v. Aluminum Co.*, 148 F.2d 416, 429 (2d Cir. 1945) (L. Hand, J.)). Here, Congress has enacted "several statutes" over the past three decades that confirm the MBTA applies to more than only purposeful killings and,

like the amendments described above, "effectively ratified" the Department's

"previous position." *Brown & Williamson*, 529 U.S. at 155-56.

For example, Congress in 2002 made clear that the MBTA applies to non-purposeful killings when it expressly addressed incidental take by military-readiness activities. *See* Pub. L. No. 107-314, § 315, 116 Stat. at 2509. Earlier that year, a district court had held that the Defense Department was violating the MBTA by killing migratory birds during live-fire training exercises on an island in the Pacific, *Ctr. for Biological Diversity v. Pirie*, 191 F. Supp. 2d 161, 173-75 (D.D.C. 2002), and it enjoined those activities, 201 F. Supp. 2d 113, 123 (D.D.C. 2002), *vacated as moot sub nom. Ctr. for Biological Diversity v. England*, 2003 WL 179848 (D.C. Cir. Jan. 23, 2003). Congress did *not* respond by asserting that the non-purposeful killing fell outside the scope of the MBTA, nor by permanently excluding those killings from the Act's reach. Instead, Congress passed a law providing only that the MBTA *temporarily* would not apply to non-purposeful killing of birds during military-readiness activities, while Interior promulgated regulations to authorize such incidental take. Pub. L. No. 107-314, § 315(a), (c)-(d), 116 Stat. at 2509.[8] Those 2007 regulations, *see* 72 Fed. Reg. 8931 (Feb. 28, 2007), impose conservation obligations on the military and allow Interior to suspend or withdraw the incidental take authorization in certain circumstances. *See* 50 C.F.R. § 21.15.

---

[8] Notably, Congress also did not extend the temporary exemption to *non-readiness* military activities—e.g., the "routine operation of installation operating support functions, such as administrative offices, military exchanges, commissaries, [and] water treatment facilities." Pub. L. No. 107-314, § 315(f)(2)(A), 116 Stat. at 2509. Congress instead chose to leave those activities subject to the MBTA's prohibitions.

This related statute forecloses the Jorjani Opinion's view that the MBTA applies only to purposeful killings. Congress specifically directed Interior to exercise its "authority … *under section 3(a) of the Migratory Bird Treaty Act* (16 U.S.C. 704(a)) to prescribe regulations to exempt the Armed Forces for the incidental taking of migratory birds." Pub. L. No. 107-314, § 315(d), 116 Stat. at 2509 (emphasis added). If the Jorjani Opinion's interpretation of the MBTA were correct, however, Interior would have no such authority under the Act. *Cf. Andrus v. Shell Oil Co.*, 446 U.S. 657, 672 (1980) (rejecting interpretation of a statute that would "virtually nullify [a later] action of Congress"). Thus, as Defendants previously recognized, this 2002 statute "would make no sense if the scope of the [MBTA] was as narrow as [the Jorjani Opinion is now] arguing." AR70; *cf. Sweet Home*, 515 U.S. at 700-01 (statutory amendment allowing Secretary to authorize incidental take supported interpretation that such take was prohibited without authorization).[9]

The Jorjani Opinion does not explain how its MBTA interpretation is consistent with Congress's 2002 enactment. It says only that Congress did not "act to expand the reach of the MBTA." AR31. But that misses the point entirely. The 2002 statute confirms Congress's understanding that the MBTA *already reached* incidental killings—which is why Congress directed the Secretary to promulgate

---

[9] The Jorjani Opinion also ignores another related statute that temporarily authorized the "take of nesting swallows" to facilitate bridge transportation projects and also directed Interior to "promulgate a regulation under the authority of section 3 of the Migratory Bird Treaty Act (16 U.S.C. 704) authorizing [such] take." Pub. L. No. 114-94, § 1439, 129 Stat. 1312, 1433 (2015). Once again, Interior would lack such authority under the Jorjani Opinion's construction of the MBTA because any take that resulted would presumably be "for the purpose" of bridge maintenance.

regulations *under the MBTA* to authorize some (but not all) incidental take by the military. *See* AR70 (recognizing that this "later legislation did not change the scope of the [MBTA], but rather … helped to clarify [its] proper interpretation"). The Service thus explained, in promulgating those regulations, that they were "authorized by the MBTA," "[e]ven in the absence of the [2002 statute]." 72 Fed. Reg. at 8946. Moreover, both the Interior and Defense Departments have since confirmed that the MBTA military-readiness regulation remains in effect. *See* AR84, 613. Indeed, because that regulation "was the result of Congress's direction to the Secretary of the Interior to prescribe regulations," the Service has acknowledged that "the Secretary could only withdraw the rule if directed to do so through subsequent legislation." AR84.

This means that the U.S. Armed Forces remains subject to protective regulation for the incidental take of migratory birds from military-readiness activities, and must "implement appropriate conservation measures to minimize or mitigate [any] significant adverse effects," 50 C.F.R. § 21.15(a)(1), while—because of the Jorjani Opinion—oil and gas developers may freely kill many more migratory birds without legal scrutiny or any fear of liability. The Jorjani Opinion never explains why Congress would have intended this bizarre result. Its interpretation of the MBTA therefore fails the "classic judicial task of reconciling many laws enacted over time, and getting them to 'make sense' in combination." *Brown & Williamson*, 529 U.S. at 143 (quoting *United States v. Fausto*, 484 U.S. 439, 453 (1988)).

In addition, Congress in 1988 reaffirmed that the MBTA imposed conservation responsibilities on Interior beyond regulating hunting and poaching. Congress directed Interior to fulfill its "responsibilities to conserve migratory nongame birds under existing authorities provided by the Migratory Bird Treaty Act," by, among other things, identifying the "effects of environmental changes and human activities" on such birds and identifying conservation measures to prevent them from becoming endangered. Pub. L. No. 100-653, § 802, 102 Stat. 3825, 3833 (1988). Congress repeated this directive the following year. *See* Pub. L. No. 101-233, § 2(a)(10), 103 Stat. 1968, 1968 (1989) (codified at 16 U.S.C. § 4401(a)(10)).

Congress in 1989 also directed that MBTA penalties and fines go toward wetlands conservation projects. *See id.* § 7(b), 103 Stat. at 1974-75 (codified at 16 U.S.C. § 4406(b)). Congress clearly contemplated that these fines would encompass non-purposeful killings because, at the time, the federal government was collecting MBTA penalties from incidental take by oil companies and pesticide manufacturers. *See supra* at 5-6; AR1362-64.  In fact, Congress enacted the provision only a few months after the Exxon Valdez oil spill—an "ecological disaster" invoked by one of the statute's sponsors when introducing the bill. *See* 135 Cong. Rec. S4014-02, S4019-20, 101st Cong., 1st Sess. (1989) (statement of Sen. Reid). That oil spill, which killed hundreds of thousands of migratory birds, led to seven-figure MBTA fines deposited into the congressionally created wetlands fund. *See* Plea Agreement ¶ III.E, *United States v. Exxon Corp.*, No. A90-015 CR (HRH) (D. Alaska Sept. 30, 1991). In the decades that followed, MBTA fines for industrial activities that

29

incidentally killed migratory birds continued to fund important wetlands restoration projects throughout North America, as Congress had intended.[10] The Jorjani Opinion then improperly halted that funding by eliminating all such fines.

In short, the 2002 statute, considered alone or alongside other "actions by Congress over the past 35 years," effectively "preclude[s] an interpretation" that the MBTA applies only to purposeful killings. *Brown & Williamson*, 529 U.S. at 155.

**D.    The Jorjani Opinion contravenes the Act's protective purpose**

The Jorjani Opinion's interpretation of the MBTA also contravenes the Act's overriding purpose of protecting migratory birds. The MBTA is a "conservation statute[] designed to prevent the destruction" of migratory birds. *Allard*, 444 U.S. at 52-53. Congress enacted the MBTA to implement a treaty "*for the protection of migratory bird*s." Act of July 3, 1918, ch. 128, 40 Stat. 755 (emphasis added). This treaty recognized that many bird species were in danger of extinction "through lack of adequate protection," and resolved to adopt a "uniform system of protection" to ensure the "preservation of such migratory birds." Canada Convention, 39 Stat. at 1702. As noted above (*supra* at 3), the Supreme Court described this purpose as a "national interest of very nearly the first magnitude." *Missouri*, 252 U.S. at 435.

Because "protection of migratory birds" is the stated purpose of the MBTA, it flies in the face of the statutory design to interpret the Act in a manner that allows

---

[10] *See, e.g.*, Press Release, U.S. Fish & Wildlife Serv., BP Deepwater Horizon Oil Spill Settlement Funds Migrate North (Apr. 27, 2015), https://bit.ly/2M9TGoJ; Press Release, U.S. Dep't of Justice, Exxon-Mobil Pleads Guilty to Killing Migratory Birds in Five States (Aug. 13, 2009), https://bit.ly/2ECUqOF; U.S. Fish & Wildlife Serv., N. Am. Wetlands Conservation Act, Biennial Reports, https://bit.ly/30pNFtW.

companies to indiscriminately kill large numbers of birds without fear of liability, especially when modest steps can be taken to avoid or minimize those bird deaths. *Cf.* 80 Fed. Reg. at 30,034 (acknowledging the Service has a "legal responsibility under the MBTA … to promote the conservation of migratory bird populations"). That is why, as correctly construed by Defendants for decades, the MBTA provides companies with a legal incentive to implement measures to protect birds.

The irrationality of the Jorjani Opinion's contrary interpretation is manifest in its application to migratory bird nests. The Service has explained that, because of the Jorjani Opinion, a person or entity can now *knowingly* "destroy an active nest while conducting any activity where the intent of the action is not to kill migratory birds or destroy their nests." AR88. But, according to the Service, that same actor generally "*cannot* … take reasonable protective actions (such as removing eggs and chicks prior to nest destruction or relocating nests) without first obtaining authorization to do so." AR88 (emphasis added). Accordingly, under the Jorjani Opinion's interpretation of the MBTA, a company could face liability for trying to *protect* fledgling birds in an active nest, but not for killing those same birds by knowingly destroying their nest. The Opinion never explains how these perverse incentives can be harmonized with the Act's protective purpose.

Instead, the Jorjani Opinion tries to justify its interpretation by suggesting that the Act's "*[o]riginal* [p]urpose" was to "[r]egulate [o]verhunting." AR24-29 (emphasis added). But that some members of Congress may have been "primarily concerned" with overhunting in 1918 "does not … indicate that hunting was

31

[Congress's] sole concern" at that time. *Corbin Farm*, 444 F. Supp. at 532; *see Moon Lake*, 45 F. Supp. 2d at 1080-82 (noting the "legislative history also suggests … that Congress intended the MBTA to regulate more than just hunting and poaching," and citing examples). "[S]tatutory prohibitions often go beyond the principal evil" that concerned Congress when it enacted the statute. *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 79 (1998). And "it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed." *Id.*

Thus, even if overhunting was a major concern of Congress, the expansive language and protective purpose of the MBTA naturally and unavoidably apply just the same to other threats—such as pesticide applications, communication towers, and oil and gas development—that emerged in the ensuing decades. *See* AR900. Even if these threats "did not exist, or were not so prevalent," in 1918, "the purpose of the [MBTA's] prohibitions remains exactly the same—preservation of migratory birds." Larry Martin Corcoran & Elinor Colbourn, *Shocked, Crushed and Poisoned: Criminal Enforcement in Non-Hunting Cases Under the Migratory Bird Treaties*, 77 Denv. U. L. Rev. 359, 401 (1999); *accord* AR615. Moreover, "that a statute can be applied in situations not expressly anticipated by Congress does not demonstrate ambiguity." *Massachusetts v. EPA*, 549 U.S. 497, 532 (2007) (quoting *Penn. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998)). "It demonstrates breadth." *Id.*

Further, Congress amended the MBTA several times after 1918 to incorporate subsequent treaty obligations designed to address industrial activities that kill birds in large numbers. *See supra* at 3; *see also, e.g.*, 72 Fed. Reg. at 8946

("The Japan and Russia treaties each call for implementing legislation that broadly prohibits the take of migratory birds."). As Defendants previously recognized, it is clear that "Congress viewed the MBTA as sufficiently broad in scope to allow implementation of the[se] later conventions" because it "amend[ed] the MBTA to include references to them, without expanding the MBTA's prohibitions." AR54.

Indeed, the United States and Canada affirmed, via a formal diplomatic exchange in 2008, that their treaty obligations extend to managing incidental take caused by "mining" and "oil and gas exploration," which had "increasingly become a concern for the long-term conservation of migratory bird populations." AR1380-81. The Jorjani Opinion wrongly suggests that Canada's view about the treaty's scope "says nothing" about the MBTA's meaning. *Compare* AR30, *with Humane Soc'y*, 217 F.3d at 887 (looking to Canada's understanding of the migratory bird treaty and its implementing legislation as an aid to interpret the MBTA), *and Allard*, 444 U.S. at 61 & n.16 (similar).[11] And the Jorjani Opinion also wrongly asserts that the "United States did not respond" to Canada's diplomatic note. AR30. In fact, the United States provided an "affirmative reply" to Canada about a week later, confirming the countries' "mutually held interpretation." AR888; *accord* AR615.

---

[11] Canada has also enacted implementing legislation regulating non-purposeful killing of migratory birds. *See, e.g.*, Migratory Birds Convention Act, S.C. 1994, c. 22, s. 5.1 (Can.); *R. v. Syncrude Canada Ltd.*, 2010 ABPC 229 (Can.) (tar sands company violated statute by depositing petroleum liquid in a wastewater pond that killed several hundred migratory birds); *R. v. J.D. Irving, Ltd.*, 2008 CarswellNB 322 (Can.) (WL) (affirming statute's application to incidental take) (AR1696-1704).

**E.    Proximate cause and the agency's regulatory authority resolve any purported concerns about the Act's scope**

Finally, the Jorjani Opinion tries to justify its "narrower construction of the MBTA" by invoking purported "grave constitutional infirmities" with its prior, longstanding interpretation. AR32-34. But "section 703's clear and precise language" is "neither vague nor overbroad." *United States v. Smith*, 29 F.3d 270, 273 (7th Cir. 1994); *see Apollo Energies*, 611 F.3d at 688-89 ("The MBTA is not unconstitutionally vague."). The Service's history of enforcing the MBTA over the last four decades also demonstrates that its prior interpretation resulted in neither "[v]irtually [u]nlimited" liability nor any "absurd results." AR33-35; *cf. Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494-95 (1982) (explaining that a statute is facially vague or overbroad only if it is "impermissibly vague in all of its applications" or reaches a "substantial amount of constitutionally protected conduct"). "While the MBTA's scope, like any statute," may "test the far reaches in application," *Apollo Energies*, 611 F.3d at 686, that does not give license to deviate from the Act's plain text and purpose.

In any event, judicially recognized limitations on MBTA liability further render the Jorjani Opinion's purported concerns of little, if any, real-world consequence. First, "proximate cause is an 'important and inherent limiting feature' to the MBTA." *Id.* at 690 (quoting *Moon Lake*, 45 F. Supp. at 1085); *see also Paroline v. United States*, 572 U.S. 434, 446 (2014) (noting that proximate cause is a "standard aspect of causation in criminal law"); *Sweet Home*, 515 U.S. at 696 n.9, 700 n.13 (Endangered Species Act take prohibition incorporates "ordinary

34

requirements of proximate causation and foreseeability"); *id.* at 712-13 (O'Connor, J., concurring) (same). Under the MBTA, then, the government must prove that migratory bird deaths were "reasonably anticipated or foreseen as a natural consequence" of the activity at issue. *Apollo Energies*, 611 F.3d at 690 (quoting Black's Law Dictionary (6th ed. 1990)). If prosecutors cannot prove proximate cause beyond a reasonable doubt, there can be no MBTA liability. *See id.* at 691 (reversing MBTA count where defendant lacked notice that his oil equipment would kill migratory birds); *see also* LaFave, Substantive Criminal Law § 6.4(j). Thus, the Service has "been careful to bring enforcement actions only in limited circumstances, such as when an entity has been repeatedly warned of [the problem] and has refused to take available measures to minimize it." AR901; *see* AR97.

Second, Interior's authority to promulgate regulations permitting the take or kill of migratory birds under the MBTA can resolve any remaining practical concerns about the scope of potential liability. *Cf. Vill. of Hoffman Estates*, 455 U.S. at 504 (noting that a party "may adopt administrative regulations" that will "suffice to clarify a standard with an otherwise uncertain scope"). "The § 703 prohibition is, by its own terms, subject to regulatory exception." *Allard*, 444 U.S. at 60 n.12. "The one exception to the prohibition is in the opening clause—'Unless and except as permitted by regulations made as hereinafter provided in this subchapter ....'" *Humane Soc'y*, 217 F.3d at 885 (quoting 16 U.S.C. § 703(a)). The very next provision of the MBTA authorizes Interior "to determine when, to what extent, if at all, and by what means" takings may occur, and "to adopt suitable regulations permitting

35

and governing the same." 16 U.S.C. § 704(a); *see Fund for Animals*, 538 F.3d at 132. Thus, while "the MBTA initially sets forth a sweeping prohibition" against killing migratory birds, it "was written in contemplation of modifying … regulations." Corcoran & Colbourn, 77 Denv. U. L. Rev. at 370. Or, as the Service has explained, "[t]he MBTA regulates, rather than absolutely forbids, take of migratory birds." 72 Fed. Reg. at 8934. The Act's prohibition of *unauthorized* incidental take therefore expressly contemplates that Interior may promulgate regulations authorizing such take in appropriate circumstances—as it has in the past. *See supra* at 6-7.

Indeed, as described above (*supra* at 7), the Service in 2015 announced its intent to develop a program regulating incidental take under the MBTA. *See* 80 Fed. Reg. at 30,034-35. The Jorjani Opinion does not dispute that such regulations could reasonably address any genuine concerns about the Act's application to incidental take. *Cf. Turtle Island*, 878 F.3d at 745 & n.4 (Callahan, J., dissenting) (observing that the "comprehensive regulation governing incidental take" envisioned in 2015 "could set forth uniform criteria for issuing permits, thereby offering predictability for the regulated and environmental communities"). The Jorjani Opinion observes, instead, that no generally applicable regulations have issued to date. AR37. But it does not explain why Defendants did not simply follow through with the 2015 rulemaking, instead of issuing an Opinion eviscerating the Act and its protective purpose. In fact, the Service explained later that it abandoned those regulations "[d]ue to the issuance of the [Jorjani] Opinion." 83 Fed. Reg. 24,080 (May 24, 2018).

36

Simply put, "[r]easonable regulation by the Secretary, in conjunction with …
requiring the prosecution to prove proximate cause beyond a reasonable doubt …,
can effectively avoid [any purportedly] absurd and unintended results." *Moon Lake*,
45 F. Supp. 2d at 1085. Thus, recognizing that Interior may regulate and, where
appropriate, authorize incidental take is a far more reasonable construction of the
MBTA than the Jorjani Opinion's attempt to limit the Act to only purposeful
killings. Indeed, Congress itself directed Interior to promulgate regulations under
the MBTA authorizing incidental take from military-readiness activities, rather
than simply excluding that take from the MBTA's reach altogether. *See* Pub. L. No.
107-314, § 315(d), 116 Stat. at 2509. But the Jorjani Opinion's interpretation of the
MBTA negates the very statutory authority that Congress directed Interior to
exercise. And it leaves the avoidable killing of migratory birds by industrial
activities like oil and gas production outside the reach of Interior's regulatory
authority altogether. That counterintuitive construction contravenes the Act's plain
text and purpose. It should be "h[e]ld unlawful and set aside" as "arbitrary,
capricious, … or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

## III.   Defendants violated NEPA

The Jorjani Opinion and FWS Guidance are also procedurally invalid under
NEPA because Defendants failed to undertake even a cursory analysis of their
environmental impacts before issuing them. NEPA is a "procedural statute that
mandates a process rather than a particular result." *Stewart Park & Reserve Coal.,
Inc. v. Slater*, 352 F.3d 545, 557 (2d Cir. 2003). It requires that an agency "withhold
its decision to proceed with an action until it has taken a 'hard look' at the

environmental consequences." *Id.* (quoting *Sierra Club v. U.S. Army Corps of Eng'rs*, 701 F.2d 1011, 1029 (2d Cir. 1983)); *see Constitution Pipeline Co., LLC v. N.Y. State Dep't of Envtl. Conservation*, 868 F.3d 87, 100 (2d Cir. 2017) (explaining that "'through a set of action-forcing procedures,' NEPA 'require[s] that agencies take a hard look at environmental consequences'" of a planned course of action (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989))).

Specifically, NEPA "requires federal agencies 'to the fullest extent possible' to prepare an environmental impact statement (EIS) for every 'recommendation or report on proposals for legislation and other major Federal actio[n] significantly affecting the quality of the human environment.'" *Monsanto Co. v. Geerston Seed Farms*, 561 U.S. 139, 145 (2013) (quoting 42 U.S.C. § 4332(2)(C)). To determine whether an action has sufficiently significant impacts to warrant an EIS, an agency may prepare an Environmental Assessment (EA). 40 C.F.R. § 1508.9. The only federal actions that may avoid analysis in an EIS or EA are those properly subject to a "categorical exclusion," which is a "category of actions which do not individually or cumulatively have a significant effect" on the environment. *Id.* § 1508.4.

An agency fulfills its "hard look" obligation under NEPA when it has "adequately considered and disclosed the environmental impact of its actions" in an EIS or an EA that addresses whether to prepare an EIS. *Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 98 (1983). And, "because NEPA provides a procedural framework within which such judgments must be made, courts are responsible for

ensuring that agencies comply with the statutory duty imposed on them by Congress." *Nat'l Audubon Soc'y v. Hoffman*, 132 F.3d 7, 14 (2d Cir. 1997).

The Jorjani Opinion will have significant environmental consequences, yet Defendants prepared *no* NEPA document addressing it. They failed to take a "hard look"—or any look at all—at the environmental implications of either the Jorjani Opinion or the FWS Guidance implementing it. They gave not a moment's thought to NEPA compliance before taking actions reversing decades of prior agency practice and policy designed to safeguard migratory birds from industry practices that foreseeably kill large numbers of birds. It is hard to conceive of a more flagrant flouting of the "action-forcing process mandated by NEPA." *Id.* at 13.

Although the Court need only find that it was unlawful for Defendants to fail to engage in any NEPA compliance at all, their momentous change in practice and policy cries out for a comprehensive EIS. An EIS is required for every "major [f]ederal action[] significantly affecting the environment," 42 U.S.C. § 4332(2)(C), and the NEPA implementing regulations issued by the Council on Environmental Quality broadly define a "major federal action" to include agency "plans, policies, or procedures," including plans "prepared or approved by federal agencies which guide or prescribe alternative uses of Federal resources, upon which future agency actions will be based," 40 C.F.R. §§ 1508.18(a), (b)(2). The regulations further define "major federal action" to encompass the "[a]doption of official policy," including "formal documents establishing an agency's policies which will result in or substantially alter agency programs." *Id.* § 1508.18(b)(1). These definitions clearly encompass the

39

Jorjani Opinion and FWS Guidance, which delineate "plans, policies, or procedures" and have already "result[ed] in or substantially alter[ed] agency programs."

Further, Interior's own NEPA regulations mandate that the environmental consequences of Solicitor's Office "legal opinions" must be analyzed in an EIS when they have either "significant impacts on … *migratory birds*"; "highly controversial environmental effects"; or "highly uncertain and potentially significant effects." 43 C.F.R. §§ 46.205(c)(1), 46.210(d), 46.215(b), (c), (d) (emphasis added). All of these criteria are met here. Consequently, the Audubon Plaintiffs are entitled to summary judgment on their claim that Defendants' actions violated NEPA and were thus "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

## CONCLUSION

The Court should grant Environmental Plaintiffs' motion for summary judgment and set aside the Jorjani Opinion and FWS Guidance as unlawful.

Respectfully submitted,

*/s/ Eric R. Glitzenstein*
Eric R. Glitzenstein
Center for Biological Diversity
1411 K Street, N.W., Suite 1300
Washington, DC 20005
(202) 849-8401
eglitzenstein@biologicaldiversity.org

*/s/ Ethan I. Strell*
Ethan I. Strell
Lorraine Sciarra
National Audubon Society
225 Varick St.
New York, NY 10014
(212) 979-3000
estrell@audubon.org
lsciarra@audubon.org

*/s/ Ian Fein*
Ian Fein
Mary Katherine Umekubo
Gonzalo E. Rodriguez
Natural Resources Defense Council
111 Sutter Street, 21st Floor
San Francisco, CA 94104
(415) 875-6100
ifein@nrdc.org
kumekubo@nrdc.org
grodriguez@nrdc.org

<u>*/s/ Jason C. Rylander*</u>
Jason C. Rylander
Defenders of Wildlife
1130 17th Street, N.W.
Washington, DC 20036
(202) 772-3245
jrylander@defenders.org

William F. Sheehan
Vice President and General Counsel
American Bird Conservancy
4301 Connecticut Ave., N.W.
Washington, DC 20008
(202) 234-7181
wsheehan123@gmail.com

*Counsel for Audubon Plaintiffs*

Mitchell S. Bernard
Natural Resources Defense Council
40 West 20th Street, 11th Floor
New York, NY 10011
(212) 727-4469
mbernard@nrdc.org

*Counsel for NRDC Plaintiffs*

January 17, 2020