IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL, INC., et al., | ) ) ) ) | 18-CV-4596 (VEC) |
| Plaintiffs, | ) ) |  |
| v. | ) ) | *consolidated with* |
| U.S. DEPARTMENT OF THE INTERIOR, et al., | ) ) ) | 18-CV-4601 (VEC) 18-CV-8084 (VEC) |
| Defendants. | ) ) ) |  |

**DECLARATION OF DANIEL A. HENGEL**

I, Daniel A. Hengel, declare as follows:

1. I am resident of Buffalo, Wyoming. I am 59 years old.

2. I have been a member of NRDC since January 2018. I became a member of NRDC because I believe that our natural resources are under attack, and governmental agencies previously trusted to protect the country's natural resources are now focused on weakening important environmental protections.

3. I hold a Bachelor of Science in Wildlife and Fisheries Science from South Dakota State University, and a Master of Science in Zoology and Physiology from the University of Wyoming. I also spent five years working on a PhD in Rangeland Ecology and Watershed Management at the University of Wyoming.

4. I am an avid birder. I love the outdoors and try to spend as much time as I can enjoying nature, whether birding, hiking, or hunting. For this reason, I

1

pursued a professional career that allowed many years of working and researching avian species outdoors

5. I became interested in birds over 50 years ago as a young kid in Eagle Butte, South Dakota. My passion for birding was greatly enhanced while a United States Peace Corps volunteer in Nepal, where I found a guidebook to Nepalese birds and began checking off species as I came upon them. As my deep interest in birding grew, it became less about checking off species and more about watching and listening to birds and observing their interactions across species.

6. One of my favorite things to do is to start the day with an early morning hike along Clear Creek as it meanders through Buffalo. The bursting of bird calls as the sun rises the singing of thrushes, sparrows, the occasional warbler, and blue jays is the best alarm clock to welcome a new day. Many of these birds are neotropical migrators, and I look forward to every fall, as they begin their southward journey to their winter homes, and their return in the spring.

7. Also, the region where I grew up is in the Central Flyway, on the migration path of the snow goose. The annual spring snow goose migration is something that I have fond memories of and I try to get back to South Dakota each year to witness "the harbingers of spring!" The annual spring migration should be experienced by everyone; seeing, and hearing, the large number of migrating geese is simply incredible.

8. I have worked for nearly thirty years as a consultant on energy projects to help ensure their compliance with environmental statutes, such as the Migratory Bird Treaty Act (MBTA), the National Environmental Policy Act (NEPA), and the Endangered Species Act (ESA).

9. In 2013, I founded a company, E3, LLC, to provide consulting services for energy development projects throughout Wyoming and South Dakota. I am the owner and operator of the company.

10. As an energy consultant, I have often worked on oil and gas pipeline projects and high-voltage transmission line projects. These projects typically require clearing a right-of-way (ROW) to dig trenches for the pipelines or to construct steel or wooden structures to support conductors. Clearing the ROW often involves mowing hundreds of miles of grasslands or shrublands and cutting down trees. Many of these pipelines are built across areas that are frequently occupied by bird species protected under the MBTA.

11. Because clearing a right of way can result in the incidental take of nests and nestlings of bird species protected by the MBTA, project developers often hired consultants, like me, to help them avoid incidental take liability under the Act. To protect project proponents' permits and reduce potential liability under the Act, I, and teams of professional biologists that I managed, typically surveyed the project area and buffer zones to ensure that no active nests existed in places that needed to be mowed, or disturbed, prior to construction activities. If upon surveying the site I determined that the area to be cleared did not contain any active nests,

the area would be cleared shortly thereafter to eliminate the possibility of protected bird species building nests during the time between surveying and clearing activity. If active nests were found, I would designate buffer zones, following US Fish and Wildlife Service (USFWS) protocols, around the nest sites which prohibited entry by construction personnel until nestlings had fledged (flown or left the nest). Buffer zones varied in size depending on the bird species occupying the nest and are designed to avoid bird impacts and MBTA liability.

12. One such pipeline project was the Bison Pipeline, which consisted of constructing a 302-mile long high-pressure natural gas pipeline from northeast Wyoming, southeastern Montana, and southwestern North Dakota. While surveying the project area, I, and my team, discovered that the project site housed active nests for birds protected under the MBTA, including nighthawks, lark buntings, several species of sparrows, and burrowing owls. Upon discovering the active nests, we recommended that buffer zones be established to prevent construction activity within the vicinity of active nests. Every night, we would update the project site maps to show any newly discovered nesting area and its buffer zone, and we would conduct daily briefings with construction personnel to ensure that activities only occur in areas outside the designated buffers zones. As part of the Conservation and Mitigations Measures developed during the Environmental Impact Statement (EIS) phase of the project, we ascertained existing burrowing owl burrows were vacant prior to collapsing the burrows ahead of the excavations (trenching) crews. We also constructed artificial burrows, in close

coordination with USFWS biologist, on the ROW after completion of constructions activities and reseeding of the ROW. For the Bison Pipeline Project, we proposed using sprinkler valve boxes as artificial nests and corrugated pipes as the tunnels connecting the artificial nests to the surface. The USFWS biologists approved of our artificial burrow design and asked for a detailed report to show to proponents of other projects proposed in burrowing owl habitat as a technique to mitigate potential loss of burrowing owl burrows.

13. Oil and gas developers hired consultants like myself, and then bore the cost of implementing conservation measures to avoid the incidental take of migratory birds, because of the threat of liability under the MBTA. I understand that, in December 2017, the Department of the Interior issued a binding legal opinion stating that the MBTA applies only to activities that have as their purpose the killing of migratory birds. By doing away with the MBTA's incidental take prohibition, this legal opinion has given oil and gas pipeline and high-voltage transmission line developers license to indiscriminately mow, excavate, and drive over areas where protected birds may be nesting without the need to take reasonable steps to avoid the unnecessary killing of nestlings and destruction of eggs. Many preventable migratory bird deaths will occur as a result.

14. Eliminating the MBTA's application to incidental take harms my ability to obtain oil and gas consulting engagements. Since the Department of the Interior issued this opinion, I have not been approached by pipeline developers for my consulting services. So long as the Department of the Interior legal opinion

remains in force, very few (if any) pipeline developers will increase their project costs and potentially delay project deadlines by hiring MBTA consultants to conduct site surveys for bird nesting activity and to take measures to avoid incidental take.

15. In addition to the harms the Department of the Interior's legal opinion causes me professionally, it also injures my recreational and aesthetic interests in birding. The area in Wyoming where I live is a prolific zone for oil and gas production. As a result of the Department of the Interior's legal opinion, oil and gas producers in this area will lack the incentive to take measures to prevent bird deaths by, for example, covering their oil and gas waste pits with nets. This will be particularly harmful to neotropical migrant species of birds transiting the arid Wyoming landscapes and potential congregating at watering sites. The oil sheen on the surface of produced water pits, from oil and gas extraction, can contaminate and coat feathers and kill migratory birds. These easily, and previously, preventable deaths will harm my enjoyment of birding by reducing the number of neotropical migrants transiting through Wyoming during annual spring and fall migrations. Similar oil and gas activities in South and North Dakota will also likely kill additional snow geese in the Central Flyway and therefore harm my recreational and aesthetic interest in witnessing their annual spring migration.

16. By contrast, if the Department of the Interior's legal opinion is vacated on the ground that the MBTA does apply to incidental take, oil and gas producers will once again have an incentive to cover their waste pits, thus preventing the needless death of neotropical migrants and snow geese during their migrations. If

the legal opinion is vacated, I am also confident that oil and gas pipeline, and high-voltage transmission line, developers will once again seek the services of energy consultants such as myself to avoid incidental take of birds protected by the MBTA.

I declare under penalty of perjury that the foregoing is true and correct. Executed on SAN 08, 2020, in BUFFALO, Wyoming.

*Daniel A. Hengel*

Daniel A. Hengel