UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x

NATURAL RESOURCES DEFENSE COUNCIL,
INC., et al.,

                              Plaintiffs,          18 Civ. 4596 (VEC)

              -against-

U.S. DEPARTMENT OF THE INTERIOR, et al.,

                              Defendants.

-------------------------------------------------------x
-------------------------------------------------------x

NATIONAL AUDUBON SOCIETY, et al.,

                              Plaintiffs,          18 Civ. 4601 (VEC)

              -against-

U.S. DEPARTMENT OF THE INTERIOR, et al.,

                              Defendants.

-------------------------------------------------------x
-------------------------------------------------------x

STATE OF NEW YORK, et al.,

                              Plaintiffs,          18 Civ. 8084 (VEC)

              -against-

U.S. DEPARTMENT OF THE INTERIOR, et al.,

                              Defendants.

-------------------------------------------------------x

**DECLARATION OF SETH SCHOFIELD IN SUPPORT OF
THE STATE PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Pursuant to 28 U.S.C. § 1746, SETH SCHOFIELD, an attorney admitted pro hac vice to practice in the United States District Court for the Southern District of New York, affirms and states as follows:

1.      I am the Senior Appellate Counsel for the Energy and Environment Bureau in the Office of the Attorney General for the Commonwealth of Massachusetts.  I am familiar with the facts of this case.  I submit this declaration in support of the motion for summary judgment by plaintiffs the State of New York, State of California, State of Illinois, State of Maryland, Commonwealth of Massachusetts, State of New Jersey, State of New Mexico, and State of Oregon (the State Plaintiffs).  The principal purpose of this declaration is to submit documentary evidence outside the Administrative Record in support of the State Plaintiffs' standing.

2.      Attached as Exhibit A is a true and correct copy of the criminal Information that the United States Attorney for the District of Massachusetts filed on March 29, 2004 in the United States District Court for the District of Massachusetts, charging defendant Bouchard Transportation Company, Inc. (Bouchard) with violating, among other things, the Migratory Bird Treaty Act (MBTA) when its Bouchard B-120 tank barge collided with underwater rocks during its transit of Buzzards Bay, Massachusetts and discharged tens of thousands of gallons of oil into the Bay.  The spill killed more than 450 birds protected by the MBTA.  I obtained the Bouchard Information by downloading a copy of it from the Public Access to Court Electronic Records service (PACER).

3.     Attached as Exhibit B is a true and correct copy of the Plea Agreement dated March 10, 2004, and filed on March 29, 2004 in the United States District Court for the District of Massachusetts.  The United States Attorney for the District of Massachusetts and Bouchard agreed to resolve, among other things, Bouchard's violation of the MBTA by, among other things, requiring Bouchard to make a payment of $10 million, $7 million of which was imposed for violating the MBTA and designated to go "to the Department of the Interior to carry out approved wetlands conservation projects." Ex. B, at 1, 3.  I obtained the Plea Agreement by downloading a copy of it from PACER.

4.     Attached as Exhibit C is a true and correct copy of the Press Release, titled "Bouchard Transportation Company Agrees to Plead Guilty to Criminal Charges and Pay $10 Million Fine Related to April 2003 Buzzards Bay Oil Spill," which the United States Attorney for the District of Massachusetts issued on March 29, 2004 in association with Bouchard's agreement to plead guilty to the criminal charges, including its violation of the MBTA.  The Office of the United States Attorney for the District of Massachusetts stated in the Press Release that "[t]he second count of the indictment alleges that [Bouchard] violated the [MBTA] by killing protected bird species as a result of th[e] oil spill."  Ex. C, at 1.  The U.S. Attorney at that time, U.S. Attorney Sullivan, is quoted in the Press Release as saying: "[t]he U.S. Attorney's Office is committed to protecting the precious natural resources in Buzzards Bay and throughout the Commonwealth. . . .  This substantial fine of $10 million will provide critically needed funds to enhance conservation efforts." Ex. C, at

1.  I obtained a copy of the Press Release during my work on the Bouchard B-120 Natural Resource Damage Assessment.

5.     Attached as Exhibit D is a true and correct copy of the federal Government's Assented-To Status Report, which the United States Attorney for the District of Massachusetts filed on October 22, 2004 and which asks "the Court [to] direct" the $7 million MBTA "fine to wetlands conservation projects in the Buzzards Bay Watershed, the area directly affected by the spill."   Ex. D, at 1 ¶ 1.  I obtained the Government's Assented-To Status Report by downloading a copy of it from PACER.

6.     Attached as Exhibit E is a true and correct copy of the criminal Superseding Information that the United States Attorney for the District of Massachusetts filed on October 22, 2004 in the United States District Court for the District of Massachusetts, expanding its charge that defendant Bouchard violated, among other things, the MBTA when its Bouchard B-120 tank barge collided with underwater rocks during its transit of Buzzards Bay, Massachusetts and discharged tens of thousands of gallons of oil into the Bay.  The spill killed more than 450 birds protected by the MBTA.  I obtained the Bouchard Superseding Information by downloading a copy of it from PACER.

7.     Attached as Exhibit F is a true and correct copy of the amended Plea Agreement, dated October 18, 2004, and filed on November 1, 2004, wherein the United States Attorney for the District of Massachusetts and Bouchard agreed to resolve, among other things, Bouchard's violation of the MBTA by, among other

things, requiring Bouchard to make a payment of $10 million, $7 million of which was imposed for violating the MBTA and designated "to the Department of the Interior to carry out approved wetlands conservation projects."  Ex. F, at 1, 3.  I obtained the Bouchard revised Plea Agreement by downloading a copy of it from PACER.

8.     Attached as Exhibit G is a true and correct copy the Judgment entered on January 5, 2005 by the United States District Court for the District of Massachusetts based on Bouchard's agreement to plead guilty to, among other things, violating the MBTA by killing migratory birds as result of the discharge of oil into Buzzards Bay from the Bouchard B-120 tank barge.  In the Judgment, the Court "strongly recommend[ed] that the [$7 million MBTA] fine . . . paid into the North American Wetlands Conservation Act Fund be used to fund eligible wetland conservation projects in the Buzzards Bay Watershed Area of Massachusetts."  Ex. G, at 7.  I obtained the Bouchard Judgment by downloading a copy of it from PACER.

9.     Attached as Exhibit H is a true and correct copy of a report published in August 2006 by the U.S. Fish and Wildlife Service (FWS) Northeast Region and titled "The U.S. Fish & Wildlife Service Role in Utilizing Oil Spill Fines: Conserving Important Habitats in Buzzards Bay, Massachusetts."   In that report, FWS states that the oil spill resulting from the grounding of the Bouchard B-120 tank barge in Buzzards Bay "killed a recorded 461 birds" and that FWS worked with other federal agencies "to recommend to the court that criminal fines from the transportation company's violation of the [MBTA] be deposited in the North American Wetlands

Conservation Fund." Ex. H, at 1 col.1.  FWS further states in the report that between 2004 and 2006, it worked with a coalition of partners to develop applications for financial grants to be awarded from the fines collected under the Court's Bouchard Judgment.  Ex. H, at 1 col.2.  "Nine projects in the Buzzards Bay watershed were ultimately selected for funding . . . ."  *Id.*  FWS also states in the report that those project grants "leverage[d] more than $16.4 million in matching partner funds" and that the projects made possible by the grants "will result in the protection and restoration of 1,773 acres of important coastal habitats in the Buzzards Bay watershed."  Ex. H, at 1 col.3.  I obtained a copy of the report by downloading it from the following link: https://acjv.org/documents/Buzzards_Bay.pdf.

10.     Attached as Exhibit I is a true and correct copy of a Press Release issued by FWS on April 27, 2015, titled "BP Deepwater Horizon Oil Spill Settlement Funds Migrate North."  In the press release, FWS states that BP Exploration and Production Inc. (BP) pleaded "guilty to 14 criminal counts stemming from its actions related to the Deepwater Horizon oil spill, including one misdemeanor count of violating the [MBTA]" and that "[a]s part of the settlement, BP agreed to pay $100 million to the North American Wetlands Conservation Fund (NAWCF) to support projects focused on wetlands restoration and conservation in the United States, Canada and Mexico."  Ex. I, at 1.  I obtained a copy of the press release by downloading it from the following link:        https://www.fws.gov/news/ShowNews.cfm?ID=FC61EB52-BF8A-45AA-C04D802711C4EF55.

11.    I, Seth Schofield, declare under penalty of perjury that the foregoing is true and correct.

Executed:    January 17, 2020
             Boston, Mass.

SETH SCHOFIELD
 *Senior Appellate Counsel*
Energy and Environment Bureau
Massachusetts Attorney General's
 Office

[page added for double-sided printing]

# Exhibit A

Information, *United States v. Bouchard
Transportation Company, Inc.*, No. 04-cr-10087-MBB
(D. Mass., filed Mar. 29, 2004) (ECF No. 1)

[page added for double-sided printing]

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Criminal No. |
| | ) | |
| v. | ) | Violations: |
| | ) | 33 U.S.C. §§1319(c)(1), 1321(b)(3) |
| | ) | (Clean Water Act) |
| BOUCHARD TRANSPORTATION | ) | 16 U.S.C. §§703, 707 |
| COMPANY, INC. | ) | (Migratory Bird Treaty Act) |
| Defendant. | ) | |

**04** CR **1 0 0 8 7** DPW

## INFORMATION

THE UNITED STATES ATTORNEY CHARGES THAT:

### The Clean Water Act and the Oil Pollution Act

1.     In the Federal Water Pollution Control Act (the "Clean Water Act"), as amended by the Oil Pollution Act, 33 U.S.C. §1321(b)(1), Congress has declared that it is the policy of the United States that there should be no discharges of oil or hazardous substances into or upon the navigable waters of the United States or the adjoining shorelines.

2.     The Clean Water Act makes it a crime for a person to negligently discharge oil into or upon the navigable waters or contiguous zone of the United States, in such quantities as may be harmful.  33 U.S.C. §§1321(b)(3) and 1319(c)(1).

3.     The Clean Water Act defines a "person" as an individual or a corporation.  33 U.S.C. §1321(a)(7).

4.     The Clean Water Act defines a "discharge" as any spilling, leaking, pumping, pouring, emitting, emptying or dumping.  33 U.S.C. §1321(a)(2).  The Clean Water Act defines "oil" as oil of any kind or in any form, including, but not limited to, petroleum, fuel oil, sludge and oil refuse.  33 U.S.C. §1321(a)(1).

5.      Federal regulations promulgated under the Clean Water Act define a "harmful" quantity of oil as including any discharges of oil that cause a film or sheen upon or discoloration of the surface of the water or adjoining shorelines or cause a sludge or emulsion to be deposited beneath the surface of the water or adjoining shorelines.  40 C.F.R. §110.3.

6.      The Clean Water Act defines the "navigable waters" of the United States as the waters of the United States and the territorial seas, which are defined to be water extending three (3) miles seaward of the low tide mark.  33 U.S.C. §§ 1362(7) and 1362(8).

**Background**

7.      At all times relevant to this Information, Bouchard Transportation Company, Inc. ("BTC") was a privately held, New York corporation with its principal place of business in Hicksville, New York.

8.      At all times relevant to this Information, BTC was in the business of the marine transportation of oil and other types of petroleum products, primarily by means of tugboats and barges.  BTC's operations were centered along the eastern seaboard of the United States and the Gulf of Mexico.

9.      On or about April 27, 2003, a tugboat owned and operated by BTC, named the Evening Tide, was traveling en route from Philadelphia, Pennsylvania to Sandwich, Massachusetts.  The Evening Tide departed from Philadelphia on April 24, 2003.

10.     During this trip, the Evening Tide was hauling a barge named the Bouchard B-120 (the "B-120") to the Mirant Canal Generating Plant located on the southern side of the Cape Cod Canal in Sandwich.  The B-120, built in 1975, is a single-hull vessel that weighs 7,912 gross tons and is 376 feet long.  The B-120 is comprised of ten separate tanks, five on the port side and five

2

on the starboard side of the vessel.

11.     The B-120 is an unpowered barge and it can only be moved with the assistance of a tugboat. The primary means by which a tugboat, such as the Evening Tide, moves the B-120 is either by towing it, using one of the two steel cables that extend off the stern of the tugboat, or by pushing the barge. The B-120 has a large, triangular shaped notch in her stern, which a tugboat like the Evening Tide can slip into in order to push the barge.

12.     On April 27, 2003, the B-120 was loaded with approximately 99,000 barrels of #6 oil, also known as Bunker C fuel. #6 oil is a thick, viscous and adhesive petroleum product that is primarily used by utilities and power plants. Measured in gallons, the B-120 was carrying more than four million gallons of # 6 oil as it traveled through Buzzards Bay on April 27, 2003. With the load it was carrying on this date, the draft of the B-120 (*i.e.* the depth to which the barge extended into the water) was approximately 25 feet, six inches.

13.     For this trip from Philadelphia to Sandwich, the Evening Tide had a crew of six individuals, comprised of a captain (the "Evening Tide Captain"), a mate, two deck hands, a chief engineer and an assistant engineer. The crew worked in six hour shifts, with each shift consisting of either the captain or the mate, one deck hand and one of the engineers.   The unpowered B-120 was manned by a two-person crew, a captain and a mate, who worked in six hour shifts.   As a general matter, the crew of the Evening Tide worked on the boat for three weeks at a time, followed by three weeks off.

14.     The mate on the Evening Tide (the "Evening Tide Mate") was hired by Bouchard as a mate in August 2002.   The duties of the mate are to be in charge of all aspects of the tugboat operations during the twelve hours each day when the mate is on-duty and the captain is off-duty.

3

According to Bouchard's Responsible Carrier Plan, when on duty the mate is responsible for, among other things, "navigat[ing] the vessel in a safe and prudent manner . . . complying with all applicable U.S. Coast Guard Inland Navigation Rules." The mate must also "observ[e] [BTC's] look-out policy," by maintaining a "proper look-out by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and the risk of collision." The mate is also responsible for maintaining radio communications with other vessels during his watch.

15. The Evening Tide Mate was initially assigned to the informal mate training program at Bouchard for a few weeks, in which he served alongside an experienced captain as an extra person during the captain's shift. The Evening Tide Mate was then promoted out of the training program to be a full mate aboard two other BTC tugboats -- the Ellen Bouchard and then the J. George Betz -- prior to being assigned to the Evening Tide. The BTC captains who worked with the Evening Tide Mate advised BTC's headquarters that they had doubts about the Evening Tide Mate's ability to handle the responsibilities of a mate in charge of a tugboat hauling an oil barge.

16. Despite these negative reports about the Evening Tide Mate's competency, the Evening Tide Mate was only briefly re-assigned to the BTC mate training program in early 2003. The Evening Tide Mate was then assigned to serve as the mate aboard the Evening Tide beginning in February 2003.

17. The Evening Tide Mate's problems continued on the Evening Tide. The Evening Tide Mate caused a barge to collide with the dock in Philadelphia in March 2003. Although there was no oil spill as a result of this incident, there was property damage to the dock. This

4

incident was reported to BTC's headquarters and the Evening Tide Mate admitted causing the accident because he misjudged the wind and current. The captain of the barge reported that the accident resulted from the Evening Tide Mate "closing on [the] dock at a fast rate" and making "corrections" that caused the barge to collide with the dock.

18.     The Evening Tide Captain also called BTC headquarters to complain about the Evening Tide Mate, but the Evening Tide Mate remained assigned to the Evening Tide and commenced a new three-week stint as the mate on April 24, 2003.

19.     The Evening Tide Mate experienced more difficulties shortly after midnight on April 27, 2003, a little more than twelve hours before the oil spill occurred. At this time, the Evening Tide Mate improperly released the starboard side tow wire off the stern of the Evening Tide, causing it to tangle and rendering it inoperable. The cost of repairing the damage caused to the starboard side tow wire as a result of this incident was several thousand dollars. The Evening Tide was still able to tow the B-120 barge by switching to the port side tow wire.

### The Oil Spill

20.     The weather on the afternoon of April 27, 2003 was beautiful; it was a bright and clear day, with winds at 10-15 knots out of the North. The sea swells that day were running three to five feet in a southwesterly direction. All the navigational, communications, mechanical and steering equipment systems aboard the Evening Tide were in good working order throughout that day.

21.     On April 27, 2003, the Evening Tide Mate was in charge of the vessel during the noon to 6:00 p.m. shift. The Evening Tide Captain was off-duty for that shift. The Evening Tide approached the entrance to Buzzards Bay Channel, as delineated by the first of a series of

5

red and green navigational buoys which clearly mark the channel, at approximately 4:30 p.m. The first navigational buoy a ship encounters as it enters the Buzzards Bay Channel from the south is a green navigational buoy located at 41-25-48 degrees North and 071-02-18 degrees West (hereinafter "the First Buzzards Bay Buoy"). All of these navigational buoys, as well as the hazards in Buzzards Bay and the depths of the various rocky shoals in this area, are clearly marked on the widely used navigational charts published by the National Oceanic and Atmospheric Administration ("NOAA"). These NOAA charts for Buzzards Bay were on-board the Evening Tide on April 27, 2003, both in paper form and on the navigational software installed on the ship's computer.

22.     As the Evening Tide was approaching the entrance to Buzzards Bay Channel it was towing the B-120, using the steel cable off the stern of the Evening Tide, which was connected to a cable wire off the bow of the B-120.   At this time, the length of the cable wire connecting the Evening Tide to the B-120 was approximately 1,200 feet.

23.     A second tug boat, the Carl Ray, which is owned and operated by a different company, was also traveling northwards towards Buzzards Bay Channel on the afternoon of April 27, 2003. Like the Evening Tide, the Carl Ray was towing a barge loaded with oil. The Carl Ray was approximately two nautical miles behind the Evening Tide, to its southeast.

24.     Prior to reaching the entrance to Buzzards Bay Channel, at approximately 4:10 p.m., the mate on the Carl Ray attempted to contact the Evening Tide several times. After initially not receiving a response, he spoke with the Evening Tide Mate and stated that the Carl Ray would be slowing down to shorten its tow wire.

6

25.     Shortly thereafter, the captain of the Carl Ray, who joined his mate in the wheelhouse of the Carl Ray, observed the route the Evening Tide was traveling as it approached the First Buzzards Bay Buoy. The captain of the Carl Ray initiated radio contact with the Evening Tide because the Evening Tide was approaching the Buzzards Bay Channel at the extreme left-hand side of the channel instead of heading for the center of the channel, as is customary. The captain of the Carl Ray was very concerned that the Evening Tide was approaching more shallow areas of Buzzards Bay, punctuated by several reefs, which exist just outside the marked channel.    Immediately to the west of the First Buzzards Bay Buoy is an area of several rocky reefs that lie 22 feet below the surface. By contrast, the depths within the marked Buzzards Bay Channel range between 42 and 63 feet.

26.     The captain of the Carl Ray, despite efforts to reach the Evening Tide over the radio for several minutes, was unable to reach anyone on the Evening Tide because the Evening Tide Mate failed to maintain radio communications.    For the second time that afternoon, no one aboard the Evening Tide responded promptly to the repeated attempts by the Carl Ray to communicate via the radio. As a result, the Evening Tide Mate missed the warnings from the Carl Ray that the Evening Tide was off course.

27.     The Evening Tide Mate's conduct, in failing to assign a crew member to relieve him in the wheelhouse and monitor the radio, violated the Evening Tide's "Watch Standing Orders" issued by Evening Tide captain Jon Richardson in January 2001. Among other things, these standing orders, which were aboard the Evening Tide on April 27, 2003, stated that the mate or captain shall "never leave the bridge UN-attended (sic) while underway or at anchor unless properly relieved."

7

28.     After several minutes, the Evening Tide Mate initiated a radio call to the Carl Ray in which the Evening Tide Mate stated that he was having difficulty bringing in his tow wire. The captain of the Carl Ray asked the Evening Tide Mate if he was where he wanted to be in the channel, in reference to the highly unorthodox approach the Evening Tide was taking. The Carl Ray received a garbled response.

29.     After this brief exchange with the Evening Tide Mate, the mate and the captain of the Carl Ray both watched closely as the Evening Tide approached the First Buzzards Bay Buoy. Each of these individuals saw the Evening Tide and the B-120 pass the First Buzzards Bay Buoy with the buoy off the starboard side of the vessels.  In other words, the Evening Tide and the B-120 traveled to the west of the First Buzzards Bay Buoy, outside the well-marked Buzzards Bay Channel.  According to these witnesses, the B-120 and the Evening Tide were approximately 1/4 of a mile on the far side of the First Buzzards Bay Buoy.

30.     The B-120 struck a rock outcropping to the west of the First Buzzards Bay Buoy as it traveled outside Buzzards Bay Channel. This reef is marked on the NOAA navigational charts as being at a depth of 22 feet.

31.     At the time of the accident, the Evening Tide and the B-120 were traveling at a speed of approximately 6 knots. The impact of the barge striking the rocks at this location ripped a twelve-foot long gash slightly to the starboard side of the keel line on the bottom of the B-120. The hole in the bottom of the barge, which was constructed of thick steel, was as wide as one foot at certain points and up to twenty-one inches deep.  The damage caused by this collision with the reef was limited to the #2 tank on the starboard side of the B-120.

8

**The Impact of the Oil Spill**

32.     As a result of this collision with the reef, tens of thousands of gallons of #6 oil was released into Buzzards Bay from the gaping hole in the B-120. The estimates of the size of the spill range from 22,000 gallons to 98,000 gallons.

33.     The discharge of this heavy, sticky oil was especially harmful to the fragile bird population in this area. More than 450 federally-protected birds were killed when they came into contact with the #6 oil discharged from the B-120. More than half of the birds killed by the BTC oil spill were Common Loons, Red Throated Loons, Common Eiders or Black Scoters. Oil from this spill also caused the death of a wide variety of other protected birds, including Black Backed Gulls, Dunlins, Herring Gulls, Long-tailed Ducks, Black Ducks, Buffleheads, Canada Geese, Common Terns, Gannets, Greater Scaups, Mergansers, Grebes, Swans, Razorbills, Scoters, Willets and Yellowlegs. Only a small number of birds who came into contact with the #6 oil from this spill were rehabilitated and returned to the wild.

34.     The oil spill also forced the immediate closure of thousands of acres of shellfish beds in Buzzards Bay, a large portion of which remained closed for several months following the oil spill. Oil from the B-120 affected close to 90 miles of Massachusetts beaches and coastline. The total cost of cleaning up this oil spill is still being determined and it is expected to run into the tens of millions of dollars. The long-term impact from the release of this oil into the water, in terms of marine life, the bird population and the overall ecology of Buzzards Bay will not be known for several years.

## COUNT ONE -- 33 U.S.C. §§1319(c)(1), 1321(b)(3)
### (Clean Water Act -- Negligent Discharge of Pollutant)

THE UNITED STATES ATTORNEY FURTHER CHARGES THAT:

     35.    Paragraphs 1-34 are realleged and incorporated by reference as though fully set

forth herein.

     36.    On or about April 27, 2003 in Buzzards Bay, in the District of Massachusetts and

elsewhere, the defendant,

BOUCHARD TRANSPORTATION COMPANY

negligently caused the discharge of a harmful quantity of oil from its barge, the Bouchard B-120,

into and upon the navigable waters of the United States.

     All in violation of Title 33 U.S.C. §§1319(c)(1) and 1321(b)(3).

## COUNT TWO- 16 U.S.C. §§703 and 707(a)
### (Migratory Bird Treaty Act)

THE UNITED STATES ATTORNEY FURTHER CHARGES THAT:

37.   Paragraphs 1-34 are realleged and incorporated by reference as though fully set forth herein.

38.   On or about April 27, 2003 in Buzzards Bay, in the District of Massachusetts and elsewhere, the defendant,

### BOUCHARD TRANSPORTATION COMPANY

without being permitted to do so by regulation as required by law, did kill a migratory non-game bird, to wit, a common loon (*Gavia immer*);

All in violation of the Migratory Bird Treaty Act, Title 16, U.S.C. §§703 and 707(a) and Title 50, *Code of Federal Regulations*, §21.11.


MICHAEL J. SULLIVAN
United States Attorney

By:

Joshua S. Levy
Nadine Pellegrini
Assistant U.S. Attorneys

Peter Kenyon
Senior Criminal Enforcement Counsel
Environmental Protection Agency

Dated: March 29, 2004

11

[page added for double-sided printing]

# Exhibit B

Plea Agreement, *United States v. Bouchard Transportation Company, Inc.*, No. 04-cr-10087-MBB (D. Mass., filed Mar. 29, 2004) (ECF No. 9)

[page added for double-sided printing]

SCANNED

DATE: 3-30-04

BY: CMG

**U.S. Department of Justice**

*Michael J. Sullivan*
*United States Attorney*
*District of Massachusetts*

---

*Main Reception: (617) 748-3100*

*United States Courthouse, Suite 9200*
*1 Courthouse Way*
*Boston, Massachusetts 02210*

March 10, 2004

Ronald W. Zdrojeski, Esq.
LeBoeuf, Lamb, Greene & MacRae
225 Asylum Street, 13th Floor
Hartford, CT 06103

Thomas M. Russo, Esq.
Freehill, Hogan & Maher
80 Pine Street
New York, NY 10005

**04 CR 1 0 0 8 7**

Re:  United States v. Bouchard Transportation Company

Dear Counsel:

This letter sets forth the agreement entered into between the United States Attorney for the District of Massachusetts (the "United States Attorney") and your client, Bouchard Transportation Company ("BTC" or the "Defendant"), in the above-captioned matter. The agreement is as follows:

1.  Guilty Plea

On or before April 2, 2004, or such date as the Court may determine, Defendant shall waive its right to indictment and plead guilty to the Information to be filed in the District of Massachusetts in substantially the form attached, charging it with (i) one count of illegally discharging oil into the navigable waters of the United States in violation of the Clean Water Act, Title 33 U.S.C. §§ 1319(c)(1), 1321(b)(3) and (ii) one count of killing migratory birds in violation of the Migratory Bird Treaty Act, Title 16 U.S.C. §§ 703, 707.

2.  Penalties

Defendant understands and agrees that the statutory maximum penalties for the counts to which it is pleading guilty are as follows:

A.    Clean Water Act
-    two times the pecuniary loss caused by the offense pursuant to 18 U.S.C. §3571(d);
-    five years probation;
-    restitution; and
-    $125 special assessment pursuant to 18 U.S.C. §3013(a)(1)(B)(iii).

B.    Migratory Bird Treaty Act
-    two times the pecuniary loss caused by the offense pursuant to 18 U.S.C. §3571(d);
-    five years probation;
-    restitution; and
-    $50 special assessment pursuant to 18 U.S.C. §3013(a)(1)(B)(ii).

3.    Sentencing Guidelines

The United States Attorney and Defendant agree that the version of United States Sentencing Guidelines ("U.S.S.G.") incorporating guideline amendments through November 1, 2002 shall cover these offenses to the limited extent that the guidelines apply in this context.   The United States Attorney and the Defendant further agree that pursuant to § 8C2.1 (commentary) and § 8C2.10 of the United States Sentencing Guidelines, which pertain to the sentencing of organizations, the Sentencing Guidelines do not determine the fine range in environmental cases, but rather leave such determination to the sound discretion of the Court in accordance with 18 U.S.C. §§3553, 3571 and 3572.

4.    Corporate Authorization

Within two weeks of the execution of this plea agreement, BTC will provide to the United States Attorney and to the Court written evidence, in the form of a notarized resolution of its Board of Directors, certifying that Defendant is authorized to waive its right to indictment, to plead guilty to the Information in this case, and to enter into and comply with all provisions of this agreement. The resolution shall further certify that an identified individual is authorized to take these actions and that all corporate formalities, including, but not limited to, approval by Defendant's directors, required for such authorization have been observed.

Defendant agrees that Ronald W. Zdrojeski or Thomas M. Russo, as attorneys for BTC, and pursuant to a duly authorized power of attorney for the Defendant, will be authorized to appear on its behalf, to enter its guilty plea and to represent it for imposition of its sentence.

2

5.   Agreed Disposition

A.   **Agreed upon Sentence**

The United States Attorney and Defendant agree, pursuant to Fed. R. Crim. P. 11(c)(1)(C), that the following is the appropriate disposition of this matter:

    i.    $10,000,000 fine to be paid as specified below in paragraph 5.B;

    ii.   a three year term of probation, during which the Defendant must comply with the special conditions of probation set forth in paragraph 8 below; and

    iii.  a $175 special assessment.

B.   **Method of Payment**

Upon imposition of the sentence, the parties agree that $9 million of the fine and the special assessments, totaling $9,000,175, be payable forthwith. $1 million out of the total fine will be suspended, provided that if BTC fails, in a material manner, to implement the special conditions of probation set forth in section 8 below, the Court may order the defendant to pay the suspended portion of this fine.

Defendant agrees to convey the entire amount of the fines and special assessments due forthwith – $9,000,175 – by wire transfer to the Clerk of the United States District Court for the District of Massachusetts. Defendant agrees to make this payment within two business days following the imposition of the sentence.

No amount of the fine shall reduce the Defendant's civil liability to any person or entity, including any federal, state or local government agency. The parties agree that $2,000,000 of the fine shall be imposed for violation of the Oil Pollution Control Act of 1990, 33 U.S.C. §1321(b)(3), and by operation of law, specifically, 33 U.S.C. §1321(s), that amount shall be directed to the Oil Spill Liability Trust Fund. The parties further agree that $7,000,000 of the fine shall be imposed for violation of the Migratory Bird Treaty Act, 16 U.S.C. §§703, 707(a), and by operation of law, specifically, 16 U.S.C. §4406(b), that amount shall be directed to the Department of the Interior to carry out approved wetlands conservation projects.

6.   Conditions Precedent

The participation of the United States Attorney in the joint agreement set forth in paragraph 5 of this agreement is conditional upon Defendant's performance of the following obligations:

A.   Defendant shall provide full and truthful cooperation to the United States Attorney as set forth in paragraph 9 of this agreement;

3

B.    No later than two business days prior to sentencing, as scheduled by the Court, Defendant shall notify the United States Attorney that Defendant's counsel is in possession of $9,000,175 in its client funds account with which to pay Defendant's fine and mandatory special assessments as provided in paragraph 5;

C.    BTC shall comply with the remedial measures set forth in paragraph 8 of this agreement; and

If Defendant fails to comply with these conditions prior to sentencing, the United States Attorney shall be free to recommend any sentence, including fine, it deems appropriate.

7.    Mandatory Special Assessment

Defendant agrees to pay the mandatory special assessments, totaling $175, to the Clerk of the Court of the United States District Court for the District of Massachusetts within two business days after the date of sentencing.

8.    Special Conditions of Probation – Remedial Measures

As stated in the paragraph 5 above, the Defendant shall be placed on probation for a period of three years. During this period of time, the Defendant will be required to comply with the conditions of probation set forth below. These special conditions of probation are in addition to, and do not relieve the defendant of complying with, all existing applicable federal laws and regulations.

A.    *Operational Measures*

i.    *Buzzards Bay Pilotage Requirement:* BTC shall hire a pilot for all trips (north or south) in which a tugboat owned or operated by BTC is traveling with a barge (hereinafter "BTC tugboat/barge unit") into Buzzards Bay, as defined as the body of water between the Cape Cod Canal and the Buzzards Bay Entrance Light [41-23-47.5 North and 71-02-00.6 West] (hereinafter "Buzzards Bay Entrance Light").

a.    In the event a pilot can not board a north-bound tugboat/barge unit prior to the Buzzards Bay Entrance Light, the BTC tugboat/barge unit shall: (1) establish and maintain radio communications with a pilot; and (2) establish and maintain radar contact with a pilot prior to proceeding into Buzzards Bay, until a pilot can board the BTC tugboat at the New Bedford pilot station. If a BTC tugboat/barge unit is unable to comply with the conditions set forth in this

4

subparagraph, it shall notify the Captain of the Port Providence prior to entering Buzzards Bay, as defined above. The requirements set forth in this subparagraph shall not apply to: (1) double hull barges; or (2) empty barges carrying only "clingage." Nothing in this subparagraph shall alter the existing authority of a captain of a BTC tugboat to operate that vessel.

b. In the event that a south-bound BTC tugboat/barge unit can not allow a pilot to disembark after the Buzzards Bay Entrance Light, the BTC tugboat/barge unit shall allow the pilot to disembark at the New Bedford pilot station. Once the pilot has disembarked, the BTC tugboat/barge unit shall: (1) establish and maintain radio communications with a pilot; (2) establish and maintain radar contact with a pilot until it exits Buzzards Bay, as defined above. If a BTC tugboat/barge unit is unable to comply with the conditions set forth in this subparagraph, it shall notify the Captain of the Port Providence, prior to entering Buzzards Bay, as defined above. The requirements set forth in this subparagraph shall not apply to: (1) double hull barges; or (2) empty barges carrying only "clingage." Nothing in this subparagraph shall alter the existing authority of a captain of a BTC tugboat to operate that vessel.

ii. *Maintenance of Radio Contact*: At all times when a tugboat/barge unit operated by BTC is underway, the individual in charge of the watch will be required to monitor radio communications, via the wheelhouse radio or through the use of a hand-held radio, consistent with applicable federal law and regulations;

iii. *Manning of Wheelhouse*: At all times when a tugboat/barge unit operated by BTC is underway, the individual in charge of the watch will not leave the wheelhouse without designating another crew member to be present in the wheelhouse;

iv. *Navigational Software Record Compliance*: BTC will operate all navigational software in a manner that ensures that a record is maintained for ten (10) days of the routes actually traveled by BTC tugboat/barge units. Within seven days of the sentencing hearing,

5

BTC will submit to the Probation Department and the United States Attorney's Office a list of all BTC vessels that do not have equipment sufficient to comply with this condition and a reasonable schedule for completing the necessary upgrades to bring those vessels into compliance. The requirements set forth in this subparagraph shall not apply to (1) double hull barges; or (2) empty barges carrying only "clingage."

## B. *Compliance Program – Independent Consultant*

BTC agrees to establish and maintain an effective compliance program to ensure compliance with the aforementioned special conditions of probation and with the operational areas set forth below in subparagraph ii. The compliance program will include the following parameters:

i.  BTC agrees that it will retain, at its own expense, the services of an independent consultant. This individual will be responsible for designing and administering this compliance program. The Defendant agrees to give the consultant full access to all BTC records, employees, facilities and vessels necessary to make a meaningful evaluation of the Defendant's current operations.

ii. BTC will retain the consultant within 7 days from the execution of this agreement and submit the curriculum vitae of the independent consultant to the United States Attorney's Office. The consultant must be approved by the United States Attorney's Office. Within 14 days of when the consultant is approved, the Defendant shall submit to the United States Attorney's Office and the United States Coast Guard, a copy of the contract between the consultant and the Defendant which details the scope of the audit to be performed, and a schedule of interim and final deadlines. The audit shall address the following areas:

> (1) hiring of mates and captain, including the due diligence performed during the hiring process concerning an applicant's licensing and recency;
> (2) performance evaluations for mates and captains, including new hires;
> (3) the tug and barge watch-standing requirements, radio communications, recency requirements, look-out requirements, manning requirements, proper use of computerized navigational aids and paper charts, preparation of proper voyage plans, and the use of computerized alarm systems to detect deviations from plotted courses;

6

(4) oil spill prevention, spill notification and spill response.

The scope of the audit must be approved by the United States Attorney's Office and the United States Coast Guard and the Defendant agrees to adopt any reasonable modifications proposed by the United States Attorney's Office or the United States Coast Guard.

iii. The consultant will follow generally accepted environmental auditing techniques, procedures and policies in designing, implementing and executing the audit, including the reporting of deficiencies and corrective measures;

iv. The consultant will prepare a draft report of its findings and recommendations which will be furnished to the Probation Department, the United States Attorney's Office and the United States Coast Guard at the same time it is given to the Defendant. This draft report will be submitted 45 days prior to the sentencing proceeding;

v. The consultant will prepare a final report of its findings and recommendations which the Defendant will furnish to the Probation Department, the United States Attorney's Office and the United States Coast Guard 21 days prior to the sentencing proceeding;

vi. The Defendant will submit a written response to the Probation Office, the United States Attorney's Office and the United States Coast Guard no later than 7 days after receiving the consultant's final written report. The response will specify what actions the Defendant will take to correct any noted deficiencies and regulatory violations;

vii. The independent consultant will submit annual reports to the Probation Department, the United States Attorney's Office and the United States Coast Guard detailing the implementation of the compliance program. The responsibilities of the independent consultant shall terminate when the period of probation is completed or at an earlier time if the Court, upon motion of either party, determines that the independent consultant's services are no longer needed.

C. **Corporate Compliance Officer**

BTC agrees to appoint a compliance officer for BTC, who is experienced in environmental regulations and compliance, and who will be responsible for all federal and state environmental regulatory compliance. At or before the time of sentencing, BTC will provide the Probation

Department, the United States Attorney's Office and the United States Coast Guard with the name and *curriculum vitae* of the individual who has been designated as the corporate compliance officer.

### D. **The Natural Resource Damage Assessment**

BTC will cooperate fully with federal, state and local officials in the Natural Resource Damage Assessment process set forth in the Oil Pollution Control Act of 1990, 33 U.S.C. §2701, *et seq.* BTC will not withdraw its acknowledgment that it is the Responsible Party as it relates to the oil spill in Buzzards Bay involving BTC that occurred on April 27, 2003 (hereinafter the "Buzzards Bay Oil Spill"), for purposes of this Natural Resource Damage Assessment process.

### 9. Cooperation with Law Enforcement

Defendant agrees to cooperate truthfully and completely with the United States Attorney in its investigation of possible violations of federal and state law and in any trial or other proceedings arising out of the investigation of the Buzzards Bay Oil Spill.

   A. Defendant understands and agrees that its cooperation obligations will require it to do the following:

      i. provide access to original documents and records;

      ii. require that, upon request and reasonable notice by the United States Attorney, Defendant's directors, officers and employees make themselves available for interviews by law enforcement agents and for attendance at legal and judicial proceedings, including grand jury sessions, trials and other court hearings; and

      iii. waive any claim of work product privilege with respect to the information disclosed to or obtained by Defendant's counsel through employee and non-employee witness interviews concerning any aspect of the Buzzards Bay Oil Spill.

   B. Defendant further understands and agrees that its cooperation obligations will require it to do the following, within 14 days of the entry of its plea, with respect to work product prepared by BTC's counsel:

      i. provide all notes and memoranda of interviews compiled and prepared by its counsel of interviews of Defendant's employees as part of its internal investigation into the Buzzards Bay Oil Spill;

      ii. provide all notes and memoranda of interviews compiled and prepared by their counsel of interviews with individuals who are not

8

directors, officers or employees of the Defendant as part of its internal investigation into the Buzzards Bay Oil Spill;

iii.    make available, upon request and reasonable notice by the United States Attorney, Defendant's counsel who conducted or participated in interviews of any individuals identified in subparagraphs 10(B)(i) and (B)(ii) above to provide information concerning the substance of any such interviews.

As limited to such materials, Defendant and its counsel will provide a complete and full waiver of the attorney-client privilege and the work-product privilege, except as to those portions of materials containing the mental impressions and opinions of their counsel. Defendant agrees that only portions of materials containing the mental impressions and opinions of their counsel will be redacted from the materials described in this paragraph. The United States Attorney agrees that production of such materials will not be construed as a general waiver of the attorney-client privilege and/or work product privilege as to any communications or materials beyond those referred to in paragraphs 10(B)(i) and (ii) and (iii) above.

C.    If Defendant complies with all the terms of this agreement, the United States Attorney will, upon request of Defendant, advise the Court and any federal, state or local government agency, including licensing agencies or authorities, of the nature and extent of any cooperation provided by Defendant.

10.    <u>Criminal Liability</u>

Provided that the Defendant complies with the terms of this agreement, the United States Attorney agrees not to seek additional criminal prosecution against Defendant in connection with the Buzzards Bay Oil Spill.

11.    <u>Probation Office Not Bound By Agreement</u>

The sentencing disposition agreed upon by the parties is not binding upon the United States Probation Office. Defendant's plea will be tendered pursuant to Fed. R. Crim. P. 11(c)(1)(C). Defendant cannot withdraw its plea of guilty unless the sentencing judge rejects the plea agreement. If the sentencing judge rejects the plea agreement, this agreement shall be null and void at the option of either the United States Attorney or the Defendant. In this regard the Defendant hereby waives any defense to any charges which it might otherwise have under any statute of limitations or the Speedy Trial Act.

12.    <u>Information For Presentence Report</u>

Defendant agrees to provide all information requested by the United States Probation Office

concerning its assets, income and financial condition.

13.    Civil Liability

By entering into this agreement, the United States Attorney does not compromise any civil liability, including but not limited to any tax liability or any liability under the Natural Resources Damage Assessment, which Defendant may have incurred or may incur as a result of its conduct and its plea of guilty to the charges specified in paragraph 1 of this agreement. BTC acknowledges and understands that its convictions pursuant to this plea agreement will trigger the debarment from government contracts and grants provisions of 33 U.S.C. §1368 and 40 C.F.R. Part 33.

14.    Restitution

The Oil Pollution Control Act of 1990, 33 U.S.C. §2701, *et seq.*, sets forth a comprehensive process for assessing and restoring natural resource damages, as well as other forms of damages that result from oil spills. BTC acknowledges and concedes that it is the Responsible Party for purposes of the damage assessment conducted pursuant to this statute. The United States Attorney and the Defendant further recognize and acknowledge that the process for determining such damages is underway with respect to the Buzzards Bay Oil Spill. In light of the availability of that forum to determine the value of the loss to the victims of the Buzzards Bay Oil Spill, as well as the complexity of the loss valuation issues, the United States Attorney and the Defendant agree that the complication and prolongation of the sentencing process that would result from fashioning an appropriate restitution order outweigh the need to provide for restitution to the victims in the context of this criminal case. Defendant agrees that nothing in this paragraph shall be construed to eliminate or reduce Defendant's civil liability to any federal, state, local or private party. Defendant further agrees that nothing in this plea agreement shall be construed to eliminate or reduce Defendant's obligations arising out of the requirements for damage restorations or claims contained in the Oil Pollution Act of 1990, 33 U.S.C. §2701, *et seq.* in connection with the Buzzards Bay Oil Spill. Defendant further agrees that nothing in this paragraph shall be construed to eliminate or reduce its liability or obligation for the restoration, rehabilitation or replacement of the natural resources damaged, destroyed or injured as a result of the Buzzards Bay Oil Spill.

15.    Withdrawal of Plea Agreement

Should Defendant's guilty plea not be accepted by the Court for whatever reason, or later be withdrawn on motion of Defendant, this agreement shall be null and void at the option of the United States Attorney.

16.    Breach of Agreement

If the United States Attorney determines that Defendant has failed materially to comply with any provision of this agreement, or has committed any crime during the pendency of this agreement, the United States Attorney may, at his sole option, be released from his commitments under this

agreement in their entirety by notifying Defendant, through counsel or otherwise, in writing. The United States Attorney may also pursue all remedies available to him under the law, irrespective of whether he elects to be released from his commitments under this agreement. Defendant recognizes that no such breach by it of any obligation under this agreement shall give rise to grounds for withdrawal of its guilty plea. Defendant understands that should any such breach of this agreement occur, the United States Attorney will have the right to use against Defendant before any grand jury, at any trial, hearing or for sentencing purposes, any statements made by its employees and agents, and any information, materials, documents or objects provided by Defendant to the United States Attorney pursuant to this agreement without any limitation. In this regard, Defendant hereby waives any defense to any charges which it might otherwise have under any statute of limitations or the Speedy Trial Act.

17.    Who Is Bound By Agreement

This agreement is limited to the United States Attorney for the District of Massachusetts and cannot and does not bind the Attorney General of the United States or any other federal, state or local prosecutive authorities.

18.    Complete Agreement

This agreement is the complete and only agreement between the parties. No promises, agreements or conditions have been entered into other than those set forth in this letter. This agreement supersedes prior understandings, if any, of the parties, whether written or oral. This agreement cannot be modified other than in a written memorandum signed by the parties or on the record in court.

If this letter accurately reflects the agreement entered into between the United States Attorney and Defendant, please sign the Acknowledgment of Plea Agreement below, and affix Defendant's corporate seal. Please also have the signatures of the corporate signatories notarized. In addition, please provide a copy of requisite authorization to enter into this agreement, by Defendant's directors (the original to be provided to the Court). Return the original of this letter to Assistant United States Attorney Joshua S. Levy.

Sincerely,

MICHAEL J. SULLIVAN
United States Attorney

By: 

JAMES B. FARMER
Assistant U.S. Attorney
Chief, Criminal Division

STEPHEN P. HEYMANN
Assistant U.S. Attorney
Deputy Chief,
Criminal Division

JOSHUA S. LEVY
Assistant U.S. Attorney

NADINE PELLEGRINI
Assistant U.S. Attorney

PETER KENYON
Senior Criminal Enforcement Counsel
Environmental Protection Agency

12

## ACKNOWLEDGMENT OF PLEA AGREEMENT
Bouchard Transportation Company

I have read this letter of agreement in its entirety, and have discussed it with the directors of Bouchard Transportation Company and with its attorneys. I hereby represent that I am an officer of Defendant corporation and that I am duly authorized to enter into this agreement. I hereby acknowledge that this letter of agreement fully sets forth the agreement of Bouchard Transportation Company with the United States Attorney for the District of Massachusetts. I further state that there have been no additional promises or representations made to or for the benefit of Bouchard Transportation Company by any officials of the United States Attorney in connection with this matter.

For Defendant
Bouchard Transportation Company

Date: 3/25/04

Corporate Seal:

Notary Acknowledgment and Seal:

VICTOR PAUL CORSO
Notary Public, State of New York
No. 02CO4984194
Qualified in Suffolk County
Certificate Filed in New York County
Commission Expires July 10,
November 29, 2005

I certify that this plea agreement letter has been reviewed by a duly authorized official of Bouchard Transportation Corporation and that he/she understands its terms.

Date: March 26, 2004
Ronald W. Zdrojeski, Esq.
Attorney for Bouchard Transportation Corporation

Date: March 26, 2004
Thomas M. Russo
Attorney for Bouchard Transportation Corporation

13

[page added for double-sided printing]

# Exhibit C

Press Release, U.S. Attorney, District of
Massachusetts, Bouchard Transportation
Company Agrees to Plead Guilty to Criminal
Charges and Pay $10 Million Fine Related to
April 2003 Buzzards Bay Oil Spill (Mar. 29, 2004)

[page added for double-sided printing]



**U.S. Department of Justice**

*Michael J. Sullivan*
*United States Attorney*
*District of Massachusetts*

MJS

Press Office· (617) 748-3139

John Joseph Moakley United States Courthouse, Suite 9200
1 Courthouse Way
Boston, Massachusetts 02210

March 29, 2004

<u>PRESS RELEASE</u>

### BOUCHARD TRANSPORTATION COMPANY AGREES TO PLEAD GUILTY TO CRIMINAL CHARGES AND PAY $10 MILLION FINE RELATED TO APRIL 2003 BUZZARDS BAY OIL SPILL

Boston, MA... United States Attorney Michael J. Sullivan; Michael E. Hubbard, Special Agent in Charge of the Environmental Protection Agency Region I's Criminal Investigation Division; William Schenkelberg, Special Agent in Charge of the Northeast Region of the U.S. Coast Guard Investigative Services; and Thomas J. Healy, Special Agent in Charge of the U.S. Fish and Wildlife Service's Office of Law Enforcement, announced today the filing of a criminal Information charging **BOUCHARD TRANSPORTATION COMPANY** ("BTC"), based in Hicksville, New York, in connection with the April 27, 2003 oil spill in Buzzards Bay. In a plea agreement also filed with the Court today, **BTC** has agreed to plead guilty to both counts in the Information, pay a fine of $10 million, and comply with several remedial measures designed to prevent any future spills by **BTC**.

The Information charges **BTC** with one count of violating the Clean Water Act by negligently causing the discharge of thousands of gallons of oil into Buzzards Bay on April 27, 2003, when the oil barge its tugboat was towing, traveled outside the clearly marked Buzzards Bay channel and struck rocky shoals lying at a depth of 22 feet.   **BTC** negligently caused the oil spill because its employee, the mate in charge of the vessel, operated the tugboat in a negligent manner and because **BTC** allowed this individual to remain at the helm of one of its tugboats despite repeated concerns that were raised about his competency.

The second count of the indictment alleges that **BTC** violated the Migratory Bird Treaty Act by killing protected bird species as a result of this oil spill. According to the Information, the April 2003 oil spill killed 450 federally protected birds, necessitated the closure of thousands of acres of shellfish beds in Buzzards Bay, and affected close to 90 miles of Massachusetts' beaches and coastline.

"The U.S. Attorney's Office is committed to protecting the precious natural resources in Buzzards Bay and throughout the Commonwealth," stated U.S. Attorney Sullivan. "This substantial fine of $10 million will provide critically needed funds to enhance conservation efforts.   Bouchard Transportation will also be required to comply with strict requirements aimed at preventing this type of environmental tragedy from ever happening again."

### The Criminal Charges

As alleged in the Information, the oil spill occurred during the afternoon of April 27, 2003, a bright and clear day. A **BTC** owned and operated tugboat, named the *Evening Tide*, was traveling en route from Philadelphia to Sandwich, Massachusetts. The *Evening Tide* was towing an unpowered barge loaded with over four million gallons of #6 oil, a thick, viscous and adhesive petroleum. All navigational, communications, and steering systems aboard the *Evening Tide* were in good working order. Navigational charts identifying all hazards in the area, which are published by the National Oceanic and Atmospheric Administration, were on-board the *Evening Tide* in paper and electronic form.

According to the Information, while traveling northwards, the *Evening Tide* veered off course as neared the first green buoy marking the beginning of Buzzards Bay channel. The *Evening Tide* and the barge traveled to the west of the first green buoy, the Information alleges, striking a series of rocks. The impact from the collision ripped a twelve foot hole in the bottom of the barge, rupturing one of the barge's ten separate tanks containing oil.

The Information alleges that on the afternoon of April 27, 2003, the Mate was at the helm of the *Evening Tide* (the "Evening Tide Mate") and was the person responsible for navigating and piloting the tugboat and barge during these hours. According to the Information, the *Evening Tide* Mate allowed the boat to drift off course and towards the rocks when he left the wheelhouse for an extended period of time to work at the stern of the tugboat. In leaving the wheelhouse unoccupied, the *Evening Tide* Mate violated the *Evening Tide*'s "Watch Standing Orders" which stated that the Mate or Captain shall, "never leave the bridge unattended while underway."

The Information also alleges that the *Evening Tide* Mate did not monitor radio communications. As a result, the Information alleges, the *Evening Tide* Mate missed efforts by a vessel traveling behind the tugboat to warn the *Evening Tide* Mate that his boat was heading out of the clearly marked Buzzards Bay Channel.

According to the Information, **BTC** was on notice of complaints concerning the competency of the *Evening Tide* Mate. In particular, other captains who had worked with the *Evening Tide* Mate during his eight months with the company had raised questions with BTC's headquarters about whether the *Evening Tide* Mate was sufficiently qualified to be at the helm of a tugboat towing a barge loaded with oil.

### The Terms of Plea Agreement

Under the terms of the plea agreement, **BTC** will be required to pay $9 million of the $10 million fine at the time of sentencing. $7 million of the fine proceeds will be deposited in the North American Wetlands Conservation Fund for BTC's violations of the Migratory Bird Treaty Act. This fund is used by the Department of the Interior to finance public-private partnerships aimed at carrying out long term conservation projects that provide and enhance habitat for the migratory birds, fish and wildlife which depend on these fragile areas for their survival. The other $2 million will be directed toward the Oil Spill Liability Trust Fund for **BTC**'s violations of the Clean Water Act. The Oil Spill

Liability Trust Fund is administered by the U.S. Coast Guard and used to pay clean up costs and damage claims for oil spills in which the responsible party is unknown.

**BTC** will also be placed on probation for a period of three years. The final $1 million portion of the criminal fine will be suspended and will be imposed only if **BTC** fails to comply with the conditions of probation. The conditions of probation imposed through the plea agreement include several remedial measures designed to prevent this type of oil spill from occurring again, including the following:

- **BTC** will be required to hire a local pilot, experienced with the waters of Buzzards Bay, to guide BTC tugboats and barges through Buzzards Bay;

- **BTC** will adhere to an extensive compliance program designed to address various operational deficiencies pertinent to the oil spill, including the hiring process for new mates, the training program for new mates, and **BTC**'s evaluation system for mates and captains;

- all **BTC** vessels will be required to maintain radio communications with other vessel traffic at all times; and

- **BTC** will be required to place a crew member inside the wheelhouse at all times.

### *The Investigation*

As a condition of its plea agreement with the United States, **BTC** has also agreed to disclose to the government the results of its internal investigation into this oil spill.

The investigation is continuing.

The investigation is being conducted by the Environmental Protection Agency's Criminal Investigation Division, the U.S. Coast Guard Investigative Services, and the U.S. Fish and Wildlife Service's Office of Law Enforcement. The U.S. Attorney would also like to recognize the U.S. Secret Service and the Massachusetts Environmental Police for their assistance to investigators on the case. This case is being prosecuted by Assistant U.S. Attorneys Joshua S. Levy and Nadine Pellegrini, along with the Environmental Protection Agency's Senior Criminal Enforcement Counsel, Peter Kenyon. The federal investigation also received substantial assistance from Assistant Attorney General Paul Molloy of the Massachusetts Attorney General's Environmental Crimes Strike Force.

Press Contact: Samantha Martin, (617) 748-3139

Bouchard Transportation Company Press Statement:
March 29, 2004

Morton S. Bouchard III, President/ CEO

In my first public statement since this most unfortunate accident, I would like to begin by apologizing to the citizens of Massachusetts and Rhode Island who have been affected by the accident. I assure you that I personally feel your anger and disgust about the effects of this accident, and that I have made and will continue to make changes within Bouchard that will help prevent the likelihood of another such tragedy.

This past month I took the lead in persuading the industry to accept the voluntary navigation routing system that was proposed by the Northeast Pilots and the Coalition for Buzzards Bay, and I commend their efforts in working within our industry to see that the energy needs of the citizens of Massachusetts are met in an environmentally safe manner.

During the calendar year 2003 and to date in 2004, Bouchard affiliates transported:

| 2004 | TOTAL VOLUMES | | TRIPS |
|------|---------------|---|-------|
| New England Area Deliveries: | January 01 through March 15 | | |
| PROVIDENCE | 1,136,787 | BBLS | 11 |
| NEW BEDFORD | 64,362 | BBLS | 1 |
| SANDWHICH/BOSTON | 2,496,151 | BBLS | 26 |
| PORTSMOUTH | 599,560 | BBLS | 6 |
| PORTLAND | 712,610 | BBLS | 8 |
| BUCKSPORT SEARSPORT | 149,507 | BBLS | 2 |
| TOTALS | 5,158,977 | BBLS | 54 |

- 1 -

**Year 2003**

| | TOTAL VOLUME MOVED | Total Moves Made |
|---|---|---|
| | 227,251,095  BBLS | 4,036 |

New England Area Deliveries:

| | | |
|---|---|---|
| PROVIDENCE | 4,636,880 BBLS | 94 |
| NEW BEDFORD | 717,979 BBLS | 9 |
| SANDWHICH | 1,596,222 BBLS | 18 |
| BOSTON | 5,141,967 BBLS | 59 |
| PORTSMOUTH | 1,452,531 BBLS | 22 |
| PORTLAND | 4,703,895 BBLS | 59 |
| BUCSPORT SEARSPORT | 739,370 BBLS | 11 |
| **TOTALS** | **18,988,844  BBLS** | **272** |

We are committed to serving the energy needs of New England safely and to contributing to the area's economic health.

Bouchard has spent over $200 million dollars on double hulls, was the first domestic tug and barge company to build double hull tank barges in 1990, and has 12 in operation with the 13th due for delivery in May 2004.  Future construction projects are also being studied.

As you would expect in any settlement, Bouchard is not in full agreement with all aspects of the plea agreement. However, we feel that it is in the best interests of the communities and citizens affected to put this aspect of the incident behind us and to move forward. This agreement does not, of course, affect our continued commitment to working in cooperation with the state and federal authorities in resolving claims and in participating in the joint natural resource damage assessment process.

Once again, sincerest apologizes from my family, my employees, and myself.

*- ends -*

For further information please contact:
James R. Lawrence
Tel. 203 550 2621

[page added for double-sided printing]

# Exhibit D

Government's Assented-To Status Report, *United States v. Bouchard Transportation Company, Inc.*, No. 04-cr-10087-MBB (D. Mass., filed Oct. 22, 2004) (ECF No. 16)

[page added for double-sided printing]

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
CLERKS OFFICE

2004 OCT 22  A 10: 42

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) |
| BOUCHARD TRANSPORTATION | ) |
| COMPANY, INC., | ) |
| | ) |
| Defendant. | ) |

Case No. 04-10087-MBB
DISTRICT COURT
DISTRICT OF MASS.

## GOVERNMENT'S ASSENTED-TO STATUS REPORT

The government hereby reports that the parties are prepared to move forward with sentencing in this matter. By way of background, the government states as follows:

1. At the originally-scheduled sentencing hearing in this matter on September 14, the Court expressed concern about whether the plea agreement was legally supported. Specifically, the Court questioned whether, under the so-called Alternative Fine Statute, 18 U.S.C. § 3571(d), the loss associated with Count 2 of the Information, charging Bouchard with violating the Migratory Bird Treaty Act ("MBTA"), could support the $7 million fine that the parties attribute in their plea agreement to that count. The government advocates that the Court direct this fine to wetlands conservation projects in the Buzzards Bay Watershed, the area directly affected by the spill.

2. The Court invited the parties to address this concern either by filing briefs in support of the plea agreement and Information, or, in consultation with the U.S. Probation Office, by amending the Plea Agreement and Information.

3. The government has since had extensive discussions with Probation about the plea agreement and how to calculate loss under the MBTA.

4. Although the government reserves its right to argue that the plea agreement is legally supported in every respect, in an effort to facilitate a resolution, the parties have agreed to amend the

plea agreement and Information in a manner consistent with the Probation Office's view about how loss ought to be calculated under the MBTA.

5.      Specifically, the government filed with this Report a Superseding Information in which Count 2 has been amended to reflect the killings of "birds," as opposed to the single "bird" charged in the original Information. The Superseding Information otherwise is materially identical to the original Information. The Probation Office has represented to the parties that the charging of multiple bird deaths in this way would allow the Court to consider as relevant conduct under Count 2 the total loss to the bird population caused by the oil spill.

6.      Although the Department of the Interior's assessment of bird-related damages will not be completed in the near future, the government has presented the Probation Office with evidence supporting a loss in excess of $5,000,000. The Probation Office has represented to the government that the evidence is sufficient to support the fine to which the parties agreed in the original plea agreement. The defendant also agrees that the loss to the bird population of Buzzards Bay exceeds $5,000,000.

7.      Accordingly, the parties shortly will file a Superseding Plea Agreement that is materially identical to the original agreement.

8.      The government requests that the court set a combined change of plea and sentencing hearing on the Superceding Information on Thursday, October 28, 2004, or on a date as soon thereafter as possible.

2

9. The defendant does not object to this Report.

Respectfully submitted,

Dated: October 22, 2004

MICHAEL J. SULLIVAN
United States Attorney

By:

Jonathan F. Mitchell
Assistant U.S. Attorney

3

## CERTIFICATE OF SERVICE

This is to certify that I have this day served upon the person listed below a copy of the foregoing document by fax and by mail:

>       Ronald J. Zdrojeski, Esq.
>       LeBoeuf, Lamb, Greene & McRae, LLP
>       225 Asylum Street, 13th Floor
>       Hartford, CT 06103
>       (860) 985-3026

This 22th day of October, 2004.

JONATHAN F. MITCHELL
ASSISTANT UNITED STATES ATTORNEY

4

# Exhibit E

Superseding Information, *United States v. Bouchard Transportation Company, Inc.*, No. 04-cr-10087-MBB (D. Mass., filed Oct. 22, 2004) (ECF No. 17)

[page added for double-sided printing]

FILED
UNITED STATES DISTRICT COURT CLERK'S OFFICE
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Criminal No. 04-10087-MBB |
| | ) | |
| v. | ) | Violations: |
| | ) | 33 U.S.C. §§1319(c)(1), 1321(b)(3) |
| | ) | (Clean Water Act) |
| BOUCHARD TRANSPORTATION | ) | 16 U.S.C. §§703, 707 |
| COMPANY, INC. | ) | (Migratory Bird Treaty Act) |
| Defendant. | ) | |

## SUPERSEDING INFORMATION

THE UNITED STATES ATTORNEY CHARGES THAT:

### The Clean Water Act and the Oil Pollution Act

1.      In the Federal Water Pollution Control Act (the "Clean Water Act"), as amended by the Oil Pollution Act, 33 U.S.C. §1321(b)(1), Congress has declared that it is the policy of the United States that there should be no discharges of oil or hazardous substances into or upon the navigable waters of the United States or the adjoining shorelines.

2.      The Clean Water Act makes it a crime for a person to negligently discharge oil into or upon the navigable waters or contiguous zone of the United States, in such quantities as may be harmful.  33 U.S.C. §§1321(b)(3) and 1319(c)(1).

3.      The Clean Water Act defines a "person" as an individual or a corporation.  33 U.S.C. §1321(a)(7).

4.      The Clean Water Act defines a "discharge" as any spilling, leaking, pumping, pouring, emitting, emptying or dumping.  33 U.S.C. §1321(a)(2).  The Clean Water Act defines "oil" as oil of any kind or in any form, including, but not limited to, petroleum, fuel oil, sludge and oil refuse.  33 U.S.C. §1321(a)(1).

5.     Federal regulations promulgated under the Clean Water Act define a "harmful" quantity of oil as including any discharges of oil that cause a film or sheen upon or discoloration of the surface of the water or adjoining shorelines or cause a sludge or emulsion to be deposited beneath the surface of the water or adjoining shorelines. 40 C.F.R. §110.3.

6.     The Clean Water Act defines the "navigable waters" of the United States as the waters of the United States and the territorial seas, which are defined to be water extending three (3) miles seaward of the low tide mark. 33 U.S.C. §§ 1362(7) and 1362(8).

### Background

7.     At all times relevant to this Information, Bouchard Transportation Company, Inc. ("BTC") was a privately held, New York corporation with its principal place of business in Hicksville, New York.

8.     At all times relevant to this Information, BTC was in the business of the marine transportation of oil and other types of petroleum products, primarily by means of tugboats and barges. BTC's operations were centered along the eastern seaboard of the United States and the Gulf of Mexico.

9.     On or about April 27, 2003, a tugboat owned and operated by BTC, named the Evening Tide, was traveling en route from Philadelphia, Pennsylvania to Sandwich, Massachusetts. The Evening Tide departed from Philadelphia on April 24, 2003.

10.     During this trip, the Evening Tide was hauling a barge named the Bouchard B-120 (the "B-120") to the Mirant Canal Generating Plant located on the southern side of the Cape Cod Canal in Sandwich. The B-120, built in 1975, is a single-hull vessel that weighs 7,912 gross tons and is 376 feet long. The B-120 is comprised of ten separate tanks, five on the port side and five

2

on the starboard side of the vessel.

11.     The B-120 is an unpowered barge and it can only be moved with the assistance of a tugboat. The primary means by which a tugboat, such as the Evening Tide, moves the B-120 is either by towing it, using one of the two steel cables that extend off the stern of the tugboat, or by pushing the barge. The B-120 has a large, triangular shaped notch in her stern, which a tugboat like the Evening Tide can slip into in order to push the barge.

12.     On April 27, 2003, the B-120 was loaded with approximately 99,000 barrels of #6 oil, also known as Bunker C fuel. #6 oil is a thick, viscous and adhesive petroleum product that is primarily used by utilities and power plants. Measured in gallons, the B-120 was carrying more than four million gallons of # 6 oil as it traveled through Buzzards Bay on April 27, 2003. With the load it was carrying on this date, the draft of the B-120 (*i.e.* the depth to which the barge extended into the water) was approximately 25 feet, six inches.

13.     For this trip from Philadelphia to Sandwich, the Evening Tide had a crew of six individuals, comprised of a captain (the "Evening Tide Captain"), a mate, two deck hands, a chief engineer and an assistant engineer. The crew worked in six hour shifts, with each shift consisting of either the captain or the mate, one deck hand and one of the engineers. The unpowered B-120 was manned by a two-person crew, a captain and a mate, who worked in six hour shifts. As a general matter, the crew of the Evening Tide worked on the boat for three weeks at a time, followed by three weeks off.

14.     The mate on the Evening Tide (the "Evening Tide Mate") was hired by Bouchard as a mate in August 2002. The duties of the mate are to be in charge of all aspects of the tugboat operations during the twelve hours each day when the mate is on-duty and the captain is off-duty.

3

According to Bouchard's Responsible Carrier Plan, when on duty the mate is responsible for, among other things, "navigat[ing] the vessel in a safe and prudent manner . . . complying with all applicable U.S. Coast Guard Inland Navigation Rules." The mate must also "observ[e] [BTC's] look-out policy," by maintaining a "proper look-out by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and the risk of collision." The mate is also responsible for maintaining radio communications with other vessels during his watch.

15.     The Evening Tide Mate was initially assigned to the informal mate training program at Bouchard for a few weeks, in which he served alongside an experienced captain as an extra person during the captain's shift. The Evening Tide Mate was then promoted out of the training program to be a full mate aboard two other BTC tugboats -- the Ellen Bouchard and then the J. George Betz -- prior to being assigned to the Evening Tide. The BTC captains who worked with the Evening Tide Mate advised BTC's headquarters that they had doubts about the Evening Tide Mate's ability to handle the responsibilities of a mate in charge of a tugboat hauling an oil barge.

16.     Despite these negative reports about the Evening Tide Mate's competency, the Evening Tide Mate was only briefly re-assigned to the BTC mate training program in early 2003. The Evening Tide Mate was then assigned to serve as the mate aboard the Evening Tide beginning in February 2003.

17.     The Evening Tide Mate's problems continued on the Evening Tide. The Evening Tide Mate caused a barge to collide with the dock in Philadelphia in March 2003. Although there was no oil spill as a result of this incident, there was property damage to the dock. This

4

incident was reported to BTC's headquarters and the Evening Tide Mate admitted causing the accident because he misjudged the wind and current. The captain of the barge reported that the accident resulted from the Evening Tide Mate "closing on [the] dock at a fast rate" and making "corrections" that caused the barge to collide with the dock.

18.     The Evening Tide Captain also called BTC headquarters to complain about the Evening Tide Mate, but the Evening Tide Mate remained assigned to the Evening Tide and commenced a new three-week stint as the mate on April 24, 2003.

19.     The Evening Tide Mate experienced more difficulties shortly after midnight on April 27, 2003, a little more than twelve hours before the oil spill occurred. At this time, the Evening Tide Mate improperly released the starboard side tow wire off the stern of the Evening Tide, causing it to tangle and rendering it inoperable. The cost of repairing the damage caused to the starboard side tow wire as a result of this incident was several thousand dollars. The Evening Tide was still able to tow the B-120 barge by switching to the port side tow wire.

### The Oil Spill

20.     The weather on the afternoon of April 27, 2003 was beautiful; it was a bright and clear day, with winds at 10-15 knots out of the North. The sea swells that day were running three to five feet in a southwesterly direction. All the navigational, communications, mechanical and steering equipment systems aboard the Evening Tide were in good working order throughout that day.

21.     On April 27, 2003, the Evening Tide Mate was in charge of the vessel during the noon to 6:00 p.m. shift. The Evening Tide Captain was off-duty for that shift. The Evening Tide approached the entrance to Buzzards Bay Channel, as delineated by the first of a series of

5

red and green navigational buoys which clearly mark the channel, at approximately 4:30 p.m. The first navigational buoy a ship encounters as it enters the Buzzards Bay Channel from the south is a green navigational buoy located at 41-25-48 degrees North and 071-02-18 degrees West (hereinafter "the First Buzzards Bay Buoy"). All of these navigational buoys, as well as the hazards in Buzzards Bay and the depths of the various rocky shoals in this area, are clearly marked on the widely used navigational charts published by the National Oceanic and Atmospheric Administration ("NOAA"). These NOAA charts for Buzzards Bay were on-board the Evening Tide on April 27, 2003, both in paper form and on the navigational software installed on the ship's computer.

22.     As the Evening Tide was approaching the entrance to Buzzards Bay Channel it was towing the B-120, using the steel cable off the stern of the Evening Tide, which was connected to a cable wire off the bow of the B-120.    At this time, the length of the cable wire connecting the Evening Tide to the B-120 was approximately 1,200 feet.

23.     A second tug boat, the Carl Ray, which is owned and operated by a different company, was also traveling northwards towards Buzzards Bay Channel on the afternoon of April 27, 2003. Like the Evening Tide, the Carl Ray was towing a barge loaded with oil. The Carl Ray was approximately two nautical miles behind the Evening Tide, to its southeast.

24.     Prior to reaching the entrance to Buzzards Bay Channel, at approximately 4:10 p.m., the mate on the Carl Ray attempted to contact the Evening Tide several times. After initially not receiving a response, he spoke with the Evening Tide Mate and stated that the Carl Ray would be slowing down to shorten its tow wire.

6

25. Shortly thereafter, the captain of the Carl Ray, who joined his mate in the wheelhouse of the Carl Ray, observed the route the Evening Tide was traveling as it approached the First Buzzards Bay Buoy. The captain of the Carl Ray initiated radio contact with the Evening Tide because the Evening Tide was approaching the Buzzards Bay Channel at the extreme left-hand side of the channel instead of heading for the center of the channel, as is customary. The captain of the Carl Ray was very concerned that the Evening Tide was approaching more shallow areas of Buzzards Bay, punctuated by several reefs, which exist just outside the marked channel. Immediately to the west of the First Buzzards Bay Buoy is an area of several rocky reefs that lie 22 feet below the surface. By contrast, the depths within the marked Buzzards Bay Channel range between 42 and 63 feet.

26. The captain of the Carl Ray, despite efforts to reach the Evening Tide over the radio for several minutes, was unable to reach anyone on the Evening Tide because the Evening Tide Mate failed to maintain radio communications. For the second time that afternoon, no one aboard the Evening Tide responded promptly to the repeated attempts by the Carl Ray to communicate via the radio. As a result, the Evening Tide Mate missed the warnings from the Carl Ray that the Evening Tide was off course.

27. The Evening Tide Mate's conduct, in failing to assign a crew member to relieve him in the wheelhouse and monitor the radio, violated the Evening Tide's "Watch Standing Orders" issued by Evening Tide captain Jon Richardson in January 2001. Among other things, these standing orders, which were aboard the Evening Tide on April 27, 2003, stated that the mate or captain shall "never leave the bridge UN-attended (sic) while underway or at anchor unless properly relieved."

7

28. After several minutes, the Evening Tide Mate initiated a radio call to the Carl Ray in which the Evening Tide Mate stated that he was having difficulty bringing in his tow wire. The captain of the Carl Ray asked the Evening Tide Mate if he was where he wanted to be in the channel, in reference to the highly unorthodox approach the Evening Tide was taking. The Carl Ray received a garbled response.

29. After this brief exchange with the Evening Tide Mate, the mate and the captain of the Carl Ray both watched closely as the Evening Tide approached the First Buzzards Bay Buoy. Each of these individuals saw the Evening Tide and the B-120 pass the First Buzzards Bay Buoy with the buoy off the starboard side of the vessels. In other words, the Evening Tide and the B-120 traveled to the west of the First Buzzards Bay Buoy, outside the well-marked Buzzards Bay Channel. According to these witnesses, the B-120 and the Evening Tide were approximately 1/4 of a mile on the far side of the First Buzzards Bay Buoy.

30. The B-120 struck a rock outcropping to the west of the First Buzzards Bay Buoy as it traveled outside Buzzards Bay Channel. This reef is marked on the NOAA navigational charts as being at a depth of 22 feet.

31. At the time of the accident, the Evening Tide and the B-120 were traveling at a speed of approximately 6 knots. The impact of the barge striking the rocks at this location ripped a twelve-foot long gash slightly to the starboard side of the keel line on the bottom of the B-120. The hole in the bottom of the barge, which was constructed of thick steel, was as wide as one foot at certain points and up to twenty-one inches deep. The damage caused by this collision with the reef was limited to the #2 tank on the starboard side of the B-120.

8

## The Impact of the Oil Spill

32.     As a result of this collision with the reef, tens of thousands of gallons of #6 oil was released into Buzzards Bay from the gaping hole in the B-120.   The estimates of the size of the spill range from 22,000 gallons to 98,000 gallons.

33.     The discharge of this heavy, sticky oil was especially harmful to the fragile bird population in this area.   More than 450 federally-protected birds were killed when they came into contact with the #6 oil discharged from the B-120.   More than half of the birds killed by the BTC oil spill were Common Loons, Red Throated Loons, Common Eiders or Black Scoters.   Oil from this spill also caused the death of a wide variety of other protected birds, including Black Backed Gulls, Dunlins, Herring Gulls, Long-tailed Ducks, Black Ducks, Buffleheads, Canada Geese, Common Terns, Gannets, Greater Scaups, Mergansers, Grebes, Swans, Razorbills, Scoters, Willets and Yellowlegs.   Only a small number of birds who came into contact with the #6 oil from this spill were rehabilitated and returned to the wild.

34.     The oil spill also forced the immediate closure of thousands of acres of shellfish beds in Buzzards Bay, a large portion of which remained closed for several months following the oil spill.   Oil from the B-120 affected close to 90 miles of Massachusetts beaches and coastline. The total cost of cleaning up this oil spill is still being determined and it is expected to run into the tens of millions of dollars.   The long-term impact from the release of this oil into the water, in terms of marine life, the bird population and the overall ecology of Buzzards Bay will not be known for several years.

9

## COUNT ONE -- 33 U.S.C. §§1319(c)(1), 1321(b)(3)
### (Clean Water Act -- Negligent Discharge of Pollutant)

THE UNITED STATES ATTORNEY FURTHER CHARGES THAT:

35.     Paragraphs 1-34 are realleged and incorporated by reference as though fully set

forth herein.

36.     On or about April 27, 2003 in Buzzards Bay, in the District of Massachusetts and

elsewhere, the defendant,

### BOUCHARD TRANSPORTATION COMPANY

negligently caused the discharge of a harmful quantity of oil from its barge, the Bouchard B-120,

into and upon the navigable waters of the United States.

All in violation of Title 33 U.S.C. §§1319(c)(1) and 1321(b)(3).

## COUNT TWO- 16 U.S.C. §§703 and 707(a)
### (Migratory Bird Treaty Act)

THE UNITED STATES ATTORNEY FURTHER CHARGES THAT:

37.     Paragraphs 1-34 are realleged and incorporated by reference as though fully set forth herein.

38.     On or about April 27, 2003 in Buzzards Bay, in the District of Massachusetts and elsewhere, the defendant,

### BOUCHARD TRANSPORTATION COMPANY

without being permitted to do so by regulation as required by law, did kill migratory non-game birds.

All in violation of the Migratory Bird Treaty Act, Title 16, U.S.C. §§703 and 707(a) and Title 50, *Code of Federal Regulations*, §21.11.

MICHAEL J. SULLIVAN
United States Attorney

By:

Jonathan F. Mitchell
Nadine Pellegrini
Assistant U.S. Attorneys

Peter Kenyon
Senior Criminal Enforcement Counsel
Environmental Protection Agency

Dated: October 22, 2004

11

CERTIFICATE OF SERVICE

This is to certify that I have this day served upon the person listed below a copy of the foregoing document by fax and mailing a copy of same:

> Ronald J. Zdrojeski, Esq.
> LeBoeuf, Lamb, Greene & McRae, LLP
> 225 Asylum Street, 13th Floor
> Hartford, CT 06103
> (860) 985-3026

This 22th day of October, 2004.

JONATHAN F. MITCHELL
ASSISTANT UNITED STATES ATTORNEY

# Exhibit F

Plea Agreement (Amended) (Oct. 18, 2004),
*United States v. Bouchard Transportation
Company, Inc.*, No. 04-cr-10087-MBB (D. Mass.,
filed Nov. 1, 2004) (ECF No. 18)

[page added for double-sided printing]



**U.S. Department of Justice**

*Michael J. Sullivan*
*United States Attorney*
*District of Massachusetts*

FILED
IN CLERK'S OFFICE

2004 NOV -1 P 2 3'

DISTRICT OF MASS.

*Main Reception: (617) 748-3100*

*United States Courthouse, Suite 9200*
*1 Courthouse Way*
*Boston, Massachusetts 02210*

October 18, 2004

Ronald W. Zdrojeski, Esq.
LeBoeuf, Lamb, Greene & MacRae
225 Asylum Street, 13th Floor
Hartford, CT   06103

Thomas M. Russo, Esq.
Freehill, Hogan & Maher
80 Pine Street
New York, NY   10005

Re:   <u>United States v. Bouchard Transportation Company</u>, CR-04-10087-MBB.

Dear Counsel:

This letter sets forth the agreement entered into between the United States Attorney for the District of Massachusetts (the "United States Attorney") and your client, Bouchard Transportation Company ("BTC" or the "Defendant"), in the above-captioned matter.  The agreement is as follows:

1.     <u>Guilty Plea</u>

On or before October 21, 2004, or such date as the Court may determine, Defendant shall plead guilty to the Superseding Information to be filed in the District of Massachusetts in substantially the form attached, charging it with (i) one count of illegally discharging oil into the navigable waters of the United States in violation of the Clean Water Act, Title 33 U.S.C. §§ 1319(c)(1), 1321(b)(3) and (ii) one count of killing migratory birds in violation of the Migratory Bird Treaty Act, Title 16 U.S.C. §§ 703, 707.  This agreement supersedes the written plea agreement between the parties dated March 10, 2004, which the parties hereby agree to be null and void.

2.     <u>Penalties</u>

Defendant understands and agrees that the statutory maximum penalties for the counts to which it is pleading guilty are as follows:

A.   Clean Water Act
-   two times the pecuniary loss caused by the offense pursuant to 18 U.S.C. §3571(d);
-   five years probation;
-   restitution; and
-   $125 special assessment pursuant to 18 U.S.C. §3013(a)(1)(B)(iii).

B.   Migratory Bird Treaty Act
-   two times the pecuniary loss caused by the offense pursuant to 18 U.S.C. §3571(d);
-   five years probation;
-   restitution; and
-   $50 special assessment pursuant to 18 U.S.C. §3013(a)(1)(B)(ii).

3.   Sentencing Guidelines

The United States Attorney and Defendant agree that the version of United States Sentencing Guidelines ("U.S.S.G.") incorporating guideline amendments through November 1, 2002 shall cover these offenses to the limited extent that the guidelines apply in this context. The United States Attorney and the Defendant further agree that pursuant to § 8C2.1 (commentary) and § 8C2.10 of the United States Sentencing Guidelines, which pertain to the sentencing of organizations, the Sentencing Guidelines do not determine the fine range in environmental cases, but rather leave such determination to the sound discretion of the Court in accordance with 18 U.S.C. §§ 3553, 3571 and 3572.

4.   Corporate Authorization

Within one week of the execution of this plea agreement, BTC will provide to the United States Attorney and to the Court written evidence, in the form of a notarized resolution of its Board of Directors, certifying that Defendant is authorized to waive its right to indictment, to plead guilty to the Superseding Information in this case, and to enter into and comply with all provisions of this agreement. The resolution shall further certify that an identified individual is authorized to take these actions and that all corporate formalities, including, but not limited to, approval by Defendant's directors, required for such authorization have been observed.

Defendant agrees that Ronald W. Zdrojeski or Thomas M. Russo, as attorneys for BTC, and pursuant to a duly authorized power of attorney for the Defendant, will be authorized to appear on its behalf, to enter its guilty plea and to represent it for imposition of its sentence.

2

5. Agreed Disposition

A. **Agreed upon Sentence**

The United States Attorney and Defendant agree, pursuant to Fed. R. Crim. P. 11(c)(1)(C), that the following is the appropriate disposition of this matter:

    i.    $10,000,000 fine to be paid as specified below in paragraph 5.B;

    ii.    a three year term of probation, during which the Defendant must comply with the special conditions of probation set forth in paragraph 8 below; and

    iii.    a $175 special assessment.

B. **Method of Payment**

Upon imposition of the sentence, the parties agree that $9 million of the fine and the special assessments, totaling $9,000,175, be payable forthwith. $1 million out of the total fine will be suspended, provided that if BTC fails, in a material manner, to implement the special conditions of probation set forth in section 8 below, the Court may order the defendant to pay the suspended portion of this fine.

Defendant agrees to convey the entire amount of the fines and special assessments due forthwith – $9,000,175 – by wire transfer to the Clerk of the United States District Court for the District of Massachusetts. Defendant agrees to make this payment within two business days following the imposition of the sentence.

No amount of the fine shall reduce the Defendant's civil liability to any person or entity, including any federal, state or local government agency. The parties agree that $2,000,000 of the fine shall be imposed for violation of the Oil Pollution Control Act of 1990, 33 U.S.C. §1321(b)(3), and by operation of law, specifically, 33 U.S.C. §1321(s), that amount shall be directed to the Oil Spill Liability Trust Fund. The parties further agree that $7,000,000 of the fine shall be imposed for violation of the Migratory Bird Treaty Act, 16 U.S.C. §§703, 707(a), and by operation of law, specifically, 16 U.S.C. §4406(b), that amount shall be directed to the Department of the Interior to carry out approved wetlands conservation projects.

6. Conditions Precedent

The participation of the United States Attorney in the joint agreement set forth in paragraph 5 of this agreement is conditional upon Defendant's performance of the following obligations:

A.    Defendant shall provide full and truthful cooperation to the United States Attorney as set forth in paragraph 9 of this agreement;

3

B.    No later than two business days prior to sentencing, as scheduled by the Court, Defendant shall notify the United States Attorney that Defendant's counsel is in possession of $9,000,175 in its client funds account with which to pay Defendant's fine and mandatory special assessments as provided in paragraph 5;

C.    BTC shall comply with the remedial measures set forth in paragraph 8 of this agreement; and

If Defendant fails to comply with these conditions prior to sentencing, the United States Attorney shall be free to recommend any sentence, including fine, it deems appropriate.

7.    <u>Mandatory Special Assessment</u>

Defendant agrees to pay the mandatory special assessments, totaling $175, to the Clerk of the Court of the United States District Court for the District of Massachusetts within two business days after the date of sentencing.

8.    <u>Special Conditions of Probation – Remedial Measures</u>

As stated in the paragraph 5 above, the Defendant shall be placed on probation for a period of three years. During this period of time, the Defendant will be required to comply with the conditions of probation set forth below. These special conditions of probation are in addition to, and do not relieve the defendant of complying with, all existing applicable federal laws and regulations.

A.    ***Operational Measures***

i.    *Buzzards Bay Pilotage Requirement:* BTC shall hire a pilot for all trips (north or south) in which a tugboat owned or operated by BTC is traveling with a barge (hereinafter "BTC tugboat/barge unit") into Buzzards Bay, as defined as the body of water between the Cape Cod Canal and the Buzzards Bay Entrance Light [41-23-47.5 North and 71-02-00.6 West] (hereinafter "Buzzards Bay Entrance Light").

a.    In the event a pilot can not board a northbound tugboat/barge unit prior to the Buzzards Bay Entrance Light, the BTC tugboat/barge unit shall: (1) establish and maintain radio communications with a pilot; and (2) establish and maintain radar contact with a pilot prior to proceeding into Buzzards Bay, until a pilot can board the BTC tugboat at the New Bedford pilot station. If a BTC tugboat/barge unit is unable to comply with the conditions set forth in this

4

subparagraph, it shall notify the Captain of the Port Providence prior to entering Buzzards Bay, as defined above. The requirements set forth in this subparagraph shall not apply to: (1) double hull barges; or (2) empty barges carrying only "clingage." Nothing in this subparagraph shall alter the existing authority of a captain of a BTC tugboat to operate that vessel.

b.    In the event that a south-bound BTC tugboat/barge unit can not allow a pilot to disembark after the Buzzards Bay Entrance Light, the BTC tugboat/barge unit shall allow the pilot to disembark at the New Bedford pilot station. Once the pilot has disembarked, the BTC tugboat/barge unit shall: (1) establish and maintain radio communications with a pilot; (2) establish and maintain radar contact with a pilot until it exits Buzzards Bay, as defined above. If a BTC tugboat/barge unit is unable to comply with the conditions set forth in this subparagraph, it shall notify the Captain of the Port Providence. The requirements set forth in this subparagraph shall not apply to: (1) double hull barges; or (2) empty barges carrying only "clingage." Nothing in this subparagraph shall alter the existing authority of a captain of a BTC tugboat to operate that vessel.

ii.    *Maintenance of Radio Contact*: At all times when a tugboat/barge unit operated by BTC is underway, the individual in charge of the watch will be required to monitor radio communications, via the wheelhouse radio or through the use of a hand-held radio, consistent with applicable federal law and regulations;

iii.    *Manning of Wheelhouse*: At all times when a tugboat/barge unit operated by BTC is underway, the individual in charge of the watch will not leave the wheelhouse without designating another crew member to be present in the wheelhouse;

iv.    *Navigational Software Record Compliance*: BTC will operate all navigational software in a manner that ensures that a record is maintained for ten (10) days of the routes actually traveled by BTC tugboat/barge units. The requirements set forth in this subparagraph shall not apply to (1) double hull barges; or (2) empty barges carrying

only "clingage."

B. **_Compliance Program – Independent Consultant_**

BTC agrees to establish and maintain an effective compliance program to ensure compliance with the aforementioned special conditions of probation and with the operational areas set forth below in subparagraph ii. The compliance program will include the following parameters:

i.  BTC agrees that it will retain, at its own expense, the services of an independent consultant. This individual will be responsible for designing and administering this compliance program. The Defendant agrees to give the consultant full access to all BTC records, employees, facilities and vessels necessary to make a meaningful evaluation of the Defendant's current operations.

ii.  BTC timely retained an independent consultant who was approved by the United States Attorney's Office, and BTC has submitted to the United States Attorney's Office and the United States Coast Guard, a copy of the contract between the consultant and the Defendant which details the scope of the audit. The audit addressed the following areas:

> (1) hiring of mates and captain, including the due diligence performed during the hiring process concerning an applicant's licensing and recency;
> (2) performance evaluations for mates and captains, including new hires;
> (3) the tug and barge watch-standing requirements, radio communications, recency requirements, look-out requirements, manning requirements, proper use of computerized navigational aids and paper charts, preparation of proper voyage plans, and the use of computerized alarm systems to detect deviations from plotted courses;
> (4) oil spill prevention, spill notification and spill response.

The scope of the audit was approved by the United States Attorney's Office and the United States Coast Guard and the Defendant adopted reasonable modifications to the scope of the audit proposed by the United States Attorney's Office and the United States Coast Guard.

iii.  The consultant represented that he followed generally accepted environmental auditing techniques, procedures and policies in designing, implementing and

6

executing the audit, including the reporting of deficiencies and corrective measures;

iv.  The consultant prepared a draft report of his findings and recommendations which was furnished to the Probation Department, the United States Attorney's Office and the United States Coast Guard at the same time it is given to the Defendant;

v.  The consultant prepared a final report of his findings and recommendations which the Defendant furnished to the Probation Department, the United States Attorney's Office and the United States Coast Guard;

vi.  The Defendant submitted a written response to the Probation Office, the United States Attorney's Office and the United States Coast Guard, specifying what actions the Defendant will take to correct any noted deficiencies and regulatory violations;

vii.  The independent consultant will submit annual reports to the Probation Department, the United States Attorney's Office and the United States Coast Guard detailing the implementation of the compliance program. The responsibilities of the independent consultant shall terminate when the period of probation is completed or at an earlier time if the Court, upon motion of either party, determines that the independent consultant's services are no longer needed.

C.  **Corporate Compliance Officer**

BTC appointed a compliance officer for BTC, who is experienced in environmental regulations and compliance, and who will be responsible for all federal and state environmental regulatory compliance. BTC provided the Probation Department, the United States Attorney's Office and the United States Coast Guard with the name and *curriculum vitae* of the individual who has been designated as the corporate compliance officer.

D.  **The Natural Resource Damage Assessment**

BTC will cooperate fully with federal, state and local officials in the Natural Resource Damage Assessment process set forth in the Oil Pollution Control Act of 1990, 33 U.S.C. §2701, *et seq.* BTC will not withdraw its acknowledgment that it is the Responsible Party as it relates to the oil spill in Buzzards Bay involving BTC that occurred on April 27, 2003 (hereinafter the "Buzzards Bay Oil Spill"), for purposes of this Natural Resource Damage Assessment process.

9. <u>Cooperation with Law Enforcement</u>

Defendant agrees to cooperate truthfully and completely with the United States Attorney in its investigation of possible violations of federal and state law and in any trial or other proceedings arising out of the investigation of the Buzzards Bay Oil Spill.

A.  Defendant understands and agrees that its cooperation obligations will require it to do the following:

 i.   provide access to original documents and records;

 ii.  require that, upon request and reasonable notice by the United States Attorney, Defendant's directors, officers and employees make themselves available for interviews by law enforcement agents and for attendance at legal and judicial proceedings, including grand jury sessions, trials and other court hearings; and

 iii. waive any claim of work product privilege with respect to the information disclosed to or obtained by Defendant's counsel through employee and non-employee witness interviews concerning any aspect of the Buzzards Bay Oil Spill.

B.  Defendant further understands and agrees that its cooperation obligations will require it to do the following, within 14 days of the entry of its plea, with respect to work product prepared by BTC's counsel:

 i.   provide all notes and memoranda of interviews compiled and prepared by its counsel of interviews of Defendant's employees as part of its internal investigation into the Buzzards Bay Oil Spill;

 ii.  provide all notes and memoranda of interviews compiled and prepared by their counsel of interviews with individuals who are not directors, officers or employees of the Defendant as part of its internal investigation into the Buzzards Bay Oil Spill;

 iii. make available, upon request and reasonable notice by the United States Attorney, Defendant's counsel who conducted or participated in interviews of any individuals identified in subparagraphs 10(B)(i) and (B)(ii) above to provide information concerning the substance of any such interviews.

As limited to such materials, Defendant and its counsel will provide a complete and full waiver of the attorney-client privilege and the work-product privilege, except as

to those portions of materials containing the mental impressions and opinions of their counsel. Defendant agrees that only portions of materials containing the mental impressions and opinions of their counsel will be redacted from the materials described in this paragraph. The United States Attorney agrees that production of such materials will not be construed as a general waiver of the attorney-client privilege and/or work product privilege as to any communications or materials beyond those referred to in paragraphs 10(B)(i) and (ii) and (iii) above.

C.      If Defendant complies with all the terms of this agreement, the United States Attorney will, upon request of Defendant, advise the Court and any federal, state or local government agency, including licensing agencies or authorities, of the nature and extent of any cooperation provided by Defendant.

10.     Criminal Liability

Provided that the Defendant complies with the terms of this agreement, the United States Attorney agrees not to seek additional criminal prosecution against Defendant in connection with the Buzzards Bay Oil Spill.

11.     Probation Office Not Bound By Agreement

The sentencing disposition agreed upon by the parties is not binding upon the United States Probation Office. Defendant's plea will be tendered pursuant to Fed. R. Crim. P. 11(c)(1)(C). Defendant cannot withdraw its plea of guilty unless the sentencing judge rejects the plea agreement. If the sentencing judge rejects the plea agreement, this agreement shall be null and void at the option of either the United States Attorney or the Defendant. In this regard the Defendant hereby waives any defense to any charges which it might otherwise have under any statute of limitations or the Speedy Trial Act.

12.     Information For Presentence Report

Defendant represents that it has provided all information requested by the United States Probation Office concerning its assets, income and financial condition.

13.     Civil Liability

By entering into this agreement, the United States Attorney does not compromise any civil liability, including but not limited to any tax liability or any liability under the Natural Resources Damage Assessment, which Defendant may have incurred or may incur as a result of its conduct and its plea of guilty to the charges specified in paragraph 1 of this agreement. BTC acknowledges and understands that its convictions pursuant to this plea agreement will trigger the debarment from government contracts and grants provisions of 33 U.S.C. §1368 and 40 C.F.R. Part 33.

9

14.    Restitution

The Oil Pollution Control Act of 1990, 33 U.S.C. §2701, *et seq.*, sets forth a comprehensive process for assessing and restoring natural resource damages, as well as other forms of damages that result from oil spills.  BTC acknowledges and concedes that it is the Responsible Party for purposes of the damage assessment conducted pursuant to this statute.  The United States Attorney and the Defendant further recognize and acknowledge that the process for determining such damages is underway with respect to the Buzzards Bay Oil Spill.  In light of the availability of that forum to determine the value of the loss to the victims of the Buzzards Bay Oil Spill, as well as the complexity of the loss valuation issues, the United States Attorney and the Defendant agree that the complication and prolongation of the sentencing process that would result from fashioning an appropriate restitution order outweigh the need to provide for restitution to the victims in the context of this criminal case.  Defendant agrees that nothing in this paragraph shall be construed to eliminate or reduce Defendant's civil liability to any federal, state, local or private party.  Defendant further agrees that nothing in this plea agreement shall be construed to eliminate or reduce Defendant's obligations arising out of the requirements for damage restorations or claims contained in the Oil Pollution Act of 1990, 33 U.S.C. §2701, *et seq.* in connection with the Buzzards Bay Oil Spill.  Defendant further agrees that nothing in this paragraph shall be construed to eliminate or reduce its liability or obligation for the restoration, rehabilitation or replacement of the natural resources damaged, destroyed or injured as a result of the Buzzards Bay Oil Spill.

15.    Withdrawal of Plea Agreement

Should Defendant's superseding guilty plea not be accepted by the Court for whatever reason, or later be withdrawn on motion of Defendant, this superseding plea agreement shall be null and void at the option of the United States Attorney.

16.    Breach of Agreement

If the United States Attorney determines that Defendant has failed materially to comply with any provision of this agreement, or has committed any crime during the pendency of this agreement, the United States Attorney may, at his sole option, be released from his commitments under this agreement in their entirety by notifying Defendant, through counsel or otherwise, in writing.  The United States Attorney may also pursue all remedies available to him under the law, irrespective of whether he elects to be released from his commitments under this agreement. Defendant recognizes that no such breach by it of any obligation under this agreement shall give rise to grounds for withdrawal of its guilty plea. Defendant understands that should any such breach of this agreement occur, the United States Attorney will have the right to use against Defendant before any grand jury, at any trial, hearing or for sentencing purposes, any statements made by its employees and agents, and any information, materials, documents or objects provided by Defendant to the United States Attorney pursuant to this agreement without any limitation. In this regard, Defendant hereby waives any defense to any charges which it might otherwise have under any statute of limitations or the Speedy Trial Act.

17.  Who Is Bound By Agreement

This agreement is limited to the United States Attorney for the District of Massachusetts and cannot and does not bind the Attorney General of the United States or any other federal, state or local prosecutive authorities.

18.  Complete Agreement

This agreement is the complete and only agreement between the parties. No promises, agreements or conditions have been entered into other than those set forth in this letter. This agreement supersedes prior understandings, whether written or oral, including the agreement between the parties dated March 10, 2004, which the parties hereby agree is null and void. This agreement cannot be modified other than in a written memorandum signed by the parties or on the record in court.

If this letter accurately reflects the agreement entered into between the United States Attorney and Defendant, please sign the Acknowledgment of Plea Agreement below, and affix Defendant's corporate seal. Please also have the signatures of the corporate signatories notarized. In addition, please provide a copy of requisite authorization to enter into this agreement, by Defendant's directors (the original to be provided to the Court). Return the original of this letter to Assistant United States Attorney Jonathan F. Mitchell.

Sincerely,

MICHAEL J. SULLIVAN
United States Attorney

By:

JAMES B. FARMER
Assistant U.S. Attorney
Chief, Criminal Division

STEPHEN P. HEYMANN
Assistant U.S. Attorney
Deputy Chief, Criminal Division

JONATHAN F. MITCHELL
NADINE PELLEGRINI
Assistant U.S. Attorneys

PETER KENYON
Senior Criminal Enforcement Counsel
Environmental Protection Agency

11

## ACKNOWLEDGMENT OF PLEA AGREEMENT
### Bouchard Transportation Company

I have read this letter of agreement in its entirety, and have discussed it with the directors of Bouchard Transportation Company and with its attorneys. I hereby represent that I am an officer of Defendant corporation and that I am duly authorized to enter into this agreement. I hereby acknowledge that this letter of agreement fully sets forth the agreement of Bouchard Transportation Company with the United States Attorney for the District of Massachusetts. I further state that there have been no additional promises or representations made to or for the benefit of Bouchard Transportation Company by any officials of the United States Attorney in connection with this matter.

For Defendant
Bouchard Transportation Company

Date:

Corporate Seal:

Notary Acknowledgment and Seal:

VICTOR PAUL CORSO
Notary Public, State of New York
No. 02CO4984194
Qualified in Suffolk County
Certificate Filed in New York County
Commission Expires July 18,

I certify that this plea agreement letter has been reviewed by a duly authorized official of Bouchard Transportation Corporation and that he/she understands its terms.

Date: October 20, 2004
Ronald W. Zdrojeski, Esq.
Attorney for Bouchard Transportation Corporation

Date: Oct 21, 2004
Thomas M. Russo
Attorney for Bouchard Transportation Corporation

12

# Exhibit G

Judgment, *United States v. Bouchard Transportation Company, Inc.*, No. 04-cr-10087-MBB (D. Mass., entered Jan. 5, 2005) (ECF No. 21)

[page added for double-sided printing]

# United States District Court
## District of Massachusetts

UNITED STATES OF AMERICA

v.

**BOUCHARD TRANSPORTATION CO.**

**JUDGMENT IN A CRIMINAL CASE**
(For Offenses Committed On or After November 1, 1987)

**Case Number:** 1: 04CR10087-MBB

Thomas Russo, Esq; Ronald Zdrojeski, Esq.
Defendant's Attorney

☐

**THE DEFENDANT:**

☒ pleaded guilty to count(s): Counts 1 and 2 of a Superseding Information

☐ pleaded nolo contendere to counts(s) _____ which was accepted by the court.

☐ was found guilty on count(s) _____ after a plea of not guilty.

Accordingly, the court has adjudicated that the defendant is guilty of the following offense(s):

| Title & Section | Nature of Offense | Date Offense Concluded | Count Number(s) |
|---|---|---|---|
| 33 USC 1319(c)(1) & 33 USC 1321(b)(3) | CLEAN WATER ACT; NEGLIGENT DISCHARGE OF POLLUTANT | 04/27/03 | 1s |
| 16 USC 703, 707(a) | MIGRATORY BIRD TREATY ACT | 04/27/03 | 2s |

☐ See continuation page

The defendant is sentenced as provided in pages 2 through _7_ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on counts(s) _____ and is discharged as to such count(s).

☐ Count(s) _____ is dismissed on the motion of the United States.

IT IS FURTHER ORDERED that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant shall notify the court and United States Attorney of any material change in the defendant's economic circumstances.

Defendant's Soc. Sec. No.: N/A

Defendant's Date of Birth: N/A

Defendant's USM No.: N/A

Defendant's Residence Address:
Hicksville, New York

Defendant's Mailing Address:
Same as above

11/18/04
Date of Imposition of Judgment

Marianne B. Bowler USMJ
Signature of Judicial Officer

The Honorable Marianne B. Bowler
Name and Title of Judicial Officer

U. S. Magistrate Judge

Date
January 5, 2005

CASE NUMBER: 1:04CR10087-MBB
DEFENDANT: BOUCHARD TRANSPORTATION CO.

Judgment - Page  2  of   7

# PROBATION

The defendant is hereby sentenced to probation for a term of        3     year(s)

[x] See continuation page

The defendant shall not commit another federal, state, or local crime.

The defendant shall not illegally possess a controlled substance.

*For offenses committed on or after September 13, 1994:*

The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of placement on probation and at least two periodic drug tests thereafter, as directed by the probation officer.

[x]    The above drug testing condition is suspended based on the court's determination that the defendant poses a low risk of future substance abuse. (Check if applicable.)

[x]    The defendant shall not possess a firearm, destructive device, or any other dangerous weapon.

If this judgment imposes a fine or a restitution obligation, it shall be a condition of probation that the defendant pay any such fine or restitution in accordance with the Schedule of Payments set forth in the Criminal Monetary Penalties sheet of this judgment.

The defendant shall comply with the standard conditions that have been adopted by this court (set forth below). The defendant shall also comply with the additional conditions on the attached page (if indicated above).

## STANDARD CONDITIONS OF SUPERVISION

1) the defendant shall not leave the judicial district without the permission of the court or probation officer;
2) the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;
3) the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;
4) the defendant shall support his or her dependants and meet other family responsibilities;
5) the defendant shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training or other acceptable reasons;
6) the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;
7) the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;
8) the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;
9) the defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer;
10) the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;
11) the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;
12) the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court;
13) as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics, and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

DEFENDANT:        BOUCHARD TRANSPORTATION CO.

CASE NUMBER:     04-10087-MBB

Judgment—Page __3__ of __7__

# ADDITIONAL PROBATION TERMS

A. OPERATIONAL MEASURES

i.   Buzzards Bay Pilotage Requirement: BTC shall hire a pilot for all trips (north or south) in which a tugboat owned or operated by BTC is traveling with a barge (hereinafter "BTC tugboat/barge unit") into Buzzards Bay, as defined as the body of water between the Cape Cod Canal and the Buzzards Bay Entrance Light [41-23-47.5 North and 71-02-00.6 West] (hereinafter "Buzzards Bay Entrance Light").

   a. In the event a pilot can not board a north-bound tugboat/barge unit prior to the Buzzards Bay Entrance Light, the BTC tugboat/barge unit shall: (1) establish and maintain radio communications with a pilot; and (2) establish and maintain radar contact with a pilot prior to proceeding into Buzzards Bay, until a pilot can board the BTC tugboat at the New Bedford pilot station. If a BTC tugboat/barge unit is unable to comply with the conditions set forth in this subparagraph, it shall notify the Captain of the Port Providence prior to entering Buzzards Bay, as defined above. The requirements set forth in this subparagraph shall not apply to: (1) double hull barges; or (2) empty barges carrying only "clingage." Nothing in this subparagraph shall alter the existing authority of a captain of a BTC tugboat to operate that vessel.

   b. In the event that a south-bound BTC tugboat/barge unit can not allow a pilot to disembark after the Buzzards Bay Entrance Light, the BTC tugboat/barge unit shall allow the pilot to disembark at the New Bedford pilot station. Once the pilot has disembarked, the BTC tugboat/barge unit shall: (1) establish and maintain radio communications with a pilot; (2) establish and maintain radar contact with a pilot until it exits Buzzards Bay, as defined above. If a BTC tugboat/barge unit is unable to comply with the conditions set forth in this subparagraph, it shall notify the Captain of the Port Providence. The requirements set forth in this subparagraph shall not apply to: (1) double hull barges; or (2) empty barges carrying only "clingage." Nothing in this subparagraph shall alter the existing authority of a captain of a BTC tugboat to operate that vessel.

ii.   Maintenance of Radio Contact: At all times when a tugboat/barge unit operated by BTC is underway, the individual in charge of the watch will be required to monitor radio communications, via the wheelhouse radio or through the use of a hand-held radio, consistent with applicable federal law and regulations;

iii.   Manning of Wheelhouse: At all times when a tugboat/barge unit operated by BTC is underway, the individual in charge of the watch will not leave the wheelhouse without designating another crew member to be present in the wheelhouse;

iv. Navigational Software Record Compliance: BTC will operate all navigational software in a manner that ensures that a record is maintained for ten (10) days of the routes actually traveled by BTC tugboat/barge units. The requirements set forth in this subparagraph shall not apply to (1) double hull barges; or (2) empty barges carrying only "clingage."

B. Compliance Program – Independent Consultant

BTC agrees to establish and maintain an effective compliance program to ensure compliance with the aforementioned special conditions of probation and with the operational areas set forth below in subparagraph ii. The compliance program will include the following parameters:

i.   BTC agrees that it will retain, at its own expense, the services of an independent consultant. This individual will be responsible for designing and administering this compliance program. The Defendant agrees to give the consultant full access to all BTC records, employees, facilities and vessels necessary to make a meaningful evaluation of the Defendant's current operations.

Defendant:   BOUCHARD TRANSPORTATION CO.
Case Number: 04-10087-MBB

Page 4 of 7

## ADDITIONAL PROBATION TERMS

ii. BTC timely retained an independent consultant who was approved by the United States's Attorney's Office, and BTC has submitted to the United States Attorney's Office and the United States Coast Guard, a copy of the contract between the consultant and the Defendant which details the scope of the audit. The audit addressed the following areas:

> (1) hiring of mates and captain, including the due diligence performed during the hiring process concerning an applicant's licensing and recency;
> (2) performance evaluations for mates and captains, including new hires;
> (3) the rug and barge watch-standing requirements, radio communications, recency requirements, look-out requirements, manning requirements, proper use of computerized navigational aids and paper charts, preparation of proper voyage plans, and the use of computerized alarm systems to detect deviations from plotted courses;
> (4) oil spill prevention, spill notification and spill response.

The scope of the audit was approved by the United States Attorney's Office and the United States Coast Guard and the Defendant adopted reasonable modifications to the scope of the audit proposed by the United States Attorney's Office and the United States Coast Guard.

iii. The consultant represented that he followed generally accepted environmental auditing techniques, procedures and policies in designing, implementing, and executing the audit, including the reporting of deficiencies and corrective measures;

iv. The consultant prepared a draft report of his findings and recommendations which was furnished to the U. S. Probation Department, the United States Attorney's Office and the United States Coast Guard at the same time it is given to the Defendant;

v. The consultant prepared a final report of his findings and recommendations which the Defendant furnished to the U. S. Probation Department, the United States Attorney's Office, and the United States Coast Guard;

vi. The defendant submitted a written response to the U. S. Probation Office, the United States Attorney's Office and the United States Coast Guard, specifying what actions the Defendant will take to correct any noted deficiencies and regulatory violations;

Defendant:    BOUCHARD TRANSPORTATION CO.               Page 5 of 7
Case Number: 04-10087-MBB

vii. The independent consultant will submit annual reports to the U. S. Probation
Department, the United States Attorney's Office and the United States Coast Guard
detailing the implementation of the compliance program.  The responsibilities of
the independent consultant shall terminate when the period of probation is completed
or at an earlier time if the Court, upon motion of either party, determines that the
independent consultant's services are no longer needed.

C.  Corporate Compliance Officer

BTC appointed a compliance officer for BTC, who is experienced in environmental
regulations and compliance, and who will be responsible for all federal and state
environmental regulatory compliance.  BTC provided the U. S. Probation Department,
the United States Attorney's Office and the United States Coast Guard with the name and
curriculum vitae of the individual who has been designated as the corporate
compliance officer.

D.  The Natural Resource Damage Assessment

BTC will cooperate fully with Federal, State and local officials in the
Natural Resource Damage Assessment process set forth in the Oil Pollution Control
Act of 1990, 33 USC Section 2701, et seq.  BTC will not withdraw its acknowledgment that it is
the Responsible Party as it relates to the oil spill in Buzzards Bay involving BTC that occurred
on April 27, 2003 (hereinafter the "Buzzards Bay Oil Spill"), for purposes of
this Natural Resource Damage Assessment process.

AO 245B   Judgment in a Criminal Case - D. Massa        (10/01)
        Sheet 5, Part A — Criminal Monetary Penalties

CASE NUMBER:   1: 04CR10087-MBB                                    Judgment - Page 6 of 7
DEFENDANT: BOUCHARD TRANSPORTATION CO.

# CRIMINAL MONETARY PENALTIES

The defendant shall pay the following total criminal monetary penalties in accordance with the schedule of payments set forth on Sheet 5, Part B.

| | Assessment | Fine | Restitution |
|---|---|---|---|
| TOTALS | $175.00 | $10,000,000.00 | |

☐ The determination of restitution is deferred until _____. An *Amended Judgment in a Criminal Case* (AO 245C) will be entered after such determination.

☐ The defendant shall make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid in full prior to the United States receiving payment.

| Name of Payee | *Total Amount of Loss | Amount of Restitution Ordered | Priority Order or Percentage of Payment |
|---|---|---|---|
| | | | |
| | | | |
| TOTALS | $0.00 | $0.00 | ☐ See Continuation Page |

☐ If applicable, restitution amount ordered pursuant to plea agreement _____

☐ The defendant shall pay interest on any fine or restitution of more than $2,500, unless the fine or restitution is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 5, Part B may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest, and it is ordered that:

   ☐ the interest requirement is waived for the   ☐ fine and/or   ☐ restitution.

   ☐ the interest requirement for the   ☐ fine and/or   ☐ restitution is modified as follows:

* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18, United States Code, for offenses committed on or after September 13, 1994 but before April 23, 1996.

AO 245B    (Rev. 3/01) Judgment in a Criminal Case
           Sheet 6 — Criminal Monetary Penalties

DEFENDANT:      BOUCHARD TRANSPORTATION CO.
CASE NUMBER:    1:04CR10087-MBB

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties shall be due as follows:

**A** ☐ Lump sum payment of $ _____ due immediately, balance due

    ☐ not later than _____ , or
    ☐ in accordance with  ☐ C,  ☐ D, or  ☐ E below; or

**B** **X** Payment to begin immediately (may be combined with  ☐ C,  ☐ D, or  ☐ E below); or

**C** ☐ Payment in _____ (e.g., equal, weekly, monthly, quarterly) installments of $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

**D** ☐ Payment in _____ (e.g., equal, weekly, monthly, quarterly) installments of $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a term of supervision; or

**E** **X** Special instructions regarding the payment of criminal monetary penalties:

**The defendant shall be fined $2,000,000.00 for violation of the Oil Spill Control Act of 1990, 33 U.S.C. Section 1321(b)(3). The fine shall be directed to the Oil Liability Trust Fund pursuant to 33 U.S.C. Section 1321(s) as well as a fine of $8,000,000.00 for violation of the Migratory Bird Treaty Act, 16 U.S.C. Sections 703, 707(a) which shall be directed to the North American Wetlands Conservation Act Fund pursuant to 16 U.S.C. Section 4406(b) to fund eligible wetlands conservation projects. $1,000,000.00 of the fine will be suspended pending the defendant's successful compliance with the conditions of its probation, including those set forth in the plea agreement which was entered on November 18, 2004 in open court. The court strongly recommends that the fine monies paid into the North American Wetlands Conservation Act Fund be used to fund eligible wetland conservation projects in the Buzzards Bay Watershed Area of Massachusetts.**

Unless the court has expressly ordered otherwise in the special instruction above, if this judgment imposes a period of imprisonment, payment of criminal monetary penalties shall be due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court, unless otherwise directed by the court, the probation officer, or the United States attorney.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several

    Defendant Name, Case Number, and Joint and Several Amount:

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s):

☐ The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) community restitution, (6) fine interest (7) penalties, and (8) costs, including cost of prosecution and court costs.

[page added for double-sided printing]

# Exhibit H

Northeast Region, U.S. Fish and Wildlife Service,
The U.S. Fish and Wildlife Service Role in Utilizing
Oil Spill Fines: Conserving Important Habitats in
Buzzards Bay, Mass. (Aug. 2006)

[page added for double-sided printing]

**U.S. Fish & Wildlife Service**

# The U.S. Fish and Wildlife Service Role in Utilizing Oil Spill Fines

## *Conserving Important Habitats in Buzzards Bay, Massachusetts*



*USCG photo*

On April 27, 2003, a tanker operated by Bouchard Transportation Company (BTC) spilled an estimated 98,000 gallons of number 6 fuel into Buzzards Bay, a federally-designated Estuary of National Significance and a state-designated Ocean Sanctuary. The spill eventually polluted 93 miles of coastline, killed a recorded 461 birds, and shut down thousands of acres of shellfish beds to harvest. The oil spill reduced the habitat quality of Buzzards Bay for migratory and resident birds, marine mammals, coastal vegetation, and coastal invertebrates.

The U.S. Fish and Wildlife Service of Law Enforcement worked with the Environmental Protection Agency, U.S. Coast Guard, and the prosecuting Assistant United States Attorney to recommend to the court that criminal fines from the transportation company's violation of the Migratory Bird Treaty Act be deposited in the North American Wetlands Conservation Fund (NAWCF). U.S. Fish and Wildlife Service Atlantic Coast Joint Venture staff provided information on the North American Wetlands Conservation Act (NAWCA) grant program and the benefits of placing criminal fine monies in the NAWCF. On November 18, 2004, the judge sentenced BTC to pay a fine of $10 million and ordered them to comply with several remedial measures designed to prevent future spills. In her sentencing order, the judge endorsed the U.S. Attorney's Office recommendation that $7 million of the fine be placed in the NAWCF and used for eligible wetlands conservation projects in the Buzzards Bay Watershed area of Massachusetts.

From 2004-2006, Atlantic Coast Joint Venture staff worked with a broad coalition of partners led by the Coalition for Buzzards Bay to put together eligible projects that could use the designated funds in the NAWCF. U.S. Fish and



*Photo courtesy of Massachusetts Audubon Society*

Wildlife Service Coastal Ecosystems program staff also assisted partners with development of grant applications. Nine projects in the Buzzards Bay watershed were ultimately selected for funding under the NAWCA program (see table and map). Projects were funded in every coastal town in the Buzzards Bay watershed of Massachusetts (except for urban coastline in the City of New Bedford). These $6.7 million in criminal fines that were placed in the NAWCF and awarded to the selected projects will leverage more than $16.4 million in matching partner funds, and will result in the protection and restoration of 1,773 acres of important coastal habitats in the Buzzards Bay watershed. The selected projects will conserve headwater swamps, tidal rivers, salt and brackish marshes, beaches, and coastal ponds that support the birds, other wildlife, and fish species most impacted by the oil spill.

Coordinated efforts by U.S. Fish and Wildlife Service programs, including the Office of Law Enforcement, Atlantic Coast Joint Venture and Coastal Ecosystems Program working with partners after the oil spill resulted in significant habitat conservation that would not have been possible without their efforts.



*The spill in Buzzards Bay eventually polluted 93 miles of coastline, killed a recorded 461 birds, and shut down thousands of acres of shellfish beds to harvest. USFWS photos*

*Repairing culverts to restore tidal flow. Photo courtesy of Massachusetts Audubon Society*

**Buzzards Bay Watershed NAWCA Projects, 2004-2006**

| PROJECT NAME | GRANT | MATCH | Acres | CYCLE | PARTNERS | ACTIVITY |
|---|---|---|---|---|---|---|
| Inner Bay Restoration & Acquisition<br>Bourne, Falmouth, Mattapoisett, Plymouth, Wareham | $800,000 | $1,679,210 | 192 | FY07 | BBNEP, CBB, DU, towns | Protection/ Restoration |
| Slocums River<br>Dartmouth | $300,000 | $900,000 | 93 | FY07 | CBB, DNRT | Protection. |
| Dike Creek<br>Dartmouth | $1,000,000 | $1,887,000 | 267 | FY07 | BCMC, CBB, TTOR | Protection |
| Tiverton Great Swamp<br>Tiverton, Rhode Island | $300,000 | $1,007,687 | 150 | FY07 | CBB, RI DEM, TNC | Protection |
| Nasketucket Bay II<br>Fairhaven, Mattapoisett | $1,000,000 | $2,210,000 | 176 | FY06 | CBB, FALPT, MLT, MET, private | Protection |
| Westport River<br>Westport | $1,000,000 | $2,335,000 | 207 | FY06 | CBB, WLCT, TTOR, MET | Protection |
| Nasketucket Bay Vivieros<br>Fairhaven | $1,000,000 | $3,118,000 | 254 | FY05 | CBB, TTOR, WLCT, SLT, FALPT, MET | Protection |
| Chapin White<br>Westport | $1,000,000 | $2,044,700 | 321 | FY05 | CBB, TTOR, WLCT, MET | Protection |
| Nasketucket Bay Field & Marsh<br>Mattapoisett | $285,000 | $1,196,853 | 113 | FY05 | CBB, FALT, MET, MCWRP, MACZM, town | Protection/ Restoration |

| Partner Abbreviation | | |
|---|---|---|
| BBNEP:  Buzzards Bay National Estuary Program | FALPT:  Fairhaven  Acushnet Land Preservation Trust | RI DEM:  RI Dept. Env. Management |
| BCMC:  Bristol County Mosquito Control | MACZM:  Mass. Office of Coastal Zone Management | SLT:  Sippican Land Trust |
| CBB:  Coalition for Buzzards Bay | MCWRP:  Mass. Corporate Wetlands Restoration Program | TNC:  The Nature Conservancy |
| DNRT:  Dartmouth Natural Resource Trust | MET:  Massachusetts Environmental Trust | TTOR:  Trustees of Reservations |
| DU:  Ducks Unlimited | MLT:  Mattapoisett Land Trust | WLCT:  Westport Land Conservation Trust |

**U.S. Fish and Wildlife Service**
**Northeast Region**
**300 Westgate Center Drive**
**Hadley, MA 01035**
**http://northeast.fws.gov/**

**U.S. Fish & Wildlife Service**
**1 800/344 WILD**
**http://www.fws.gov**

**August, 2006**



*Photo courtesy of Massachusetts Audubon Society.*



Atlantic Coast Joint Venture






North American Wetlands Conservation Fund - Buzzards Bay Projects

Map prepared by: Buzzards Bay National Estuary Program, 2870 Cranberry Highway, E. Wareham, MA 02538, August 9, 2006

**LEGEND**

- NAWCA Funded Sites
- NAWCA Match Sites
- Existing Protected Open Space
- Developed Areas
- Waterbodies
- Major Roads
- Buzzards Bay Watershed

Data Sources: MassGIS & Buzzards Bay NEP

Tiverton Great Swamp Project

Westport River & Chapin White Projects

Dike Creek & Slocums River Projects

Nasketucket Bay Projects

Inner Bay Projects

Little Compton, RI
Tiverton, RI
Westport
Fall River
Freetown
Lakeville
Dartmouth
New Bedford
Acushnet
Middleborough
Carver
Fairhaven
Mattapoisett
Rochester
Marion
Wareham
Plymouth
Falmouth
Bourne

[page added for double-sided printing]

# Exhibit I

Press Release, U.S. Fish and Wildlife Service,
BP Deepwater Horizon Oil Spill Settlement
Funds Migrate North (Apr. 27, 2015)

[page added for double-sided printing]



(https://www.fws.gov)

(https://www.fws.gov)

Conserving the Nature of America (https://www.fws.gov) (https://www.fws.gov/)

Search USFWS

◀ Back

Press Release
BP Deepwater Horizon Oil Spill Settlement Funds Migrate North

## April 27, 2015

**Contact:**
Division of Public Affairs
External Affairs
Telephone: 703-358-2220
Website: https://www.fws.gov/external-affairs/public-affairs/ (https://www.fws.gov/external-affairs/public-affairs/)



The Prairie Pothole Region of the United States and Canada is where over half of North America's waterfowl nest. This area is referred to as the "Duck Factory". Credit: Krista Lundgren/USFWS
Higher Quality Version of Image (https://flic.kr/p/rCTJkH)

Most of us, if given a choice, would steer clear of potholes. Many migratory birds, however, actively seek out potholes -- provided you're talking about the thousands of temporary, seasonal, and semi- permanent wetlands wetlands known as "potholes" that are found in the prairies of the Northern Great Plains. Despite their importance to wildlife, these shallow wetland "potholes" are often drained, filled, or degraded by development and agricultural practices. With its mission focus on wetlands restoration and conservation, the Service naturally has placed a priority on enhancing, restoring and acquiring bird habitat in what's known as the Prairie Pothole Region. What might come as a surprise, however, is that projects in the region are being funded with legal settlement money from the 2010 oil spill that took place in the Gulf of Mexico.

On January 29, 2013, BP pled guilty to 14 criminal counts stemming from its actions related to the Deepwater Horizon oil spill, including one misdemeanor count of violating the Migratory Bird Treaty Act.

As part of the settlement, BP agreed to pay $100 million to the North American Wetlands Conservation Fund (NAWCF) to support projects focused on wetlands restoration and conservation in the United States, Canada and Mexico. According to the agreement, those organizations that apply to NAWCF for some of the $100 million need to show that their projects are "designed to benefit migratory bird species and other wildlife affected by the ... oil spill." The organizations must also match the grants at least dollar to dollar, so in effect, more than $200 million will be spent in this way on species and their habitats affected by the spill.

"A lot of other organizations are putting a lot of money in the Gulf region," says Mike Kreger, Special Assistant to the Assistant Director for Migratory Birds, "because that's where the oil spill occurred." He says the Service, however, is focused on the fact that eligible projects can benefit an affected species at any stage of its migratory cycle in North America. That means settlement money can fund projects in the Prairie Pothole Region, which is concentrated in the Dakotas and is arguably the most productive nesting area for migratory waterfowl in North America.

"The Prairie Pothole Region is what we call 'America's Duck Factory,'" Kreger says. "As so many of our birds depend on this Prairie Pothole Region, it's a good place to put [BP settlement] dollars."

Of the $100 million in BP settlement money placed in NAWCF, $70 million was earmarked for the United States. As of February 2015, $20 million in grants has been awarded to support 17 U.S. projects. Seven of these are Prairie Pothole Region-related and will receive grants that total $8.5 million.

The Migratory Bird Conservation Commission (MBCC) makes the final decision on how to spend these NAWCF funds. In the most recent round of proposals approved for funding (November 2014), commission members awarded $2 million to a project aimed at protecting 10,074 acres of the Prairie Pothole Region located in North Dakota through conservation easements; the land will be added to the Service's National Wildlife Refuge System. Another grant, for $1 million, went to a proposal co- submitted by the Service for a project that focuses on the Prairie Pothole Region west of the James River in South Dakota. This grant will permanently protect 3,651 acres of wetlands and adjacent grasslands to be managed as Game Production Areas. Funds will also be used to restore and enhance 4,759 acres of "pothole" wetlands currently at risk of conversion to cropland.

The Service sometimes applies for NAWCF funding for projects, but is more often involved on the other side of the grant process. For example, Director Dan Ashe represents the Service on the North American Wetlands Conservation Council, which reviews proposals and recommends projects for funding to the MBCC. In addition, the Service's Migratory Bird Program administers those projects the MBCC has selected to receive NAWCF grant money. This work includes processing grant paperwork and regularly monitoring grant projects to ensure they are complying with all regulations.

"The Service is committed to achieving large-scale, sustainable restoration of the Gulf of Mexico," says Linda Walker, Senior Advisor for Gulf Restoration for the Service. "To do this, you actually need to take a step back, look north and consider the vast area that drains into the Gulf. Awarding BP settlement money for projects in areas like the Prairie Pothole Region can help ensure there are critical food, nesting and resting areas for birds heading for the Gulf not only now, but down the road."

*Information contained in older news items may be outdated.* These materials are made available as historical archival information only. Individual contacts have been replaced with general External Affairs office information. No other updates have been made to the information and we do not guarantee current accuracy or completeness.

---

*The mission of the U.S. Fish and Wildlife Service is working with others to conserve, protect, and enhance fish, wildlife, plants, and their habitats for the continuing benefit of the American people. We are both a leader and trusted partner in fish and wildlife conservation, known for our scientific excellence, stewardship of lands and natural resources, dedicated professionals, and commitment to public service. For more information on our work and the people who make it happen, visit www.fws.gov (https://www.fws.gov/).*

*For more information on our work and the people who make it happen, visit http://www.fws.gov/ (https://www.fws.gov/). Connect with our Facebook page (https://www.facebook.com/usfws), follow our tweets (https://twitter.com/usfws), watch our YouTube Channel (https://www.youtube.com/usfws) and download photos from our Flickr page (http://www.flickr.com/photos/usfwshq/).*

U.S. Fish and Wildlife Service Home Page (https://www.fws.gov) | Department of the Interior (http://www.doi.gov/) | USA.gov (http://www.usa.gov/)  | About the U.S. Fish and Wildlife Service (https://www.fws.gov/help/about_us.html) | Accessibility (https://www.fws.gov/help/accessibility.html)  | Privacy (https://www.fws.gov/help/policies.html) | Notices

(https://www.fws.gov/help/notices.html)  | Disclaimer (https://www.fws.gov/help/disclaimer.html)  | FOIA
(https://www.fws.gov/irm/bpim/foia.html)