UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------x

NATURAL RESOURCES DEFENSE
COUNCIL, INC., *et al.*,

                       Plaintiffs,

    -against-

U.S. DEPARTMENT OF THE INTERIOR, *et al.*,

                       Defendants.

18 Civ. 4596 (VEC)

-------------------------------------------------------------------------x

NATIONAL AUDUBON SOCIETY, *et al.*,

                       Plaintiffs,

    -against-

U.S. DEPARTMENT OF THE INTERIOR, *et al.*,

                       Defendants.

18 Civ. 4601 (VEC)

-------------------------------------------------------------------------x

STATE OF NEW YORK, *et al.*,

                       Plaintiffs,

    -against-

U.S. DEPARTMENT OF THE INTERIOR, *et al.*,

                       Defendants.

18 Civ. 8084 (VEC)

-------------------------------------------------------------------------x

**MEMORANDUM OF LAW OF DEFENDANTS U.S. DEPARTMENT OF THE INTERIOR, U.S. FISH AND WILDLIFE SERVICE, AND DANIEL JORJANI IN SUPPORT OF THEIR CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO THE PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT**

                                 GEOFFREY S. BERMAN
                                 United States Attorney for the
ANDREW E. KRAUSE             Southern District of New York
Assistant U.S. Attorney        *Attorney for Defendants*
– Of Counsel –               Telephone:  (212) 637-2769

# TABLE OF CONTENTS

**PAGE**

PRELIMINARY STATEMENT ................................................................................1

BACKGROUND ...................................................................................................3

    A.    The Historical Precursors of the Migratory Bird Treaty Act ...................................3

    B.    The Migratory Bird Treaty of 1916, the Migratory Bird Treaty Act of 1918, and Subsequent Treaties and Legislation.................................................3

    C.    The Current Language of the MBTA.........................................................5

    D.    Competing Judicial Interpretations of the MBTA ........................................7

        1.    Courts that Have Limited the MBTA to Exclude Incidental Take .............7

        2.    Courts that Have Extended the MBTA to Include Incidental Take...........9

    E.    Opinion M-37050 Sets Forth the DOI's Interpretation of the MBTA..................11

    F.    Actions Following the Issuance of Opinion M-37050.........................................12

        1.    The April 11, 2018 Guidance Memorandum...............................................12

        2.    Ongoing Rulemaking Efforts......................................................................13

    G.    Procedural History ......................................................................................14

LEGAL STANDARDS ...........................................................................................15

ARGUMENT...........................................................................................................16

    I.    OPINION M-37050 PROPERLY INTERPRETS THE SCOPE OF THE MBTA..............................................................................16

        A.    Defendants' Interpretation of the MBTA Is Entitled to Deference ..........16

B.      The Interpretation Set Forth in Opinion M-37050 Is the Appropriate
        Reading of the Relevant Text of the MBTA...............................................17

        1.      The Verbs "Take" and "Kill" Must Be
                Understood In Context.................................................................17

        2.      Opinion M-37050 Is Consistent with
                Common Law Definitions..............................................................20

        3.      Language Regarding the Time, Means, or Manner of
                Prohibited Acts Does Not Alter the Meaning of Which
                Acts Are Prohibited......................................................................21

        4.      Strict Liability for Misdemeanor Offenses Does Not Expand
                the Scope of Conduct Prohibited Under the MBTA.....................22

C.      The History and Purpose of the MBTA Demonstrate That
        the Statute Was Designed to Restrict Conduct Directed
        Specifically at Migratory Birds................................................................24

D.      The Original Meaning of the Operative Language of the MBTA
        Remains the Same....................................................................................27

E.      The MBTA Should Be Interpreted Narrowly to Avoid
        Constitutional Infirmity ..........................................................................33

        1.      Interpreting the MBTA to Prohibit Incidental Take Would
                Criminalize a Broad Swath of Otherwise Lawful Activities .........34

        2.      Prosecutorial Discretion, Attempted Narrowing Constructions,
                and the Existence of Permitting Authority Are Not Sufficient
                to Cure an Improperly Vague Law ................................................36

F.      Second Circuit Precedent Does Not Require the Court to Reject
        Defendants' Interpretation of the MBTA in Opinion M-37050 ...............39

II.     OPINION M-37050 WAS NOT A MAJOR FEDERAL ACTION THAT
        REQUIRED DEFENDANTS TO COMPLY WITH NEPA ................................43

CONCLUSION.....................................................................................................46

# TABLE OF AUTHORITIES

**CASES**                                                               **PAGE**

*Alaska v. Andrus*,
   591 F.2d 537 (9th Cir. 1979) ........................................................................... 45

*Ardestani v. Immigration and Naturalization Serv.*,
   502 U.S. 129 (1991)........................................................................................ 17

*Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*,
   515 U.S. 687 (1995)............................................................................. 19, 20, 21

*Baggett v. Bullitt*,
   377 U.S. 360 (1964)................................................................................. 36, 39

*Beecham v. United States*,
   511 U.S. 368 (1994)........................................................................................ 19

*Catskill Mts. Chptr. of Trout Unlimited, Inc. v. City of New York*,
   451 F.3d 77 (2d Cir. 2006)............................................................................. 41

*Catskill Mts. Chptr. of Trout Unlimited, Inc. v. U.S. Envtl. Protection Agency*,
   846 F.3d 492 (2d Cir. 2017)........................................................................... 18

*Chevron U.S.A., Inc. v. NRDC*,
   467 U.S. 837 (1984)........................................................................................ 40

*City of N.Y. v. Beretta U.S.A. Corp.*,
   524 F.3d 384 (2d Cir. 2008)........................................................................... 18

*Connally v. General Constr. Co.*,
   269 U.S. 385 (1926)........................................................................................ 33

*Ctr. for Biological Diversity v. Pirie*,
   191 F. Supp. 2d 161 (D.D.C. 2002)............................................................... 10

*Ctr. for Biological Diversity v. Pirie*,
   201 F. Supp. 2d 113 (D.D.C. 2002)........................................................ 31, 42

*Curry v. U.S. Forest Serv.*,
   988 F. Supp. 541 (W.D. Pa. 1997).................................................................. 9

*Defenders of Wildlife v. Andrus*,
   627 F.2d 1238 (D.C. Cir. 1980)..................................................................... 45

*Doe v. Leavitt*,
    552 F.3d 75 (1st Cir. 2009) ........................................................................ 16

*Dunn v. United States*,
    442 U.S. 100 (1979) ................................................................................... 33

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*,
    485 U.S. 568 (1988) ................................................................................... 34

*Encino Motorcars, LLC v. Navarro*,
    136 S. Ct. 2117 (2016) ............................................................................... 42

*Estate of Landers v. Leavitt*,
    545 F.3d 98 (2d Cir. 2008) ......................................................................... 16

*Fed. Commc'ns Comm'n v. Fox Television Stations, Inc.*,
    556 U.S. 50 (2009) ..................................................................................... 43

*Fed. Commc'ns Comm'n v. Fox Television Stations, Inc.*,
    567 U.S. 239 (2012) ................................................................................... 33

*Fund for Animals v. Kempthorne*,
    538 F.3d 124 (2d Cir. 2008) .................................................................. 31, 45

*Geer v. Connecticut*,
    161 U.S. 519 (1896) ................................................................................... 20

*Griffin v. Oceanic Contractors*,
    458 U.S. 564 (1982) ................................................................................... 35

*In re Maxwell Commc'n Corp. plc*,
    93 F.3d 1036 (2d Cir. 1996) ....................................................................... 30

*Just Bagels Mfg., Inc. v. Mayorkas*,
    900 F. Supp. 2d 363 (S.D.N.Y. 2012) ....................................................... 15

*Keyishian v. Bd. of Regents*,
    385 U.S. 589 (1967) ................................................................................... 36

*Kolovrat v. Oregon*,
    366 U.S. 187 (1961) ................................................................................... 31

*Mahler v. U.S. Forest Serv.*,
    927 F. Supp. 1559 (S.D. Ind. 1996) ................................................. *passim*

*Manning v. United States*,
  146 F.3d 808 (10th Cir. 1998) ...................................................................... 17

*McMaster v. United States*,
  731 F.3d 881 (9th Cir. 2013) ........................................................................ 17

*Missouri v. Holland*,
  252 U.S. 416 (1920) ........................................................................................ 4

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
  545 U.S. 967 (2005) ........................................................................... 17, 40, 41

*Newton County Wildlife Association v. U.S. Forest Service*,
  113 F.3d 110 (8th Cir. 1997) ................................................................ 8, 9, 20

*NRDC v. Nat'l Highway Traffic Safety Admin.*,
  894 F.3d 95 (2d Cir. 2018) ........................................................................... 15

*Roy v. Teachers Ins. & Annuity Ass'n*,
  878 F.2d 47 (2d Cir. 1989) ........................................................................... 18

*Seattle Audubon Soc'y v. Evans*,
  952 F.2d 297 (9th Cir. 1991) ............................................................. 8, 9, 20, 21

*Secs. & Exch. Comm'n v. Chenery Corp.*,
  332 U.S. 194 (1947) ...................................................................................... 46

*Secs. & Exch. Comm'n v. Rosenthal*,
  650 F.3d 156 (2d Cir. 2011) ......................................................................... 35

*Skidmore v. Swift & Co.*,
  323 U.S. 134 (1944) ........................................................................... 16, 17, 41

*Smith v. Goguen*,
  415 U.S. 566 (1974) ...................................................................................... 39

*South Carolina v. United States*,
  199 U.S. 437 (1905) ...................................................................................... 27

*Third Nat'l Bank v. Impac, Ltd.*,
  432 U.S. 312 (1977) ...................................................................................... 18

*United States v. Apollo Energies, Inc.*,
  611 F.3d 679 (10th Cir. 2010) ................................................................ 10, 35

*United States v. Brigham Oil & Gas, L.P.*,
    840 F. Supp. 2d 1202 (D.N.D. 2012) ................................................ 9, 20, 21, 34

*United States v. CITGO Petroleum Corp.*,
    801 F.3d 477 (5th Cir. 2015) ..................................................... *passim*

*United States v. Corbin Farm Serv.*,
    444 F. Supp. 510 (E.D. Cal. 1978) ............................................... 10, 35, 37

*United States v. FMC Corporation*,
    572 F.2d 902 (2d Cir. 1978) ..................................................... *passim*

*United States v. Mead Corp.*,
    533 U.S. 218 (2001) ............................................................. 16

*United States v. Moon Lake Elec. Ass'n, Inc.*,
    45 F. Supp. 2d 1070 (D. Colo. 1999) ........................................... 10, 25, 26, 36

*United States v. North Dakota*,
    650 F.2d 911 (8th Cir. 1981) ................................................... 26

*United States v. Ray Westall Operating, Inc.*, ,
    No. CR 05-1516-MV, 2009 U.S. Dist. LEXIS 130674 (D.N.M. Feb. 25, 2009) .............. 9

*United States v. Rollins*,
    706 F. Supp. 742 (D. Idaho 1989) ............................................... 37

*United States v. Shabani*,
    513 U.S. 10 (1994) .............................................................. 20

*United States v. Williams*,
    553 U.S. 285 (2008) ........................................................... 18, 33

*United States v. Wulff*,
    758 F.2d 1121 (6th Cir. 1985) .................................................. 6

*Washington State Dep't of Social Services v. Keffeler*,
    537 U.S. 371 (2003) ............................................................ 16

*Whitman v. Am. Trucking Assn's*,
    531 U.S. 457 (2001) ............................................................ 32

*Wilderness Soc'y v. U.S. Fish and Wildlife Serv.*,
    353 F.3d 1051 (9th Cir. 2003) .................................................. 17

## STATUES

5 U.S.C. § 551 ................................................................................................................ 2

5 U.S.C. § 701 ................................................................................................................ 2

5 U.S.C. § 706(2)(A) ...................................................................................................... 15

16 U.S.C. § 703 ....................................................................................................... *passim*

16 U.S.C. § 707 .......................................................................................................... 6, 7

16 U.S.C. § 715 .............................................................................................................. 4

16 U.S.C. § 1362(13) ..................................................................................................... 21

16 U.S.C. § 1531 ............................................................................................................ 8

16 U.S.C. § 1532(19) .................................................................................................. 8, 21

42 U.S.C. § 4321 ............................................................................................................ 2

42 U.S.C. § 4332 ...................................................................................................... 44, 45

Pub. L. No. 65-186, 40 Stat. 755 ................................................................................ 4, 29

Pub. L. No. 70-770, 45 Stat. 1222 .............................................................................. 4, 26

Pub. L. No. 74-728, 49 Stat. 1555 .................................................................................. 27

Pub. L. No. 86-732, 74 Stat. 866 ..................................................................................... 6

Pub. L. No. 107-314, 116 Stat. 2458 ......................................................................... 31, 32

## REGULATIONS

40 C.F.R. § 1508.18(b)(1) .............................................................................................. 44

43 C.F.R. § 46.205(c)(1) ................................................................................................ 44

43 C.F.R. § 46.210 ......................................................................................................... 45

43 C.F.R. § 46.215 ......................................................................................................... 45

50 C.F.R. § 10.12 ....................................................................................................... 6, 20

50 C.F.R. § 10.13 ....................................................................................................... 6, 34

50 C.F.R. Part 21 ........................................................................................................... 12

## OTHER AUTHORITIES

55 Cong. Rec. 4813 (1917) ........................................................................... 26

55 Cong. Rec. 4816 (1917) ........................................................................... 25

Executive Order 13,186, 66 Fed. Reg. 3853 (Jan. 17, 2001) .................................32, 33

85 Fed. Reg. 5913 (Feb. 3, 2020) ............................................................. 14, 43

85 Fed. Reg. 5915 (Feb. 3, 2020) ............................................................. *passim*

S. Treaty Doc. No. 104-28 .......................................................................... 5, 28

S. Treaty Doc. No. 105-26 .......................................................................... 5, 28

39 Stat. 1702 .................................................................................... 3, 4, 22

50 Stat. 1311 ........................................................................................ 5, 28

25 U.S.T. 3329 ...................................................................................... 5, 28

29 U.S.T. 4647 ...................................................................................... 5, 28

Defendants U.S. Department of the Interior ("DOI"), U.S. Fish and Wildlife Service ("FWS"), and Daniel Jorjani (collectively "Defendants"), by their attorney, Geoffrey S. Berman, United States Attorney for the Southern District of New York, respectfully submit this memorandum of law in support of their cross-motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, and in opposition to the motions for summary judgment filed by the Environmental Plaintiffs,[1] *see* Dkt. No. 68, and the States[2] (collectively, with the Environmental Plaintiffs, the "Plaintiffs"), *see* Dkt. No. 69, in these consolidated actions.

## PRELIMINARY STATEMENT

Section 2 of the Migratory Bird Treaty Act ("MBTA"), 16 U.S.C. § 703(a), makes it unlawful for persons "at any time, by any means or in any manner to pursue, hunt, take, capture, kill, attempt to take, capture, or kill, [or] possess" specific migratory birds.  For more than 50 years after this criminal statute was enacted, the federal government confined its enforcement efforts to persons who took actions directed at migratory birds, their nests, or their eggs.  It was not until the 1970s that federal prosecutors began applying the MBTA to "incidental" actions.  This expansion of federal authority, which was not accompanied by any substantive legislative or regulatory change, resulted in criminal prosecutions of individuals and businesses for "incidental take"—otherwise lawful activity not specifically directed at harming migratory birds, but that nonetheless results in the deaths of protected migratory birds.  In the ensuing decades, various criminal defendants challenged their MBTA convictions for "incidental take" offenses, and

---

[1] The "Environmental Plaintiffs" consist of the Natural Resources Defense Council and the National Wildlife Federation ("NRDC Plaintiffs"), and the National Audubon Society, the American Bird Conservancy, the Center for Biological Diversity, and Defenders of Wildlife ("Audubon Plaintiffs").

[2] The "States" consist of the States of New York, California, Illinois, Maryland, New Jersey, New Mexico, and Oregon, and the Commonwealth of Massachusetts.

federal district courts and courts of appeals have offered conflicting interpretations.  Certain

courts, including the Second Circuit Court of Appeals in 1978, have ruled that "incidental take"

is a crime under the MBTA, and others, including the Fifth Circuit Court of Appeals in 2015,

have concluded that the statute cannot be read to include a prohibition on "incidental take."

These contradictory and confusing precedents have created a convoluted patchwork of legal

standards for applying what is supposed to be a uniform national criminal law, and made it

difficult for those individuals and entities potentially subject to MBTA enforcement to

understand what does and does not constitute a crime.

Solicitor's Opinion M-37050 was issued on December 22, 2017, and explains in detail

why the text, history, and purpose of the MBTA make clear that Section 2 of the statute applies

only to actions that are directed at migratory birds, their nests, or their eggs, and not to mortality

or injury to migratory birds that results from, but is not the purpose of, a particular action.  While

this interpretation is contrary to the prior practice and position of the DOI, Opinion M-37050 sets

forth Defendants' view that the previous expansive assertion of federal authority to apply the

MBTA to "incidental take" is not supported by the plain language of the statute or its legislative

history.  This agency pronouncement is entitled to deference because of the thoroughness evident

in its consideration and the validity of its reasoning.

For all of the reasons set forth in greater detail below, Plaintiffs' challenges to the

issuance of Opinion M-37050 and the FWS's April 2018 guidance memorandum, pursuant to the

Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.*, 701 *et seq.* ("APA"), and the National

Environmental Policy Act, 42 U.S.C. § 4321 *et seq.* ("NEPA"), should be rejected, and summary

judgment should be granted in favor of Defendants.

## BACKGROUND

### A.    The Historical Precursors of the Migratory Bird Treaty Act

According to the FWS, "[b]y the late 1800s, hunting and shipment of birds for the commercial market (to embellish the platters of elegant restaurants) and the plume trade (to provide feathers to adorn ladies' fancy hats) had taken their toll," reducing many species of birds to near extinction.  (Administrative Record ("AR") 2); *see* https://www.fws.gov/birds/policies-and-regulations/laws-legislations/other-relevant-laws.php (last visited Mar. 27, 2020) ("FWS—Other Relevant Laws").  In May 1900, Congress enacted the Lacey Act—the first federal law protecting wildlife—which prohibited game taken illegally in one state from being shipped across state lines.  (AR 3); *see* FWS—Other Relevant Laws.  Because this statute proved ineffective in stopping interstate shipments, Congress adopted the Weeks-McLean Law in 1913; this legislative action, which deemed a wide swath of migratory birds "to be within the custody and protection of the Government of the United States," was designed to stop commercial market hunting and the illegal shipment of migratory birds from one state to another.  (AR 3); FWS—Other Relevant Laws.  The broad assertion of federal authority in the Weeks-McLean Law was immediately subjected to legal challenges, and multiple federal district courts declared the law unconstitutional.  (AR 4).  Proponents of nationwide hunting regulations began to explore the notion that Congress could overcome these constitutional concerns by anchoring federal authority over wild game in the structure of an international treaty.  (AR 4-5).

### B.    The Migratory Bird Treaty of 1916, the Migratory Bird Treaty Act of 1918, and Subsequent Treaties and Legislation

In 1916, the United States and the United Kingdom—acting on behalf of Canada—entered into the "Convention between the United States and Great Britain for the protection of migratory birds."  39 Stat. 1702 (Aug. 16, 1916) (ratified Dec. 7, 1916) ("Convention"); (AR 5).

The Convention had the stated purpose of "saving from indiscriminate slaughter and of insuring the preservation of such migratory birds as are either useful to man or are harmless." *Id.* Among other things, the Convention obligated the parties to establish "close[d] seasons during which no hunting shall be done except for scientific or propagating purposes under permits issued by proper authorities," to serve "as an effective means of preserving migratory birds," *id.* at 1703 (art. II); prohibit the "taking of nests or eggs of migratory game or insectivorous or nongame birds . . . except for scientific or propagating purposes," *id.* at 1704 (art. V); prohibit during a closed season the "shipment or export of migratory birds or their eggs," *id.* (art. VI); establish specifically enumerated closed seasons for certain types of birds, *id.* at 1703-04 (arts. III and IV); and provide for the issuance of permits to kill any of the protected birds under particular conditions, *id.* at 1704 (art. VII). Pursuant to Article VIII of the Convention, the parties agreed to "take, or propose to their respective appropriate law-making bodies, the necessary measures for insuring the execution" of the Convention. *Id.*

To satisfy the United States' obligations under the Convention, Congress enacted the MBTA, Pub. L. No. 65-186, 40 Stat. 755 (1918) (codified as amended at 16 U.S.C. §§ 703-712), which protected birds from the specific acts described in the statute. Relying in significant part on the fact that the enactment of the MBTA was intertwined with the Convention and thus authorized by the treaty power in Article VI of the U.S. Constitution, the Supreme Court rejected a constitutional challenge and upheld the MBTA just two years later. *See Missouri v. Holland*, 252 U.S. 416, 432-34 (1920). In 1929, to "more effectively meet the obligations of the United States under the [Convention]," Congress passed the Migratory Bird Conservation Act, Pub. L. No. 70-770, 45 Stat. 1222-23 (1929) (codified as amended at 16 U.S.C. §§ 715-715s), which protected birds by providing for the acquisition of land for use as "inviolate sanctuaries."

The United States subsequently entered into several similar treaties to protect migratory birds—the "Convention between the United States of America and Mexico for the protection of migratory birds and game mammals," 50 Stat. 1311 (Feb. 7, 1936) (ratified Mar. 15, 1937) ("Mexico Convention"); the "Convention between the Government of the United States of America and the Government of Japan for the Protection of Migratory Birds and Birds in Danger of Extinction, and Their Environment," 25 U.S.T. 3329 (Mar. 4, 1972) (ratified Sept. 19, 1974) ("Japan Convention"); and the "Convention between the United States of America and the Union of Soviet Socialist Republics Concerning the Conservation of Migratory Birds and Their Environment," 29 U.S.T. 4647 (Nov. 19, 1976) (ratified Oct. 13, 1978) ("Russia Convention").[3] (AR 7-10).  These additional treaties were implemented by incorporating them into the MBTA. *See* 16 U.S.C. § 703(a).

### C.    The Current Language of the MBTA

In its current form, the language of Section 2 of the MBTA, which is the focus of Opinion M-37050, states that:

> Unless and except as permitted by regulations made as hereinafter provided in this subchapter, it shall be unlawful at any time, by any means or in any manner, to pursue, hunt, take, capture, kill, attempt to take, capture, or kill, possess, offer for sale, sell, offer to barter, barter, offer to purchase, purchase, deliver for shipment, ship, export, import, cause to be shipped, exported, or imported, deliver for transportation, transport or cause to be transported, carry or cause to be carried, or receive for shipment, transportation, carriage, or export, any migratory bird, any part, nest, or egg of any such bird, or any product, whether or not manufactured, which consists, or is composed in whole or part, of any such bird or any part, nest, or egg thereof . . . .

---

[3] In addition, the treaties with Canada and Mexico were amended in 1995 and 1997, respectively.  *See* S. Treaty Doc. No. 104-28 (1995); S. Treaty Doc. No. 105-26 (1997) (AR 8-9).

16 U.S.C. § 703(a); *see also* 50 C.F.R. § 10.13 (list of applicable migratory birds).  FWS's

general wildlife regulations, which are applicable to multiple statutes including the MBTA,

define the term "take" as "to pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt

to pursue, hunt, shoot, wound, kill, trap, capture, or collect."  50 C.F.R. § 10.12.  For purposes of

the MBTA, this definition subsumes several actions specifically identified in the statutory text

within the meaning of "take."  (AR 11).  The phrase "incidental take" does not appear in either

the MBTA or in the relevant implementing regulations.  (AR 12).

The MBTA is a criminal statute—in general, violations of the MBTA are misdemeanor

offenses punishable by imprisonment of no more than six months, a fine of no more than

$15,000, or both.  16 U.S.C. § 707(a).  Courts have held that misdemeanor violations of the

MBTA are strict liability offenses—if an action falls within the scope of activity prohibited by

the misdemeanor provisions of the statute, it is a criminal violation regardless of whether the

violator acted with intent.  *See, e.g.*, *United States v. CITGO Petroleum Corp.*, 801 F.3d 477, 488

(5th Cir. 2015); (AR 12-13 & n.76).  In 1960, the MBTA was amended to make it a felony to

take any migratory bird with the intent to sell or barter such bird, or to sell or barter any

migratory bird.  (AR 10); Pub. L. No. 86-732, 74 Stat. 866.  After the United States Court of

Appeals for the Sixth Circuit found this to be an unconstitutional violation of a defendant's due

process rights, *see United States v. Wulff*, 758 F.2d 1121, 1125 (6th Cir. 1985), Congress

amended the felony provision of the MBTA to limit it only to "knowing" violations.  *See* 16

U.S.C. § 707(b) (felony liability for "[w]hoever, in violation of this Act, shall knowingly (1) take

by any manner whatsoever any migratory bird with intent to sell, offer to sell, barter or offer to

barter such bird, or (2) sell, offer for sale, barter or offer to barter, any migratory bird").  It is also

a felony to take a bird with the aid of bait if the person knows or reasonably should know that the area is baited.  *See* 16 U.S.C. § 707(c).

### D.      Competing Judicial Interpretations of the MBTA

More than 50 years after the MBTA was enacted, beginning in the 1970s, federal prosecutors started filing criminal charges under the MBTA against "not just hunters who violate the MBTA, but also oil and gas, timber, mining, chemical, and electricity companies," whose activities "incidentally" caused the deaths of migratory birds.  (AR 918).  Defendants in these criminal actions have filed various challenges to the statute, which have resulted in substantially different conclusions from federal courts as to whether Section 2 of the MBTA prohibits incidental take, and if so, to what extent.  (AR 13).

### 1.      Courts that Have Limited the MBTA to Exclude Incidental Take

The most recent decision on the question of whether the MBTA prohibits incidental take was issued in 2015 by the United States Court of Appeals for the Fifth Circuit.  (AR 17); *see CITGO*, 801 F.3d 477.  In *CITGO*, the court concluded, based on "the statute's text, its common law origin, a comparison with other relevant statutes, and rejection of the argument that strict liability can change the nature of the necessary illegal act," that a "'taking' is limited to deliberate acts done directly and intentionally to migratory birds," and that the MBTA's "ban on 'takings' only prohibits intentional acts (not omissions) that directly (not indirectly or accidentally) kill migratory birds."  801 F.3d at 488-89, 494.  The court further noted that the scope of liability under a broad interpretation of the MBTA is "hard to overstate," and "would enable the government to prosecute at will and even capriciously (but for the minimal protection of prosecutorial discretion) for harsh penalties."  *Id.* at 493-94.  As set forth in Opinion M-37050, the *CITGO* decision "triggered [DOI's] further evaluation of the question" of whether the MBTA should be read to prohibit incidental take.  (AR 17).

7

The *CITGO* court framed its decision as being in agreement with precedents from the United States Courts of Appeals for the Eighth and Ninth Circuits.  *See* 801 F.3d at 488-89.  In *Seattle Audubon Society v. Evans*, the Ninth Circuit held that "habitat destruction, leading indirectly to bird deaths" does not amount to the "'taking' of migratory birds within the meaning of the [MBTA]."[4]  952 F.2d 297, 303 (9th Cir. 1991).  The FWS's regulatory definition of "take," which is applicable to the MBTA, describes "physical conduct of the sort engaged in by hunters and poachers, conduct which was undoubtedly a concern at the time of the statute's enactment in 1918," *id.* at 302, and the court determined that it was "not free to give words a different meaning than that which Congress and the Agencies charged with implementing congressional directives have historically given them," *id.* at 303.[5]  Six years later in *Newton County Wildlife Association v. United States Forest Service*, 113 F.3d 110 (8th Cir. 1997), the Eighth Circuit rejected an attempt to enjoin certain timber sales because they would result in the deaths of nesting migratory birds.  The court stated that "it would stretch [the MBTA] far beyond the bounds of reason to construe it as an absolute criminal prohibition on conduct, such as timber harvesting, that *indirectly* results in the death of migratory birds," and "agree[d] with the Ninth Circuit that the ambiguous terms 'take' and 'kill' in 16 U.S.C. § 703 mean 'physical conduct of

---

[4] The court further distinguished actions leading "indirectly" to the death of birds, such as habitat destruction, from actions that lead directly to the death of birds, such as exposing birds to a highly toxic pesticide, leaving open whether the MBTA reaches the later conduct.  *Seattle Audubon*, 952 F.2d at 303.

[5] The *Seattle Audubon* court explained that Congress provided a broader definition of "take"—including the verbs "harass" and "harm"—in the Endangered Species Act, 16 U.S.C. § 1531 *et seq.* (the "ESA") in 1973.  *Seattle Audubon*, 952 F.2d at 303 (quoting 16 U.S.C. § 1532(19)).  When the MBTA was amended in 1974, there was no modification of the definition of "take" applicable to the MBTA.  *See id.*

the sort engaged in by hunters and poachers.'" *Id.* at 115 (quoting *Seattle Audubon*, 952 F.2d at 302).

District courts have relied on *Seattle Audubon* and *Newton County* to find that the MBTA does not prohibit incidental take.  *See Mahler v. U.S. Forest Serv.*, 927 F. Supp. 1559, 1579 (S.D. Ind. 1996) ("Properly interpreted, the MBTA applies to activities that are intended to harm birds or to exploit harm to birds, such as hunting and trapping, and trafficking in birds and bird parts. The MBTA does not apply to other activities that result in unintended deaths of migratory birds."); *United States v. Brigham Oil & Gas, L.P.*, 840 F. Supp. 2d 1202, 1212, 1213 (D.N.D. 2012) ("it is highly unlikely that Congress ever intended to impose criminal liability on the acts or omissions of persons involved in lawful commercial activity which may indirectly cause the death of birds protected under the [MBTA]," and "to extend the [MBTA] to reach other activities that indirectly result in the deaths of covered birds would yield absurd results"); *Curry v. U.S. Forest Serv.*, 988 F. Supp. 541, 549 (W.D. Pa. 1997) ("the loss of migratory birds as a result of timber sales of the type at issue in this case do not constitute a 'taking' or 'killing' within the meaning of the MBTA"); *United States v. Ray Westall Operating, Inc.*, No. CR 05-1516-MV, 2009 U.S. Dist. LEXIS 130674, at *17-18 (D.N.M. Feb. 25, 2009) ("There is no language in the MBTA expressly extending the prohibition against killing migratory birds to acts or omissions that are not directed at migratory birds but which may indirectly kill migratory birds.  The Court concludes that the MBTA only prohibits conduct directed at migratory birds.").

### 2.   Courts that Have Extended the MBTA to Include Incidental Take

Meanwhile, the United States Courts of Appeals for the Second and Tenth Circuits have applied the MBTA to the incidental taking of migratory birds.  In *United States v. FMC Corporation*, the Second Circuit upheld a conviction of a corporation stemming from the death of a number of birds that came into contact with water that had been contaminated by the

9

defendant's manufacture of pesticides.  572 F.2d 902, 908 (2d Cir. 1978).  While characterizing

as absurd the argument that the MBTA's prohibition on killing is "without limitation," and

noting that the application of criminal punishment to all instances of incidental take would

"offend reason and common sense," *id.* at 905, the court reasoned that it was sufficient for

liability that "FMC engaged in an activity involving the manufacture of a highly toxic chemical;

and FMC failed to prevent this chemical from escaping into the pond and killing birds," *id.* at

908.

The Tenth Circuit determined that for the MBTA "to pass constitutional muster," it must

be understood to have a proximate cause requirement—that is, criminal liability would only

attach where the injury to migratory birds "'might be reasonably anticipated or foreseen as a

natural consequence of the wrongful act.'"  *United States v. Apollo Energies, Inc.*, 611 F.3d 679,

690 (10th Cir. 2010) (quoting *United States v. Moon Lake Elec. Ass'n, Inc.*, 45 F. Supp. 2d 1070,

1085 (D. Colo. 1999)).  Thus, for the *Apollo Energies* court, incidental take is prohibited by the

MBTA when a defendant has or should have knowledge that its conduct may kill or injure

migratory birds, and it does so.  *Id.* at 690 n.5; (AR 15).

Several district courts also have found that incidental take of migratory birds is prohibited

by the MBTA.  *See United States v. Corbin Farm Serv.*, 444 F. Supp. 510, 536 (E.D. Cal. 1978)

("the MBTA can constitutionally be applied to impose criminal penalties on those who did not

intend to kill migratory birds," though "[i]f defendants acted with reasonable care or if they were

powerless to prevent the violation, then a very different question would be presented"); *Moon

Lake Elec. Ass'n*, 45 F. Supp. 2d at 1085 (relying on the need for prosecutors to prove proximate

causation as an assurance against the potential for "absurd results"); *Ctr. for Biological Diversity

v. Pirie*, 191 F. Supp. 2d 161, 173-74 (D.D.C. 2002) (live-fire military training exercises that

unintentionally killed migratory birds within the training area violated the MBTA), *vacated as moot sub nom. Ctr. for Biological Diversity v. England*, No. 02-5163, 2003 U.S. App. LEXIS 1110, at *2 (D.C. Cir. Jan. 23, 2003).

### E.   Opinion M-37050 Sets Forth the DOI's Interpretation of the MBTA

In the final days of the last presidential administration, on January 10, 2017, the then-Solicitor of the DOI issued Opinion M-37041 (AR 43-72), an interpretation of the MBTA deemed necessary "[b]ecause of the confusion caused by the varying case law" (AR 44). By memorandum dated February 6, 2017, the Acting Secretary of the DOI suspended and temporarily withdrew Opinion M-37041, along with three other Opinions of the Solicitor that were issued after November 6, 2017, "to enable agency officials appointed or designated by [President Trump] . . . to review the opinions and the underlying regulations or decisions to which they apply." (AR 42). As set forth in that memorandum, each of the suspended opinions, including Opinion M-37041, "was written in part to support regulations, decisions, or nationwide guidance or policies that are currently under review by the new Administration." (AR 42).

On December 22, 2017, the DOI issued Opinion M-37050 (AR 1-41),[6] a memorandum entitled "The Migratory Bird Treaty Act Does Not Prohibit Incidental Take," which analyzes

---

[6] At the time Opinion M-37050 was issued, the position of Solicitor of the DOI—the chief attorney for the Department and principal legal adviser to the Secretary of the Interior—was vacant. Opinion M-37050 was signed by Defendant Jorjani, then the Principal Deputy Solicitor, who was exercising the authority of the Solicitor pursuant to an express delegation from the Secretary of the Interior. (AR 1). Jorjani was confirmed by the United States Senate to be the Solicitor of the DOI on September 24, 2019, and continues to hold that position today. *See* https://www.doi.gov/pressreleases/us-senate-confirms-daniel-jorjani-solicitor-department-interior (last visited Mar. 27, 2020).

"whether the [MBTA] prohibits accidental or 'incidental' taking or killing of migratory birds."[7] (AR 1). The 41-page Opinion M-37050 permanently withdraws and replaces Opinion M-37041, and explains that the "text, history, and purpose of the MBTA demonstrate that" the Act's prohibition on pursuing, hunting, taking, capturing, killing, or attempting to do the same applies only to actions that are directed at migratory birds, their nests, or their eggs, and not to injuries to or deaths of migratory birds that result from an action but are not the purpose of that action. (AR 41). The memorandum asserts that "[n]either the plain language of the statute nor its legislative history support the notion that Congress intended to criminalize, with fines and potential jail time, otherwise lawful conduct that might incidentally result in the taking of one or more birds." (AR 2 n.4).

### F.     Actions Following the Issuance of Opinion M-37050

#### 1.   The April 11, 2018 Guidance Memorandum

The Principal Deputy Director of the FWS issued a memorandum to the Service Directorate on April 11, 2018 to "provide[] guidance to clarify what constitutes prohibited take, what actions must be taken when conducting lawful intentional take (e.g., obtain a permit via 50 C.F.R. Part 21), and what changes to prior practice should be made in light of the M-Opinion." (AR 80-86). Among other things, the Guidance Memorandum states that the FWS "will continue to work with any partner that is interested in voluntarily reducing impacts to migratory birds and their habitats," and "will continue to develop best management practices to protect migratory birds and their habitats in partnership with any industry, federal, state, and tribal entity as interest dictates, and in the course of project review, will continue to provide

---

[7] Opinion M-37050 explains that for purposes of the document, the term "incidental take" refers to "both takings and/or killings that directly and foreseeably result from, but are not the purpose of, an activity." (AR 12).

recommendations through [its] advisory role under other authorities."  (AR 80-81).  Any such

comments, recommendations, or requirements from the FWS must not be "based on, nor imply,

authority under the MBTA to regulate incidental take of migratory birds."  (AR 81).

### 2. Ongoing Rulemaking Efforts

Since Opinion M-37050 was first released, the DOI has indicated its intention to take

further steps to promulgate regulations to implement the M-Opinion.  In an e-mail sent by the

FWS's then-Principal Deputy Director, Greg Sheehan, to all FWS employees on the day Opinion

M-37050 was published, Sheehan wrote that the FWS would "begin working on regulations that

implement this opinion in 2018."[8]  (AR 73-74).  In November 2018, the Office of Management

and Budget's Office of Information and Regulatory Affairs published an update to its Fall 2018

Unified Agenda of Regulatory and Deregulatory Actions, a listing of current and anticipated

regulatory actions by all agencies of the federal government.  Included in this update was an

entry explaining that the FWS "proposes to establish regulations that define the scope of the

[MBTA] as it applies to conduct resulting in the injury or death of migratory birds protected by

the Act."  *See* https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=

201810&RIN=1018-BD76 (last visited Mar. 27, 2020).

On February 3, 2020, the FWS published in the *Federal Register* a proposed rule entitled

"Regulations Governing Take of Migratory Birds."  85 Fed. Reg. 5915 (Feb. 3, 2020) (the

"Proposed Rule").  As set forth in the summary of the regulatory action, the proposal is "to adopt

a regulation that defines the scope of the [MBTA] as it applies to conduct resulting in the injury

or death of migratory birds protected by the Act.  The Proposed Rule is consistent with [Opinion

---

[8] Thus, contrary to the Court's suggestion in its July 31, 2019 Opinion and Order, *see* Dkt. No. 53 at 27, Defendants' interest in initiating a rulemaking did not arise "for the first time" in November 2018, and was not pursued as an attempt to avoid judicial review in this matter.

M-37050], which concludes that the MBTA's prohibitions on pursuing, hunting, taking, capturing, killing, or attempting to do the same, apply only to actions directed at migratory birds, their nests, or their eggs." *Id.*  The FWS accepted written comments on the Proposed Rule through March 19, 2020. *Id.*  In addition, in a separate *Federal Register* entry, the FWS announced that it intends to prepare a draft environmental impact statement ("EIS") pursuant to NEPA in connection with the Proposed Rule. *See* 85 Fed. Reg. 5913 (Feb. 3, 2020).  The FWS requested information and recommendations from the public through March 19, 2020 on the scope of the issues to be included in the EIS, either through written comments or through participation in online public webinars. *Id.* at 5914; *see also* https://fws.gov/migratorybirds/ 2020Regulation.php# (last visited Mar. 27, 2020).

### G.  Procedural History

The Environmental Plaintiffs filed their complaints on May 24, 2018, alleging that Opinion M-37050 misconstrues the MBTA and is therefore "'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" pursuant to the APA. *See* Dkt. No. 1 ¶¶ 79, 81[9]; 18 Civ. 4601 Dkt. No. 1 ¶¶ 72-79.  In addition, the complaint filed by the Audubon Plaintiffs alleges that Defendants' adoption and implementation of Opinion M-37050 violated the procedural requirements of the APA, 18 Civ. 4601 Dkt. No. 1 ¶¶ 80-83, and failed to comply with NEPA, *id.* ¶¶ 84-87.  The States filed their complaint on September 5, 2018, alleging that Opinion M-37050 violates the APA. *See* 18 Civ. 8084 Dkt. No. 1 ¶¶ 42-46.  Defendants filed a consolidated brief in support of their motions seeking dismissal of all three complaints on November 20, 2018. *See, e.g.*, Dkt. Nos. 26-28.

---

[9] Unless otherwise specified, all citations to documents from the ECF docket ("Dkt. No.") are references to the docket in 18 Civ. 4596 (VEC), the consolidated docket for these three matters. *See* Dkt. No. 53 at 7 (ordering consolidation).

On July 31, 2019, the Court granted in part and denied in part Defendants' motions,
allowing Plaintiffs' substantive APA claims and the Audubon Plaintiffs' NEPA claim to
proceed, but dismissing the Audubon Plaintiffs' claim that Defendants were required to follow
the APA's "notice and comment" procedures before issuing Opinion M-37050.[10]  *See* Dkt. No.
53.  The Environmental Plaintiffs and the States filed their motions for summary judgment on the
remaining claims on January 21, 2020.  Dkt. Nos. 68, 69.

## LEGAL STANDARDS

Summary judgment may be granted if there exists "no genuine dispute as to any material
fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "When a
party seeks review of agency action under the APA, the entire case on review is a question of
law such that judicial review of agency action is often accomplished by filing cross-motions for
summary judgment."  *Just Bagels Mfg., Inc. v. Mayorkas*, 900 F. Supp. 2d 363, 372 (S.D.N.Y.
2012) (quotation marks and alteration omitted).  Under the APA, agency decisions may only be
set aside if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance
with law."  5 U.S.C. § 706(2)(A); *NRDC v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95,
107 (2d Cir. 2018).

---

[10] Defendants' motions to dismiss raised various threshold arguments, including
Plaintiffs' lack of standing and the absence of a final agency action, *see* Dkt. No. 27 at 11-36,
which were rejected.  Those arguments are not repeated here, but are preserved for appeal, if
necessary.

**ARGUMENT**

I.    **OPINION M-37050 PROPERLY INTERPRETS THE SCOPE OF THE MBTA**

A.    **Defendants' Interpretation of the MBTA Is Entitled to Deference**

Defendants' interpretation of the MBTA, as detailed in Opinion M-37050, is not arbitrary, capricious, or an abuse of discretion, and it is squarely in accordance with law.  Indeed, the plain language of the MBTA, the underlying purpose of the statute as reflected in the legislative history at the time of its enactment, and the imperative to avoid impinging on constitutional due process protections leads to the conclusion articulated in the M-Opinion: the MBTA's prohibitions on pursuing, hunting, taking, capturing, killing or attempting to do the same are limited to those actions that are specifically directed at migratory birds, their nests, or their eggs.

Opinion M-37050 is legally valid and is entitled to deference.  *See Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944); *United States v. Mead Corp.*, 533 U.S. 218, 234-35 (2001).  To the extent that the text of the statute does not resolve the issue, the deference accorded to an agency's interpretation depends "upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade." *Skidmore*, 323 U.S. at 140; *see Estate of Landers v. Leavitt*, 545 F.3d 98, 107 (2d Cir. 2008).  Deference under *Skidmore* is not an "unabashed tautology," under which "deference is due only when an inquiring court is itself persuaded that the agency got it right.  Otherwise, *Skidmore* deference would not be deference at all." *Doe v. Leavitt*, 552 F.3d 75, 81 (1st Cir. 2009).  Interpretations by agencies, which possess "a body of experience and informed judgment," *Skidmore*, 323 U.S. at 140, "warrant respect" from the courts, *Washington State Dep't of Social Services v. Keffeler*, 537 U.S. 371, 385 (2003).

Courts have applied *Skidmore* deference to DOI Solicitor's Opinions, and this Court should do the same. *See McMaster v. United States*, 731 F.3d 881, 892 (9th Cir. 2013) ("We conclude that the Solicitor's Opinion is entitled to respect under *Skidmore*. It is a well-reasoned, formal, signed, twenty-two page opinion that is thorough in its consideration, and ultimately persuasive." (citation, quotation marks, and alterations omitted))[11]; *Manning v. United States*, 146 F.3d 808, 814 n.4 (10th Cir. 1998). Such deference is appropriate here even though, as Defendants acknowledge, the interpretation contained in Opinion M-37050 "is contrary to the prior practice of [the DOI]." (AR 2 n.4). As the Supreme Court has recognized, "[a]n initial agency interpretation is not instantly carved in stone. On the contrary, the agency must consider varying interpretations and the wisdom of its policy on a continuing basis, for example, in response to changed factual circumstances, or a change in administrations." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005) (citations, quotations marks, and alteration omitted).

## B.   The Interpretation Set Forth in Opinion M-37050 Is the Appropriate Reading of the Relevant Text of the MBTA

The plain meaning of the relevant statutory text of the MBTA is in accordance with the interpretation of the statute set forth in Opinion M-37050.

### 1.   The Verbs "Take" and "Kill" Must Be Understood In Context

As the Supreme Court has instructed, "[t]he starting point in statutory interpretation is the language of the statute itself." *Ardestani v. Immigration and Naturalization Serv.*, 502 U.S. 129, 135 (1991) (quotation marks and alterations omitted); (AR 18, 1383); *see Catskill Mts. Chptr. of*

---

[11] The Ninth Circuit Court of Appeals panel that decided *McMaster* critiqued the 2003 decision in *Wilderness Society v. United States Fish and Wildlife Service*, 353 F.3d 1051 (9th Cir. 2003) (*en banc*), on which the Environmental Plaintiffs rely. *See McMaster*, 731 F.3d at 891 n.4; (Brief of Environmental Plaintiffs, Dkt. No. 68-1 ("Env. Br.") at 13).

*Trout Unlimited, Inc. v. U.S. Envtl. Protection Agency*, 846 F.3d 492, 512 (2d Cir. 2017).  "A court must assume that the legislative purpose is expressed by the ordinary meaning of the words used," and "absent a clearly expressed legislative intention to the contrary, the language used must ordinarily be regarded as conclusive."  *Roy v. Teachers Ins. & Annuity Ass'n*, 878 F.2d 47, 49 (2d Cir. 1989) (quotation marks and alterations omitted).  Here, the relevant text of the MBTA indicates that the statute only criminalizes deliberate actions that result in bird deaths.

The critical language of the MBTA that is addressed in Opinion M-37050 reads: "it shall be unlawful at any time, by any means or in any manner, to pursue, hunt, take, capture, [or] kill . . .  any migratory bird, [or] any part, nest, or egg of any such bird."  16 U.S.C. § 703(a). The "commonsense" canon of statutory construction known as *noscitur a sociis* "counsels that a word is given more precise content by the neighboring words with which it is associated." *United States v. Williams*, 553 U.S. 285, 294 (2008); *see Third Nat'l Bank v. Impac, Ltd.*, 432 U.S. 312, 321 (1977) ("As always, the meaning of particular phrases must be determined in context . . . .") (quotation marks and alteration omitted); *see City of N.Y. v. Beretta U.S.A. Corp.*, 524 F.3d 384, 401 (2d Cir. 2008) ("the meaning of doubtful terms or phrases may be determined by reference to their relationship with other associated words or phrases (*noscitur a sociis*)") (quotation marks omitted); (AR 1386).  Section 2 of the MBTA groups together five verbs— pursue, hunt, take, capture, and kill—and the canon of *noscitur a sociis* recommends in favor of reading each verb to have a related meaning.  (AR 18-19).

The verbs "pursue," "hunt," and "capture" plainly require an action that is directed at migratory birds, nests, or eggs.  As set forth in Opinion M-37050, this is illustrated by the first entry for each of these words in the 1934 edition of *Webster's New International Dictionary of the English Language*: (i) pursue means "[t]o follow with a view to overtake; to follow eagerly,

or with haste; to chase"; (ii) hunt means "[t]o follow or search for (game or prey) for the purpose, and with the means of capturing or killing"; and (iii) capture means "[t]o take captive; to seize or take possession of by force, surprise, or stratagem; to overcome and hold; to secure by the exercise of effort, skill, or ingenuity against competition or opposition."  (AR 19, 1399, 1402, 1405-06, 1409).[12]  As these definitions make clear, one does not passively or accidentally pursue, hunt, or capture; rather, each requires a deliberate action specifically directed at achieving a goal.  (AR 19).  The verbs "kill" and "take," however, could refer to active or passive conduct, depending on the context—"take" has many definitions, including the more active "[t]o catch, seize, or attach through the effect of a sudden force or influence" and the more passive "[t]o lay or get hold of through arms, hands or fingers," while "kill" could mean the more active "[t]o deprive of life; to put to death; to slay" or serve as the "general term for depriving of life."  (AR 19 & n. 121).  Considered together with the other active verbs in this section of the MBTA, however, the proper meaning of "take" and "kill" for purposes of the statute is an affirmative act directed immediately and intentionally against migratory birds.  (AR 20); *see Beecham* v. *United States,* 511 U.S. 368, 371 (1994) ("That several items in a list share an attribute counsels in favor of interpreting the other items as possessing that attribute as well."); *see Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 719-20 (1995) (Scalia, J., dissenting) (explaining that certain components of the definition of the term "take" in the ESA—which are identical to the other prohibited acts referenced in the MBTA— refer to deliberate actions).

---

[12] The Proposed Rule cites to substantially similar definitions from a 1913 dictionary. *See* 85 Fed. Reg. at 5916.

This conclusion is also supported by the FWS regulations applicable to the MBTA, which define "take" to mean "to pursue, hunt, shoot, wound, kill, trap, capture, or collect," or attempt to do the same.  50 C.F.R. § 10.12.  The component actions of "take" in this definition involve affirmative, direct actions to reduce animals to human control (AR 20); this "reinforces the dictionary definition, and confirms that 'take' does not refer to accidental activity or the unintended results of other conduct." *Brigham Oil & Gas*, 840 F. Supp. 2d at 1209; *see Newton Cnty.*, 113 F.3d at 115 (the "terms 'take' and 'kill' in 16 U.S.C. § 703 mean 'physical conduct of the sort engaged in by hunters and poachers'" (quoting *Seattle Audubon*, 952 F.2d at 302)).

### 2.  Opinion M-37050 Is Consistent with Common Law Definitions

The determination in Opinion M-37050 that "take" refers to an action directed immediately against a particular animal also is supported by the use of the word "take" in the common law.  It is a "settled principle of statutory construction that, absent contrary indications, Congress intends to adopt the common law definition of statutory terms." *United States v. Shabani*, 513 U.S. 10, 13 (1994).  As Justice Scalia observed, "the term ['take'] is as old as the law itself.  To 'take,' when applied to wild animals, means to reduce those animals, by killing or capturing, to human control." *Sweet Home*, 515 U.S. at 717 (Scalia, J., dissenting).[13]  Indeed, the Supreme Court has cited ancient and foundational texts that place "take" in the context of humans acquiring control over wild animals, referencing the sixth century Digest of Justinian ("all the animals which can be taken upon the earth, in the sea, or in the air, that is to say, wild animals, belong to those who take them") and the 18th century Blackstone's Commentaries ("every man from the prince to the peasant has an equal right of pursuing and taking to his own

---

[13] The *Sweet Home* majority did not address the common law meaning of "take" as applied to wildlife, because "Congress explicitly defined the operative term 'take' in the ESA . . . thereby obviating the need for [the Court] to probe its meaning."  515 U.S. at 697 n.10.

use all such creatures as are *ferae naturae*").  *Geer v. Connecticut*, 161 U.S. 519, 523, 527

(1896), *overruled on other grounds*, *Hughes v. Oklahoma*, 441 U.S. 322, 325 (1979); *see also*

*Brigham Oil & Gas,* 840 F. Supp. 2d at 1208 ("The ordinary meaning of the word 'take,' when

applied to wildlife, denotes intentionally reducing the wildlife to possession.").  Consistent with

the common law understanding of the term "take" as applied to wildlife, Opinion M-37050

properly construes "take" in the MBTA to "describe[ ] a class of acts (not omissions) done

directly and intentionally (not indirectly and by accident) to particular animals (not populations

of animals)."[14]  *Sweet Home*, 515 U.S. at 718 (Scalia, J., dissenting).  The common law meaning

of "take" is of particular relevance in interpreting the MBTA because Congress did not define

the term in the statute.

### 3.  Language Regarding the Time, Means, or Manner of Prohibited Acts Does Not Alter the Meaning of Which Acts Are Prohibited

That the conduct prohibited by the MBTA is foreclosed "at any time, by any means, or in

any manner" does not signify that the statute prohibits any activity whatsoever that results in the

death of a protected bird species.  *Mahler*, 927 F. Supp. at 1580 ("The phrase, while broad, need

not be read as extending the statute to activities that cause unintended deaths of birds—the result

that the Second Circuit said in *FMC Corp.* would 'offend reason and common sense.'" (quoting

572 F.2d at 905)).  As the *CITGO* court explained, "[t]he addition of adverbial phrases connoting

'means' and 'manner[]' . . . does not serve to transform the nature of the activities themselves.

---

[14] The fact that Congress in other statutes later expanded "take" beyond its common-law meaning confirms that Congress intended to adopt the common-law definition for the MBTA. *See, e.g.,* 16 U.S.C. § 1532(19) (defining "take" under the ESA to include the terms "harass" and "harm"); 16 U.S.C. § 1362(13) (defining "take" under the Marine Mammal Protection Act to include the term "harass"); *see also Seattle Audubon,* 952 F.2d at 303 (holding "that the differences in the proscribed conduct under ESA and the MBTA are 'distinct and purposeful,'" and that prohibitions under the ESA are broader than those under the MBTA).

For instance, the manner and means of hunting may differ from bowhunting to rifles, shotguns, and air rifles, but hunting is still a deliberately conducted activity.  Likewise, rendering all-inclusive the manner and means of 'taking' migratory birds does not change what 'take' means, it merely modifies the mode of take."  801 F.3d at 490.  At bottom, Opinion M-37050 reasonably concludes that this language does not change the nature of the acts prohibited by the MBTA—it "simply clarifies that activities directed at migratory birds, such as hunting and poaching, are prohibited whenever and wherever they occur and whatever manner is applied."  (AR 22).  This conclusion is supported by the Convention that prompted the MBTA—the treaty authorizes only certain activities specifically directed at migratory birds, such as hunting during circumscribed open seasons, and take for limited purposes such as scientific use or propagation.  *See* 39 Stat. 1702.

### 4.  Strict Liability for Misdemeanor Offenses Does Not Expand the Scope of Conduct Prohibited Under the MBTA

The January 2017 M-Opinion assumed that because the misdemeanor provision of the MBTA is a strict liability offense—meaning that no criminal intent is required for a violation to have taken place—any act that takes or kills a bird from a species protected by the MBTA must be included within the meaning of statute, as long as the act results in the death of a bird.  (AR 22).  But this reading improperly ignores the meaning and context of the actual acts prohibited by the MBTA—"voluntary affirmative acts directed at reducing an animal to human control, such as when a hunter shoots a protected bird, causing its death."  (AR 22).  The critical consideration is that the actor was engaged in an activity the object of which was to render a bird subject to human control.  There is no criminal liability under the MBTA for actions that are not directed toward rendering a bird subject to human control, even if those actions—such as driving

22

a car, allowing a pet cat to roam outdoors, or constructing a building with windows[15]—could

foreseeably result in the deaths of protected birds.  In these circumstances, under the

interpretation of the MBTA set forth in Opinion M-37050, no "take" has occurred within the

meaning of the statute, and therefore the strict liability provisions of the Act would not be

triggered.  The fact that the taking and killing of migratory birds is a strict liability crime does

not answer the separate question of what acts are criminalized under the statute.  (AR 23).  As

the Fifth Circuit explained in *CITGO*, "we disagree that because misdemeanor MBTA violations

are strict liability crimes, a 'take' includes acts (or omissions) that indirectly or accidentally kill

migratory birds."  801 F.3d at 492.  Moreover, because there has not been "an affirmative action

to cause migratory bird deaths," *id.*, "[a] person whose car accidentally collided with [a]

bird . . . has committed no act 'taking' the bird for which he could be held strictly liable.  Nor do

the owners of electrical lines 'take' migratory birds who run into them," *id.* at 493.

As Plaintiffs note, at the time of the 1986 amendment to the MBTA, which added a *mens

rea* requirement to the felony provisions of the statute to address constitutional due process

concerns, a comment in the legislative history reaffirmed the principle of strict liability for the

misdemeanor portions of the statute.  A similar comment was included in the legislative history

associated with the 1998 amendment that added a negligence requirement to the MBTA

prohibition on hunting over a baited field.  (Env. Br. at 21-22; Brief of States, Dkt. No. 69-1

("States' Br.") at 18-20).  But neither of these actions expands the types of activities that can

give rise to misdemeanor liability under the proper reading of the statute articulated in Opinion

M-37050.  Addressing the legislative history for the 1986 amendments, the *Mahler* court

---

[15] According to the FWS, these are the three greatest "human-caused threats to birds."
*See* https://www.fws.gov/birds/bird-enthusiasts/threats-to-birds.php (last updated Sept. 14, 2018)
(last visited Mar. 27, 2020) ("FWS—Threats to Birds"); (AR 34).

explained that the "comment in favor of strict liability does not show any intention on the part of Congress to extend the scope of the MBTA beyond hunting, trapping, poaching, and trading in birds and bird parts to reach any and all human activity that might cause the death of a migratory bird." 927 F. Supp. at 1581.  It is possible for someone engaged in one of those activities to commit a misdemeanor violation of the MBTA without any intent to do so—for example, if he or she killed a protected migratory bird without intending to kill a *protected* bird, such as when hunting upland game birds that are not covered by the MBTA.  *See id.*; (AR 22-24).  Nothing in Opinion M-37050 alters this conclusion—there can still be strict liability under the statute for the specific types of actions that are actually prohibited by the statute.  Properly defining these actions is not tantamount to "impos[ing] a mental state requirement on the general prohibition," as the States suggest.  (States' Br. at 19).  The fact that Section 2 of the MBTA is a strict liability statute also "does not mean . . . that Congress intended for 'strict liability' to apply to all forms of human activity, such as cutting a tree, mowing a hayfield, or flying a plane," that could foreseeably result in migratory bird deaths.  *Mahler*, 927 F. Supp. at 1581.  The interpretation articulated in Opinion M-37050 reasonably limits the range of actions prohibited by the MBTA to those that are directed at migratory birds, and excludes "more attenuated conduct, such as lawful commercial activity, that unintentionally and indirectly results in the death of migratory birds."  (AR 24).

### C.   The History and Purpose of the MBTA Demonstrate That the Statute Was Designed to Restrict Conduct Directed Specifically at Migratory Birds

The history of the MBTA and the debate surrounding its adoption illustrate that the statute was part of Congress's efforts to regulate the hunting of migratory birds in direct response to extreme over-hunting.  (AR 24); *Mahler*, 927 F. Supp. at 1574 (S.D. Ind. 1996) ("The MBTA was designed to forestall hunting of migratory birds and the sale of their parts.").  Testimony

from Department of Agriculture officials and statements from individual members of Congress during the legislative hearing considering the bill focused on prohibitions on hunting.  Senator Marcus A. Smith of Arizona explained: "Nobody is trying to do anything here except to keep pothunters from killing game out of season, ruining the eggs of nesting birds, and ruining the country by it.  Enough birds will keep every insect off of every tree in America, and if you will quit shooting them they will do it."  55 Cong. Rec. 4816 (1917); (AR 24-25); *see Moon Lake*, 45 F. Supp. 2d at 1080 (also quoting statement of Representative Kincheloe ("[i]f you want the pothunters to disregard this solemn treaty we made with Canada and kill these migratory birds and stop their propagation, then you want to vote against this bill"), and detailing other statements from members of Congress focused on hunting).

The *Moon Lake* court also described certain contemporary statements from the legislative record that it viewed as indicative of a congressional purpose broader than "just hunting and poaching."  45 F. Supp. 2d at 1080.  Upon closer examination, however, these statements are consistent with a limited reading of the MBTA.  (AR 26-28).  One such statement is a letter from the Secretary of State to the President attributing the decrease in migratory bird populations to habitat destruction ("the extension of agriculture, and particularly the draining on a large scale of swamps and meadows") and hunting ("improved firearms and a vast increase in the number of sportsmen"), which was specifically discussed during legislative debate, with the suggestion that the MBTA was intended to address both issues.  *See id.* at 1080-81; (AR 27).  But Congress addressed hunting and habitat destruction through separate statutes—the MBTA, which addressed the direct and intentional killing of migratory birds, and the Migratory Bird Conservation Act of 1929, which was designed to "more effectively" implement the Migratory Bird Treaty by protecting bird habitats through the establishment of "sanctuaries."  *See* 45 Stat.

1222.  These statutes are complementary—"[t]ogether, the [MBTA] in regulating hunting and possession and the Conservation Act by establishing sanctuaries and preserving natural waterfowl habitat help implement our national commitment to the protection of migratory birds." *United States v. North Dakota*, 650 F.2d 911, 913-14 (8th Cir. 1981).  If the MBTA was originally understood to protect migratory bird habitats from incidental destruction, enactment of the Migratory Bird Conservation Act nine years later would have had less significance.  (AR 27).

The *Moon Lake* court also highlighted a statement by one member of Congress who spoke of the potential for the statute to create criminal liability for a child who, "largely through inadvertence and without meaning anything wrong, happens to throw a stone at and strikes and injures a robin's nest and breaks one of the eggs . . . ."  45 F. Supp. 2d at 1081.  But even this is an example of conduct directed towards a bird—the stone was *thrown at* the nest—rather than an act which only incidentally affects a protected species.  In other statements, members of Congress expressed concern about "sportsmen," people "killing" birds, "shooting" of game birds or "destruction" of insectivorous birds, and whether the purpose of the MBTA was to favor a steady supply of "game animals for the upper classes."  *Id.* at 1081-82.  Even those statements that purportedly suggest that the MBTA prohibits incidental take illustrate that members of Congress were focused on potential restrictions on hunting and the impact of the statute on individual hunters.  (AR 28-29).

Moreover, at the time the MBTA was enacted, federal regulation of the hunting of wild birds was politically controversial and legally tenuous.  (AR 29).  One senator, speaking in opposition to the MBTA, suggested that it would "utterly indefensible" for the government to "make it a crime for a man to shoot game on his own farm," and that a government official enforcing such a law "ought to be driven from office."  55 Cong. Rec. 4813 (1917) (statement of

Senator James A. Reed).  And the question of whether the federal government had the authority to regulate the killing or taking of any wild animal was unresolved prior to the enactment of the MBTA.  (AR 29).  When Congress previously attempted to give the federal government the power to regulating hunting seasons nationwide with the 1913 Weeks-McLean Law, it was subject to immediate judicial challenges and was declared unconstitutional by multiple courts. (AR 3-4).  Given the legal uncertainty and political controversy surrounding federal regulation of intentional hunting, it is highly unlikely that Congress intended for the MBTA to confer authority upon the executive branch to regulate all manner of economic activity that had an accidental or unintended impact on migratory birds.  (AR 29).

### D.   The Original Meaning of the Operative Language of the MBTA Remains the Same

Opinion M-37050 acknowledges that there have been subsequent treaties and legislation relevant to the MBTA since the statute was enacted in 1918, but properly concludes that none of these developments altered the meaning of the critical language of the law as it applies to the taking of migratory birds.  The fixed-meaning canon of statutory construction counsels that "[w]ords must be given the meaning they had when the text was adopted."  (AR 1384); *see South Carolina v. United States*, 199 U.S. 437, 448 (1905) (referring to the U.S. Constitution, and explaining that the meaning of a written instrument "does not alter.  That which it meant when adopted, it means now.").  The proper reading of Section 2 of the MBTA is still that it prohibits only affirmative acts directed immediately and intentionally against migratory birds.

The current iteration of the relevant language of the MBTA—making it unlawful for persons "at any time, by any means, or in any manner, to pursue, hunt, take, capture, kill, attempt to take, capture, kill, or possess" specific migratory birds—was adopted in 1935 as part of the Mexico Treaty Act and has remained unchanged since then.  *Compare* Pub. L. No. 74-728, 49

Stat. 1555 § 3 *with* 16 U.S.C. § 703(a).  As with the Convention, the Mexico Convention focused

primarily on hunting and establishing protections for birds in the context of take and possession

for commercial use, *see* 50 Stat. 1311, and there is no indication that the Mexico Treaty Act was

intended to broaden the scope of the MBTA beyond deliberate and purposeful actions.  (AR 30).

Federal prosecutors did not begin applying the MBTA to incidental actions until more than 50

years after the initial adoption of the MBTA, and more than 25 years after the passage of the

Mexico Treaty Act.  (AR 30 & n.163).  This newfound federal authority was not accompanied by

any corresponding substantive legislative changes.  (AR 30).

The 1972 Japan Convention and the 1976 Russia Convention both authorized purposeful

take for specific activities such as hunting, scientific and educational purposes, and protection

against injury to persons and property; these treaties also included language about protecting

habitat and preventing damage from pollution and other environmental degradation.  *See* 25

U.S.T. 3329; 29 U.S.T. 4647.  Subsequent protocols amending the Convention and the Mexico

Convention also included broad language regarding the preservation of bird populations,

protection of their environments, and protection from pollution.  *See* S. Treaty Doc. 104-28

(1995); S. Treaty Doc. 105-26 (1997).  But none of these agreements explicitly addressed

incidental take, included specific prohibitions of anything other than purposeful take of

migratory birds, or prompted amendments to the MBTA (other than technical changes to

incorporate the newer conventions) to expand the statute beyond its original purposes.  (AR 30-

31).  Both Plaintiffs (Env. Br. at 32-33; States' Br. at 2, 24) and Opinion M-37041 (AR 54) place

undue weight on the language of these later conventions in attempting to impart a broader

meaning to the relevant MBTA provisions, particularly given that many other federal laws may

require consideration of potential impacts to birds.  *See Mahler*, 927 F. Supp. at 1581 ("Many

other statutes enacted in the intervening years also counsel against reading the MBTA to prohibit any and all migratory bird deaths resulting from logging activities in national forests.  As is apparent from the record in this case, the Forest Service must comply with a myriad of statutory and regulatory requirements to authorize even the very modest type of salvage logging operation of a few acres of dead and dying trees at issue in this case.).  And while the MBTA states that the statute is "for the protection of migratory birds," 40 Stat. 755, this phrase cannot do the work that the Environmental Plaintiffs ascribe to it, (Env. Br. at 30-32), and certainly should not override the appropriate interpretation of the specific language of the criminal prohibitions of the MBTA, all of which point toward restrictions on acts affirmatively directed at migratory birds, their nests, or their eggs.

The exchange of diplomatic notes with Canada in 2008 regarding whether regulation of incidental take is consistent with the Convention also does not require a different interpretation of the meaning of the relevant language of the MBTA.  (Env. Br. at 33; States' Br. at 24-25).  Canada's July 2, 2008 transmission indicated that Canada was "considering an approach to the management of incidental take" that would make "the authorization of incidental take contingent on compliance with approved conservation measures."  (AR 1381).  As part of this communication, Canada asserted that its contemplated management approach is consistent with the Convention.  (AR 1381).  On July 10, 2008, the United States responded that "Canada's note and this affirmative reply establish a mutually held interpretation of the Government of Canada and the Government of the United States with respect to the Convention."  (AR 888).[16]  But the parties' mutual understanding that a potential regulatory structure for incidental take in

---

[16] At the time Opinion M-37050 was published, the DOI had the mistaken understanding that the United States did not respond to the July 2, 2008 diplomatic note from Canada.  (AR 30 n.165).

Canada—a structure that was never implemented—was consistent with the Convention does not

contradict the interpretation of the MBTA set forth in Opinion M-37050.  Notably, more than 90

years after the signing of the Convention, Canada appears to have been concerned that regulation

of incidental take was not obviously contemplated by the treaty.  If anything, this confirms that

Congress's contemporaneous intention in drafting the MBTA in 1918 was to prohibit the types

of direct, affirmative actions towards birds indicated by the common law usage of the term

"take" and the surrounding verbs in Section 2 of the statute.  Moreover, the diplomatic notes only

go as far as to say that Canada's contemplated regulations regarding incidental take are

*consistent* with the Convention—there is certainly no agreement that such incidental take

regulations are *required* by the treaty.

Contrary to the States' contention, the concept of international comity is not applicable

here.  (States' Br. at 24-25).  As the Second Circuit explained in the leading case cited by the

States, "'international comity' may describe two distinct doctrines: as a canon of construction, it

might shorten the reach of a statute; second, it may be viewed as a discretionary act of deference

by a national court to decline to exercise jurisdiction in a case properly adjudicated in a foreign

state, the so-called comity among courts."  *In re Maxwell Commc'n Corp. plc*, 93 F.3d 1036,

1047 (2d Cir. 1996).  The second of these doctrines has no bearing on this case, and Plaintiffs'

position here is not designed to "shorten the reach of a statute," but to broaden it.  The

interpretation of the MBTA set forth in Opinion M-37050 does not undermine the United States'

commitment to any of the treaties that are incorporated into the MBTA—none of which

specifically or directly prohibit incidental take of migratory birds—nor can it be said to violate

any sort of universally understood "law of nations," *id.* at 1047, regarding this issue.[17]  As the

---

[17] Particularly given the conflicting interpretations given to the MBTA by various federal
courts in the United States, Plaintiffs' reliance on an interpretation of the Convention in a single

States note, the Supreme Court accords "great weight" to the meaning given to treaties "by the departments of government particularly charged with their negotiation and enforcement." *Kolovrat v. Oregon*, 366 U.S. 187, 194 (1961); *see Fund for Animals v. Kempthorne*, 538 F.3d 124, 134 (2d Cir. 2008); (States' Br. at 25).  Here, the DOI and the FWS—the departments of government charged with the enforcement of the MBTA—have provided a detailed and thorough interpretation of the MBTA, after due consideration of, among other things, the various treaties that underlie that statute; this Court should give "great weight" to that analysis.

Plaintiffs also place significant emphasis on the 2003 appropriations bill that explicitly exempted military-readiness activities from liability under the MBTA for incidental takings.  *See* Pub. L. No. 107-314, 116 Stat. 2458, 2509-10 (2002); (Env. Br. at 26-28; States' Br. at 20).  The Bob Stump National Defense Authorization Act for Fiscal Year 2003 was enacted on December 2, 2002, just seven months after a district court found that live-fire military exercises that resulted in the unintentional deaths of migratory birds violated the MBTA and enjoined the Department of Defense from conducting such military training exercises.  *Ctr. for Biological Diversity v. Pirie*, 201 F. Supp. 2d 113, 123 (D.D.C. 2002), *vacated as moot sub nom. Ctr. for Biological Diversity v. England*, No. 02-5163, 2003 U.S. App. LEXIS 1110, at *2 (D.C. Cir. Jan. 23, 2003).  Rather than wait for the district court's interpretation of the statute to be tested through the government defendants' appeal, Congress acted in a limited fashion to preempt a specific and immediate impediment to military-readiness activities.  The legislation notably did not add or amend any specific language in the MBTA.  Rather, it dictated that Section 2 of the MBTA "shall not apply to the incidental taking of a migratory bird by a member of the Armed

---

decision from Canada's New Brunswick Provincial Court, purportedly to provide some guidance as to how this Court should evaluate an act of Congress and an interpretation of that statute by a United States federal government agency, is unavailing.  (States' Br. at 25; Env. Br. at 33 n.11).

Forces during a military readiness activity authorized by the Secretary of Defense or the Secretary of the military department concerned."  116 Stat. at 2509-10.  Nothing in this statute authorized the government to pursue incidental takings charges in contexts other than the specific circumstance addressed in the *Pirie* decisions.

Plaintiffs maintain that this law would not have been necessary at all if the MBTA did not prohibit incidental take more broadly—there would be no need to create an exception for this or any other specific type of incidental take unless incidental take was restricted already.  But this interpretation goes too far.  Had Congress intended to definitively address the uncertain and controversial subject of the applicability of the MBTA to incidental take—a question that already had generated a split of authority in federal district and appellate courts—it is not likely that it would have done so via a brief insert into a large appropriations package.  As the Supreme Court has held, "Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes."[18] *Whitman v. Am. Trucking Assn's*, 531 U.S. 457, 468 (2001).  Congress approved "an exceptionally narrow exemption," and "[b]y proceeding in a carefully targeted way, Congress had no reason to address the full scope of the MBTA."  *CITGO*, 801 F.3d at 491.  "Whether Congress deliberately avoided more broadly changing the MBTA or simply chose to address a discrete problem, the most that can be said is that Congress did no more than the plain text of the amendment means."[19]  *Id.*

_____

[18] Similarly, statutes directing that MBTA penalties go toward wetlands conservation projects and addressing the DOI's "responsibilities to conserve migratory game birds under existing authorities provided by the MBTA," (Env. Br. at 29-30), cannot plausibly be read as any kind of commentary on the fundamental meaning of the underlying statute.

[19] To the extent Plaintiffs suggest that Executive Order 13,186, 66 Fed. Reg. 3853 (Jan. 17, 2001) ("Responsibilities of Federal Agencies to Protect Migratory Birds"), issued in the final days of the Clinton Administration, expanded the definition of "take" in the MBTA, they are

### E.     The MBTA Should Be Interpreted Narrowly to Avoid Constitutional Infirmity

To the extent it is necessary to reach beyond the plain meaning of the statute to conclude that Opinion M-37050 sets forth the proper reading of Section 2 of the MBTA, the Court also should uphold the M-Opinion because the interpretation that limits the application of the MBTA to conduct that is specifically directed at birds is necessary to avoid potential constitutional concerns.  The Supreme Court has recognized that "[a] fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required."  *Fed. Commc'ns Comm'n v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).  Due process mandates "that no individual be forced to speculate, at peril of indictment, whether his conduct is prohibited."  *Dunn v. United States*, 442 U.S. 100, 112 (1979).  A "statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law."  *Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926).  Thus, "[a] conviction or punishment fails to comply with due process if the statute or regulation under which it is obtained 'fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.'"  *Fox Television Stations*, 567 U.S. at 253 (quoting *Williams*, 553 U.S. at 304).  As the Supreme Court has advised, "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such

---

mistaken.  (Env. Br. at 24 n.7; States' Br. at 7).  The executive order is limited to the management of the federal government; thus, to the extent it defined "take" to include incidental take, it was "for purposes of [the] order," *id.* § 2, 5(b).  It did not, and without further legislative or regulatory action could not, change the underlying law or regulations.  *See id.* § 5(b).  The executive order does not redefine "take" for purposes of assigning criminal liability under the MBTA.  (AR 32 n. 172).

problems unless such construction is plainly contrary to the intent of Congress." *Edward J.*

*DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988).

To impose liability under Section 2 of the MBTA for acts that are not directed at migratory birds

would raise these constitutional concerns.

### 1. Interpreting the MBTA to Prohibit Incidental Take Would Criminalize a Broad Swath of Otherwise Lawful Activities

The "scope of liability" under an interpretation of the MBTA that makes criminally liable

all persons who kill or take migratory birds incidental to another activity is "hard to overstate,"

*CITGO*, 801 F.3d at 493, and "offers unlimited potential for criminal prosecutions," *Brigham*

*Oil*, 840 F. Supp. 2d at 1213.  More than 1,000 species of birds—"nearly every bird species in

North America" (AR 1360)—are currently protected by the MBTA, *see* 50 C.F.R. § 10.13,

"including many of the most numerous and least endangered species one can imagine," *Mahler*,

927 F. Supp. at 1576.  And human activity results in significant bird mortality every year—the

FWS estimates that the three greatest "human-caused threats" to birds are cats (which kill an

estimated 2.4 billion birds per year); collisions with building glass (which kill an estimated 599

million bird per year); and collisions with vehicles (which kill an estimated 214.5 million birds

per year).  *See* FWS—Threats to Birds; (AR 34 (incorporating similar information from older

version of FWS data)).  While it would be a clear and understandable rule to interpret the MBTA

to apply strict criminal liability to any instance where a protected migratory bird is killed as a

result of these "human caused threats," it would also make potential criminals out of millions of

Americans.  (AR 34-35); *see Mahler*, 927 F. Supp. 1577-78 ("the criminal law ordinarily

requires proof of at least negligence before a person can be held criminally liable for causing the

death of another human being.  [The plaintiff's] approach to the MBTA would impose criminal

liability on a person for the death of a bird under circumstances where no criminal liability would

be imposed for even the death of another *person*." (emphasis in original)).  This interpretation

has the potential to produce absurd results, which are to be avoided.  *See Griffin v. Oceanic*

*Contractors,* 458 U.S. 564, 575 (1982) ("interpretations of a statute which would produce absurd

results are to be avoided if alternative interpretations consistent with the legislative purpose are

available"); *Secs. & Exch. Comm'n v. Rosenthal*, 650 F.3d 156, 162 (2d Cir. 2011) ("It is, to be

sure, well-established that a statute should be interpreted in a way that avoids absurd results."

(quotation marks and alteration omitted)).  In fact, even courts that have determined that

incidental take is prohibited under the MBTA have expressed concerns about the breath of the

statute as applied literally.  *See FMC Corp.,* 572 F.2d at 905 ("Certainly construction that would

bring every killing within the statute such as deaths caused by automobiles, airplanes, plate glass

modern office buildings or picture windows in residential dwellings into which birds fly, would

offend reason and common sense."); *Corbin Farm Serv.,* 444 F. Supp. at 536.

Contrary to the suggestion of Plaintiffs and some courts, these potentially problematic

results are not ameliorated by limiting the definition of incidental take to "direct and foreseeable

harm," or by invoking the requirement that a criminal defendant must have proximately caused

the death of a protected migratory bird.  (Env. Br. at 34-35); *Moon Lake*, 45 F. Supp. 2d at 1085

(an "important and inherent limiting feature of the MBTA's misdemeanor provision [is that] [t]o

obtain a guilty verdict . . . the government must prove proximate causation"); *Apollo Energies*,

611 F.3d at 690 ("the MBTA requires a defendant to proximately cause the statute's violation for

the statute to pass constitutional muster").  But the *Moon Lake* court, quoting *Black's Law*

*Dictionary*, defines proximate cause as "that which, in a natural and continuous sequence,

unbroken by any efficient intervening cause, produces the injury and without which the accident

could not have happened, if the injury be one which might be *reasonably anticipated or foreseen*

*as a natural consequence of the wrongful act.*"  45 F. Supp. 2d at 1085 (emphasis in original);

(AR 1378).  This principle does nothing to limit the scope of incidental take—the death of birds

as a result of activities such as driving or maintaining buildings with large windows is most

certainly a "reasonably anticipated or foreseen consequence" of those actions.  Indeed, collisions

with vehicles and buildings are the second- and third-most common human-caused threats to

birds, resulting in more than 800 million bird deaths each year.  Limiting incidental take to direct

and foreseeable results does little to prevent absurd outcomes.

> **2.      Prosecutorial Discretion, Attempted Narrowing Constructions, and the Existence of Permitting Authority Are Not Sufficient to Cure an Improperly Vague Law**

Both courts and the government have traditionally relied on the exercise of prosecutorial

discretion to mitigate concerns about potentially absurd applications of Section 2 of the MBTA

to incidental take.  *See, e.g., FMC Corp.*, 572 F.2d at 905 (certain "situations properly can be left

to the sound discretion of prosecutors and the courts").  But the Supreme Court has declared that

"[i]t will not do to say that a prosecutor's sense of fairness and the Constitution would prevent a

successful . . . prosecution for some of the activities seemingly embraced within the sweeping

statutory definitions."  *Baggett v. Bullitt*, 377 U.S. 360, 373 (1964); *see Mahler*, 927 F. Supp. at

1582 ("Such trust in prosecutorial discretion is not really an answer to the issue of statutory

construction" in interpreting the MBTA).  For broad statutes that may be applied to seemingly

minor situations, "[i]t is no answer to say that the statute would not be applied in such a case."

*Keyishian v. Bd. of Regents*, 385 U.S. 589, 599 (1967); *Moon Lake*, 45 F. Supp. 2d at 1084

("[w]hile prosecutors necessarily enjoy much discretion, proper construction of a criminal statute

cannot depend upon the good will of those who must enforce it.").  As Defendants have

explained in the Proposed Rule, "[p]roductive and otherwise lawful economic activity should not

be functionally dependent upon the ad hoc exercise of enforcement discretion."  85 Fed. Reg. at 5922.

Various other efforts to engraft a narrowed scope on the MBTA's supposed prohibition of incidental take have also not succeeded in providing potential violators with clarity on what conduct would or would not expose them to criminal liability.  In *FMC Corporation*, the Second Circuit, drawing an analogy to tort law, indicated that criminal liability was appropriate because the company, a pesticide manufacturer, had engaged in "extrahazardous activities."  572 F.2d at 907.  But the term "extrahazardous activities" is not found anywhere in the MBTA, nor has it been defined by the FWS, and the court did not provide any specific guidance as to how far this concept extends.  *See Mahler,* 927 F. Supp. at 1583 n.9 (noting that the *FMC Corporation* court's "limiting principle . . . of strict liability for hazardous commercial activity . . . ha[s] no apparent basis in the statute itself or in the prior history of the MBTA's application since its enactment.").  Therefore, even within the Second Circuit, is unclear what activities are "extrahazardous," and people must guess at what is prohibited under the cloud of potential criminal liability.  This uncertainty is problematic under the Supreme Court's due process jurisprudence.  *See United States v. Rollins,* 706 F. Supp. 742, 744-45 (D. Idaho 1989) (holding that the MBTA was unconstitutionally vague as applied to a farmer who used due care in applying pesticides that subsequently killed migratory birds, and observing that "[t]he statute itself does not state that poisoning of migratory birds by pesticide constitutes a criminal violation.  Such specificity would not have been difficult to draft into the statute."); *but see Corbin Farm*, 444 F. Supp. 534-36 (holding that the use of pesticides resulting in the deaths of migratory birds could constitute violations of the MBTA).

37

The MBTA contemplates the issuance of permits authorizing the taking of wildlife, *see* 16 U.S.C. § 703(a), but no permit scheme is generally available to allow incidental take, and even permit regimes that have been contemplated by the FWS would only have addressed potential incidental take by certain actors.  (Env. Br. at 7 (referring to potential regulations that would have established incidental take authorization for "certain industry sectors")).  Accordingly, potential violators have no mechanism to ensure that their actions comply with the law.  Voluntary guidelines issued by the FWS for different industries recommend best practices to avoid incidental take of protected birds, but these guidelines offer only limited protection to potential violators.  (AR 38-39).  In the absence of a permit issued pursuant to a DOI regulation, it is not clear that the FWS has any authority under the MBTA to require minimizing or mitigating actions that balance the environmental harm from the taking of migratory birds with other societal goals, such as the production of wind or solar energy.  The guidelines thus do not provide enforceable legal protections for people and businesses who abide by their terms.  (AR 38-39).  Even the guidelines themselves state that "it is not possible to absolve individuals or companies" from liability under the MBTA.  (AR 302).  Rather, the guidelines make clear only that the FWS may take full compliance into consideration in exercising its discretion whether or not to refer an individual or company to the Department of Justice for prosecution.  (AR 302). Under this approach, it is impossible for individuals and companies to know exactly what is required of them under the law when otherwise lawful activities result in accidental bird deaths. Even if they comply with everything requested of them by the FWS, they may still be prosecuted, and still found guilty of criminal conduct.  In the district court proceeding that led to the *FMC Corporation* appeal, the jury was instructed that it could not consider the company's remediation efforts as a defense.  *See FMC Corp.,* 572 F.2d at 904 ("Therefore, under the law

good will and good intention and measures taken to prevent the killing of the birds are not a

defense." (quoting jury charge)).

Due process "requires legislatures to set reasonably clear guidelines for law enforcement

officials and triers of fact in order to prevent arbitrary and discriminatory enforcement." *Smith* v.

*Goguen,* 415 U.S. 566, 572-73 (1974) (quotation marks omitted).  Interpreting the MBTA to

criminalize incidental takings of migratory birds raises potential due process concerns.  *See*

*Baggett*, 377 U.S. at 373 ("Well-intentioned prosecutors and judicial safeguards do not neutralize

the vice of a vague law.").  In contrast, the interpretation set forth in Opinion M-37050 avoids

these concerns by reading Section 2 of the MBTA as prohibiting only those actions, such as

hunting and poaching, that are specifically directed at migratory birds, their nests, or their eggs,

and not prohibiting incidental take.

### F.  Second Circuit Precedent Does Not Require the Court to Reject Defendants' Interpretation of the MBTA in Opinion M-37050

As noted above and in Opinion M-37050, the Second Circuit in *FMC Corporation* upheld

a conviction of a pesticide manufacturer under the MBTA because the corporation manufactured

a "dangerous chemical" and "failed to act to prevent" this chemical from reaching a pond where

it was ingested by protected migratory birds.  572 F.2d at 907-08.  The case did not address the

meaning of the word "take" in Section 2 of the MBTA, *see id.* at 903 (focusing on "kill" as the

key statutory term), but it does stand for the proposition that a person or entity may be criminally

liable under the MBTA for actions that were not directed at migratory birds, but result in the

death of migratory birds even though that was not the purpose of the action.  Yet *FMC*

*Corporation* did not embrace an unqualified reading of Section 2 of the MBTA—it discussed

liability in terms of actors engaged in "extrahazardous activities," indicated that interpreting the

statute so as to prohibit killing "without limitation" would "offend reason and common sense,"

and suggested that appropriate application of the statute could be ensured through "the sound discretion of prosecutors and the courts," before finding that the particular facts and circumstances of the case were "sufficient to impose strict liability on FMC." *Id.* at 905, 907-08. In no way did the court in *FMC Corporation*—a more than 40-year-old precedent authored before other Courts of Appeals rejected such a broad reading of the MBTA—determine that the result was compelled by unambiguous statutory language; rather, the panel explained that in its view, there was "no help to be had from legislative history or decisional authority," and that "resort must be had to a rule of reason or even better, common sense." *Id.* at 905.

In *Brand X*, the Supreme Court set aside a decision of the Ninth Circuit that relied on that court's own prior interpretation of a statutory provision rather than considering and applying deference to an agency interpretation of the statute in question. *Brand X*, 545 U.S. at 982.  The *Brand X* Court determined that "[b]efore a judicial construction of a statute, whether contained in a precedent or not, may trump an agency's, the court must hold that the statute unambiguously requires the court's construction." *Id.* at 985.  "Only a judicial precedent holding that the statute unambiguously forecloses the agency's interpretation, and therefore contains no gap for the agency to fill, displaces a conflicting agency construction." *Id.* at 982-83.  This analysis is consistent with the Supreme Court's decision in *Chevron U.S.A., Inc. v. NRDC,* 467 U.S. 837 (1984), which "teaches that a court's opinion as to the best reading of an ambiguous statute an agency is charged with administering is not authoritative, [and therefore] the agency's decision to construe that statute differently from a court does not say that the court's holding was legally wrong.  Instead, the agency may, consistent with the court's holding, choose a different construction, since the agency remains the authoritative interpreter (within the limits of reason) of such statutes." *Brand X*, 545 U.S. at 983.  Here, nothing in the *FMC Corporation* decision

can be read to suggest that the Second Circuit viewed the language of Section 2 of the MBTA as unambiguous.  572 F.2d at 905, 907-08.  This is not a judicial precedent that forecloses contrary agency interpretation pursuant to *Brand X*.

While *Brand X*, by its terms, applies only to agency interpretations for which agencies are entitled to *Chevron* deference, *see* 545 U.S. at 983, the animating principle of *Brand X*— ensuring the proper role of administrative agencies in interpreting statutes meant for implementation by those agencies—is still instructive.  In the Second Circuit, even in a situation where a relevant agency action was only entitled to *Skidmore* deference, the court demonstrated a willingness to reconsider a prior precedent in part based on the agency's subsequent interpretation of the statutory provision at issue.  *Catskill Mts. Chptr. of Trout Unlimited, Inc. v. City of New York*, 451 F.3d 77, 82-84 (2d Cir. 2006).  Consideration of the DOI's interpretation of the MBTA is particularly warranted because of the circumstances faced by Defendants here, with courts of appeals having offered conflicting assessments of the same statutory provision. These decisions have created regulatory uncertainty and inconsistency both for Defendants and for parties potentially subject to MBTA enforcement.  As a result of the patchwork of judicial decisions before the publication of Opinion M-37050, the federal government was clearly prohibited from enforcing an incidental take prohibition in the territory covered by the Fifth Circuit, and faced restrictions in the Eighth Circuit and Ninth Circuits as well.  Meanwhile, in the Second and Tenth Circuits, the federal government was permitted to apply the MBTA to incidental take, albeit with differing judicial limitations.  Various district courts have also provided their own interpretations, sometimes in jurisdictions where courts of appeals have not addressed the issue.  *See* Background Section D, *supra*.

This convoluted patchwork of legal standards took shape despite the fact that the courts were all attempting to apply the same underlying law.  As explained in the Proposed Rule, Defendants have determined that it is in their own interests, "as well as that of the public, to have and apply a national standard that sets a clear, articulable rule for when an operator crosses the line into criminality.  The most effective way to reduce uncertainty and have a truly national standard is for the [FWS] to codify and apply a uniform interpretation of the MBTA that its prohibitions do not apply to incidental take, based upon the Fifth Circuit's ruling in [*CITGO*]."  85 Fed. Reg. at 5923.  Where different courts have issued conflicting interpretations of a statute that an agency is charged with enforcing, it is particularly appropriate to defer to the agency's well-reasoned interpretation of that statute, rather than allow the precedent from a single court— which did not find the statutory language at issue to be unambiguous—to control the outcome.[20]

There is no dispute that Defendants have changed their interpretation of the meaning of Section 2 of the MBTA.  (AR 2 n.4) (recognizing that "this interpretation is contrary to the prior practice of [the DOI]).  But "[a]gencies are free to change their existing policies as long as they provide a reasoned explanation for the change."  *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016).  An agency must "display awareness that it *is* changing position" and "show that there are good reasons" for its new policy, but it need not show that "the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible

---

[20] In its July 31, 2019 Opinion and Order, the Court suggested that the proper time to litigate the "appropriate remedy" would be in the event that "Plaintiffs prevail on the merits" of their claims.  Dkt. No. 53 at 15 n.10.  Accordingly, this memorandum of law does not address Defendants' view of what remedy would be appropriate if the Court were to deny Defendants' motion for summary judgment and grant Plaintiffs' motions.  This approach is consistent with that of other courts that have deferred consideration of remedies until after resolving the parties' competing motions on the merits of plaintiffs' APA claims.  *See, e.g.*, *Pirie*, 201 F. Supp. 2d at 115 (evaluating the parties' separate submissions on the issue of remedy).

42

under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates." *Fed. Commc'ns Comm'n v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (emphases in original).  Defendants have satisfied these requirements here—Opinion M-37050 acknowledges the change in Defendants' interpretation of the MBTA, and provides a thorough and detailed accounting for why the interpretation in Opinion M-37050 is the appropriate way to read the statute in light of its text, history, and purpose.  The court should defer to Defendants' interpretation, and reject Plaintiffs' APA challenges.

## II.    OPINION M-37050 WAS NOT A MAJOR FEDERAL ACTION THAT REQUIRED DEFENDANTS TO COMPLY WITH NEPA

Defendants were not obligated to perform a NEPA analysis in connection with Opinion M-37050 because the legal opinion is only an interpretative rule that serves as Defendants' first step in its policymaking practice regarding this issue, and because Defendants' decision not to act in the enforcement context is not subject to NEPA review.  As contemplated since the day Opinion M-37050 was first issued (AR 73-74), Defendants are moving forward with a formal rulemaking process to codify the legal interpretation set forth in the M-Opinion as official policy binding on the federal government and the public, which the DOI had determined all along would be the culmination of the decision-making process.  And as part of the rulemaking, Defendants are engaged in a NEPA process to prepare an EIS.  *See* 85 Fed. Reg. 5913.  This is not a situation where Defendants have engaged in a "flagrant flouting" of the NEPA requirements (Env. Br. at 39)—rather, Defendants are adhering to NEPA at the final stage of their administrative action.  The DOI has taken a similar approach with other legal opinions offering interpretations of statutes—notably, there was no NEPA review performed in

connection with the issuance of Opinion M-37041, which analyzed the identical statutory

provision of the MBTA.

As set forth in Defendants' briefing on the motion to dismiss in these consolidated

lawsuits, Defendants did not consider the M-Opinion as a final agency action subject to review

under the APA, let alone a "major federal action" subject to NEPA.  *See* Dkt. No.27 at 38-40;

Dkt. No. 50 at 17-19; 42 U.S.C. § 4332(2)(C).  The Court previously ruled that Opinion M-

37050 fit within the portion of the Council on Environmental Quality regulations defining

"major Federal action" that covers "formal documents establishing an agency's policies which

will result in or substantially alter agency programs."  *See* Dkt. No. 53 at 33-34; 40 C.F.R.

§ 1508.18(b)(1).  But developments since the July 31, 2019 order provide additional evidence

that the real "formal" action regarding Defendants' interpretation of the MBTA is the Proposed

Rule—the culmination of the administrative process that began with the M-Opinion.  That

"major Federal action" is being considered in accordance with NEPA.

In addressing the parties' arguments regarding the Audubon Plaintiffs' now-dismissed

notice-and-comment claim, the Court found that Opinion M-37050 is a "quintessentially

interpretative" rule, determining how the issue of incidental take is to be treated under an

existing statutory provision.  *See* Dkt. No. 53 at 31.  Indeed, the M-Opinion served an advisory

purpose—it provided clarification of the DOI's view of the existing law in an effort to minimize

confusion and ensure certainty for potentially regulated parties.  The DOI's NEPA regulations

regarding when and how a NEPA analysis must be performed were not triggered by this

preliminary action by Defendants—there was no need for the DOI to consider whether a

categorical exclusion exempts the action from NEPA review, *see* 43 C.F.R. § 46.205(c)(1), and

no need to determine whether any of the enumerated "extraordinary circumstances" vitiate the

categorical exclusion, *see* 43 C.F.R. §§ 46.210, 46.215.[21]  The NEPA analysis for Defendants'

interpretation of Section 2 of MBTA is appropriately unfolding in the context of the final, formal

rulemaking initiated by the DOI and the FWS, and it was not error for Defendants not to have

performed a NEPA review at an earlier stage.

     In addition, Opinion M-37050 is fundamentally an expression of how the DOI and the

FWS will conduct enforcement of Section 2 of the MBTA, with a clear statement of ways in

which the agencies will not exercise authority under the statute.  While NEPA applies when an

agency proposes a "major Federal *action* significantly affecting the quality of the human

environment," 42 U.S.C. § 4332 (emphasis added), agency decisions *not* to act have long been

understood to be outside the scope of NEPA—"the nonexercise of power by an executive-branch

office does not call for compliance with NEPA," even with respect to "authority and duties [the

Secretary] may possess."  *Alaska v. Andrus*, 591 F.2d 537, 538, 541 (9th Cir. 1979).  A NEPA

analysis plainly is not required for individual agency decisions to decline to exercise

enforcement authority—for example, if an FWS agent declines to refer a particular incident of

taking of a migratory bird, there is no NEPA duty to analyze that decision.  *See Defenders of

Wildlife* v. *Andrus,* 627 F.2d 1238, 1246 (D.C. Cir. 1980) ("No agency could meet its NEPA

obligations if it had to prepare an environmental impact statement every time the agency had

power to act but did not do so.").  With Opinion M-37050, Defendants announced a change in

agency policy regarding the enforcement of the MBTA, based on the considered view that the

interpretation set forth in the M-Opinion is the proper application of the law.  If decisions not to

---

[21] Even if the Court were to award judgment for the Audubon Plaintiffs on the NEPA
claim, the Court should decline the invitation to dictate a particular type of action by Defendants
to comply with NEPA.  (Env. Br. at 39-40).  "The court's role is to ensure that NEPA's
procedural requirements have been satisfied, not to interject itself within the area of discretion of
the executive as to the choice of the action to be taken."  *Fund for Animals*, 538 F.3d at 137
(quotation marks omitted).

pursue criminal prosecutions for incidental take had been made on a case-by-case basis, there would have been no NEPA implications for those individual adjudications; similarly, there should be no NEPA requirement for Defendants' decision to announce this shift toward non-enforcement as generally applicable guidance. *See Secs. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 203 (1947) ("the choice made between proceeding by general rule or by individual, *ad hoc* litigation is one that lies primarily in the informed discretion of the administrative agency"). And again, as Defendants' policymaking process progresses from the enforcement guidance of the M-Opinion to the formal Proposed Rule, the procedural requirements of NEPA are being followed at the appropriate time.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment should be granted, and Plaintiffs' motions for summary judgment should be denied.

Dated:   New York, New York
      March 27, 2020

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
*Attorney for Defendants*

By:   */s/ Andrew E. Krause*
    ANDREW E. KRAUSE
    Assistant United States Attorney
    86 Chambers Street, Third Floor
    New York, New York  10007
    Telephone:  (212) 637-2769
    Facsimile:  (212) 637-2786