# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL, INC., et al., | ) ) ) ) |
| *Plaintiffs*, | ) ) |
| v. | ) 18-CV-4596 (VEC) |
| U.S. DEPARTMENT OF THE INTERIOR, et al., | ) ) ) |
| *Defendants*. | ) ) ) |
| NATIONAL AUDUBON SOCIETY, et al., | ) ) ) |
| *Plaintiffs*, | ) ) |
| v. | ) 18-CV-4601 (VEC) |
| U.S. DEPARTMENT OF THE INTERIOR, et al., | ) ) ) |
| *Defendants*. | ) ) ) |
| STATE OF NEW YORK, et al., | ) ) |
| *Plaintiffs*, | ) ) |
| v. | ) 18-CV-8084 (VEC) |
| U.S. DEPARTMENT OF THE INTERIOR, et al., | ) ) ) |
| *Defendants*. | ) ) ) |

## ENVIRONMENTAL PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................ii

INTRODUCTION ........................................................................................... 1

ARGUMENT .................................................................................................. 2

I.    The Jorjani Opinion misconstrues the MBTA .................................................. 2

    A.  The Jorjani Opinion contravenes the Second Circuit's
        binding interpretation of the MBTA ........................................................ 2

        1.  Second Circuit precedent controls ................................................... 2

        2.  Other court decisions do not change the outcome................................. 4

        3.  The Jorjani Opinion deserves no deference ........................................ 6

    B.  The Jorjani Opinion is contrary to the Act's text and
        purpose, as well as related statutes ....................................................... 9

        1.  The Act's plain language broadly encompasses killing
            migratory birds by any means and in any manner............................... 9

        2.  The Jorjani Opinion undermines the Act's purpose
            of protecting migratory birds ...................................................... 13

        3.  Related statutes confirm Congress's understanding
            that the Act applies to more than purposeful killings........................ 16

    C.  No constitutional concern justifies the Jorjani Opinion's
        construction............................................................................... 20

        1.  Proximate cause limits the Act's reach .......................................... 20

        2.  Regulatory authority can resolve any remaining concerns.................. 22

II.    Defendants violated NEPA................................................................... 25

III.    Vacatur is the appropriate remedy ...................................................... 29

CONCLUSION................................................................................... 32

# TABLE OF AUTHORITIES

## Cases

*Alaska v. Andrus,*
  591 F.2d 537 (9th Cir. 1979) ........................................................................ 29

*Ali v. Fed. Bureau of Prisons,*
  552 U.S. 214 (2008) .................................................................................. 12

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n,*
  988 F.2d 146 (D.C. Cir. 1993) ..................................................................... 30

*Allina Health Servs. v. Sebelius,*
  746 F.3d 1102 (D.C. Cir. 2014) .................................................................... 31

*Andrus v. Allard,*
  444 U.S. 51 (1979) .................................................................... 9, 14, 16, 22

*Andrus v. Shell Oil Co.,*
  446 U.S. 657 (1980) .................................................................................. 17

*Arkansas v. Farm Credit Servs.,*
  520 U.S. 821 (1997) .................................................................................. 13

*Babbitt v. Sweet Home Chapter of Cmtys.,*
  515 U.S. 687 (1995) ............................................................................. 11, 17

*Baldwin v. United States,*
  140 S. Ct. 690 (2020) .................................................................................. 3

*Beecham v. United States,*
  511 U.S. 368 (1994) .................................................................................. 10

*Brodsky v. U.S. Nuclear Regulatory Comm'n,*
  704 F.3d 113 (2d Cir. 2013) ........................................................................ 26

*California v. U.S. Dep't of the Interior,*
  381 F. Supp. 3d 1153 (N.D. Cal. 2019) ........................................................... 30

*Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York,*
  451 F.3d 77 (2d Cir. 2006) ........................................................................... 3

*Causse Mfg. Co. v. United States,*
    151 F. 4 (2d Cir. 1906) ..................................................................... 12

*Chevron USA Inc. v. NRDC,*
    467 U.S. 837 (1984) ........................................................................... 3

*Christensen v. Harris Cty.,*
    529 U.S. 576 (2000) ........................................................................... 8

*City Club of N.Y. v. U.S. Army Corps of Eng'rs,*
    246 F. Supp. 3d 860 (S.D.N.Y. 2017) ............................................... 30

*Conn. Nat'l Bank v. Germain,*
    503 U.S. 249 (1992) ......................................................................... 12

*Conservation Law Found. v. Pritzker,*
    37 F. Supp. 3d 254 (D.D.C. 2014) ................................................... 31

*Cty. of Maui v. Hawaii Wildlife Fund,*
    --- S. Ct. ---, No. 18-260,
    2020 WL 1941966 (U.S. Apr. 23, 2020) ...................... 9, 12, 20, 21, 24

*Defenders of Wildlife v. Andrus,*
    627 F.2d 1238 (D.C. Cir. 1980) ....................................................... 29

*DePierre v. United States,*
    564 U.S. 70 (2011) ........................................................................... 14

*Estate of Landers v. Leavitt,*
    545 F.3d 98 (2d Cir. 2008) ................................................................ 7

*FDA v. Brown & Williamson Tobacco Corp.,*
    529 U.S. 120 (2000) ......................................................................... 19

*FEC v. Akins,*
    524 U.S. 11 (1998) ........................................................................... 31

*Friends of Animals v. Romero,*
    948 F.3d 579 (2d Cir. 2020) ............................................................. 27

*Gen. Dynamics Land Sys., Inc. v. Cline,*
    540 U.S. 581 (2004) ........................................................................... 8

iii

*Graham Cty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson,*
    559 U.S. 280 (2010) ........................................................................... 10

*Guertin v. United States,*
    743 F.3d 382 (2d Cir. 2014) ......................................................... 29-30

*Gundy v. United States,*
    139 S. Ct. 2116 (2019) ...................................................................... 13

*Holder v. Humanitarian Law Project,*
    561 U.S. 1 (2010) ............................................................................... 22

*Humane Soc'y v. Glickman,*
    217 F.3d 882 (D.C. Cir. 2000) ................................................. 7, 9, 15

*Humane Soc'y of the U.S. v. Johanns,*
    520 F. Supp. 2d 8 (D.D.C. 2007) ...................................................... 28

*In re Bernard L. Madoff Inv. Sec. LLC,*
    779 F.3d 74 (2d Cir. 2015) ............................................................. 6, 8

*Kisor v. Wilkie,*
    139 S. Ct. 2400 (2019) ........................................................................ 8

*Kleppe v. Sierra Club,*
    427 U.S. 390 (1976) ........................................................................... 27

*Loving v. United States,*
    517 U.S. 748 (1996) ........................................................................... 17

*Manning v. United States,*
    146 F.3d 808 (10th Cir. 1998) ............................................................. 7

*McMaster v. United States,*
    731 F.3d 881 (9th Cir. 2013) ............................................................... 7

*Mhany Mgmt., Inc. v. Cty. of Nassau,*
    819 F.3d 581 (2d Cir. 2016) ................................................................ 2

*Missouri v. Holland,*
    252 U.S. 416 (1920) ........................................................................... 21

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Ins. Co.,*
    463 U.S. 29 (1983) ............................................................................. 26

*Nat'l Audubon Soc'y v. Hoffman*,
    132 F.3d 7 (2d Cir. 1997) ................................................................................ 25

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
    545 U.S. 967 (2005) .................................................................................... 2, 3

*New York v. U.S. Dep't of Commerce*,
    351 F. Supp. 3d 502 (S.D.N.Y. 2019) ............................................................ 30

*New York v. U.S. Dep't of Commerce*,
    139 S. Ct. 2551 (2019) ................................................................................... 30

*New York v. U.S. Dep't of Commerce*,
    No. 19-212, 2019 WL 7668098 (2d Cir. Aug. 7, 2019) .................................... 30

*Newton Cty. Wildlife Ass'n v. U.S. Forest Serv.*,
    113 F.3d 110 (8th Cir. 1997) ........................................................................... 5

*NLRB v. SW Gen., Inc.*,
    137 S. Ct. 929 (2017) ..................................................................................... 14

*NRDC v. EPA*,
    489 F.3d 1250 (D.C. Cir. 2007) ...................................................................... 31

*NRDC v. EPA*,
    676 F. Supp. 2d 308 (S.D.N.Y. 2009) ....................................................... 31, 32

*NRDC v. EPA*,
    808 F.3d 556 (2d Cir. 2015) ........................................................................... 31

*NRDC v. FAA*,
    564 F.3d 549 (2d Cir. 2009) ........................................................................... 27

*N.Y. City Health & Hosps. Corp. v. Perales*,
    954 F.2d 854 (2d Cir. 1992) ............................................................................. 7

*Personal Watercraft Indus. Ass'n v. Dep't of Commerce*,
    48 F.3d 540 (D.C. Cir. 1995) .......................................................................... 24

*Pollinator Stewardship Council v. EPA*,
    806 F.3d 520 (9th Cir. 2015) .......................................................................... 31

*Protect Our Cmtys. Found. v. Jewell,*
     825 F.3d 571 (9th Cir. 2016) ............................................................................ 5

*Pub. Emps. for Envtl. Responsibility v. FWS,*
     189 F. Supp. 3d 1 (D.D.C. 2016) .................................................................... 31

*San Luis & Delta-Mendota Water Auth. v. Haugrud,*
     848 F.3d 1216 (9th Cir. 2017) ........................................................................ 14

*Seattle Audubon Soc'y v. Evans,*
     952 F.2d 297 (9th Cir. 1991) ............................................................................ 5

*Skidmore v. Swift & Co.,*
     323 U.S. 134 (1944) .......................................................................................... 3

*Sierra Club v. U.S. Army Corps of Eng'rs,*
     772 F.2d 1043 (2d Cir. 1985) .......................................................................... 26

*Sprint Spectrum L.P. v. Willoth,*
     176 F.3d 630 (2d Cir. 1999) ............................................................................ 12

*Stoneridge Inv. Partners, LLC v. Sci.-Atlanta,*
     552 U.S. 148 (2008) ........................................................................................ 16

*Turtle Island Restoration Network v. Dep't of Commerce,*
     878 F.3d 725 (9th Cir. 2017) ..................................................................... 5, 13

*United States v. Apollo Energies, Inc.,*
     611 F.3d 679 (10th Cir. 2010) .................................................... 4, 9, 20, 21, 22

*United States v. CITGO Petroleum Corp.,*
     801 F.3d 477 (5th Cir. 2015) ............................................................................ 5

*United States v. Corbin Farm Serv.,*
     444 F. Supp. 510 (E.D. Cal. 1978) ................................................................. 13

*United States v. Corbin Farm Serv.,*
     578 F.2d 259 (9th Cir. 1978) .......................................................................... 13

*United States v. Diaz,*
     122 F. Supp. 3d 165 (S.D.N.Y. 2015) .............................................................. 6

*United States v. Diaz,*
     854 F.3d 197 (2d Cir. 2017) ............................................................................. 6

*United States v. FMC Corp.*,
    572 F.2d 902 (2d Cir. 1978) ................................................................. 2, 6, 9, 11

*United States v. Mead Corp.*,
    533 U.S. 218 (2001) ........................................................................................ 8

*United States v. Moon Lake Elec. Ass'n, Inc.*,
    45 F. Supp. 2d 1070 (D. Colo. 1999) ........................................... 12, 20, 22, 23

*United States v. Russotti*,
    780 F. Supp. 128 (S.D.N.Y. 1991) ................................................................. 4

*United States v. Stevens*,
    559 U.S. 460 (2010) ............................................................................. 10-11, 13

*United States v. Tenzer*,
    213 F.3d 34 (2d Cir. 2000) ............................................................................. 3

*United States v. Wilkerson*,
    361 F.3d 717 (2d Cir. 2004) ........................................................................... 4

*World Wrestling Entm't, Inc. v. Jakks Pac., Inc.*,
    425 F. Supp. 2d 484 (S.D.N.Y. 2006) ........................................................... 4

*World Wrestling Entm't, Inc. v. Jakks Pac., Inc.*,
    328 F. App'x 695 (2d Cir. 2009) ................................................................... 4

## Statutes and Regulations

Administrative Procedure Act

    5 U.S.C. § 706 ................................................................................... 25, 29, 30

Migratory Bird Treaty Act

    Act of July 3, 1918, ch. 128, 40 Stat. 755 ..................................... 13
    16 U.S.C. § 703(a) ........................................................... 1, 9, 13, 22
    16 U.S.C. § 704(a) ..................................................................... 17
    16 U.S.C. § 704(b) ....................................................................... 9

16 U.S.C. § 4406 ....................................................................................... 19

42 U.S.C. § 4332 ....................................................................................... 27

Pub. L. No. 100-653, 102 Stat. 3825 (1988) ................................................ 19

Pub. L. No. 101-233, 103 Stat. 1968 (1989) ................................................ 19

Pub. L. No. 107-314, 116 Stat. 2458 (2002) ..................................... 17, 18, 23

Pub. L. No. 114-94, 129 Stat. 1312 (2015) ................................................ 17

## Regulations

40 C.F.R. § 1500.1 ........................................................................... 27

40 C.F.R. § 1508.18 .......................................................................... 28

50 C.F.R. § 10.12 ............................................................................ 11

50 C.F.R. § 21.15 ............................................................................ 18

72 Fed. Reg. 8931 (Feb. 28, 2007) ..................................................... 22-23

80 Fed. Reg. 30,032 (May 26, 2015) .................................... 16, 21, 23, 24, 28

83 Fed. Reg. 24,080 (May 24, 2018) ...................................................... 23

## Treaties

Convention for the Protection of Migratory Birds,
   39 Stat. 1702 (Aug. 16, 1916) (Canada Convention) ....................... 15

## Other Authorities

Black's Law Dictionary (6th ed. 1990) ..................................................... 20

Black's Law Dictionary (11th ed. 2019) ................................................... 30

Exec. Order 13186, 66 Fed. Reg. 3853 (Jan. 10, 2001) .............................. 11

*R. v. J.D. Irving, Ltd.*,
   2008 CarswellNB 322 (Can.) (WL) ................................................. 15

*R. v. Syncrude Canada Ltd.*,
   2010 ABPC 229 (Can.) ................................................................. 16

## INTRODUCTION

The Migratory Bird Treaty Act (the Act or MBTA) provides that, "[u]nless and except as permitted by regulations," it shall be unlawful to "kill" migratory birds "by any means or in any manner." 16 U.S.C. § 703(a). As the Second Circuit has correctly held, this expansive language encompasses industrial activities that directly and predictably kill birds, even if that is not the activity's specific purpose. The MBTA thereby appropriately encourages industry to avoid unnecessary bird deaths, furthering the Act's stated purpose of protecting migratory birds.

Defendants acknowledged this for decades until—at the behest of the oil and gas industry, and with no consideration of the resulting impacts to migratory birds—the Jorjani Opinion reinterpreted the MBTA to exempt effectively all industrial activities from the Act's reach. In defending the Jorjani Opinion's reversal of their longstanding position, Defendants ignore the Act's plain language and protective purpose, as well as the perverse incentives resulting from their new interpretation. Instead, Defendants make a plea for deference that cannot overcome binding circuit precedent and erroneously cite the constitutional avoidance canon as an excuse to immunize industrial activities from liability that raises no constitutional problems. Finally, Defendants never explain why any real-world concerns about the Act's reach could not be resolved by their authority to regulate and, where appropriate, permit incidental take under section 704(a) of the MBTA— just as Congress itself has specifically directed them to do in such circumstances.

The Jorjani Opinion and FWS Guidance implementing it must be set aside.

ARGUMENT

**I.     The Jorjani Opinion misconstrues the MBTA**

**A.     The Jorjani Opinion contravenes the Second Circuit's binding interpretation of the MBTA**

**1.     Second Circuit precedent controls**

Defendants concede that the Second Circuit has held that an actor may be "liable under the MBTA for actions that … result in the death of migratory birds even though that was not the purpose of the action." Defs.' Mem. Supp. Summ. J. 39, Dkt. 79 [hereinafter Defs.' Br.]. In *United States v. FMC Corp.*, 572 F.2d 902 (2d Cir. 1978), the Second Circuit held a pesticide manufacturer liable for killing dozens of migratory birds in a toxic wastewater pond, notwithstanding the company's arguments that it did not specifically "inten[d] to kill birds" and "took no affirmative act to do so." *Id.* at 905-08. That holding resolves this case because the Jorjani Opinion concluded that the MBTA applies "*only* to affirmative actions that have as their purpose the taking or killing of migratory birds." AR2 (emphasis added). The Jorjani Opinion therefore "runs headlong into Circuit precedent," *Mhany Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581, 616 (2d Cir. 2016), and must be set aside.[1]

Defendants cannot escape this binding precedent by invoking *National Cable & Telecommunications Ass'n v. Brand X Internet Services*, 545 U.S. 967 (2005). As

---

[1] Defendants observe that the Second Circuit focused on the term "kill" and did not adopt an "unqualified reading" of the statute. Defs.' Br. 39. As explained below, *see infra* 9-13, 20-22, the court was *correct* to focus on "kill" in 16 U.S.C. § 703(a) and to recognize that the statute's reach was not "without limitation." *FMC Corp.*, 572 F.2d at 905. Regardless, the Jorjani Opinion simply cannot be reconciled with the Second Circuit's holding in *FMC Corp.*, which affirmed a conviction that could not have been sustained if the Jorjani Opinion's construction of the MBTA were correct.

2

Defendants acknowledge, that decision "applies only to agency interpretations for which agencies are entitled to *Chevron* deference." Defs.' Br. 41. The Jorjani Opinion is unquestionably *not* entitled to deference under *Chevron USA Inc. v. NRDC*, 467 U.S. 837 (1984), *see* States' Reply Supp. Summ. J. 2 n.1, Dkt. 84 [hereinafter States' Reply Br.], which is why Defendants argue instead for only the (lesser) respect it might receive under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), *see* Defs.' Br. 16-17. But even if the Jorjani Opinion warranted any such respect— which it does not, *see infra* 6-9—the Supreme Court has explained that prior circuit precedent "remains binding law" for "agency interpretations [like the Jorjani Opinion] to which *Chevron* is inapplicable." *Brand X*, 545 U.S. at 983.[2]

The Second Circuit's decision in *Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York*, 451 F.3d 77 (2d Cir. 2006), does not suggest otherwise. *Contra* Defs.' Br. 41. There, the court applied the law-of-the-case doctrine—not *Brand X*—in entertaining (and rejecting) a party's request that the court reconsider its interpretation of the Clean Water Act. *Catskill*, 451 F.3d at 80-85. Under the law-of-the-case doctrine, a three-judge panel may reconsider an earlier decision *in that same case* "if there are cogent, compelling reasons for doing so." *Id.* at 80 (citing *United States v. Tenzer*, 213 F.3d 34, 39 (2d Cir. 2000)).[3]

---

[2] Defendants assert that the "animating principle of *Brand X*" extends beyond the *Chevron* context. Defs.' Br. 41. But Justice Thomas, who authored *Brand X*, has described *Chevron* as "the foundation" of that decision. *Baldwin v. United States*, 140 S. Ct. 690, 691 (2020) (Thomas, J., dissenting from denial of certiorari).

[3] Even then, until the circuit court reconsiders its earlier decision, the earlier decision still "binds the district court," which has a "duty to follow the appellate court's ruling." *Tenzer*, 213 F.3d at 40 (quotation omitted).

Here, by contrast, Defendants seek to avoid longstanding circuit precedent interpreting the MBTA *in a previous case*. The law-of-the-case doctrine is therefore inapposite. Instead, this Court—and even the Second Circuit itself—must adhere to *FMC Corp.* "until such time as [it is] overruled either by an en banc panel … or by the Supreme Court." *United States v. Wilkerson*, 361 F.3d 717, 732 (2d Cir. 2004). And absent such overruling, it is "axiomatic that a district court cannot … regard the circuit court's interpretation of a given statute as not binding." *United States v. Russotti*, 780 F. Supp. 128, 131 (S.D.N.Y. 1991).

### 2.    Other court decisions do not change the outcome

Contrary to Defendants' suggestion, *see* Defs.' Br. 41-42, case law in *other* circuits cannot alter the binding nature of the Second Circuit's settled precedent here. A district court "cannot … take a position contrary to that of its circuit court." *World Wrestling Entm't, Inc. v. Jakks Pac., Inc.*, 425 F. Supp. 2d 484, 499 (S.D.N.Y. 2006) (quotation omitted), *aff'd*, 328 F. App'x 695 (2d Cir. 2009). In any event, even if it were relevant, Defendants exaggerate any disagreement among the courts. *See* Defs.' Br. 7-11. As Defendants previously acknowledged, the "majority" of courts have agreed with the agencies' prior, longstanding interpretation. AR43, 55.

For example, the Tenth Circuit, like the Second Circuit, has squarely held that the MBTA applies to industrial activities that directly and foreseeably kill migratory birds, regardless of whether that is the activity's specific purpose. *See United States v. Apollo Energies, Inc.*, 611 F.3d 679, 684-90 (10th Cir. 2010). And while Defendants (like the Jorjani Opinion) now suggest that the Eighth and Ninth Circuits have concluded otherwise, *see* Defs.' Br. 8, they are mistaken. Those courts

4

held merely that "*habitat destruction*, leading *indirectly* to bird deaths," does not

amount to the "'taking' of migratory birds within the meaning of the [MBTA]."

*Seattle Audubon Soc'y v. Evans*, 952 F.2d 297, 303 (9th Cir. 1991) (emphasis added);

*see Newton Cty. Wildlife Ass'n v. U.S. Forest Serv.*, 113 F.3d 110, 115 (8th Cir. 1997)

(agreeing with *Seattle Audubon* that the MBTA does not apply to activity that

"*indirectly* results in the death of migratory birds" (emphasis in original)). The

Ninth Circuit expressly distinguished those indirect habitat impacts—which are not

at issue here—from the "direct, though unintended" bird killings that occurred in

*FMC Corp.*, and which the Jorjani Opinion has now unlawfully excluded from the

MBTA's reach. *Seattle Audubon*, 952 F.2d at 303; *see* Defs.' Br. 8 n.4.[4]

The only appellate court to have reached an arguably conflicting result is the

Fifth Circuit. *See United States v. CITGO Petroleum Corp.*, 801 F.3d 477 (5th Cir.

2015). That outlier decision, however, construed only the word "take" in section 703

of the MBTA—and concededly did not have "an opportunity to interpret 'kill'"—

because the defendant had been "indicted for 'taking' or 'aiding and abetting taking'

of migratory birds, not for 'killing them.'" *Id.* at 489 & n.10. As Defendants

---

[4] More recent cases, ignored by Defendants and the Jorjani Opinion, clarify the
Ninth Circuit's understanding that the MBTA *does* apply to industrial activities
that directly (albeit incidentally) kill migratory birds. *See Protect Our Cmtys.
Found. v. Jewell*, 825 F.3d 571, 586 (9th Cir. 2016) (holding that, while the
incidental killing of birds by a private company "*is* contrary to the MBTA," an
agency's "regulatory role" in permitting the activity was "too far removed from the
ultimate legal violation to be *independently* unlawful" (emphasis added)); *Turtle
Island Restoration Network v. Dep't of Commerce*, 878 F.3d 725, 733-35 (9th Cir.
2017) (analyzing MBTA "special permit" authorizing incidental take and
emphasizing the Act's "expansive language" and "conservation intent").

acknowledge, *see* Defs.' Br. 39, the Second Circuit, by contrast, focused on the term "kill" in section 703. *See FMC Corp.*, 572 F.2d at 904, 906.

Thus, no actual circuit split exists on whether the MBTA applies to the direct and foreseeable *killing* of birds by industrial activities. But even if there was such a split, that would still provide no basis to uphold the Jorjani Opinion—which was premised not on resolving any disagreement in the courts to promote uniformity, *contra* Defs.' Br. 42, but rather on the (erroneous) conclusion that the Fifth Circuit's interpretation of the MBTA was correct. *See, e.g.*, AR23-24, 31 (adopting the Fifth Circuit's arguments); Defs.' Br. 21-23 (similar).

To affirm the Jorjani Opinion, then, this Court would have to reject the Second (and Tenth) Circuit's view of the MBTA and adopt the Fifth Circuit's. That is not permissible: "the Second Circuit has spoken directly to the issue presented by this case, and this Court is required to follow that decision." *United States v. Diaz*, 122 F. Supp. 3d 165, 179 (S.D.N.Y. 2015), *aff'd*, 854 F.3d 197 (2d Cir. 2017).

### 3. The Jorjani Opinion deserves no deference

Even if deference could theoretically make a difference here, *but see supra* 2-4, the Jorjani Opinion does not deserve any. Considerations relevant to assessing whether an agency interpretation commands respect under *Skidmore* include the exercise of the agency's "expertise, … the consistency of its views over time, and the ultimate persuasiveness of its arguments." *In re Bernard L. Madoff Inv. Sec. LLC*, 779 F.3d 74, 82 (2d Cir. 2015) (quotation omitted). Each of these is absent here.

First, because the Jorjani Opinion contradicts the agencies' "longstanding" interpretation of the MBTA, it deserves no special respect for its "change of heart."

6

*Humane Soc'y v. Glickman*, 217 F.3d 882, 887 (D.C. Cir. 2000). Defendants cite

*Estate of Landers v. Leavitt*, 545 F.3d 98 (2d Cir. 2008), where the Second Circuit

afforded *Skidmore* respect to an agency's "consistent and long-held position" that it

had "adopted more than 40 years ago." *Id.* at 107-08; *see* Defs.' Br. 16. The Jorjani

Opinion is the opposite: it *reversed* the agencies' long-held position of more than 40

years and is starkly inconsistent with a January 2017 Solicitor's Opinion that had

recently reaffirmed that longstanding interpretation and practice. *See* AR43-72; *see

also Manning v. United States*, 146 F.3d 808, 814 n.4 (10th Cir. 1998) (affording

*Skidmore* respect to a 40-year-old Solicitor's memo that was "consistent with earlier

and later pronouncements by the agency"). The Second Circuit has declined to apply

*Skidmore* in cases "of such inconsistency" because the "expertise in statutory

interpretation to which [courts] normally defer becomes dubious when the expert

cannot make up its own mind." *N.Y. City Health & Hosps. Corp. v. Perales*, 954 F.2d

854, 861-62 (2d Cir. 1992).[5]

Second, any claim of expertise is especially dubious here because—as the

administrative record reflects, and *amici* Former Interior Department Officials

confirm—the Jorjani Opinion's "complete reversal" of the agencies' longstanding

interpretation occurred "without any input" from the Fish and Wildlife Service

(FWS or Service) personnel who implement the MBTA on a day-to-day basis.

---

[5] Because the Jorjani Opinion is "clearly contrary" to the agencies' longstanding
position, this case is also distinguishable from *McMaster v. United States*, 731 F.3d
881 (9th Cir. 2013), where the relevant interpretation only "*arguably* represent[ed]
a change in the agency's views." *Id.* at 892 (emphasis added).

Amicus Br. 9, Dkt. 70-1. The Jorjani Opinion thus does not "bring the benefit of specialized experience to bear" on the interpretive question at issue. *United States v. Mead Corp.*, 533 U.S. 218, 235 (2001). Instead, while the record reflects frequent communication with energy industry representatives, *see* AR618-55, agency personnel "with the deepest understanding of how MBTA enforcement efforts fit into the Department's greater conservation mission" appear to have been "cut … out of the process of developing the Jorjani M-Opinion." Amicus Br. 9-11; *see also, e.g.*, AR908. The result is evident in the Opinion's flawed reasoning, which ignores the Service's successes in implementing the MBTA in a reasonable manner, overlooks the statute's overriding protective purpose, and misrepresents the United States' prior representations to its treaty partners. *See infra* 13-16; AR614-17 (January 2018 letter from former Interior officials highlighting these and other mistakes).

Third, the Jorjani Opinion does not merit *Skidmore* respect because its interpretation of the MBTA is "ultimately unpersuasive." *Madoff*, 779 F.3d at 83; *accord Christensen v. Harris Cty.*, 529 U.S. 576, 587 (2000). As explained in greater detail below, Defendants' attempt to limit the MBTA to only purposeful activities like hunting and poaching is "clearly wrong" in light of the Act's "text, … purpose, and … relationship to other federal statutes." *Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 600 (2004); *cf. Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019) (deference to an agency's interpretation is appropriate "only when th[e] legal toolkit is empty"). Accordingly, even if this Court were free to depart from binding Second Circuit precedent, it should reject and set aside the Jorjani Opinion's interpretation

8

of the MBTA that is "neither persuasive nor reasonable." *Cty. of Maui v. Hawaii Wildlife Fund*, --- S. Ct. ---, No. 18-260, 2020 WL 1941966, at *8 (U.S. Apr. 23, 2020) (declining to afford *Skidmore* respect to an agency interpretation that would allow "easy evasion" of an environmental statute's "basic purposes").

**B.     The Jorjani Opinion is contrary to the Act's text and purpose, as well as related statutes**

**1.     The Act's plain language broadly encompasses killing migratory birds by any means and in any manner**

"As legislation goes," section 703 of the MBTA "contains broad and unqualified language." *Humane Soc'y*, 217 F.3d at 885. It applies to the "kill[ing]" of "any migratory bird," "at any time," and "by any means or in any manner." 16 U.S.C. § 703(a). This plain language, which the Supreme Court has described as "expansive," *Andrus v. Allard*, 444 U.S. 51, 59 (1979), encompasses the killing of migratory birds in toxic wastewater ponds and oil and gas equipment. *See, e.g.*, *FMC Corp.*, 572 F.2d at 905-08; *Apollo Energies*, 611 F.3d at 684-91.

The Jorjani Opinion nonetheless construes this expansive language narrowly, contending that it applies only to "actions that *have as their purpose* the taking or killing of migratory birds." AR2, 18 (emphasis added). But a "plain reading of § 703's text" does not contain any such purpose requirement. *Apollo Energies*, 611 F.3d at 684. And when Congress has meant to limit wildlife provisions to only purposeful activity, it has done so expressly—including elsewhere in the MBTA itself. *See, e.g.*, 16 U.S.C. § 704(b)(2) (making it unlawful to bait an area "*for the purpose of* causing, inducing, or allowing any person to take or attempt to take any migratory game bird" (emphasis added)). In fact, when Congress added such

9

mental-state requirements elsewhere in the MBTA, it deliberately left the scope of section 703 as is, reaffirming Defendants' then-consistently held view that it applies beyond only purposeful killings. *See* Envtl. Pls.' Mem. Supp. Summ. J. 21-23, Dkt. 68-1 [hereinafter Envtl. Pls.' Br.] (discussing statutory history).

Defendants cannot reconcile the Jorjani Opinion's interpretation of the MBTA with section 703's undisputed lack of a mental-state requirement. Conceding the strict liability nature of that provision, Defendants contend that the purposeful killing requirement they read into the MBTA derives not from any required mental state, but rather from "what acts are criminalized under the statute." Defs.' Br. 22-24. Contrary to this contention, however, the Jorjani Opinion makes liability *for the very same act* turn solely on the actor's "subjective purpose." *See* Envtl. Pls.' Br. 23-24 (quoting AR82 and discussing, e.g., pressure-washing bird nests off a bridge). Defendants do not explain how that could be so if the Jorjani Opinion's interpretation derived from the *actus reus* rather than *mens rea. See* AR22-23.

Nor does the canon of *noscitur a sociis* support the Jorjani Opinion's strained interpretation. *Contra* Defs.' Br. 18-19. The Supreme Court has explained that the canon—which is "by no means a hard and fast rule," *Beecham v. United States*, 511 U.S. 368, 371 (1994)—should not be used to "rob" any term of its "independent and ordinary significance." *Graham Cty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 288 (2010) (quotations omitted). Indeed, the Court has specifically rejected an attempt to use the canon to construe the term "kill" in a manner that departs from its "ordinary meaning." *United States v. Stevens*, 559

U.S. 460, 474-75 (2010). The Jorjani Opinion does just that, however—disregarding
the ordinary meaning of "kill" and rendering the term superfluous in section 703.

Defendants therefore err by focusing on the common law meaning of "take,"
*see* Defs.' Br. 20-21, while largely ignoring section 703's separate use of the term
"kill." The ordinary meaning of that separate term is—and has long been—to
"deprive of life." Defs.' Br. 19 (quoting AR19 n.21). And it "lacks any connotation in
common law as being restricted to hunting or intentional conduct." AR50; *see FMC
Corp.*, 572 F.2d at 904, 906-08 (rejecting argument that section 703's "use of the
word 'kill' imports an intentional act"). An oil and gas company can thus unlawfully
"kill" a migratory bird, consistent with that term's ordinary meaning, irrespective of
the company's motives or the common law meaning of "take." *See* Envtl. Pls.' Br. 24
(citing *Babbitt v. Sweet Home Chapter of Cmtys.*, 515 U.S. 687, 701 n.15 (1995)).[6]

The Jorjani Opinion's application of the *noscitur a sociis* canon also fails
because it interprets the term kill in section 703 to have "essentially the same
function as" the common law meaning of take, "thereby denying it independent
meaning." *Sweet Home*, 515 U.S. at 702. "It is a well-settled rule of statutory
construction that 'courts should disfavor interpretations of statutes that render

---

[6] Defendants' reliance on the agencies' general regulatory definition of "take" is also
mistaken. *See* Envtl. Pls.' Br. 24 n.7. Contrary to Defendants' contention, *see* Defs.'
Br. 20, the Executive Branch has long understood that general definition to
encompass "both 'intentional' and 'unintentional' take," including "take that results
from, but is not the purpose of, the activity in question." Exec. Order 13186, § 2(a)-
(c), 66 Fed. Reg. 3853 (Jan. 10, 2001) (citing 50 C.F.R. § 10.12); *see also* AR57.

language superfluous.'" *Sprint Spectrum L.P. v. Willoth*, 176 F.3d 630, 640 (2d Cir.

1999) (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992)).

Defendants never explain what function the term "kill" serves in section 703

under their interpretation. Instead, they fault the Second Circuit for "focusing on

'kill' as the key statutory term." Defs.' Br. 39. As other courts have recognized,

however, section 703's reference to "killing"—in addition to other prohibited acts,

including "taking"—illustrates "that Congress intended to prohibit conduct beyond

that normally exhibited by hunters and poachers." *United States v. Moon Lake Elec.*

*Ass'n, Inc.*, 45 F. Supp. 2d 1070, 1074-75 (D. Colo. 1999).

Finally, Defendants' more limited construction of section 703 would be

particularly inappropriate given Congress's emphasis that the Act applies to killing

migratory birds "by any means or in any manner." 16 U.S.C. § 703(a); *see Causse*

*Mfg. Co. v. United States*, 151 F. 4, 6 (2d Cir. 1906) (per curiam) (rejecting use of

*noscitur a sociis* canon to "limit[]" the phrase "in any manner"). Defendants' "new

interpretation," which limits section 703 to only purposeful killings, is "difficult to

reconcile" with Congress's repeated usage of "*any*." *Cty. of Maui*, 2020 WL 1941966,

at *8. Instead, the "expansive language of the provision"—encompassing the killing

of migratory birds by *any* means or in *any* manner—"strongly suggests its scope is

not so limited." *Id.*; *see also Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 219-20

(2008) (highlighting the "expansive meaning" of "any," especially when repeated).

In fact, the extraordinarily "broad language 'by any means or in any manner'

belies the contention that Congress intended to limit the imposition of criminal

penalties to those who hunted or captured migratory birds." *United States v. Corbin Farm Serv.*, 444 F. Supp. 510, 532 (E.D. Cal.), *aff'd*, 578 F.2d 259 (9th Cir. 1978) (per curiam). In section 703, then, the term "'kill[]' should be read according to [its] ordinary meaning"—i.e., "to deprive of life." *Stevens*, 559 U.S. at 474-75.

### 2.    The Jorjani Opinion undermines the Act's purpose of protecting migratory birds

A straightforward reading of the Act's "expansive language"—i.e., that its reference to killing migratory birds "by any means and in any manner" applies to industrial activities that directly and foreseeably kill migratory birds—is further confirmed by the Act's "conservation intent." *Turtle Island*, 878 F.3d at 733, 735; *cf. Arkansas v. Farm Credit Servs.*, 520 U.S. 821, 827 (1997) ("federal courts must guard against interpretations" that "might defeat [a statute's] purpose and text").

Congress enacted the MBTA to implement a treaty "for the protection of migratory birds." Act of July 3, 1918, ch. 128, 40 Stat. 755. Any reasonable interpretation of the Act should therefore be consistent with this stated purpose. *Cf. Gundy v. United States*, 139 S. Ct. 2116, 2126 (2019) (plurality opinion) (beginning the statutory analysis with the statute's "declaration of purpose"). Yet, instead of motivating industry to avoid unnecessary bird deaths—as had been the case under the agencies' prior, longstanding interpretation—the Jorjani Opinion invites companies to kill large numbers of birds with impunity, even where modest steps could (and, previously, would) have been taken to avoid that result. Indeed, under the Jorjani Opinion, a company could face liability for trying to *protect* fledgling birds in an active nest, but not for *killing* those same birds by knowingly destroying

13

their nest. Envtl. Pls.' Br. 31 (discussing AR88). Defendants do not explain how that result is a reasonable—let alone required—construction of a "conservation statute[]" that was specifically "designed to prevent the destruction" of migratory birds. *Allard*, 444 U.S. at 52-53.

Instead, Defendants cite "statements from individual members of Congress" who, around the time of the MBTA's enactment, were "focused on prohibitions on hunting." Defs.' Br. 24-25.[7] But "[w]hat Congress ultimately agrees on is the text that it enacts, not the preferences expressed by certain legislators." *NLRB v. SW Gen., Inc.*, 137 S. Ct. 929, 942-43 (2017) (explaining that "floor statements by individual legislators rank among the least illuminating forms of legislative history"). Here, "Congress chose statutory language broad enough to meet" new threats to migratory bird populations as they emerged in the ensuing decades. *DePierre v. United States*, 564 U.S. 70, 85 (2011). Thus, "even if Congress … did not contemplate" the myriad modern-day industrial threats that have emerged since the MBTA was first enacted, those threats nevertheless "fall well within" the statute's broad language and protective purpose. *San Luis & Delta-Mendota Water Auth. v. Haugrud*, 848 F.3d 1216, 1229 (9th Cir. 2017); *see* Envtl. Pls.' Br. 32.[8]

---

[7] Defendants' arguments regarding the Migratory Bird Conservation Act are misplaced because, as explained above, *see supra* 4-5, Plaintiffs do not maintain that the MBTA "protect[s] migratory bird *habitats* from incidental destruction." *Contra* Defs.' Br. 25-26 (emphasis added).

[8] Defendants previously explained that increased awareness of these threats—not any new interpretation of the MBTA—prompted them to begin enforcing the MBTA against such threats in the 1970s. AR900; *see* Amicus Br. 4-5; *contra* Defs.' Br. 1, 28.

14

The same is true for the underlying treaty the MBTA implements. That 1916 convention between the United States and Canada (via Great Britain) recognized that many bird species were in danger of extinction "through lack of adequate protection," so the countries resolved to adopt a "uniform system of protection" to broadly ensure the "preservation of such migratory birds." Convention for the Protection of Migratory Birds, 39 Stat. 1702 (Aug. 16, 1916) (Canada Convention). Although the "main threat" to migratory birds in 1916 may have been overhunting, the convention's broad language and protective purpose apply "just as easily" to "different threats to migratory bird populations [that] arise." AR1697, 1701 (*R. v. J.D. Irving, Ltd.*, 2008 CarswellNB 322 ¶¶ 6, 27 (Can.) (WL)); *see also Humane Soc'y*, 217 F.3d at 887 (looking to Canada's understanding of the underlying treaty as an aid in interpreting the MBTA's scope).

Indeed, the United States and Canada agreed, in a 2008 diplomatic exchange, that regulations imposing conservation measures on activities like "mining" and "oil and gas exploration"—which had "increasingly become a concern for the long-term conservation of migratory bird populations"—were consistent with the countries' commitments under the convention. AR886-88, 1380-81. Defendants now admit, contrary to the Jorjani Opinion's "mistaken understanding," Defs.' Br. 29 n.16, that the United States affirmed this "mutually held interpretation" of the convention. *Compare* AR888, *with* AR30 n.165. Defendants thus try to downplay the significance of this affirmation, contending that the Jorjani Opinion does not "contradict" the countries' interpretation because the United States agreed only

15

that incidental take regulations are "*consistent* with," rather than "*required* by," the convention. Defs.' Br. 30.

This *post hoc* effort to shore up the Jorjani Opinion fails. By *foreclosing* similar regulations under the MBTA, *see infra* 22-24, the Opinion unquestionably undermines the countries' shared understanding that the convention's protections for migratory birds encompass incidental take. *See* States' Reply Br. 20-21.[9]

In fact, Defendants previously acknowledged—when contemplating similar incidental take regulations under the MBTA—that they had a "legal responsibility under the MBTA and the treaties the Act implements to promote the conservation of migratory bird populations." 80 Fed. Reg. 30,032, 30,034 (May 26, 2015). The Jorjani Opinion flouts this responsibility: it undermines rather than promotes the conservation of migratory birds, resulting in countless bird deaths that would have been avoided under Defendants' prior interpretation. *See* Envtl. Pls.' Br. 15-17.

### 3. Related statutes confirm Congress's understanding that the Act applies to more than purposeful killings

In construing the MBTA, the Supreme Court has noted that "[r]elated statutes may sometimes shed light upon a previous enactment." *Allard*, 444 U.S. at 62; *cf. Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 163 (2008) ("the views of subsequent Congresses … are entitled to significant weight" (quotation and

---

[9] Even if Canada has not implemented the specific regulatory structure contemplated in the diplomatic exchange, *see* Defs.' Br. 29-30, Defendants do not dispute that Canada has regulated the non-purposeful killings of migratory birds in a manner that is prohibited by the Jorjani Opinion's interpretation of the MBTA. *See, e.g.*, *R. v. Syncrude Canada Ltd.*, 2010 ABPC 229 (Can.) (holding tar sands company liable under Canadian statute for killing birds in a wastewater pond).

16

alteration omitted)). Here, a related statute regarding incidental take by the U.S. Armed Forces effectively forecloses the Jorjani Opinion's view that the MBTA applies only to purposeful killings. *See* Envtl. Pls.' Br. 26-28.

This 2002 statute directed Interior to exercise its authority "*under section 3(a) of the Migratory Bird Treaty Act* (16 U.S.C. 704(a))" to prescribe regulations governing incidental take of migratory birds by military-readiness activities. Pub. L. No. 107-314, § 315(d)(1), 116 Stat. 2458, 2509 (2002) (emphasis added). The statute was thus plainly "premised on" Interior "having authority" to regulate incidental take under the MBTA. *Loving v. United States*, 517 U.S. 748, 770 (1996). That authority *would not exist*, however, if "taking" and "killing" in the MBTA referred only to activities that were specifically directed at birds. *See* 16 U.S.C. § 704(a). The Jorjani Opinion thus impermissibly negates the very authority that Congress directed Interior to exercise. *Cf. Andrus v. Shell Oil Co.*, 446 U.S. 657, 672 (1980) (rejecting interpretation of a statute that would "virtually nullify [a later] action of Congress"); *Sweet Home*, 515 U.S. at 700-01 (statutory amendment allowing Interior to authorize incidental take under the Endangered Species Act indicated such take was otherwise prohibited).[10]

Defendants never explain how the Jorjani Opinion's interpretation of the Act can be reconciled with Congress's directive that Interior promulgate incidental take

---

[10] The same is true regarding another related statute—ignored by both the Jorjani Opinion and Defendants—that directed Interior to promulgate MBTA regulations governing incidental take during bridge transportation projects. *See* Envtl. Pls.' Br. 27 n.9 (discussing Pub. L. No. 114-94, § 1439, 129 Stat. 1312, 1433 (2015)).

regulations "under" the MBTA. Instead, Defendants observe that the 2002 statute "did not add or amend any specific language in the MBTA." Defs.' Br. 31. But that observation is irrelevant because the statute confirmed Congress's understanding that the MBTA *already reached* incidental killings. *See* Envtl. Pls.' Br. 27-28.

Defendants also note that one provision of the 2002 statute stated that section 703 of the MBTA "shall not apply to the incidental taking of a migratory bird … during a military readiness activity." Defs.' Br. 31-32 (quoting Pub. L. No. 107-314, § 315(a)). But this expressly "[i]nterim" provision only *temporarily* excluded such activities *until Interior promulgated the MBTA regulations* that Congress mandated. *See* Pub. L. No. 107-314, § 315(a), (c)-(d). That Congress chose *not* to permanently exclude such activities from the Act's reach—but rather to require that the Department of Defense identify measures to "minimize and mitigate" their "adverse impacts" on migratory birds, *id.* § 315(b)—confirms Congress's understanding that the MBTA applies to incidental take, as well as its desire not to leave those bird deaths entirely unregulated. *See* Amicus Br. 7-8.

Indeed, Defendants have acknowledged that they cannot withdraw the military-readiness regulations without a further act of Congress. AR84. This means that the Jorjani Opinion leaves oil and gas developers and other industrial actors free to incidentally kill migratory birds without taking even the most minimal protective steps, while the U.S. Armed Forces remain subject to regulation—*under the authority of the MBTA*—for their incidental killing of migratory birds during military-readiness activities. *See* 50 C.F.R. § 21.15(a)(1) (requiring that the Armed

18

Forces "implement appropriate conservation measures to minimize or mitigate [any] significant adverse effects"). Defendants simply ignore this nonsensical result of their construction. *See* Envtl. Pls.' Br. 28.

The Jorjani Opinion also subverts Congress's intent in a 1989 statute that directed MBTA fines and penalties toward wetlands conservation projects. *See* Pub. L. No. 101-233, § 7(b), 103 Stat. 1968, 1974-75 (1989) (codified at 16 U.S.C. § 4406(b)). Defendants do not dispute that Congress, when it enacted this statute, understood the MBTA to encompass incidental killing of migratory birds. The federal government prosecuted oil companies and pesticide manufacturers for incidental bird killings at the time, and courts had uniformly affirmed that understanding. Defendants assert only that the statute did not "comment[]" on the "fundamental meaning" of the MBTA. Defs.' Br. 32 n.18.[11] But they do not explain how it is consistent with Congress's design for the Jorjani Opinion to have now halted all future penalty payments for incidental killings—including for egregious incidents of bird mortality, such as oil spills like Exxon Valdez and Deepwater Horizon—despite Congress's understanding that such penalties would be used to fund wetlands conservation projects. *See* Envtl. Br. 29-30 & n.10; Amicus Br. 16-17.

In short, Congress in these related statutes "effectively ratified" the agencies' "previous position" that the MBTA applies to more than purposeful killings. *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 155-56 (2000).

---

[11] Defendants' new interpretation also flouts their "responsibilities to conserve migratory *non*game birds under … the Migratory Bird Treaty Act." Pub. L. No. 100-653, § 802, 102 Stat. 3825, 3833 (1988) (emphasis added); *contra* Defs.' Br. 32 n.18.

### C.   No constitutional concern justifies the Jorjani Opinion's construction

Defendants contend that their construction of the MBTA is necessary to avoid "potential constitutional concerns" because their prior, longstanding interpretation was impermissibly vague and had the "potential to produce absurd results." Defs.' Br. 33-35. But there is "no evidence" of any absurd results in the past four-plus decades of MBTA enforcement, and both the courts and the agencies "have tools" to address such concerns "should they arise." *Cty. of Maui*, 2020 WL 1941966, at *10.

### 1.   Proximate cause limits the Act's reach

First, courts have recognized that "proximate cause is an 'important and inherent limiting feature' to the MBTA." *Apollo Energies*, 611 F.3d at 690 (quoting *Moon Lake*, 45 F. Supp. 2d at 1085). The federal government must always prove, beyond a reasonable doubt, that migratory bird deaths were "reasonably anticipated or foreseen as a natural consequence" of the activity at issue. *Id.* (quoting Black's Law Dictionary 1225 (6th ed. 1990)). Defendants suggest that this requirement "does nothing to limit the scope" of liability. Defs.' Br. 36. They are wrong.

The Tenth Circuit, for example, reversed one count of an MBTA conviction where it found insufficient evidence that the defendant was or should have been aware that specific equipment would kill migratory birds. *Apollo Energies*, 611 F.3d at 691. The court affirmed convictions only for bird deaths that were "reasonably foreseeable" to the defendants. *Id.*

Consistent with these principles, the federal government has historically brought enforcement actions "only after notifying an industry of its concerns

20

regarding avian mortality, working with the industry to find solutions, and proactively educating industry about ways to avoid or minimize take of migratory birds." 80 Fed. Reg. at 30,034. Defendants do not suggest that any constitutional concerns exist where an actor has been "repeatedly warned" of a problem but "refused to take available measures to minimize it." AR901.

Moreover, Defendants have not identified a single absurd result that arose during the many decades they applied the MBTA to incidental killings. *See Cty. of Maui*, 2020 WL 1941966, at *10 (rejecting government's new interpretation of a statute where agency had applied its prior interpretation "for over 30 years" with no "unmanageable" results).[12] Nor do they dispute that they reversed their interpretation to relieve regulatory burdens on the energy industry, *see* Envtl. Pls.' Br. 8, rather than to address any real-world threat of enforcement against someone driving a car, *contra* Defs.' Br. 34. Thus, Defendants' "absurd results" argument is just a smokescreen to immunize industry actors who clearly had "fair notice" that their killing of birds ran afoul of the MBTA. Defs.' Br. 33-35 (citation omitted); *see also Apollo Energies*, 611 F.3d at 686 (observing it is "obvious" that oil and gas development "can take or kill migratory birds," even if the MBTA, "like any

---

[12] In *County of Maui*, the Court also rejected respondents' interpretation of the relevant statutory provision as being narrowed by a proximate cause requirement. 2020 WL 1941966, at *5. The Court expressly limited its rationale to "the context of water pollution," however, where it sought to avoid intruding on the "substantial responsibility and autonomy" that "Congress intended to leave … to the States" under the Clean Water Act. *Id.* Those concerns do not implicate the MBTA. *Cf. Missouri v. Holland*, 252 U.S. 416, 435 (1920) (observing that migratory birds "can be protected only by national action in concert with that of another power").

statute," might "test the far reaches in application"); *Holder v. Humanitarian Law Project*, 561 U.S. 1, 20 (2010) (an actor "who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others" (citation omitted)).

Accordingly, in both theory and in decades of actual practice, proximate cause limits the scope of MBTA liability by requiring proof that it was "reasonably anticipated" that birds would die as a "natural consequence" of defendants' activities that posed foreseeable threats to migratory birds. *Apollo Energies*, 611 F.3d at 690. "Proper application of the law to an MBTA prosecution, therefore, should not lead to absurd results." *Moon Lake*, 45 F. Supp. 2d at 1085.

## 2. Regulatory authority can resolve any remaining concerns

Defendants do not dispute that Interior's regulatory authority under the MBTA can resolve any remaining practical concerns about the scope of potential liability. *See* Envtl. Pls.' Br. 35-37. By its plain terms, section 703 is "subject to regulatory exception." *Allard*, 444 U.S. at 60 n.12; *see* 16 U.S.C. § 703(a) (making it unlawful to kill migratory birds "[u]nless and except as permitted by regulations made as hereinafter provided in this subchapter"). Section 704(a) then authorizes Interior to determine "to what extent, if at all, and by what means" killing migratory birds is "compatible with the terms of the conventions," and to "adopt suitable regulations permitting and governing the same."

In other words, as Defendants previously acknowledged, "[t]he MBTA regulates, rather than absolutely forbids, take of migratory birds." 72 Fed. Reg.

22

8931, 8934 (Feb. 28, 2007). Accordingly, even if section 703 encompasses a "[b]road [s]wath" of activities, Defs.' Br. 34, "[r]easonable regulation" under section 704(a) can "effectively avoid" any purportedly absurd or "unintended results," *Moon Lake*, 45 F. Supp. 2d at 1085.

Congress has made this clear. As described above, *see supra* 17-18, Congress did *not* respond to an injunction against incidental take by military-readiness activities by permanently excluding those activities (much less all incidental killings) from the MBTA's reach. Instead, Congress directed the Armed Forces to identify measures to minimize their adverse impacts on birds and directed Interior to promulgate regulations authorizing those activities under section 704(a). *See* Pub. L. No. 107-314, § 315, 116 Stat. at 2509. This regulatory resolution in the military-readiness context demonstrates that the agencies' authority to adopt regulations governing and, where appropriate, permitting incidental take under the MBTA can resolve any "concerns about the brea[d]th of the statute." Defs.' Br. 35.

The Jorjani Opinion, by contrast, responded to conjectural applications of the MBTA (that have never occurred) by construing the Act to exclude non-purposeful killings altogether. It thereby halted not only industry's legal incentive to minimize their impacts on birds, but also the Service's more recent efforts, initiated in 2015, to develop a program regulating incidental take from industry sectors. *See* 80 Fed. Reg. at 30,034-35; 83 Fed. Reg. 24,080 (May 24, 2018) (announcing that FWS was abandoning those regulatory efforts "[d]ue to issuance of the [Jorjani] Opinion").

23

Defendants do not explain why that regulatory program would not have resolved their desire to afford industry more certainty under the MBTA. *See* Envtl. Pls.' Br. 36. Instead, they note that the program would have addressed incidental take only "by certain actors." Defs.' Br. 38. But that was because the contemplated program appropriately focused on industrial activities that "involve significant avian mortality" and for which "reasonable and effective measures to avoid or minimize" bird deaths already exist. 80 Fed. Reg. at 30,034-35 (identifying measures to reduce threats from, e.g., oil, gas, and wastewater disposal pits; gas burner pipes; communication towers; and electric transmission lines).

"An agency does not have to 'make progress on every front before it can make progress on any front.'" *Personal Watercraft Indus. Ass'n v. Dep't of Commerce*, 48 F.3d 540, 544 (D.C. Cir. 1995) (citation omitted). In any case, Defendants do not explain why they could not promulgate regulations to address non-purposeful killings by other actors as well. *Cf. Cty. of Maui*, 2020 WL 1941966, at *10 (observing that an agency could mitigate concerns about a purportedly expansive statutory prohibition "by (for example) developing general permits for recurring situations or by issuing permits based on best practices where appropriate").

Rather than follow through with *any* regulations, however, the Jorjani Opinion unreasonably construed the MBTA to exclude all this "significant avian mortality" from the agencies' regulatory reach and to eliminate industry's legal incentive to take "reasonable and effective measures" to protect migratory birds. 80 Fed. Reg. at 30,034. That counterintuitive and result-oriented construction

24

contravenes the Act's plain language and flouts the statute's paramount conservation purpose. It should be "h[e]ld unlawful and set aside" as "arbitrary, capricious, … or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

## II.   Defendants violated NEPA

Defendants concede that, in reversing decades of agency policy and practice regarding the protection of migratory birds, they ignored the National Environmental Policy Act (NEPA). They did not prepare an Environmental Impact Statement (EIS) or an Environmental Assessment (EA) before issuing the Jorjani Opinion. Nor did they invoke a "categorical exclusion" from NEPA's requirements. *See* Defs.' Br. 44. Likewise, the Service engaged in no NEPA analysis before issuing the FWS Guidance implementing the Opinion. The administrative record reflects that Defendants did not even contemplate engaging in NEPA review before taking either of these actions, which have already had significant adverse impacts on migratory birds throughout the country.[13]

None of Defendants' proffered justifications for ignoring NEPA appear in the administrative record; they are thus impermissible "*post hoc* rationalizations" of

---

[13] Defendants have not contested Plaintiffs' declarations and other evidence that, as a direct result of the Jorjani Opinion and FWS Guidance, Defendants halted MBTA investigations and enforcement actions and refused to pursue new ones, with attendant adverse impacts on migratory birds and Plaintiffs' concrete interests in them. *See* Envtl. Pls.' Br. 15-16. The Court may also consider this evidence in ascertaining that the underlying agency actions have environmental impacts that Defendants failed to consider under NEPA. *See Nat'l Audubon Soc'y v. Hoffman*, 132 F.3d 7, 14-15 (2d Cir. 1997) ("NEPA imposes a duty on federal agencies to compile a comprehensive analysis of the potential environmental impacts of its proposed action, and review of whether the agency's analysis has satisfied this duty often requires a court to look at evidence outside the administrative record.").

government counsel. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 50 (1983) ("It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself."); *see also Brodsky v. U.S. Nuclear Regulatory Comm'n*, 704 F.3d 113, 119 (2d Cir. 2013) (similar). But even if the Court entertains them, Defendants' arguments betray a fundamental misunderstanding of NEPA's requirements and the function they serve in ensuring that an agency considers environmental impacts during its decisionmaking process.

Defendants first contend that, while they concededly engaged in no NEPA review before issuing the Jorjani Opinion or FWS Guidance, they are now "adhering to NEPA *at the final stage of their administrative action*"—i.e., as part of the rulemaking they are conducting "to codify the legal interpretation set forth in the M-Opinion" that they have been implementing on the ground for *more than two years*. Defs.' Br. 43 (emphasis added).

NEPA's procedural requirements, however, do not exist so that agencies can rubber-stamp decisions previously made and actions already implemented. To the contrary, they are meant to "force federal agencies to consider environmental concerns *early in the decisionmaking process* so as to prevent any unnecessary despoiling of the environment." *Sierra Club v. U.S. Army Corps of Eng'rs*, 772 F.2d 1043, 1049 (2d Cir. 1985) (emphasis added). Consequently, "NEPA requires a federal agency to prepare an EIS *before* taking any major action that will 'significantly affect[] the quality of the human environment.'" *Friends of Animals v. Romero*, 948 F.3d 579, 585 (2d Cir. 2020) (emphasis added) (quoting 42 U.S.C.

§ 4332(c)); *see also Kleppe v. Sierra Club*, 427 U.S. 390, 406 (1976) ("[T]he moment

at which an agency must have a final statement ready is the time at which it makes

a recommendation or report on a *proposal* for federal action" (internal quotation

omitted)); *NRDC v. FAA*, 564 F.3d 549, 556 (2d Cir. 2009) ("The agency's overall

EIS-related obligation is to take a 'hard look' at the environmental consequences

*before* taking a major action." (quotation omitted) (emphasis added)); 40 C.F.R.

§ 1500.1(b) ("NEPA procedures must insure that environmental information is

available to public officials and citizens *before decisions are made and before actions*

*are taken*." (emphasis added)).

Moreover, the Court has already held that the Jorjani Opinion "*definitively*

concludes that the MBTA does not prohibit incidental takes, and because that

conclusion is binding on [Interior] and FWS, any 'forthcoming individual decisions

regarding criminal enforcement of the MBTA' or '*other actions premised on' the*

*Opinion are but a fait accompli*." Dkt. 53 at 23-24 (emphasis added) (citations

omitted). Defendants' reference to the Jorjani Opinion as serving merely an

"advisory purpose," Defs.' Br. 44, flies in the face of the record, *see* Envtl. Pls.' Br. 9,

the government's own prior representation that the Opinion is "*binding on the DOI*

*as a whole*," Dkt. 27 at 28-29 (emphasis added) (citation omitted), and, most

important, the Court's prior ruling, *see* Dkt. 53 at 21-22.

Accordingly, Defendants' admitted failure to take even a sideways glance—let

alone a "hard look"—at environmental impacts and alternatives *before* jettisoning

decades of practice and policy on MBTA compliance constitutes an egregious NEPA

27

violation. Federal agencies are not permitted to leap first and look later under

NEPA.[14]

Further, as Defendants acknowledge, the Court has already ruled that the

Jorjani Opinion "fit[s] within the portion of the Council on Environmental Quality

regulations defining 'major Federal action' that covers 'formal documents

establishing an agency's policies which will result in or substantially alter agency

programs.'" Defs.' Br. 44 (citing Dkt. 53 at 33-34). The Court explained that the

Opinion "is certainly 'formal'"; it "'permanently' establishes [Interior's] policy that

the MBTA does not apply to incidental takes"; and "because the Opinion effectively

precludes [Interior] and FWS personnel from prosecuting incidental takes under the

MBTA, it is at least plausible that it will 'substantially alter agency programs,' to

the extent it has not already done so." Dkt. 53 at 34 (quoting 40 C.F.R.

§ 1508.18(b)(1)). Defendants have not disputed any of this, nor can they.

Accordingly, the Court's previous ruling compels the conclusion that the

Jorjani Opinion constitutes a "major federal action" for which NEPA analysis was

required—especially given the evidence establishing that the Opinion *has*

---

[14] That no NEPA review was performed before the issuance of Opinion M-37041 is
of no moment. *Contra* Defs.' Br. 44. In contrast to the fundamental policy change
adopted in the Jorjani Opinion, that January 2017 Opinion *reaffirmed* Defendants'
longstanding regulatory policy and practice. AR43-72; *see also Humane Soc'y of the
U.S. v. Johanns*, 520 F. Supp. 2d 8, 31 (D.D.C. 2007) (explaining that "whether an
action perpetuates [or alters] the 'regulatory status quo' is the proper measure of
whether NEPA analysis should apply"). Insofar as the Service had previously
contemplated any change—i.e., a new program for regulating incidental take under
the MBTA—it announced its intent to prepare a programmatic EIS beforehand and
invited public comments on its scope. *See* 80 Fed. Reg. at 30,033.

"substantially alter[ed] agency programs" by terminating ongoing MBTA investigations and enforcement actions throughout the country, and foreclosing many others that would have been pursued under the policy that existed prior to the Opinion. *See supra* 25 n.13.

Finally, Defendants contend that "agency decisions *not* to act have long been understood to be outside the scope of NEPA." Defs.' Br. 45. But Defendants *did* act: they issued a binding document that reversed decades of prior policy and practice under the MBTA. Nor did Defendants merely announce a discretionary "policy regarding the *enforcement*" of the MBTA, Defs.' Br. 45; rather, as the Court has already explained, they "*definitively* conclude[d] that the MBTA *does not prohibit* incidental take[]." Dkt. 53 at 23. And the Service then followed with the FWS Guidance that instructed agency personnel how they must abide by the Jorjani Opinion in their day-to-day implementation of the MBTA.[15]

In sum, Audubon Plaintiffs are entitled to summary judgment on their claim that these agency actions were taken in violation of NEPA and therefore adopted "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

## III.   Vacatur is the appropriate remedy

Vacatur is the "usual" remedy when agency action is held unlawful under the Administration Procedure Act (APA). *Guertin v. United States*, 743 F.3d 382, 388

---

[15] In contrast, the cases cited by Defendants literally entailed no affirmative federal agency action at all but, rather, total "inaction." *Alaska v. Andrus*, 591 F.2d 537, 540 (9th Cir. 1979) (holding that an agency's "inaction" in response to a wildlife program conducted by a state was not a "major federal action" requiring NEPA compliance); *Defenders of Wildlife v. Andrus*, 627 F.2d 1238 (D.C. Cir. 1980) (same).

(2d Cir. 2014). The APA provides that the reviewing court "shall" "set aside" agency action found to be unlawful. 5 U.S.C. § 706(2); *see* Black's Law Dictionary (11th ed. 2019) (defining "set aside" as "to annul or vacate"). Vacatur is thus "consistent with both the plain language of the APA and the principle that agency action taken in violation of the APA cannot be afforded the force and effect of law." *New York v. U.S. Dep't of Commerce*, 351 F. Supp. 3d 502, 673 (S.D.N.Y. 2019) (quotation omitted), *aff'd in part, rev'd in part and remanded*, 139 S. Ct. 2551 (2019), *appeal dismissed*, No. 19-212, 2019 WL 7668098 (2d Cir. Aug. 7, 2019).

"Nothing in Defendants' briefing suggests that this is one of the 'rare' circumstances in which a court should deviate from the general rule that vacatur is the appropriate remedy." *City Club of N.Y. v. U.S. Army Corps of Eng'rs*, 246 F. Supp. 3d 860, 872 (S.D.N.Y. 2017) (citation omitted). Defendants suggest only that the Court should "defer[] consideration of remedies." Defs.' Br. 42 n.20. But they have "had ample opportunity to prepare their briefs in this action"; any additional remedy briefing would thus be "unnecessary" and simply "result in further delay." *California v. U.S. Dep't of the Interior*, 381 F. Supp. 3d 1153, 1179 (N.D. Cal. 2019).

Courts authorizing remand without vacatur have done so where an agency demonstrates a "serious possibility that [it] will be able to substantiate its decision on remand" or where "the consequences of vacating may be quite disruptive." *New York*, 351 F. Supp. 3d at 673-74 (quoting *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 151 (D.C. Cir. 1993)). Neither is true here.

First, the Jorjani Opinion and FWS Guidance must be vacated because Defendants' interpretation "conflicts with the plain meaning" of the MBTA. *NRDC v. EPA*, 489 F.3d 1250, 1261 (D.C. Cir. 2007); *accord Conservation Law Found. v. Pritzker*, 37 F. Supp. 3d 254, 271 (D.D.C. 2014). "If a reviewing court agrees that the agency misinterpreted the law, it will set aside the agency's action and remand the case—even though the agency … might later, in the exercise of its lawful discretion, reach the same result for a different reason." *FEC v. Akins*, 524 U.S. 11, 25 (1998).

As to Audubon Plaintiffs' NEPA claim as well, "vacating a rule or action promulgated in violation of NEPA is the standard remedy." *Pub. Emps. for Envtl. Responsibility v. FWS*, 189 F. Supp. 3d 1, 2 (D.D.C. 2016) (quotation omitted). Defendants' failure to undertake the environmental review required by NEPA "constitutes a serious deficiency." *NRDC v. EPA*, 676 F. Supp. 2d 308, 313 (S.D.N.Y. 2009) (vacating pesticide registration where agency failed to comply with notice-and-comment procedural requirement). Nor does it matter, for the reasons stated above, that the Service now intends to conduct a NEPA review. *See supra* 26-28.

Second, "there is no indication that vacatur would lead to disruptive consequences." *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014). Courts have remanded without vacatur where setting aside the action would leave a regulatory vacuum and harm health or the environment. *See, e.g.*, *NRDC v. EPA*, 808 F.3d 556, 584 (2d Cir. 2015) (leaving Clean Water Act regulations in place until agency issued new ones); *Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015) (collecting cases). Here, by contrast, were the Jorjani

Opinion and FWS Guidance vacated, "Defendants would once again be empowered to prosecute incidental take[]," as they did for many decades. Dkt. 53 at 15-16. Accordingly, this is not the rare case where leaving an unlawful action in place "serves the public interest more so than vacating" it. *NRDC*, 676 F. Supp. 2d at 312.

## CONCLUSION

The Court should grant Environmental Plaintiffs' motion for summary judgment, deny Defendants' cross-motion for summary judgment, and vacate the Jorjani Opinion and FWS Guidance.

Respectfully submitted,

/s/ Eric R. Glitzenstein
Eric R. Glitzenstein
Center for Biological Diversity
1411 K Street, N.W., Suite 1300
Washington, DC 20005
(202) 849-8401
eglitzenstein@biologicaldiversity.org

/s/ Ethan I. Strell
Ethan I. Strell
Lorraine Sciarra
National Audubon Society
225 Varick St.
New York, NY 10014
(212) 979-3000
estrell@audubon.org
lsciarra@audubon.org

/s/ Jason C. Rylander
Jason C. Rylander
Defenders of Wildlife
1130 17th Street, N.W.
Washington, DC 20036
(202) 772-3245
jrylander@defenders.org

/s/ Ian Fein
Ian Fein
Mary Katherine Umekubo
Gonzalo E. Rodriguez
Natural Resources Defense Council
111 Sutter Street, 21st Floor
San Francisco, CA 94104
(415) 875-6100
ifein@nrdc.org
kumekubo@nrdc.org
grodriguez@nrdc.org

Mitchell S. Bernard
Natural Resources Defense Council
40 West 20th Street, 11th Floor
New York, NY 10011
(212) 727-4469
mbernard@nrdc.org

*Counsel for NRDC Plaintiffs*

William F. Sheehan
Vice President and General Counsel
American Bird Conservancy
4301 Connecticut Avenue, N.W.
Washington, DC 20008
(202) 234-7181
wsheehan123@gmail.com

*Counsel for Audubon Plaintiffs*                                      May 4, 2020