UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ x

NATURAL RESOURCES DEFENSE COUNCIL,  :
INC., et al.,                                                            :
               Plaintiffs,                                 :
     -against-                                                 :     18 Civ. 4596 (VEC)
                                  :
U.S. DEPARTMENT OF THE INTERIOR, et al.,  :
                                  :
               Defendants.                              :

------------------------------------------------------------------ x

NATIONAL AUDUBON SOCIETY, et al.,        :
                                  :
               Plaintiffs,                                 :
     -against-                                                 :     18 Civ. 4601 (VEC)
                                  :
U.S. DEPARTMENT OF THE INTERIOR, et al.,  :
                                  :
               Defendants.                              :

------------------------------------------------------------------ x

STATE OF NEW YORK, et al.,                      :
                                  :
                        Plaintiffs,                   :     18 Civ. 8084 (VEC)
       -against-                                               :
                                  :
U.S. DEPARTMENT OF THE INTERIOR, et al.,  :
                                  :
               Defendants.                              :

------------------------------------------------------------------ x

## THE STATES' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' CROSS-MOTION

Matthew Eisenson
  *Assistant Attorney General*
Andrew J. Gershon
  *Senior Counsel*
Monica B. Wagner
  *Deputy Bureau Chief*
    *of Counsel*

LETITIA JAMES
Attorney General of the State of New York
Attorney for Plaintiffs
28 Liberty St
New York, NY 10005
(212) 416-8446
matthew.eisenson@ag.ny.gov

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................... 1

ARGUMENT ................................................................................................ 2

    A.  Interior's Reinterpretation of the Act Is Not Entitled to Deference. .............. 2

    B.  The Text of the MBTA Prohibits Incidentally Taking or Killing Migratory Birds. .......................................................................................... 4

        1.  Interior Misapplies *Noscitur a Sociis*. ....................................... 4

        2.  Interior Improperly Seeks to Impose a Mental State Requirement on a Strict Liability Provision. ......................................... 10

    C.  The Act's Purpose and History, as Well as International Law, Support Interior's Longstanding Interpretation that the MBTA Prohibits Incidentally Taking or Killing Migratory Birds. .......................................... 12

        1.  The Migratory Bird Treaty Act Was Enacted with the Broad Purpose of Protecting Birds. ........................................................ 12

        2.  Congress Repeatedly Ratified Interior's Longstanding Interpretation that the Act Prohibits Incidental Take. ................................ 14

        3.  The Court Should Avoid a Reading of the MBTA that Conflicts with International Law ..................................................... 18

    D.  The Second Circuit's Holding that the MBTA Prohibits Incidental Take Is Binding on this Court. ................................................................ 22

    E.  Proximate Cause and Discretion Are Sufficient to Protect Due Process...... 24

CONCLUSION ........................................................................................... 25

# TABLE OF AUTHORITIES

## Cases

*Air France v. Saks*, 470 U.S. 392 (1985) .................................................................. 22

*Ali v. Fed. Bureau of Prisons*, 552 U.S. 214 (2008) .................................................. 9

*Andrus v. Allard*, 444 U.S. 51 (1979) ................................................................. 15, 16

*Babbitt v. Sweet Home Chapter of Cmtys. for a Great Oregon*, 515 U.S. 687 (1995) . 6, 7, 9, 12

*Benjamins v. British European Airways*, 572 F.2d 913 (2d Cir. 1978)...................... 22

*Browder v. United States*, 312 U.S. 335 (1941) ....................................................... 15

*Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York*, 451 F.3d 77 (2d Cir. 2006) ..................................................................................................... 23

*Catskill Mountains Chapter of Trout Unlimited, Inc. v. EPA*, 846 F.3d 492 (2d Cir. 2017) ........................................................................................................................ 3

*Causse Mfg. Co. v. United States*, 151 F. 4 (2d Cir. 1906) .......................................... 9

*Cheung v. United States*, 213 F.3d 82 (2d Cir. 2000) ............................................... 18

*Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984) .................................................. 2

*Christensen v. Harris Cty.*, 529 U.S. 576 (2000) ........................................................ 3

*Chrysler Corp. v. Brown*, 441 U.S. 281 (1979) ........................................................ 14

*Cty. of Maui v. Hawaii Wildlife Fund*, No. 18-260, 2020 WL 1941966 (U.S. Apr. 23, 2020) ........................................................................................................................ 3

*Duncan v. Walker*, 533 U.S. 167 (2001) .................................................................... 8

*Efstathiadis v. Holder*, 752 F.3d 591 (2d Cir. 2014)................................................ 10

*Factor v. Laubenheimer*, 290 U.S. 276 (1933)......................................................... 21

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) ........................... 14

*Graham Cty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280 (2010) .................................................................................................... 5, 6

*I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421 (1987) ....................................................... 3

*In re Picard, Tr. for Liquidation of Bernard L. Madoff Inv. Sec. LLC*, 917 F.3d 85 (2d Cir. 2019) .......................................................................................... 18

*Kim Ho Ma v. Ashcroft*, 257 F.3d 1095 (9th Cir. 2001) ............................................ 19

*Lamie v. U.S. Tr.*, 540 U.S. 526 (2004) ....................................................................... 12

*Loving v. United States*, 517 U.S. 748 (1996) ............................................................ 15

*Massachusetts v. EPA*, 549 U.S. 497 (2007)...................................................... 13, 15

*Maximov v. United States,* 299 F.2d 565 (2d Cir.1962), *aff'd,* 373 U.S. 49 (1963) .... 21

*Medellin v. Texas*, 552 U.S. 491 (2008) ...................................................................... 19

*Morissette v. United States*, 342 U.S. 246 (1952)...................................................... 12

*Moskal v. United States*, 498 U.S. 103 (1990)............................................................. 5

*Murray v. Schooner Charming Betsy*, 6 U.S. 64 (1804).............................................. 18

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967 (2005)...... 3

*Olin Corp. v. Insurance Co. of N. Am.*, 762 F. Supp. 548 (S.D.N.Y. 1991) ................ 15

*Olympic Airways v. Husain*, 540 U.S. 644 (2004) ...................................................... 22

*Pennsylvania Dept. of Corrections v. Yeskey*, 524 U.S. 206 (1998) ............................ 13

*Ropes v. Clinch*, 20 F. Cas. 1171 (C.C.S.D.N.Y. 1871) .............................................. 19

*Russell Motor Car Co. v. United States*, 261 U.S. 514 (1923) ............................. 5, 6, 7

*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944)............................................................. 2

*United States v. Apollo Energies, Inc.*, 611 F.3d 679 (10th Cir. 2010)............. 6, 20, 24

*United States v. FMC Corp.*, 572 F.2d 905 (2d Cir. 1978)................................. passim

*United States v. Li*, 206 F.3d 56 (1st Cir. 2000) ........................................................ 21

*United States v. Mead Corp.*, 533 U.S. 218 (2001) ...................................................... 2

*United States v. Moon Lake Elec. Ass'n, Inc.*, 45 F. Supp. 2d 1070 (D. Colo. 1999)... 8, 14

*United States v. Stevens*, 559 U.S. 460 (2010) ............................................................. 6

*United States v. Wong*, 40 F.3d 1347 (2d Cir. 1994) ..................................................... 22

*United States v. Wulff*, 758 F.2d 1121 (6th Cir. 1985) ................................................ 12

*Weinberger v. Rossi*, 456 U.S. 25 (1982) ........................................................................ 18

## Statutes

16 U.S.C. § 703(a) ..................................................................................................... 1, 4, 7

18 U.S.C. 1112(a) ............................................................................................................. 5

Pub. L. No. 105-312, § 102, 112 Stat. 2956 (1998) (codified at 16 U.S.C. § 704(b)) .. 16

Pub. L. No. 107-314, § 315, 116 Stat. 2458, 2509 (2002) ............................................. 16

Pub. L. No. 74-728, § 3, 49 Stat. 1555 (1936) ........................................................ 8, 13

Pub. L. No. 99-645, § 501, 100 Stat. 3582, 3590 (1986) (codified at 16 U.S.C. §
    707(b)-(c)) ................................................................................................................... 16

## Other Authorities

3A Lawyers' Medical Cyclopedia § 24.51, "Regulation of Pesticides," (Matthew
    Bender & Company, Inc., coverage through April 2020; Release No. 51) ............. 15

50 C.F.R. § 10.12 ........................................................................................................... 17

Antonin Scalia & Bryan A. Gardner, Reading Law (2012) ........................................ 15

Convention between the United States and Great Britain for the Protection of
    Migratory Birds, 39 Stat. 1702 (Aug. 16, 1916) (ratified Dec. 7, 1916) .......... 13, 20

Exec. Order No. 13186, 66 Fed. Reg. 3853 § 2(a) (Jan. 10, 2001) .............................. 18

RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES § 114
    (1987) ......................................................................................................................... 18

S. Rep. No. 105-366 (1998) .......................................................................................... 11

Webster's Second New Int'l Dictionary (1934) ............................................................. 5

## PRELIMINARY STATEMENT

After more than forty years of enforcing the Migratory Bird Treaty Act ("MBTA") to prevent the taking and killing of migratory birds incidental to industrial activity, defendants ("Interior") argue that their successful enforcement efforts were an "expansion of federal authority" without "substantive legislative or regulatory change." Defs.' Mem. Supp. Summ. J. ("Interior Br.") 1, Dkt. 79. That remarkable claim, however, is wrong: Interior's enforcement of the Act to protect migratory birds from the threat of modern industrial activity was fully consistent with the Act's text as enacted in 1918 and amended in 1936. Indeed, the Act plainly prohibits taking or killing migratory birds "at any time, by any means or in any manner," whether doing so is the purpose of the activity or incidental to otherwise lawful activity. *See* 16 U.S.C. § 703(a). This interpretation is also consistent with the Act's broad purpose, legislative history, and international comity. Moreover, it is the law of the Second Circuit. *United States v. FMC Corp.*, 572 F.2d 902, 905 (2d Cir. 1978).

The Jorjani Opinion's conclusion that the prohibition on taking or killing migratory birds applies only to "affirmative actions that have as their purpose the taking or killing of migratory birds," AR2, is based on several errors of law. First, Interior admits that "take" and "kill" can describe both affirmative and passive conduct but invokes the *noscitur a sociis* canon to argue that those terms are limited to affirmative conduct here because other terms in the statute describe affirmative conduct. However, the *noscitur a sociis* canon may not be applied to interpret "kill" because that term is unambiguous, nor may it be applied to deprive "take" and "kill"

of their independent meaning. Second, Interior admits that the Act imposes strict liability for taking and killing migratory birds. But a strict-liability prohibition by definition does not require an intentional or purposeful act. Third, Interior argues that its new interpretation is necessary to avoid the absurd result of, for example, prosecuting cat owners when cats attack birds. In four decades of successful enforcement, such absurd results have not materialized because proximate cause and the sound discretion of prosecutors and courts have been sufficient to prevent those results.

## ARGUMENT

### A.  Interior's Reinterpretation of the Act Is Not Entitled to Deference.

Interior recognizes that *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944), establishes the standard for evaluating whether deference is owed to the Jorjani Opinion but concludes wrongly that the Opinion is entitled to deference.[1] *See* Interior Br. 17. *Skidmore* requires a court to decide how much weight to give to an agency's interpretation of ambiguous statutory language based on "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." 323 U.S. at 140. Agency interpretations are "entitled to respect"

---

[1] As Interior recognizes, the Jorjani Opinion is not entitled to deference under *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984). *See* Interior Br. 41. Unlike cases applying *Chevron* deference, a Solicitor's Opinion is not the product of "notice-and-comment rulemaking or formal adjudication," which "tend[] to foster the fairness and deliberation" that would merit *Chevron* deference. *See United States v. Mead Corp.*, 533 U.S. 218, 229-30 (2001).

under *Skidmore* "only to the extent those interpretations have the power to persuade." *Christensen v. Harris Cty.*, 529 U.S. 576, 587 (2000); *see also Cty. of Maui v. Hawaii Wildlife Fund*, No. 18-260, 2020 WL 1941966, at *8 (U.S. Apr. 23, 2020) (declining to defer to interpretation that was "neither persuasive nor reasonable").

First, the Jorjani Opinion is not entitled to deference under *Skidmore* because, as discussed at pp. 4-12, the language of the statute unambiguously prohibits taking and killing migratory birds, whether it is the purpose of one's actions or incidental to otherwise lawful activity. *See Catskill Mountains Chapter of Trout Unlimited, Inc. v. EPA*, 846 F.3d 492, 509 (2d Cir. 2017) (explaining that *Skidmore* deference applies "only when the statutory language at issue is ambiguous"). Even if there were any ambiguity, however, there would be no deference because, as discussed at pp. 4-22, the Opinion is inconsistent with the text, purpose and history of the statute, as well as principles of international comity.

Second, it is undisputed that the Opinion conflicts with Interior's longstanding interpretation that the Act prohibits actions that incidentally take or kill birds. *See* Interior Br. 17, 42. When *Skidmore* applies, "[a]n agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is entitled to considerably less deference than a consistently held agency view." *I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 446 n.30 (1987) (quotation marks omitted). Interior argues based on *National Cable & Telecommunications Ass'n v. Brand X Internet Services*, 545 U.S. 967, 981 (2005), that inconsistent interpretation by an agency does not deprive the agency's new interpretation from receiving deference. Interior Br. 17. But

as Interior concedes, *Brand X* "applies only to agency interpretations for which agencies are entitled to *Chevron* deference," *id.* at 41, and thus does not apply here. Ultimately, Interior's inconsistency greatly diminishes the Jorjani Opinion's persuasive power and any deference it might otherwise be due if all of *Skidmore*'s other factors did not point decidedly in the other direction.

## B.   The Text of the MBTA Prohibits Incidentally Taking or Killing Migratory Birds.

The plain language of the MBTA unambiguously prohibits incidental take by disallowing the taking or killing of migratory birds "at any time, by any means or in any manner," regardless of one's purpose or mental state. *See* 16 U.S.C. § 703(a). The Jorjani Opinion's conclusion that the Act is limited to "affirmative actions that have as their purpose the taking or killing of migratory birds," AR2, misapplies *noscitur a sociis* and improperly engrafts an intent requirement onto a strict liability prohibition where the language otherwise plainly does not require intent.

### 1.   Interior Misapplies *Noscitur a Sociis*.

Interior recognizes that "take" and "kill" can "refer to active or passive conduct" but argues based on the *noscitur a sociis* canon that those terms cover only active conduct. Interior Br. 18-19. Because "take" and "kill" are part of a list that includes three terms that ordinarily describe active conduct—"pursue," "hunt," and "capture"—Interior argues that "take" and "kill" require "an affirmative act directed immediately and intentionally against migratory birds." *Id.* at 19; *see* 16 U.S.C. § 703(a). Interior misuses *noscitur a sociis* in three ways: (1) *noscitur a sociis* does not apply to "kill" because the word is unambiguous; (2) even if the canon did apply to

4

both "take" and "kill," Interior misuses the canon by depriving those terms of their independent significance; and (3) Interior discounts other contextual information, including that the meaning of "take" is informed by the meaning of "kill" and that taking and killing are unlawful "at any time, by any means or in any manner."

First, *noscitur a sociis* does not apply "except in the domain of ambiguity," "where words are of obscure or doubtful meaning." *Russell Motor Car Co. v. United States*, 261 U.S. 514, 520 (1923). Similarly, *noscitur* may not be applied to deprive a word of its "ordinary" meaning. *Graham Cty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 288 (2010) (quotation marks omitted); *see also Moskal v. United States*, 498 U.S. 103, 108 (1990) (when interpreting a statute, a court "look[s] first to its language" and "giv[es] the words used their ordinary meaning") (quotation marks omitted)). When "the meaning of the several words, standing apart, [is] perfectly plain," each should be given "its natural value and appropriate scope." *Russell Motor Car Co.*, 261 U.S. at 520-21 (holding that "modify" and "cancel" should not be limited "to the scope of the word 'requisition,' simply because the latter has a necessarily narrower application").

Here, "kill" is a broad but unambiguous term. According to the 1934 edition of Webster's Second New International Dictionary cited in the Jorjani Opinion, "kill" is "the general term for depriving of life," which encompasses both intentional and unintentional conduct. AR19-20 n.121. And "kill" is routinely used to encompass unintentional conduct. *See* 18 U.S.C. § 1112(a) (defining manslaughter as the "unlawful killing of a human being without malice" and involuntary manslaughter as

the commission of an act "which might produce death").

Indeed, the Supreme Court has held that "kill" is unambiguous and rejected using *noscitur a sociis* to narrow its meaning. In *United States v. Stevens*, 559 U.S. 460, 465, 474-75 (2010), which involved a First Amendment challenge to a ban on depictions of animals being "intentionally maimed, mutilated, tortured, wounded or killed" the government argued, based on *noscitur a sociis*, that "killed" should be read, along with "maimed," "mutilated," and "tortured," to require cruelty. *Id.* at 474. The Court rejected that argument because the term "killed" "contains little ambiguity" and "should be read according to [its] ordinary meaning," which is to "deprive of life." *Id.* at 474-75. Just as one can plainly kill without cruelty, one can plainly kill without intent. *See United States v. Apollo Energies, Inc.*, 611 F.3d 679, 688-89 (10th Cir. 2010) (holding that the Act's prohibition on killing migratory birds is "not vague," even though it applies to wide "range of conduct that will lead to the death" of birds, including deaths that were not intended).

Second, a court should not apply *noscitur a sociis* to "rob" words of their "independent" meaning. *Graham Cty. Soil & Water Conservation Dist.*, 559 U.S. at 288 (quotation marks omitted); *see also Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 702 (1995) (holding that the lower court had improperly "employed *noscitur a sociis* to give 'harm' essentially the same function as other words in the definition, thereby denying it independent meaning"); *Russell Motor Car*, 261 U.S. at 519 ("That a word may be known by the company it keeps is, however, not an invariable rule, for the word may have a character of its own not to be submerged by

its association."). Unlike pursuing, hunting, or capturing, the terms "take" and "kill" encompass both active and passive conduct, as Interior recognizes. Interior Br. 19. That those words have broader meaning than other terms in the list provides no basis to deprive them of their full meaning. *See Russell Motor Car*, 261 U.S. at 520-21.

Third, by focusing on "pursue," "hunt," and "capture," Interior wrongly discounts other language in the same sentence. If *noscitur a sociis* applies here, then the meaning of "take" can be ascertained from "kill," which also accompanies it and is the general term for "depriving of life." In *Sweet Home*, the Supreme Court held that the D.C. Circuit had misapplied *noscitur a sociis* when it ruled that "harm"— which is one of the definitions of "take" under the Endangered Species Act—"must refer to a direct application of force because the words around it do." 515 U.S. at 701-02. The Court found that "[s]everal of the words that accompany 'harm' in the [statute's] definition of 'take,' especially 'harass,' 'pursue,' 'wound,' and 'kill,' refer to actions or effects that do not require direct applications of force." *Id.* Here as well, "kill," which accompanies the term "take," does not refer to an action that requires a direct application of force or even affirmative conduct intentionally directed at birds. As a result, "take" should also not be limited to that conduct.

Critically, the MBTA also provides that "it shall be unlawful at any time, *by any means* or *in any manner*, to pursue, hunt, take, capture [or] kill" migratory birds. 16 U.S.C. § 703(a) (emphasis added). The "by any means or in any manner" text before the words "take" and "kill" gives those terms a broad and expansive meaning and repudiates Interior's argument that they mean only an affirmative act directed

intentionally against migratory birds. *See United States v. Moon Lake Elec. Ass'n*, 45 F. Supp. 2d 1070, 1079 (D. Colo. 1999) ("I do not regard the following language as vague or ambiguous: 'it shall be unlawful at any time, by any means or in any manner, to . . . kill . . . any migratory bird.'"); *id.* (finding that "Congress expressed its will in reasonably plain terms" (quotation marks omitted)). It is, of course, a court's "duty to give effect, if possible, to every clause and word of a statute," especially those that are "pivotal." *Duncan v. Walker*, 533 U.S. 167, 174 (2001) (quotation marks omitted). Here, Congress's 1936 amendment moved the phrase "at any time or in any manner," which was previously buried in the middle of the provision, to the beginning, so that it would directly precede "pursue, hunt, take, capture [or] kill," thus making that phrase pivotal. Pub. L. No. 74-728, § 3, 49 Stat. 1555, 1556 (1936). The words "by any means" were also added for emphasis. AR48.

That pivotal language also repudiates Interior's argument that "take" should be given its common-law definition, which is "to reduce [wild] animals, by killing or capturing, to human control." *See* Interior Br. 20. The Tompkins Opinion, which preceded the Jorjani Opinion and concluded that the MBTA prohibits take and kill incidental to industrial activities, found that the common-law definition of "take" encompasses unintentional acts. AR50. But even if the common-law definition did not cover unintentional acts, Interior has admitted that the dictionary definitions of "take" "could refer to active or passive conduct." Interior Br. 19. Here, Congress's pivotal use of "at any time, by any means or in any manner" dictates that a broad definition of "take," which includes both active and passive conduct, applies.

Moreover, even if Congress *did* intend to give "take" a narrow meaning that excluded unintentional conduct, the Jorjani Opinion's attempt to limit "kill" to conduct directed at birds would amount to imposing the common-law definition of "take" on "kill" and render "kill" superfluous. *See Sweet Home*, 515 U.S. at 701 n.15 (declining to limit liability to "affirmative conduct intentionally directed against a particular animal or animals," because, even if such a limitation were consistent with the common-law definition of "take," there is no such limitation on "kill").

Interior argues that "at any time, by any means or in any manner" "simply clarifies that activities directed at migratory birds, such as hunting and poaching, are prohibited whenever and wherever they occur and whatever manner is applied." AR22; Interior Br. 22. That argument is circular: Interior ignores the phrase "by any means or in any manner" when it argues that "take" and "kill" are limited to activities directed at migratory birds and then argues that "by any means or in any manner" refers only to those limited activities. But the statute prohibits taking or killing "by any means or in any manner," thus giving "take" and "kill" their full and expansive meaning. *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 219-20 (2008) (noting that the "expansive word 'any' and the absence of restrictive language left 'no basis in the text for limiting' the phrase 'any other term of imprisonment' to federal sentences" (citations omitted)). Indeed, the Second Circuit has declined to use the *noscitur a sociis* canon to narrow the scope of the phrase "in any manner." In *Causse Mfg. v. United States*, 151 F. 4, 5-6 (2d Cir. 1906), the court rejected an interpretation of a provision relating to fruits "dried, desiccated, evaporated or prepared *in any manner,*"

that would limit the meaning of "in any manner" to include "only fruits prepared by a drying process" (emphasis added). Likewise, this Court should reject Interior's argument that taking or killing birds "in any manner" means only an affirmative act of taking or killing birds in a manner akin to hunting or poaching.

### 2.   Interior Improperly Seeks to Impose a Mental State Requirement on a Strict Liability Provision.

The Jorjani Opinion's conclusion that the Act's strict-liability prohibition against taking or killing migratory birds is limited to "affirmative actions that have as their *purpose* the taking or killing of migratory birds" is invalid on its face. *See* AR2 (emphasis added). It cannot simultaneously be true that the general prohibition on taking and killing migratory birds both (1) lacks an intent or purpose requirement and (2) applies only to actions taken with a particular purpose. In addition, the MBTA's text repudiates any intent requirement.

Interior readily concedes that the general prohibition on taking or killing migratory birds imposes strict liability. *See* Interior Br. 22-24. Strict liability, by definition, means there is no mental state requirement. *See Efstathiadis v. Holder*, 752 F.3d 591, 596 (2d Cir. 2014) ("a crime in which *mens rea* is not required [is] referred to as a 'strict liability' offense"). When there is no such requirement, the intent or *purpose* of the action is not an element of the crime. It is irrelevant.

Therefore, the Act's strict-liability prohibition cannot be limited to "affirmative actions that have as their *purpose* the taking or killing of migratory birds." *See* AR2 (emphasis added). In its brief, Interior avoids quoting this passage of the Jorjani Opinion, and for good reason: it directly imposes an intent or purpose requirement on

the provision. Instead, Interior now argues that the Act "prohibits only affirmative acts directed immediately and *intentionally against* migratory birds," Interior Br. 27 (emphasis added), and that the Act "applies only to actions that are directed at migratory birds, their nests, or their eggs, and not to mortality or injury to migratory birds that results from, but is *not the purpose of*, a particular action," *id.* at 2 (emphasis added)). But the interpretation before the Court is the one embraced by the Jorjani Opinion, not what Interior argues in its brief. In any event, the new interpretations Interior now proffers also specify a mental state requirement—that the actor set out with the intent or purpose of taking or killing migratory birds.

Under Interior's interpretation, strict liability—which was described in a congressional report as "the hallmark of the law," S. Rep. No. 105-366 at 2 (1998)—would apply only in rare and obscure situations, if at all. Interior's sole example is that a person would be strictly liable "if he or she killed a protected migratory bird without intending to kill a *protected* bird, such as when hunting upland game birds that are not covered by the MBTA." Interior Br. 24 (emphasis in original). But even that would not violate the MBTA, according to the Jorjani Opinion, because killing a migratory[2] bird would not be the hunter's *purpose*.

In any case, Interior's argument fails, because "[a]n element of scienter can be read into an otherwise silent statute only where the crime is one borrowed from the common law," which is not the case here. *United States v. Wulff*, 758 F.2d 1121, 1124

---

[2] Upland game birds are not "migratory birds" under the Act. 50 C.F.R. § 10.13.

(6th Cir. 1985) (citing *Morissette v. United States*, 342 U.S. 246, 262 (1952)). As the Tompkins Opinion concluded, restricting the Act's scope to actions directed at birds would amount to "grafting a scienter component onto the prohibited act," which would confuse two separate elements of the crime. AR71; *see Sweet Home*, 515 U.S. at 701-02 ("[T]o the extent the [lower] court read a requirement of intent or purpose into the words used to define 'take,' it ignored [the statute's] express provision that a 'knowin[g]' action is enough to violate the Act.").

## C.     The Act's Purpose and History, as Well as International Law, Support Interior's Longstanding Interpretation that the MBTA Prohibits Incidentally Taking or Killing Migratory Birds.

Because the text unambiguously prohibits incidentally taking or killing migratory birds, the Court need not examine the Act's purpose or history, or principles of international law. *See Lamie v. U.S. Tr.*, 540 U.S. 526, 536 (2004). But to the extent the Court deems it useful to confirm what the Act's text unambiguously prohibits, those considerations further support a prohibition against taking or killing birds, whether doing so is the purpose of the action or incidental to otherwise lawful activity. *See id.* at 539.

### 1.     The Migratory Bird Treaty Act Was Enacted with the Broad Purpose of Protecting Birds.

Congress enacted the MBTA to implement a treaty that proclaimed a broad purpose of "saving from indiscriminate slaughter and of insuring the preservation of such migratory birds as are either useful to man or are harmless." Convention between the United States and Great Britain for the Protection of Migratory Birds, 39 Stat. 1702 (Aug. 16, 1916) (ratified Dec. 7, 1916) ("Convention"). The treaty's

sweeping purpose equally embraces prohibiting indiscriminate shooting by hunters *and* indiscriminate poisoning by uncovered industrial waste ponds. As the Second Circuit held in *FMC Corp.*, the Act's broad protective purpose supports applying the MBTA to incidental take. 572 F.2d at 908 (citing both the lack of a mental state requirement and the fact that "Congress recognized the important public policy behind protecting migratory birds" in deciding to apply strict liability to incidental take). The fact that the treaty—and the law implementing it—did not explicitly anticipate the industrial threats that would emerge over the course of the twentieth century is immaterial: the broad language of the Act "reflects an intentional effort to confer the flexibility necessary to forestall [its] obsolescence." *See Massachusetts v. EPA*, 549 U.S. 497, 532 (2007) (the broad language of the Clean Air Act covers greenhouse gas emissions even though Congress "might not have appreciated the possibility that burning fossil fuels could lead to global warming"). Indeed, a broadly worded statute with a broad purpose should "be applied in situations not expressly anticipated by Congress." *See Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998).

As discussed above (p. 8), Congress amended the relevant provision in 1936 to confirm its breadth by making clear that taking or killing migratory birds "at any time, by any means or in any manner" was prohibited. *See* 49 Stat. at 1556. Congress's intent is unambiguous: it amended the Act to emphasize that the prohibitions on taking and killing migratory birds are to be broadly construed and disavowed any attempt to construe those words narrowly.

Contrary to Interior's argument, the legislative history of the Act does not compel a different conclusion. Interior Br. 24-27. As Interior notes, *id.* at 40, the Second Circuit held in *FMC Corp.* that "there is no help to be had from legislative history." 572 F.2d at 905. Likewise, the court in *Moon Lake* found that "there is no clearly expressed legislative intent that the MBTA regulates only physical conduct associated with hunting or poaching." 45 F. Supp.2d at 1080-82. In any event, for each legislator quoted by Interior who ascribed a narrow purpose to the Act, *see* Interior Br. 25, there were others who "construed the MBTA as having a very broad scope," *Moon Lake*, 45 F. Supp. 2d at 1081. And it is well established that "[t]he remarks of a single legislator, even the sponsor, are not controlling in analyzing legislative history." *Chrysler Corp. v. Brown*, 441 U.S. 281, 311 (1979).

### 2. Congress Repeatedly Ratified Interior's Longstanding Interpretation that the Act Prohibits Incidental Take.

More importantly, after federal prosecutors began to bring enforcement actions for incidental take, Congress repeatedly ratified Interior's interpretation that incidental take was prohibited, both in amendments to the Act and in related legislation. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 155-56 (2000) (agency's interpretation of statute "effectively ratified" by subsequent legislation); States' Mem. Supp. Sum. J. ("States' Opening Br.") 18-20, Dkt. 69-1.

As an initial matter, Interior observes that federal prosecutors did not begin applying the MBTA to "incidental" actions until the 1970s, and that this change "was not accompanied by any substantive legislative or regulatory change." Interior Br. 1. But the threat of things like modern pesticides to birds did not exist until the middle

of the twentieth century and the public's awareness of that threat took years to develop.[3] Again, "[o]ld laws apply to changed situations," and "even a criminal statute embraces everything which subsequently falls within its scope." *Browder v. United States*, 312 U.S. 335, 339-40 (1941); *see also Massachusetts v. EPA*, 549 U.S. at 532. The MBTA is a broadly worded statute, *see* pp. 4-10 above, and it is widely accepted that "[b]road language can encompass the onward march of science and technology," Antonin Scalia & Bryan A. Gardner, Reading Law 86 (2012).

Subsequent legislative history "is particularly relevant," where, as here, "Congress has twice reviewed and amended the statute without rejecting the [agency's] view." *Andrus v. Allard*, 444 U.S. 51, 57 (1979). In addition, courts give "great weight" to subsequent history where, as here, Congress enacts new legislation that is "premised" on a particular interpretation of the earlier statute. *Loving v. United States*, 517 U.S. 748, 770 (1996); *see also Andrus*, 444 U.S. at 62 ("Related statutes may sometimes shed light upon a previous enactment.").

Here, Congress ratified Interior's longstanding interpretation that the Act applies to incidental take at least three times: (a) in 1986, when Congress imposed a

---

[3] As noted in 3A Lawyers' Medical Cyclopedia § 24.51 (Regulation of Pesticides) (6th ed. 2019 & Supp. No. 51 2020) knowledge gained during World War II "led to startling developments in the field of synthetic pesticide manufacture." During the post-War period "the use of pesticides increased not only in volume but also in variety and application technique." *Id.* It took years for certain environmental harms attributable to this explosive growth of pesticide use to become known. *See, e.g., Olin Corp. v. Insurance Co. of N. Am.*, 762 F. Supp. 548, 552-53 (S.D.N.Y. 1991) (describing growing concern about DDT and its effect on humans and the environment, highlighted by the publication of Rachel Carson's *Silent Spring* in 1962).

knowledge requirement on the felony provision of the Act while declining to impose such a requirement on the general prohibition against taking or killing migratory birds, *see* Pub. L. No. 99-645, § 501, 100 Stat. 3582, 3590 (1986) (codified at 16 U.S.C. § 707(b)-(c)); (b) in 1998, when Congress imposed a negligence requirement on violations involving the use of bait while once again declining to impose a mental state requirement on the general prohibition, Pub. L. No. 105-312, § 102, 112 Stat. 2956 (1998) (codified at 16 U.S.C. § 704(b)); and (c) in 2002, when Congress enacted separate legislation that temporarily exempted from MBTA liability "the incidental taking of a migratory bird by a member of the Armed Forces during a military-readiness activity," Pub. L. No. 107-314, § 315, 116 Stat. 2458, 2509 (2002).

Interior argues that the 1986 and 1998 amendments reaffirmed only that the general prohibition imposed strict liability, not that incidental take was prohibited. Interior Br. 23-24. That distinction fails to recognize that a strict-liability provision that prohibits taking or killing migratory birds "at any time, by any means or in any manner" prohibits incidental take. Moreover, Interior fails to address what the Supreme Court has called "particularly significant"—that "Congress has twice reviewed and amended the statute without rejecting the [agency's] view." *See Andrus*, 444 U.S. at 57. Here, Congress did not just amend the statute; it amended the mental state requirements of the statute, which are directly relevant to the question at issue. By amending the statute without rejecting the interpretation that the Act prohibits incidental take, Congress ratified that interpretation. *See also* States' Opening Br. 3-4, 19-20 (explaining that congressional reports in support of the amendments

explicitly reaffirmed the Act's strict liability nature).

Interior's attempt to evade the significance of the 2002 military readiness legislation is as misleading as it is wrong. While it may be true that the 2002 legislation did not "alter the fundamental details" of MBTA enforcement or "definitively address" whether the MBTA applies to incidental take, Interior Br. 32, the legislation was premised on, and specifically animated by, an intent to provide a narrow exemption for incidental take caused by military readiness activities. And Congress then directed Interior to exercise its authority under the MBTA to promulgate regulations governing incidental take for military readiness activities. 116 Stat. at 2509. If Congress did not understand and intend for the MBTA to prohibit the incidental taking of migratory birds, then Congress could certainly have made that intent clear and such an expressed intent would have nullified any need to enact the limited military readiness exception. But, in fact, Congress did not travel that path and its action was consistent with and thus endorsed decades of agency practice as well as an executive order issued just one year earlier, which confirmed that "take" as defined under 50 C.F.R. § 10.12 for multiple statutes, "includes both 'intentional' and 'unintentional' take" for purposes of the MBTA. *See* Exec. Order No. 13186, 66 Fed. Reg. 3853 § 2(a) (Jan. 10, 2001).[4] Where, as here, a later statute is premised on

---

[4] Interior argues that the Executive Order defined "take" only for the purposes of management by the federal government actions and not for purposes of assigning criminal liability. Interior Br. 32-33 n.19. The notion that a statutory term would have different meanings when applied to different parties is highly suspect. *Cf. Gustafson v. Alloyd Co.*, 513 U.S. 561, 570 (1995) ("[I]dentical words used in different

an agency's interpretation of an earlier statute, that interpretation should be given "great weight." *See Loving*, 517 U.S. at 770.

### 3. The Court Should Avoid a Reading of the MBTA that Conflicts with International Law.

Interior misconstrues the States' argument that international comity supports the longstanding interpretation that the MBTA prohibits incidental take. The States do not contend that adjudicatory or prescriptive comity apply here. *See* Interior Br. 30. [5] Rather, the States argue that if the Court finds ambiguity in the MBTA, it should apply the *Charming Betsy* canon to avoid conflict between the MBTA and the migratory bird treaties. *See* States' Opening Br. 24. This canon, which takes its name from *Murray v. Schooner Charming Betsy*, 6 U.S. 64 (1804), directs courts to construe ambiguous statutes so as not to violate international law. Restatement (Third) of the Foreign Relations Law of the United States § 114 (1987); *Weinberger v. Rossi*, 456 U.S. 25, 32 (1982); *Cheung v. United States*, 213 F.3d 82, 92 (2d Cir. 2000).

Here the relevant international law includes the treaties themselves as well as the post-ratification understanding of those treaties as evidenced by diplomatic notes and the legal opinion of another signatory nation. *Medellin v. Texas*, 552 U.S. 491,

---

parts of the same act are intended to have the same meaning."). But the scope of the order is ultimately immaterial. It is just another example of the federal government's longstanding and previously consistent interpretation of the Act to apply to incidental take.

[5] Adjudicatory comity involves a discretionary act to decline jurisdiction of a case being adjudicated in a foreign state. *In re Picard, Tr. for Liquidation of Bernard L. Madoff Inv. Sec. LLC*, 917 F.3d 85, 101 (2d Cir. 2019). Prescriptive comity asks whether "a court [should] presume that Congress, out of respect for foreign sovereigns, limited the application of domestic law on a given set of facts[.]" *Id.*

506-07 (2008) ("Because a treaty ratified by the United States is 'an agreement among sovereign powers,' we have also considered as 'aids to its interpretation' the negotiation and drafting history of the treaty as well as 'the postratification understanding' of signatory nations."). These sources all point in one direction: a shared understanding between the parties that the treaties are meant to prevent incidental take. Therefore, to avoid a conflict between the treaties and the MBTA, the statute should be interpreted to prohibit incidental take. *See Ropes v. Clinch*, 20 F. Cas. 1171, 1172-73 (C.C.S.D.N.Y. 1871) (a court must "look at the treaty, and, if it be possible to find an interpretation of the statute which will involve no infraction of the treaty, no violation of the pledged faith of the government of the United States to the government of another country, to give it that interpretation, and without hesitation"); *Kim Ho Ma v. Ashcroft*, 257 F.3d 1095, 1114 (9th Cir. 2001) (applying the *Charming Betsy* canon to avoid conflict between the Immigration and Nationality Act and Article 9 of the International Covenant on Civil and Political Rights).

Interior argues that the interpretation of the MBTA in the Jorjani Opinion does not conflict with international law because none of the migratory bird treaties "specifically or directly prohibit incidental take of migratory birds." Interior Br. 30. Yet, Interior admits that "these treaties also included language about protecting habitat and preventing damage from pollution and other environmental degradation." *Id.* at 28. It is precisely this language that reflects a shared commitment to prevent incidental take. Because deaths from pollution are unintentional, they are incidental takes. *See FMC Corp.*, 572 F.2d at 908 (liability

imposed on corporation when pollution it caused killed migratory birds).

Interior argues that the States "place undue weight on the language of these later conventions in attempting to impart a broader meaning to the relevant MBTA provisions." Interior Br. 28. But even the original 1916 treaty with Canada, which preceded the Act itself, proclaimed a broad purpose of "saving from indiscriminate slaughter and of *insuring the preservation* of such migratory birds as are either useful to man or are harmless." *See* 39 Stat. 1702 (emphasis added). Interior also argues that "Congress addressed hunting and habitat destruction through separate statutes" with the MBTA addressing hunting and the Migratory Bird Conservation Act of 1929 addressing habitat destruction. Interior Br. 25. But the fact that the Migratory Bird Conservation Act addressed habitat destruction does not preclude the MBTA from addressing incidental take caused by pollution or other industrial hazards of the type at issue in *FMC Corp.*, 572 F.2d 902, and *Apollo Energies*, 611 F.3d 679.

Interior further argues that the diplomatic notes between Canada and the United States show that Canada "appears to have been concerned that regulation of incidental take was not obviously contemplated by the treaty." Interior Br. 30. On the contrary, Canada initiated the exchange of notes because it was concerned that *allowing* incidental take through a permitting system would violate the treaty's prohibition on incidental take. Canada's note expresses a shared understanding that the term "take of migratory birds" in the Convention includes incidental take. *See* AR 1380-81. Canada's note does not seek consultation on whether incidental take is prohibited but rather whether "making the authorization of incidental take

contingent on compliance with approved conservation measures" is consistent with the Convention. AR1381. Canada's note and the United States' response thus establish that it was (until now) the "mutually held interpretation" of the two governments that such an approach is consistent with the Convention. *Id.*[6]

Interior also argues that the diplomatic notes are unpersuasive because they "only go as far as to say that Canada's contemplated regulations regarding incidental take are *consistent* with the Convention." Interior Br. 30. But a court should strive to "give the specific words of a treaty a meaning consistent with the genuine shared expectations of the contracting parties." *Maximov v. United States,* 299 F.2d 565, 568 (2d Cir. 1962), *aff'd*, 373 U.S. 49 (1963); s*ee also* AR46 n.22. In ascertaining the meaning of "take" in the treaties, a court may look "to the negotiations and diplomatic correspondence of the contracting parties relating to the subject-matter, and to their own practical construction of it." *Factor v. Laubenheimer*, 290 U.S. 276, 294-95 (1933). Again, and significantly, the notes exchanged between Canada and the United States express the "mutually held interpretation" that the "take of migratory birds" referred to in the Convention, as amended, includes incidental take. AR1380-81.

Furthermore, Interior is incorrect that the decision from a Canadian court rejecting a narrow interpretation of the term "taking" is unpersuasive. Interior Br.

---

[6] Interior argues that the Court should give great weight to its analysis because it is charged with the enforcement of the MBTA. Interior Br. 31. However, the Jorjani Opinion conflicts with the views previously expressed by the State Department, which are "entitled to substantial weight in treaty interpretation," because the State Department "negotiates and administers such treaties." *See United States v. Li*, 206 F.3d 56, 67 (1st Cir. 2000) (concurring opinion).

30-31, n.17. When interpreting treaty provisions, the judicial opinions of other signatories are "'entitled to considerable weight.'" *Air France v. Saks*, 470 U.S. 392, 404 (1985) (quoting *Benjamins v. British European Airways*, 572 F.2d 913, 919 (2d Cir. 1978)); *see also Olympic Airways v. Husain*, 540 U.S. 644, 660 (2004) (Scalia, J., dissenting) ("We can, and should, look to decisions of other signatories when we interpret treaty provisions."). Accordingly, it is significant that a Canadian court found that the treaty and its amendments did not limit takings to hunting-related offenses. AR1697-98. This decision, along with the diplomatic notes, shows that the migratory bird treaties are meant to prevent incidental take. To avoid conflict with the treaties, this Court should interpret the MBTA to prohibit incidental take.

### D. The Second Circuit's Holding that the MBTA Prohibits Incidental Take Is Binding on this Court.

The Second Circuit has held that the MBTA prohibits incidental take. *FMC Corp.*, 572 F.2d at 908 (affirming a finding of liability against a company that unintentionally poisoned migratory birds). That precedent is binding on this Court. *See United States v. Wong*, 40 F.3d 1347, 1373 (2d Cir. 1994) ("[U]ntil the Supreme Court rules otherwise, the district court would be obliged to follow our precedent, even if that precedent might be overturned in the near future.").

Interior mistakenly relies on *Brand X* to argue that this Court should defer to Interior's interpretation of the MBTA rather than the Second Circuit's interpretation. *Brand X* held that, when the *Chevron* standard applies, a court is required to give deference to an agency's interpretation of an ambiguous statute even when the court has previously interpreted the statute. 545 U.S. at 982-83. But *Brand X*, as Interior

concedes, applies only to agency interpretations that are otherwise entitled to *Chevron* deference, and, as Interior also concedes, the Jorjani Opinion is not subject to *Chevron* deference. *See* pp. 2-4 above.

Under *Skidmore*, the Jorjani Opinion's interpretation of the MBTA is owed deference only insofar as the Opinion has the power to persuade. *See* pp. 2-3 above.  The Jorjani Opinion lacks the power to persuade because, in addition to the reasons discussed above, *see* pp. 2-22, it is inconsistent with the Second Circuit's contrary interpretation in *FMC Corp.* Interior argues that this Court should consider out-of-circuit opinions that purportedly conflict with *FMC Corp.*, Interior Br. 41, but none of those is a binding precedent in this Circuit.[7] Tension with other circuits is not a basis for a district court to decline to follow the law of its circuit. *See Monsanto v. United States*, 348 F.3d 345, 351 (2d Cir. 2003).

Interior also argues that, in *Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York*, 451 F.3d 77, 82-84 (2d Cir. 2006), the Second Circuit "demonstrated a willingness to reconsider a prior precedent in part based on the agency's subsequent interpretation of the statutory provision at issue." Interior Br. 41. But the Second Circuit declined to do that in *Catskill Mountains*, *see id.* at 86-87, and in any event, reconsideration of the *FMC Corp.* decision is a question for the Second Circuit, not this Court.

---

[7] In addition, as the Environmental Plaintiffs explain in detail, the tension between *FMC Corp.*, 572 F.2d 902, and decisions by other appellate courts is overstated. Env. Pls.' Reply Supp. Mot. Summ. J. pp. 4-6, Dkt. 83.

**E.      Proximate Cause and Discretion Are Sufficient to Protect Due Process.**

Finally, Interior raises due process concerns about applying the statute to incidental take. Interior argues that the previous interpretation was both (1) so ambiguous that one could not know whether he or she was at risk of a criminal prosecution and (2) so broad that it threatened to criminalize the everyday activities of millions of Americans. *See* Interior Br. 34, 38. Interior warns that the previous interpretation could have led to the absurd result of punishing individuals for driving a car, constructing a building with windows, or allowing a cat to roam outdoors, *id.* at 22-23. These hyperbolic concerns, however, have no basis in law or reality.

First, decades of experience show that proximate cause has served as a reasonable limitation on MBTA enforcement to avoid the absurd results of which Interior warns. *See* AR64-66. As the Tenth Circuit explained in *Apollo Energies,* "proximate cause is an important and inherent limiting feature to the MBTA," and liability only attaches when the injury is "reasonably anticipated or foreseen as a natural consequence of the wrongful act." 611 F.3d at 690 (quotation marks omitted). In that case, proximate cause was established by evidence that "trapped birds are a reasonably anticipated or foreseeable consequence of failing to cap the exhaust stack and cover access holes to the heater/treater." *Id.*

Second, prosecutorial and judicial discretion offer further protection against the parade of horribles that Interior hypothesizes. In *FMC Corp.*, the Second Circuit observed that, although the broadest possible construction of the Act could

theoretically lead to absurd results, "[s]uch situations properly can be left to the sound discretion of prosecutors and the courts." 572 F.2d at 905.

Third, neither the administrative record nor caselaw indicates that such results occurred in more than 40 years of enforcement. Indeed, Interior's enforcement protocol for incidental take successfully induced compliance without the need for prosecution in most cases. As the Jorjani Opinion acknowledged, prosecution was used as a last resort after the violator was provided notice and opportunity to cure. *See* AR38 n.205. For decades, the standard procedure was to "provide notice to industry of the risks posed by facilities and equipment, encourage compliance through remediation, adaptive management and, where possible, permitting, and *reserve for prosecution those cases in which companies ignore, deny, or refuse to comply with a [Best Management Practices] approach to avian protection in conducting their business.*" *Id.* (emphasis in original); *see also* Mowad Decl. ¶¶ 24-26, Dkt. 68-2 (explaining that FWS employed an enforcement protocol that emphasized cooperation and reserved prosecution only for those who refused to cooperate).

Thus, both Interior and the courts have proven themselves fully capable of effectuating the MBTA as written and intended to cover incidental taking and killing of migratory birds, and Interior's newfound due process concerns provide no basis to conclude otherwise.

## CONCLUSION

For the foregoing reasons, the States' motion for summary judgment vacating the Jorjani Opinion should be granted and Interior's cross-motion should be denied.

25

DATED: May 4, 2020                    Respectfully submitted,

                                      FOR THE STATE OF NEW YORK

                                      LETITIA JAMES
                                      Attorney General

                                      By: _/s/ Matthew Eisenson_____
                                          Matthew Eisenson (ME 1987)
                                          *Assistant Attorney General*
                                          Andrew J. Gershon
                                          *Senior Counsel*
                                          Monica B. Wagner
                                          *Deputy Bureau Chief*
                                          Environmental Protection Bureau
                                          Office of the Attorney General
                                          28 Liberty St
                                          New York, NY 10005
                                          (212) 416-8446
                                          matthew.eisenson@ag.ny.gov

FOR THE STATE OF CALIFORNIA

XAVIER BECERRA
Attorney General
David A. Zonana
Supervising Deputy Attorney General

By:  */s/ Andrew Wiener*
    Andrew Wiener
    Elizabeth Rumsey
    *Deputy Attorneys General*
    1515 Clay Street
    Oakland, CA 94612-0550
    (510) 879-1975
    Andrew.Wiener@doj.ca.gov
    Elizabeth.Rumsey@doj.ca.gov

FOR THE STATE OF ILLINOIS

KWAME RAOUL
Attorney General

By:  */s/ Gerald Karr*
    Gerald Karr
    *Supervising Attorney*
    Jason James
    *Assistant Attorney General*
    Matthew J. Dunn
    *Chief, Environmental*
    *Enforcement/Asbestos Litig. Div.*
    69 West Washington 18th Floor
    Chicago, IL 60602
    (312) 814-3369
    gkarr@atg.state.il.us
    jjames@atg.state.il.us

FOR THE STATE OF MARYLAND

BRIAN E. FROSH
Attorney General

By:  */s/ John B. Howard, Jr.*
    John B. Howard, Jr.
    *Special Assistant Attorney General*
    Office of the Attorney General
    200 Saint Paul Place
    Baltimore, Maryland 21202
    (410) 576-6300
    jbhoward@oag.state.md.us

FOR THE COMMONWEALTH OF MASSACHUSETTS

MAURA HEALEY
Attorney General

By:  */s/ Seth Schofield*
    Seth Schofield
    *Senior Appellate Counsel*
    *Assistant Attorney General*
    Megan M. Herzog
    *Special Assistant Attorney General*
    Environmental Protection Division
    One Ashburton Place, 18th Floor
    Boston, MA 02108
    (617) 963-2436
    seth.schofield@mass.gov
    megan.herzog@mass.gov

FOR THE STATE OF NEW JERSEY

GURBIR S. GREWAL
Attorney General

By:  */s/ Dianna Shinn*
    Dianna Shinn
    *Deputy Attorney General*
    New Jersey Division of Law
    R.J. Hughes Justice Complex
    25 Market Street
    Trenton, NJ 08625
    (609) 376-2804
    dianna.shinn@law.njoag.gov

FOR THE STATE OF NEW MEXICO

HECTOR BALDERAS
Attorney General

By:  */s/ William Grantham*
    Cholla Khoury, Division Director
    William Grantham
    *Assistant Attorneys General*
    State of New Mexico
    Office of the Attorney General
    Consumer & Environmental
    Protection Division
    201 Third St NW, Suite 300
    Albuquerque, NM 87102
    (505) 717-3520
    WGrantham@nmag.gov
    CKhoury@nmag.gov

FOR THE STATE OF OREGON

ELLEN F. ROSENBLUM
Attorney General

By:  */s/ Steve Novick*
    Steve Novick
    *Special Assistant Attorney General*
    Natural Resources Section
    Oregon Department of Justice
    1162 Court Street NE
    Salem, OR 97301-4096
    (503) 971-1891
    steve.novick@doj.state.or.us