UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------x

NATURAL RESOURCES DEFENSE
COUNCIL, INC., *et al.*,

                    Plaintiffs,

      -against-

U.S. DEPARTMENT OF THE INTERIOR, *et al.*,

                  Defendants.

18 Civ. 4596 (VEC)

---------------------------------------------------------------------x

NATIONAL AUDUBON SOCIETY, *et al.*,

                    Plaintiffs,

      -against-

U.S. DEPARTMENT OF THE INTERIOR, *et al.*,

                  Defendants.

18 Civ. 4601 (VEC)

---------------------------------------------------------------------x

STATE OF NEW YORK, *et al.*,

                    Plaintiffs,

      -against-

U.S. DEPARTMENT OF THE INTERIOR, *et al.*,

                  Defendants.

18 Civ. 8084 (VEC)

---------------------------------------------------------------------x

**REPLY MEMORANDUM OF LAW OF DEFENDANTS U.S. DEPARTMENT OF THE
INTERIOR, U.S. FISH AND WILDLIFE SERVICE, AND DANIEL JORJANI IN
FURTHER SUPPORT OF THEIR CROSS-MOTION FOR SUMMARY JUDGMENT**

GEOFFREY S. BERMAN
United States Attorney for the
ANDREW E. KRAUSE         Southern District of New York
Assistant U.S. Attorney       *Attorney for Defendants*
– Of Counsel –            Telephone:  (212) 637-2769

# TABLE OF CONTENTS

**PAGE**

PRELIMINARY STATEMENT .............................................................................................1

ARGUMENT .....................................................................................................................1

I.     OPINION M-37050 PROPERLY INTERPRETS THE SCOPE OF
THE MBTA .............................................................................................................1

     A.     Defendants' Interpretation of the MBTA Is Entitled to Deference ........................2

     B.     The Interpretation Set Forth in Opinion M-37050 Is the Appropriate
Reading of the Relevant Text of the MBTA............................................................3

          1.     The Verbs "Take" and "Kill" Must Be Understood In Context .................3

          2.     Language Regarding the Time, Means, or Manner of Prohibited
Acts Does Not Alter the Meaning of Which Acts Are Prohibited..............6

          3.     Strict Liability for Misdemeanor Offenses Does Not Expand the
Scope of Conduct Prohibited Under the MBTA.........................................7

     C.     The History and Purpose of the MBTA Demonstrate That the Statute Was
Designed to Restrict Conduct Directed Specifically at Migratory Birds.................9

     D.     Opinion M-37050 Is Not Undermined By Any MBTA Amendments or
Other Legislation, and Is Consistent with Migratory Bird Treaties......................11

          1.     Plaintiffs' Reliance on Subsequent Acts of Congress Is Unavailing........11

          2.     Opinion M-37050 Is Consistent with Relevant International Law...........15

     E.     The MBTA Should Be Interpreted Narrowly to Avoid
Constitutional Infirmity .......................................................................................16

     F.     Second Circuit Precedent Does Not Require the Court to Reject Defendants'
Interpretation of the MBTA in Opinion M-37050................................................18

II.    OPINION M-37050 WAS NOT A MAJOR FEDERAL ACTION THAT
REQUIRED DEFENDANTS TO COMPLY WITH NEPA ...........................................19

III.   CONSIDERATION OF POTENTIAL REMEDIES SHOULD BE DEFERRED OR
OPINION M-37050 SHOULD BE REMANDED WITHOUT VACATUR ...................20

CONCLUSION..................................................................................................................24

# TABLE OF AUTHORITIES

**CASES**                                              **PAGES**

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n,*
  988 F.2d 146 (D.C. Cir. 1993) ............................................................ 21, 22, 23

*Andrus v. Allard,*
  444 U.S. 51 (1979) ........................................................................................ 12

*Baggett v. Bullitt,*
  377 U.S. 360 (1964) ...................................................................................... 17

*Ctr. for Biological Diversity v. Pirie,*
  201 F. Supp. 2d 113 (D.D.C. 2002) .............................................................. 21

*Cty. of Maui v. Haw. Wildlife Fund,*
  140 S. Ct. 1462 (2020) .............................................................................. 2, 16

*Encino Motorcars, LLC v. Navarro,*
  136 S. Ct. 2117 (2016) .................................................................................. 19

*Fed. Commc'ns Comm'n v. Fox Television Stations, Inc.,*
  567 U.S. 239 (2012) ...................................................................................... 17

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.,*
  529 U.S. 120 (2000) ................................................................................... 9, 12

*Keyishian v. Bd. of Regents,*
  385 U.S. 589 (1967) ...................................................................................... 17

*Loving v. United States,*
  517 U.S. 748 (1996) ...................................................................................... 13

*Madsen v. Women's Health Center, Inc.,*
  512 U.S. 753 (1994) ...................................................................................... 24

*Mahler v. U.S. Forest Serv.,*
  927 F. Supp. 1559 (S.D. Ind. 1996) ............................................... 3, 6, 7, 13

*Maracich v. Spears,*
  570 U.S. 48 (2013) .......................................................................................... 5

*Massachusetts v. U.S. Envtl. Protection Agency,*
  549 U.S. 497 (2007) ...................................................................................... 10

*McMaster v. United States,*
  731 F.3d 881 (9th Cir. 2013) .......................................................................... 3

*Mellouli v. Lynch*,
135 S. Ct. 1980 (2015) ............................................................. 6

*Nat. Res. Def. Council v. U.S. Envtl. Prot. Agency*,
676 F. Supp. 2d 307 (S.D.N.Y. 2009) ................................... 21

*Nat. Res. Def. Council v. U.S. Nuclear Regulatory Comm'n*,
606 F.2d 1261 (D.C. Cir. 1979) ............................................ 22

*Newton Cty. Wildlife Ass'n v. U.S. Forest Serv.*,
113 F.3d 110 (8th Cir. 1997) ............................... 3, 5. 9, 19

*Penn. Dep't of Corr. v. Yesky*,
524 U.S. 206 (1998) ............................................................. 10

*Protect Our Cmtys. Found. v. Jewell*,
825 F.3d 571 (9th Cir. 2016) ................................................ 3

*Pub. Emps. for Envtl. Responsibility v. Hopper*,
827 F.3d 1077 (D.C. Cir. 2016) ........................................... 22

*Rainwater v. United States*,
356 U.S. 590 (1958) ...................................................... 11, 14

*Robertson v. Methow Valley Citizens Council*,
490 U.S. 332 (1989) ............................................................. 23

*Rogers v. United States*,
367 F.2d 998 (8th Cir. 1966) ................................................ 8

*Seattle Audubon Soc'y v. Evans*,
952 F.2d 297 (9th Cir. 1991) ......................................... 3, 19

*Secs. & Exch. Comm'n v. Rosenthal*,
650 F.3d 156 (2d Cir. 2011) ................................................ 17

*Skidmore v. Swift & Co.*,
323 U.S. 134 (1944) ............................................................... 2

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
282 F. Supp. 3d 91 (D.D.C. 2017) ...................................... 22

*Sugar Cane Growers Co-op. of Fla. v. Veneman*,
289 F.3d 89 (D.C. Cir. 2002) ......................................... 21, 22

*Susquehanna Int'l Grp., LLP v. Secs. & Exch. Comm'n*,
866 F.3d 442 (D.C. Cir. 2017) ....................................... 21, 22

*Turtle Island Restoration Network v. Dep't of Commerce*,
  878 F.3d 725 (9th Cir. 2017) ................................................................ 3

*United States v. Brigham Oil & Gas, L.P.*,
  840 F. Supp. 2d 1202 (D.N.D. 2012) ..................................................... 4

*United States v. CITGO Petroleum Corp.*,
  801 F.3d 477 (5th Cir. 2015) ........................................................ *passim*

*United States v. Corrow*,
  119 F.3d 796 (10th Cir. 1997) .............................................................. 8

*United States v. FMC Corp.*,
  572 F.2d 902 (2d Cir. 1978) ......................................................... *passim*

*United States v. Mead Corp.*,
  533 U.S. 218 (2001) ............................................................................. 2

*United States v. Morgan*,
  311 F.3d 611 (5th Cir. 2002) ................................................................ 8

*United States v. North Dakota*,
  650 F.2d 911 (8th Cir. 1981) ................................................................ 9

*United States v. Reese*,
  27 F. Supp. 833 (W.D. Tenn. 1939) ..................................................... 8

*United States v. Schultze*,
  28 F. Supp. 234 (W.D. Ky. 1939) ......................................................... 8

*United States v. Southwestern Cable Co.*,
  392 U.S. 157 (1968) ........................................................................... 11

*United States v. Stevens*,
  559 U.S. 460 (2010) ............................................................................. 5

*United States v. Williams*,
  553 U.S. 285 (2008) ............................................................................. 5

*Util. Air Regulatory Grp. v. U.S. Envtl. Protection Agency*,
  573 U.S. 302 (2014) ........................................................................... 10

*Virginia Soc'y for Human Life, Inc. v. Fed. Election Comm'n*,
  263 F.3d 379 (4th Cir. 2001) ............................................................. 24

## STATUTES

16 U.S.C. § 703 ........................................................................................ *passim*

16 U.S.C. § 704(a) .......................................................................................... 13

16 U.S.C. § 4406 ............................................................................................. 15

Pub. L. No. 114-94, 129 Stat. 1312 ............................................................... 14

## REGULATIONS

50 C.F.R. § 10.12 .............................................................................................. 5

50 C.F.R. § 20.11(c)(2) ..................................................................................... 8

50 C.F.R. part 21 .............................................................................................. 7

50 C.F.R. § 21.15(a)(1) ..................................................................................... 7

## OTHER AUTHORITIES

85 Fed. Reg. 5913 (Feb. 3, 2020) .................................................................. 19

85 Fed. Reg. 5915 (Feb. 3, 2020) ................................................ 9, 16, 17, 18

85 Fed. Reg. 34,626 (June 5, 2020) .............................................................. 20

Defendants,[1] by their attorney, Geoffrey S. Berman, United States Attorney for the Southern District of New York, respectfully submit this reply memorandum of law in further support of their cross-motion for summary judgment in these consolidated actions pursuant to Rule 56 of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

Opinion M-37050 thoroughly explains that the text, history, and purpose of the MBTA make clear that Section 2 of the statute applies only to actions that are directed at migratory birds, their nests, or their eggs, and that prior expansive assertions of authority to pursue criminal charges for "incidental" takings and killings cannot be supported. The M-Opinion replaces a patchwork of legal standards created over a period of decades by contradictory judicial decisions with a uniform national understanding of the appropriate meaning of this criminal law, and thereby provides clarity both for parties potentially subject to enforcement actions and for the agencies charged with carrying out that enforcement.

For the reasons set forth below and in Defendants' opening memorandum of law, Plaintiffs' challenges to Opinion M-37050 and the FWS's April 2018 guidance memorandum should be rejected, and summary judgment should be granted in favor of Defendants.

## ARGUMENT

## I.    OPINION M-37050 PROPERLY INTERPRETS THE SCOPE OF THE MBTA

Plaintiffs' reply submissions either minimize or ignore the extent to which courts across the United States have issued divergent decisions on the proper meaning of Section 2 of the MBTA, and the difficulties that these different standards have created both for individuals and

---

[1] Abbreviations and capitalized terms herein have the same meaning as in the Defendants' memorandum of law in support of their cross-motion for summary judgment and in opposition to Plaintiffs' motions for summary judgment (Dkt. No.79) ("Def. Mem.").

entities potentially subject to criminal prosecution under the statute and for the government agencies charged with MBTA enforcement.  (Def. Mem. at 7–11).  The definitive legal interpretation set forth in Opinion M-37050 eliminates these inconsistencies by providing a clear, articulable standard for what constitutes a criminal violation of the misdemeanor provision of the MBTA.

### A.    Defendants' Interpretation of the MBTA Is Entitled to Deference

As the Supreme Court recently reaffirmed, courts "often pay particular attention to an agency's views in light of the agency's expertise in a given area, its knowledge gained through practical experience, and its familiarity with the interpretive demands of administrative need." *Cty. of Maui v. Haw. Wildlife Fund*, 140 S. Ct. 1462, 1474 (2020) (citing *United States* v. *Mead Corp.*, 533 U.S. 218, 234-35 (2001); *Skidmore* v. *Swift & Co.*, 323 U.S. 134, 139–40 (1944)) (ultimately declining to defer to agency interpretation of statute).[2]  Opinion M-37050—which reflects a thorough and detailed analysis of the text and purpose of the statute by the agency with "a body of experience and informed judgment" regarding the MBTA—should receive such deference.  *See Skidmore*, 323 U.S. at 140.  And while Opinion M-37050 represents a change in the DOI's interpretation of the MBTA, that fact alone does not foreclose deference.  Indeed, the Ninth Circuit Court of Appeals concluded that a DOI Solicitor's M-Opinion that "carefully analyze[d] the text, purpose, and legislative history of [the relevant statute], as well as the modern judicial treatment of [other pertinent issues]" was "entitled to respect under *Skidmore*," even though it appeared to be in tension with a prior policy of the Bureau of Land Management

---

[2] Defendants agree with the States that deference applies only to the extent that the text of the statute does not resolve the issue.  (Def. Mem. at 16); Dkt. No. 84 ("States Rep.") at 3.

and "arguably represent[ed] a change in the agency's view." *McMaster v. United States*, 731

F.3d 881, 892 (9th Cir. 2013). Inconsistency "is just one factor under *Skidmore*." *Id.*

### B. The Interpretation Set Forth in Opinion M-37050 Is the Appropriate Reading of the Relevant Text of the MBTA

#### 1. The Verbs "Take" and "Kill" Must Be Understood In Context

The principal conclusion of Opinion M-37050—that Section 2 of the MBTA only

criminalizes specific actions directed at birds—is consistent with the text and purpose of the

statute and interpretations offered by various courts. As the Eighth Circuit Court of Appeals has

explained, "the MBTA's plain language prohibits *conduct directed at migratory birds*—'pursue,

hunt, take, capture, kill, possess,' and so forth." *Newton Cty. Wildlife Ass'n v. U.S. Forest Serv.*,

113 F.3d 110, 115 (8th Cir. 1997) (emphasis added). Expressing its agreement with a prior

interpretation of this same language by the Ninth Circuit, the *Newton County* court found that

"ambiguous terms 'take' and 'kill' in 16 U.S.C. § 703 mean 'physical conduct of the sort

engaged in by hunters and poachers, conduct which was undoubtedly a concern at the time of the

statute's enactment in 1918.'"[3] *Id.* (quoting *Seattle Audubon Soc'y v. Evans*, 952 F.2d 297, 302

(9th Cir. 1991)[4]); *Mahler v. U.S. Forest Serv.*, 927 F. Supp. 1559, 1579 (S.D. Ind. 1996)

---

[3] While Plaintiffs seek to dismiss Defendants' reliance on the canon of *noscitur a sociis* because, among other things, the term "kill" in the MBTA purportedly is unambiguous and because of how the verb "kill" has been interpreted in other statutes, (States' Rep. at 4–10; Env. Rep. at 10–11), it is noteworthy that the Eighth Circuit—addressing the meaning of "kill" in the MBTA—described the term as ambiguous, and interpreted it in a manner consistent with the meaning ascribed to it in Opinion M-37050.

[4] The Environmental Plaintiffs attempt to minimize the significance of the Ninth Circuit's pronouncement in *Seattle Audubon* by referring to *dicta* from more recent cases. (Env. Rep. at 5 n.4). But the selectively quoted passages from *Protect Our Communities Foundation v. Jewell*, 825 F.3d 571, 586 (9th Cir. 2016), are from the Court's recitation of the arguments by the plaintiff environmental organizations in that case, not a holding that contradicts *Seattle Audubon*, a decision that is not cited in the opinion at all. Similarly, *Turtle Island Restoration Network v. Department of Commerce*, 878 F.3d 725, 733–35 (9th Cir. 2017), does not cite (let alone purport

("Courts may not disregard the context in which even apparently broad statutory terms are used. The words 'take' and 'kill' were used in a context that clearly focused on hunting, trapping, and poaching."). In the MBTA, "'take' refers to conduct directed at birds, such as hunting and poaching, and not acts or omissions having merely the incidental or unintended effect of causing bird deaths." *United States v. Brigham Oil & Gas, L.P.*, 840 F. Supp. 2d 1202, 1208 (D.N.D. 2012). And while the Fifth Circuit Court of Appeals in *United States v. CITGO Petroleum Corporation* did not have to consider the meaning of "kill" to reach its decision, the court in *dicta* observed that "there is reason to think that the MBTA's prohibition on 'killing' is similarly limited to deliberate acts that effect bird deaths."[5]  801 F.3d 477, 489 n.10 (5th Cir. 2015).

Plaintiffs contend that construing both "take" and "kill" under the MBTA to require an affirmative act directed immediately against migratory birds effectively renders the term "kill" superfluous. (Env. Rep. at 11–12; States' Rep. at 9). But Opinion M-37050 recognizes that "take" and "kill" have discrete definitions, and the interpretation of these verbs in the M-Opinion does not make them redundant or deny them independent meaning. (AR 20). Certain actions would constitute killings under the statute even if they did not amount to takings, because the killing did not result in "reduc[ing][the migratory bird] to man's dominion and mak[ing it] the object of profit." (AR 22). For example, as set forth in the FWS Guidance, if a rancher shoots protected birds on his property without an appropriate permit and leaves those birds without

---

to contradict) *Seattle Audubon*, or offer a different definition of the terms "take" and "kill" within Section 2 of the MBTA.

[5] The Second Circuit Court of Appeals questioned the significance of "kill" as an independent term in Section 2 of the MBTA, querying "whether the word 'kill' must be read in connection with the surrounding words and whether it is only mentioned as the usual result of pursuing, hunting or capturing." *United States v. FMC Corp.*, 572 F.2d 902, 903 n.1 (2d Cir. 1978).

subsequently collecting (possessing) them, the rancher still has violated the "kill" provision of Section 2 even though he may not have violated the "take" provision. (AR 83). A killing can be a taking if the killing is done to reduce the animal to human control—indeed, the FWS's general wildlife regulations, which are applicable to the MBTA, include "kill" as one component of the definition of "take," along with other actions (such as pursuing, hunting, and capturing) that are directed immediately against animals to reduce them to human control. *See* 50 C.F.R. § 10.12. Yet just as it is possible to "hunt" or "pursue" a protected migratory bird without taking it or killing it, it is possible to "kill" a bird without taking it under the interpretation set forth in the M-Opinion. Thus, pursuant to the interpretation of Section 2 detailed in Opinion M-37050, the verb "kill" retains an independent meaning to capture certain types of activity directed at birds that result in bird deaths to the extent those actions fall outside the meaning of "take."

Applying the *noscitur a sociis* canon to the list of prohibited conduct in Section 2 of the MBTA does not rob those terms of their meaning, but rather appropriately gives those terms "more precise content by the neighboring words with which [they are] associated." *United States v. Williams*, 553 U.S. 285, 294 (2008); *Maracich v. Spears*, 570 U.S. 48, 62–63 (2013) (applying *noscitur a sociis*, and explaining that "the phrases 'in connection with' and 'investigation in anticipation of litigation,' which are capable of many meanings, can be construed in light of their accompanying words in order to avoid giving the statutory exception unintended breadth" (internal quotation marks and citation omitted)).[6] When the five verbs are

---

[6] Ironically, Plaintiffs point to a Supreme Court decision where the Court's broad interpretation of "kill" was a principal factor in rendering the challenged criminal statute constitutionally infirm. (States Rep. at 6; Env. Rep. at 10–11); *United States v. Stevens*, 559 U.S. 460, 474–76 (2010). Nevertheless, it remains the case, as Opinion M-37050 concludes, that "it would stretch this 1918 statute far beyond the bounds of reason to construe it as an absolute criminal prohibition on conduct . . . that *indirectly* results in the death of migratory birds." *Newton Cty.*, 113 F.3d at 115 (emphasis in original); (AR 16).

considered together, the proper interpretation of both "take" and "kill" under the MBTA requires that for a criminal violation, there must be an affirmative act directed against migratory birds. (AR 19–20); (Def. Mem. at 17–20).

### 2. Language Regarding the Time, Means, or Manner of Prohibited Acts Does Not Alter the Meaning of Which Acts Are Prohibited

The fact that the MBTA refers to certain types of conduct being prohibited "at any time, by any means, or in any manner" does not necessitate the broad interpretation that Plaintiffs seek to interpose. Multiple courts have refused to read this phrase to "extend[] the statute to activities that cause unintended deaths of birds." *Mahler*, 927 F. Supp. at 1580; *CITGO*, 801 F.3d at 490 ("rendering all-inclusive the manner and means of 'taking' migratory birds does not change what 'take' means, it merely modifies the mode of take"). While Plaintiffs argue for a "full and expansive" reading of the terms "kill" and "take," (States Rep. at 9), even the Second Circuit rejected the argument that "the statute[,] as to killing[,] is without limitation," explaining that such a reading "would offend reason and common sense." *FMC Corp.*, 572 F.2d at 905 (quotation marks omitted); *cf. Mellouli v. Lynch*, 135 S. Ct. 1980, 1990 (2015) (explaining that statutory terms with "broad" and "indeterminate" meanings may have to be read more narrowly based on context, and concluding that a "sweeping interpretation departs so sharply from the statute's text and history that it cannot be considered a permissible reading"). Rather than creating unbounded scope of potential criminal conduct that could reach into the most pedestrian aspects of American life, the phrase "at any time, by any means or in any manner" in Section 2 of the MBTA is best understood as language "intended to reach the full range of means for hunting or capturing birds, so that creative hunters and poachers could not avoid the statute by devising new techniques to accomplish their ends." *Mahler*, 927 F. Supp. at 1579–80; *CITGO*, 801 F.3d at 490, 494. For the acts that are properly considered to be prohibited by the MBTA—

*i.e.*, conduct directed at migratory birds, such as hunting and poaching—the phrase makes clear that such activities "are prohibited whenever and wherever they occur and whatever manner is applied."[7] (AR 22).

### 3. Strict Liability for Misdemeanor Offenses Does Not Expand the Scope of Conduct Prohibited Under the MBTA

Plaintiffs mistakenly rely on the absence of a mental state requirement in Section 2 of the MBTA to attempt to answer the separate question of what acts are properly understood to be criminal violations of the statute. (States Rep. at 10–12; Env. Rep. at 9–10). Just because there is no *mens rea* element does not mean that every action that could foreseeably result in the death of a migratory bird subjects individuals or entities to criminal prosecution under the MBTA's misdemeanor provision. *See Mahler*, 927 F. Supp. at 1581. At bottom, even for a strict liability crime, "a defendant must still commit the act to be liable. Further, criminal law requires that the defendant commit the act voluntarily." *CITGO*, 801 F.3d at 492; (AR 23). The Fifth Circuit therefore concluded that "requiring defendants, as an element of an MBTA misdemeanor crime, to take an affirmative action to cause migratory bird deaths is consistent with the imposition of strict liability." *Id.*

Contrary to the States' suggestion, strict liability would not be limited to "rare and obscure situations." (States' Rep. at 11). Indeed, the application of strict liability principles to Section 2 of the MBTA first arose in early legal challenges to MBTA prosecutions for

---

[7] Consistent with the interpretation of Section 2 set forth in Opinion M-37050, the regulations governing exceptions to the prohibition largely contemplate permits for an array of activities that are "directed at protected birds, such as permits allowing for control of injurious birds, scientific collecting permits, and rehabilitation permits—all activities well within the scope of Section 2." (AR 20-21 n.126); *see* 50 C.F.R. part 21; *but see* 50 C.F.R. § 21.15(a)(1) (allowing for incidental take in the context of military-readiness activities).

hunting[8]—activity that is still clearly prohibited based on the interpretation of the statute set forth in Opinion M-37050. *See United States v. Schultze,* 28 F. Supp. 234, 236 (W.D. Ky. 1939) (finding defendants who had killed doves in the vicinity of a baited field guilty though there was no evidence of any guilty knowledge or intent); *United States v. Reese*, 27 F. Supp. 833, 834 (W.D. Tenn. 1939) ("The foregoing portions of the statute and the pertinent regulation quoted reveal that guilt is in nowise conditioned on scienter."). There are various other situations where strict liability would apply under the interpretation set forth in the M-Opinion. For example, if the FWS issued a permit to purposefully take protected species (as it does in certain contexts, *see* 50 C.F.R. part 21; (Def. Mem. at 24)), strict liability would apply if the permit holder shot, or otherwise killed by an action directed at the bird, a protected species that was not covered by the permit. Similarly, hunters who exceed the "daily bag limit"—the maximum number of birds permitted to be taken by one person in any one day during an open season, *see* 50 C.F.R. § 20.11(c)(2)—commit a strict liability offense pursuant to Section 2 of the MBTA. *See United States v. Morgan*, 311 F.3d 611, 615 (5th Cir. 2002). In addition, strict liability is also applicable to various misdemeanor possession violations of the MBTA. *See, e.g.*, *United States v. Corrow*, 119 F.3d 796, 798 (10th Cir. 1997); *Rogers v. United States*, 367 F.2d 998, 1001 (8th Cir. 1966).

By explaining that Section 2 of the MBTA criminalizes only actions that are specifically directed at migratory birds, their nests, or their eggs, Opinion M-37050 is not attempting to impose a scienter requirement, but rather to properly delineate that only those actions that are

---

[8] These cases were decided decades before the first applications of Section 2 of the MBTA to "incidental" actions.

directed at migratory birds are prohibited.[9]  (AR 24); *see Newton Cty.*, 113 F.3d at 115 (the

"MBTA's plain language prohibits conduct directed at migratory birds").

### C.     The History and Purpose of the MBTA Demonstrate That the Statute Was Designed to Restrict Conduct Directed Specifically at Migratory Birds

While there is no dispute that Congress enacted the MBTA to endeavor to protect

migratory birds, Plaintiffs' reading of Section 2 provides for criminal penalties for conduct that

plainly would not have been contemplated in 1918, not only because "modern-day industrial

threats" did not exist at that time, (Env. Rep. at 14; States Rep. at 13), but because industrial

activity not directed at birds was well beyond what the statute sought to curtail.  *See United

States v. North Dakota*, 650 F.2d 911, 914 (8th Cir. 1981) (describing the MBTA as a statute for

"regulating hunting and possession" of migratory birds).  The Canada Convention specifically

addressed particular threats directed at migratory birds such as hunting and the shipment or

export of migratory birds or their eggs—these are the issues that were of substantial concern at

that time, and the concerns that animated legislators seeking to implement the treaty obligations

of the United States in enacting the MBTA.  (AR 2–6).  Moreover, the fact that a statute has a

particular "overriding purpose" does not by itself answer the question of how that statute is to be

interpreted.  *See Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120,

155–56, 162 (rejecting FDA assertion of authority to regulate tobacco products despite the

overriding purpose of the Food, Drug, and Cosmetic Act to protect the public health).

---

[9] The States highlight points from the M-Opinion that were not quoted in Defendants' opening memorandum of law.  (States' Rep. at 10–11).  But Defendants consistently explained the principal conclusion of the M-Opinion: only actions that are *specifically directed at* migratory birds, their nests, or their eggs are misdemeanor criminal violations of the MBTA. (Def. Mem. at 16, 19, 33, 39).  This is the same language used in the Proposed Rule defining the scope of the MBTA's misdemeanor provision.  *See* 85 Fed. Reg. 5915 (Feb. 3, 2020).

Plaintiffs do not address the legal and political backdrop that preceded the Canada Convention and the MBTA, where even federal regulation of hunting was on uncertain footing. (AR 29); (Def. Mem. at 26–27). The notion that Congress at this time intended to empower the executive branch not only to pursue criminal penalties for hunting and other such activities directed at migratory birds, but also for the dramatically broader range of activities contemplated by Plaintiffs, is difficult to fathom. (AR 29); *see Util. Air Regulatory Grp. v. U.S. Envtl. Protection Agency*, 573 U.S. 302, 324 (2014) (rejecting interpretation of statute "because it would bring about an enormous and transformative expansion in [the agency's] regulatory authority without clear congressional authorization").

While courts undoubtedly have endorsed the notion that broad statutory language can be read to allow some flexibility in future application, Plaintiffs' extrapolation of the language of the MBTA is not analogous to finding that state prison inmates are covered by the protections of the Americans with Disabilities Act, or that a greenhouse gas fits within the definition of "air pollutant" under the Clean Air Act. (States Rep. at 13 (citing *Massachusetts v. U.S. Envtl. Protection Agency*, 549 U.S. 497, 532 (2007), and *Penn. Dep't of Corr. v. Yesky*, 524 U.S. 206, 212 (1998))). In each of those cases, broad statutory language was found to be expansive enough to accommodate incremental additions to covered persons or materials subject to regulation. But even *Massachusetts* "does not foreclose the [EPA's] use of statutory context to infer that certain of the Act's provisions use 'air pollutant' to denote not every conceivable airborne substance, but only those that may sensibly be encompassed within the particular regulatory program." *Util. Air Regulatory Grp.*, 573 U.S. at 319. Here, Plaintiffs' view of the covered criminal conduct of Section 2 of the MBTA would make the boundaries of prohibited activity unrecognizable to the Congress that enacted the MBTA, with the scope of the newfound statutory coverage vastly

outstripping the objectives that prompted the enactment of the legislation in the first place. Instead, the interpretation of Section 2 of the MBTA contained in Opinion M-37050, which properly reflects the text, purpose, legislative history, and objectives of the statute, should not be disturbed.

### D. Opinion M-37050 Is Not Undermined By Any MBTA Amendments or Other Legislation, and Is Consistent with Migratory Bird Treaties

#### 1. Plaintiffs' Reliance on Subsequent Acts of Congress Is Unavailing

While Plaintiffs point to various Congressional actions in the more than 100 years since the MBTA was enacted as purported evidence that incidental takings and killings of migratory birds were meant to be prohibited by Section 2 of the statute, none of those actions specifically addressed the legal question resolved by Opinion M-37050, and are therefore of limited value. (Def. Mem. at 23–24, 31–32).

As the Supreme Court has recognized, one Congress's interpretation of a statute passed by another Congress "has very little, if any, significance." *Rainwater v. United States*, 356 U.S. 590, 593 (1958). In *Rainwater*, the petitioner maintained that a 1918 amendment of the criminal provisions of the False Claims Act of 1863—which excluded false claims against certain corporations from the reach of the statute—should also be applied to the civil provisions of that Act, which had not been amended. *See id.* But the Court rejected this contention, observing that "[a]t most, the 1918 amendment is merely an expression of how the 1918 Congress interpreted a statute passed by another Congress more than a half century before," and refused to reinterpret the statute based on the subsequent related, but indirect, legislative development. *Id.*; *see also United States v. Southwestern Cable Co.*, 392 U.S. 157, 170 (1968) ("The views of one Congress as to the construction of a statute adopted many years before by another Congress have very little, if any, significance.") (quotation marks omitted).

The 1986 and 1998 amendments to the MBTA, the 2003 legislation regarding military-readiness activity, and other statutes referenced by Plaintiffs do not amount to a "ratification" of the DOI's prior interpretation of the statute. To support the idea that Congress "ratified" the DOI's prior interpretation of the MBTA by remaining silent regarding Section 2 even while making other amendments to the statute, the States rely on *Brown & Williamson*. (States' Rep. at 14). But in reaching the conclusion that Congressional action ratified a prior course of conduct by the FDA, the *Brown & Williamson* Court focused on the fact that Congress had enacted several statutes to create a distinct regulatory scheme that was predicated on the FDA's view of its regulatory authority; indeed, the Court specifically disavowed reliance on the idea of "simple inaction by Congress" as a basis for the finding of ratification. *See* 529 U.S. 155–56. That was the Court's view even though the inaction—consideration and rejection of bills that would have given the FDA authority to regulate tobacco products—addressed the precise controversy at issue in that case. *See id.* at 155. Here, Plaintiffs cannot even point to inaction by Congress in the face of specific proposed legislation regarding whether Section 2 of the MBTA does or does not apply to incidental takings and killings of migratory birds; rather, they rely exclusively on the fact that Congress did not address Section 2 even as it was making other modifications to the statute. (States' Rep. at 15–16; Env. Rep. at 9–10). No significance should be ascribed to the fact that Congress did not act on matters that were not even specifically before legislators at that time.

It also is not instructive that Congress twice amended the MBTA purportedly "without rejecting the [agency's] [earlier] view." (States' Rep. at 15, 16 (quoting *Andrus v. Allard*, 444 U.S. 51. 57 (1979))). In *Andrus*, the agency position in question had been clearly articulated in regulations "for some time preceding these amendments" to the Eagle Protection Act. 444 U.S.

at 57 n.8.  By contrast, before the 1986 and 1998 amendments to the MBTA, the DOI's interpretation of Section 2 of the MBTA had been expressed not in a regulation but primarily in response to legal challenges to the scope of the agency's regulatory authority and, certainly before the 1998 amendments, those challenges had occasioned conflicting judicial interpretations of the scope of the statute.  Nor can the 1986 or 1998 amendments be said to be "premised" on any specific interpretation of whether incidental takings and killings are prohibited by Section 2 of the MBTA.  (States' Rep. at 15, 17 (quoting *Loving v. United States*, 517 U.S. 748, 770 (1996)).  In *Loving*, one statute was said to be premised on another where it expressly incorporated, with a citing reference, pertinent terms of the other statute; the 1986 and 1998 amendments to the MBTA are not "premised" on a particular interpretation of Section 2 with anything resembling that kind of precision.[10]

Plaintiffs continue to over-read the significance of the language of the 2003 appropriations bill that was designed to preempt a specific and immediate impediment to military-readiness activities created by a district court interpretation of the MBTA.  (Def. Mem. at 31–32; Env. Rep. at 17–19; States Rep. at 17–18).  In directing the FWS to draft regulations to address the taking of migratory birds as part of military-readiness activities, Congress referenced Section 3 of the MBTA, 16 U.S.C. 704(a), because that is the authority pursuant to which the FWS may issue regulations under the MBTA.  This reference should not be viewed as a broader commentary on the scope of regulatory authority under Section 3, or as an implicit statement as to the proper meaning and scope of Section 2 of the MBTA—Section 3 is simply the means by

---

[10] The only references to Section 2 of the MBTA in connection with the 1986 and 1998 amendments that Plaintiffs have noted in their briefing are comments in legislative history "reaffirming" the principle of strict liability.  But this did not expand the types of activities that can give rise to criminal liability under the proper reading of the statute articulated in Opinion M-37050.  (Def. Mem. at 23); *Mahler*, 927 F. Supp. at 1581.

which the FWS could promulgate the regulation sought by Congress to avoid future litigation

that could interfere with military readiness. Again, unlike in *Loving*, the 2003 appropriations bill

does not specifically incorporate the language of Section 2 that is at issue in Opinion M-37050,

and it is a stretch to say that the 2003 action was "premised" on a particular understanding of the

misdemeanor provision. Whether or not this Congress thought the MBTA broadly applied to

incidental takings or killings was not relevant to the task at hand,[11] and in any event, the views of

the 2003 Congress on this question have "very little, if any, significance." *Rainwater*, 356 U.S.

at 593. As explained by the Fifth Circuit in *CITGO*, Congress approved "an exceptionally

narrow exemption," and "[b]y proceeding in a carefully targeted way, Congress had no reason to

address the full scope of the MBTA." 801 F.3d at 491. "Whether Congress deliberately avoided

more broadly changing the MBTA or simply chose to address a discrete problem, the most that

can be said is that Congress did no more than the plain text of the amendment means." *Id.*

Neither of the other statutes referenced by the Environmental Plaintiffs compels a

different result. (Env. Rep. at 17 n.10 & 19). In the Fixing America's Surface Transportation

("FAST") Act, Pub. L. No. 114-94, § 1439, 129 Stat. 1312, 1433 (2015), Congress allowed

"take," without permit requirements, of nesting swallows to facilitate bridge repair, maintenance,

or construction. The statute made no reference to "incidental" take—it broadly authorized "take"

without a permit under certain conditions, and can be read to apply to intentional take of

swallows and nests before construction work began, a limitation that is consistent with the M-

Opinion. Indeed, prior to the passage of the FAST Act, the FWS had issued depredation

---

[11] The States posit that "[i]f Congress did not understand and intend for the MBTA to prohibit the incidental taking of migratory birds, the Congress could certainly have made that intent clear." (States Rep. at 17.) It is also true that if Congress could not reach sufficient agreement on whether Section 2 of the MBTA should or should not be read to prohibit incidental taking of migratory birds, it could have elected to take only the limited action that it did.

(intentional take) permits or special purpose permits for intentional nest take at bridge projects; the statute can be read as doing away with this particular permit requirement. Moreover, the provision of the North American Wetlands Conservation Act that provides for MBTA fines and penalties to be directed toward wetlands-conservation projects, 16 U.S.C. § 4406(b), also reveals nothing about Congress's understanding of what types of conduct are prohibited under the statute.[12] There is no indication in this statute that Congress was relying in any way on fines or penalties for violating the MBTA in the context of incidental take; and even if Opinion M-37050 reduces the amount of fine and penalty money that can be appropriated in accordance with this statute, the supplemental appropriations provision included in 16 U.S.C. § 4406(c) makes plain that Congress may act to address any perceived shortfall.

### 2. Opinion M-37050 Is Consistent with Relevant International Law

The interpretation of the MBTA set forth in Opinion M-37050 does not contravene the United States' obligations pursuant to any of the treaties that are implemented by the MBTA, none of which explicitly prohibit incidental take of migratory birds. The Canada Convention was entered into at a time when private and commercial hunting had caused substantial damage to migratory bird populations, to the point where lawmakers explored as many avenues as possible to attempt to assert regulatory authority. (AR 2–4). Reading Section 2 of the MBTA to prohibit only affirmative acts directed against migratory birds aligns with the facts and concerns that prompted the Convention in the first place. While the States point to language from subsequent treaties about habitat protections and pollution (States Rep. at 19), those treaty obligations are implemented in laws other than the MBTA, including the Migratory Bird

---

[12] Contrary to the Environmental Plaintiffs' suggestion, (Env. Rep. at 19), Defendants did not concede that Congress had any particular understanding of the MBTA when it enacted this legislation. (Def. Mem. at 32 n. 18.)

Conservation Act, *see* 85 Fed. Reg. at 5920; (Def. Mem. at 25-26), and need not be read into Section 2 of the MBTA.

Further, the 2008 exchange of diplomatic notes between the United States and Canada did not mandate that either party take any action with respect to the regulation of incidental take pursuant to the Convention—and indeed there is no dispute that Canada did not implement the regulatory structure that it apparently was contemplating. (Def. Mem. at 29-30). Moreover, the sharp disagreement among federal district and appellate courts in the United States about the proper interpretation of Section 2 of the MBTA illustrates the limited utility of relying on decisions from two Canadian provincial trial-level courts to provide a definitive representation of Canada's interpretation of the Convention. (Env. Rep. at 15, 16 n.9; States' Rep. at 21-22). The legal interpretation of Section 2 of the MBTA set forth in Opinion M-37050 took account of numerous factors, including the text, history, and purpose of the treaty that initially prompted enactment of the statute, and this analysis should be upheld.

## E.     The MBTA Should Be Interpreted Narrowly to Avoid Constitutional Infirmity

Plaintiffs do not fundamentally dispute that their interpretation of the MBTA has the potential to reach extraordinarily broadly, as migratory bird deaths are "reasonably foreseeable" consequences of operating vehicles or maintaining buildings with glass windows, which result in hundreds of millions of bird deaths each year. For this reason, proximate cause is not a meaningful limitation on the scope of Section 2. *See Cty. of Maui*, 140 S. Ct. at 1470–71 (rejecting "proximate cause" as a proposed limitation on statutory construction, explaining that the term "derives from general tort law, and it takes on its specific content based primarily on 'policy' considerations"). Accordingly, a reading of the misdemeanor provision that criminalizes incidental takings and killings still risks producing absurd results. (Def. Mem. at

34–36); *see Secs. & Exch. Comm'n v. Rosenthal*, 650 F.3d 156, 162 (2d Cir. 2011) ("It is, to be sure, well-established that a statute should be interpreted in a way that avoids absurd results" (quotation marks and alteration omitted)); *CITGO*, 801 F.3d at 494 (concluding that Congress did not intend to allow for the government to prevent "takings" and "killings" of migratory birds "by regulating every activity that proximately causes bird deaths, because this would lead to "absurd results"); *FMC Corp.,* 572 F.2d at 905 ("Certainly construction that would bring every killing within the statute such as deaths caused by automobiles, airplanes, plate glass modern office buildings or picture windows in residential dwellings into which birds fly, would offend reason and common sense").

Plaintiffs maintain that any concerns about vagueness or absurd results are unfounded because prior enforcement practices included "warnings" to inform industrial actors that the government believed them to be in violation of the law before lodging criminal charges,[13] and that there has been no history of absurd prosecutions.  (Env. Rep. at 20–21; States' Rep. at 24–25).  But this is just another means of relying on enforcement discretion to remedy an underlying statutory problem—a plainly insufficient answer to the risk of criminal prosecution for "activities seemingly embraced within the sweeping statutory definitions."  *Baggett v. Bullitt*, 377 U.S. 360, 373 (1964); *see Keyishian v. Bd. of Regents*, 385 U.S. 589, 599 (1967); 85 Fed. Reg. at 5922 ("Productive and otherwise lawful economic activity should not be functionally dependent upon the ad hoc exercise of enforcement discretion").

---

[13] Such a "warning" would not be a necessary consideration for the due process analysis if the statute provided the requisite "fair notice" to potentially regulated persons or entities of "conduct that is forbidden or required."  *Fed. Commc'ns Comm'n v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).

And while Defendants acknowledge that the DOI and the FWS contemplated certain regulations under the agencies' prior interpretation of the statute, under the proper interpretation of Section 2 set forth in the M-Opinion, there is no longer a need for the type of regulatory regime that the Environmental Plaintiffs envision. Because, as set forth in Opinion M-37050, Section 2 of the MBTA prohibits only those actions, such as hunting and poaching, that are specifically directed at migratory birds, their nests, or their eggs, separate regulations providing a permitting mechanism for incidental takings or killings would be superfluous.

### F. Second Circuit Precedent Does Not Require the Court to Reject Defendants' Interpretation of the MBTA in Opinion M-37050

The MBTA prescribes criminal penalties, and the scope of what is prohibited by the statute should be subject to a common understanding throughout the United States, both for individuals and entities potentially subject to criminal prosecution and for the agencies charged with enforcing the law. This is the fundamental objective of Opinion M-37050 and the Proposed Rule—"to have and apply a national standard that sets a clear, articulable rule for when an operator crosses the line into criminality." 85 Fed. Reg. at 5923.

Because of the caveats, qualifications, and concerns expressed by the Second Circuit in its 1978 decision in *FMC Corporation*, that precedent does not foreclose the legal interpretation of Section 2 of the MBTA articulated in the M-Opinion. (Def. Mem. at 39-43). The panel in *FMC Corporation* did not embrace the type of unqualified reading of Section 2 of the MBTA for which Plaintiffs advocate here. Rather, it discussed liability in terms of actors engaged in "extrahazardous activities," indicated that interpreting the statute so as to prohibit killing "without limitation" would "offend reason and common sense," and suggested that appropriate application of the statute could be ensured through "the sound discretion of prosecutors and the courts," before finding that the particular facts and circumstances of the case were "sufficient to

impose strict liability on FMC." *Id.* at 905, 907–08. The *FMC Corporation* panel did not indicate that the outcome of that case was compelled by unambiguous language in the MBTA, *see id.* at 905, and the Second Circuit's holding has been called into question by numerous subsequent decisions, including by other Circuit Courts. *See CITGO*, 801 F.3d at 491–92; *Seattle Audubon Soc'y*, 952 F.2d at 303; *Newton Cty.*, 113 F.3d at 115. In light of the regulatory uncertainty caused by courts' conflicting views of Section 2 of the MBTA, it is particularly appropriate to defer to the unifying construction of the agency charged with interpreting that law, rather than allowing a single court's qualified view to control the outcome.

As the Supreme Court has made clear, "[a]gencies are free to change their existing policies as long as they provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016). Defendants have provided a thorough explanation for why the text, history, and purpose of the MBTA dictates that Section 2 should be read to prohibit only those actions that are directed at migratory birds, their nests, or their eggs. This court should defer to Defendants' interpretation, and reject Plaintiffs' APA challenges.

## II. OPINION M-37050 WAS NOT A MAJOR FEDERAL ACTION THAT REQUIRED DEFENDANTS TO COMPLY WITH NEPA

For the reasons set forth in their opening memorandum of law, Defendants dispute that a NEPA analysis was required for Opinion M-37050, a legal interpretation that served as Defendants' first step in a policymaking effort that has now advanced to notice-and-comment rulemaking. (Def. Mem. at 43–46). The NEPA process in which Defendants are currently engaged as part of the rulemaking, *see* 85 Fed. Reg. 5913, is taking place at the appropriate time—that is, before any final, formal agency action memorializing Defendants' interpretation of

Section 2 of the MBTA.[14]  A notice of availability inviting public comment on the draft EIS has now been published in the *Federal Register*.  *See* 85 Fed. Reg. 34,626 (June 5, 2020).

The Environmental Plaintiffs are wrong to attempt to dismiss the reality that Opinion M-37050 is, at bottom, a statement about the scope of the enforcement authority of the DOI and the FWS pursuant to Section 2 of the MBTA.  There is no dispute that NEPA does not apply to individual agency decisions to decline to exercise enforcement authority, and there should be no NEPA requirement for Defendants' decision to announce this shift toward non-enforcement as generally applicable guidance.  (Def. Mem. at 46).  Opinion M-37050 was an initial step in Defendants' policymaking process, and Defendants' compliance with the procedural obligations of NEPA in connection with the Proposed Rule should be sufficient to award summary judgment to Defendants on the NEPA claim.

## III.    CONSIDERATION OF POTENTIAL REMEDIES SHOULD BE DEFERRED OR OPINION M-37050 SHOULD BE REMANDED WITHOUT VACATUR

Further briefing and argument on the appropriate remedy in this matter should be postponed until after the Court rules on the parties' cross-motions for summary judgment, in accordance with the language from the July 31, 2019 Opinion and Order indicating that Defendants would have the opportunity to "litigat[e] the appropriate remedy *should Plaintiffs prevail on the merits*."  Dkt. No. 53 at 15 n.10 (emphasis added).  If the Court grants Plaintiffs' motions, Defendants do not envision a "remedy phase" of briefing requiring substantial time or

---

[14] It is disingenuous to refer to the ongoing evaluation of the Proposed Rule as a "rubber-stamp [of] decisions previously made." (Env. Br. at 26).  The DOI and the FWS are currently reviewing and addressing the more than 6,400 substantive comments submitted in response to the Proposed Rule (including by several of the Plaintiffs in these consolidated actions), ensuring that all interested parties have had an opportunity to be heard before any rule is finalized. Further, the DOI and the FWS already have reviewed and addressed the more than 1,900 comments submitted in response to the notice of intent to prepare an environmental impact statement ("EIS") and incorporated them into the draft EIS.

lengthy submissions. Other courts evaluating APA claims regarding the MBTA have provided for separate remedy briefing from the parties over the course of approximately one month following the merits decision. *See Ctr. for Biological Diversity v. Pirie*, 201 F. Supp. 2d 113, 115 (D.D.C. 2002) (original merits decision issued Mar. 13, 2002; remedy submissions submitted by Apr. 17, 2002). To properly evaluate the factors that courts consider in determining whether to remand agency actions without vacating them, it is necessary to understand the scope of the Court's rulings, consider how Defendants could address those rulings, and assess what disruption would result. *See Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 151 (D.C. Cir. 1993). This highlights why it would be preferable to address issues of remedy after a decision on the merits of the parties' claims, as the Court previously suggested.

If the Court elects to address the remedy without further submissions, however, the appropriate outcome would be to remand the M-Opinion to the DOI without vacatur. Courts have repeatedly recognized that the APA does not require vacatur and permits remand without vacatur instead. *See Allied-Signal, Inc.*, 988 F.2d at 151; *accord Susquehanna Int'l Grp., LLP v. Secs. & Exch. Comm'n*, 866 F.3d 442, 451 (D.C. Cir. 2017); *Nat. Res. Def. Council v. U.S. Envtl Prot. Agency*, 676 F. Supp. 2d 307, 312 (S.D.N.Y. 2009) ("Where an agency action is remanded for further proceedings, the determination of whether or not also to vacate the agency action is left to the court's discretion.") (citing *Sugar Cane Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 98 (D.C. Cir. 2002)). The "decision whether to vacate depends on the seriousness of the [action]'s deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed." *Allied-Signal*, 988 F.2d at 150-51 (quotation marks omitted). Courts examine these two factors separately, "bearing

in mind that there is no rule requiring either the proponent or opponent of vacatur to prevail on both factors." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 282 F. Supp. 3d 91, 97 (D.D.C. 2017) (quotation marks and alteration omitted).

Here, the *Allied-Signal* factors weigh in favor of remand without vacating Opinion M-37050. As to the first factor for Plaintiffs' APA claims, there is "at least a serious possibility" that the Defendants may issue an interpretation of Section 2 of the MBTA that addresses whatever deficiencies the Court might identify. *Allied-Signal*, 988 F.2d at 151 (remanding agency action in part because there was "at least a serious possibility that the [agency] will be able to substantiate its decision on remand"). In other decisions, courts have described the standard the agency must meet still more leniently. *See Susquehanna Int'l*, 866 F.3d at 451 (remanding without vacatur where agency "*may* be able to approve the Plan once again, after conducting a proper analysis on remand" (emphasis added)); *Sugar Cane Growers*, 289 F.3d at 98 (remanding without vacatur where "it is at least possible" that agency could justify its original decision on remand). Defendants are in the middle of a robust notice-and-comment process regarding the Proposed Rule, which contemplates a formal, final interpretation of the statute. Being able to take into account the Court's decision, along with the thousands of comments submitted by state and local governments, organizations, and individuals, may enable Defendants to craft a final rule that would satisfy any issues identified by the Court. With respect to the Audubon Plaintiffs' NEPA claim, in the NEPA context in particular, before halting federal action supported by insufficient NEPA analysis, courts conduct a "particularized analysis of the violations that have occurred," weighing "the possibilities for relief" and "any countervailing considerations of public interest." *Pub. Emps. for Envtl. Responsibility v. Hopper*, 827 F.3d 1077, 1084 (D.C. Cir. 2016); *see also Nat. Res. Def. Council v. U.S. Nuclear Regulatory*

*Comm'n*, 606 F.2d 1261, 1272 (D.C. Cir. 1979). With a full-fledged NEPA analysis currently underway in connection with the Proposed Rule, there again is at least a "serious possibility" that Defendants will be able to justify their challenged action following completion of the NEPA process. Under *Allied-Signal*, the seriousness of the defect is not considered in a vacuum, but with an eye to whether the agency may be able to stand by its original decision following remand. Even if the Court determines that Defendants violated NEPA, there is at least a serious possibility that a similar legal interpretation of Section 2 of the MBTA may be reissued after an environmental impact statement is prepared, given that NEPA does not require that an agency reach any particular substantive outcome after taking the requisite hard look at significant environmental impacts. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).

As to the second factor, vacating the M-Opinion while the remand proceeds and while the Proposed Rule is still under consideration could cause serious disruption and harm to the public interest in the form of needless legal uncertainty regarding the meaning of a criminal statute. This Court previously found that Plaintiffs satisfied the redressability requirement of Article III of the U.S. Constitution in part because, as Plaintiffs argued, vacatur of the M-Opinion could affect the conduct and decisionmaking of private parties across the nation. *See* Dkt. No. 53 at 15-16 & n. 12. This was the case even though indisputably, the DOI could still exercise its discretion not to pursue enforcement for incidental take even in the absence of the M-Opinion. *See id.* Accordingly, the potential for serious disruption is evident. The fundamental purpose of Opinion M-37050 was to articulate a clear national understanding of the scope of what could give rise to a criminal penalty under Section 2 of the MBTA. Vacating the M-Opinion would do away with that certainty and require potentially regulated parties to return to a landscape where

their activities could be subject to different risks of criminal prosecution based on the boundaries of the States in this lawsuit and federal judicial circuits. Such disruption would be for naught if Defendants are able to address any of the Court's concerns on remand, or complete the rulemaking process and issue a final rule that contains an interpretation of Section 2 of the MBTA that is consistent with the Proposed Rule and Opinion M-37050. If the Court grants summary judgment in favor of the Plaintiffs on any of their claims, the appropriate remedy would simply be to remand the agency actions for further consideration.[15]

## CONCLUSION

For the foregoing reasons, and for the reasons set forth in Defendants' prior submission, Defendants' motion for summary judgment should be granted, and Plaintiffs' motions for summary judgment should be denied.

Dated:   New York, New York
         June 5, 2020

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
*Attorney for Defendants*

By:   */s/ Andrew E. Krause*
      ANDREW E. KRAUSE
      Assistant United States Attorney
      86 Chambers Street, Third Floor
      New York, New York  10007
      Telephone:  (212) 637-2769
      Facsimile:  (212) 637-2786

---

[15] To the extent that the Court nonetheless decides to vacate the M-Opinion and the FWS Guidance, the remedy applied should reach only to the extent necessary to provide relief to Plaintiffs in this case. *See Virginia Soc'y for Human Life, Inc. v. Fed. Election Comm'n*, 263 F.3d 379, 394 (4th Cir. 2001) ("[n]othing in the language of the APA" requires an unlawful agency action be "set[ ] aside . . . for the entire country"); *Madsen v. Women's Health Center, Inc.*, 512 U.S. 753, 765 (1994) (equitable principles require that an injunction "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs").