UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__8/11/2020__

-------------------------------------------------------------X
NATURAL RESOURCES DEFENSE COUNCIL, :
INC.; NATIONAL WILDLIFE FEDERATION, :
                                       :

                          Plaintiffs, :
                                         :            18-CV-4596 (VEC)

            -against-                       :            OPINION AND ORDER
                                         :

U.S. DEPARTMENT OF THE INTERIOR; U.S. :
FISH AND WILDLIFE SERVICE; DANIEL :
JORJANI, in his official capacity as the person :
exercising authority of the Solicitor of the Interior, :
                                         :

                          Defendants. :
-------------------------------------------------------------X
-------------------------------------------------------------X
NATIONAL AUDUBON SOCIETY; AMERICAN: :
BIRD CONSERVANCY; CENTER FOR :
BIOLOGICAL DIVERSITY; DEFENDERS OF :
WILDLIFE, :
                                         :            18-CV-4601 (VEC)

                          Plaintiffs, :

            -against-                       :

U.S. DEPARTMENT OF THE INTERIOR; U.S. :
FISH AND WILDLIFE SERVICE; DANIEL :
JORJANI, :
                                         :

                          Defendants. :
-------------------------------------------------------------X
-------------------------------------------------------------X
STATE OF NEW YORK; STATE OF :
CALIFORNIA; STATE OF ILLINOIS; STATE :
OF MARYLAND; COMMONWEALTH OF :
MASSACHUSETTS; STATE OF NEW JERSEY; :
STATE OF NEW MEXICO; STATE OF :           18-CV-8084 (VEC)
OREGON, :
                                         :

                          Plaintiffs, :

            -against-                       :
                                         :

U.S. DEPARTMENT OF THE INTERIOR; U.S.          :
FISH AND WILDLIFE SERVICE; DANIEL             :
JORJANI, in his official capacity as Principal      :
Deputy Solicitor exercising the authority of the   :
Solicitor of the Interior,                                    :
                                                                         :
                                               Defendants.   :
---------------------------------------------------------------X

VALERIE CAPRONI, United States District Judge:

It is not only a sin to kill a mockingbird, it is also a crime.[1]  That has been the letter of the

law for the past century.  But if the Department of the Interior has its way, many mockingbirds

and other migratory birds that delight people and support ecosystems throughout the country will

be killed without legal consequence.

In December 2017 the Principal Deputy Solicitor of the U.S. Department of the Interior

("DOI") issued a memorandum renouncing almost fifty years of his agency's interpretation of

"takings" and "killings" under the Migratory Bird Treaty Act of 1918 ("MBTA").  According to

the DOI today, the MBTA does not prohibit incidental takes or kills because the statute applies

only to activities specifically aimed at birds.

Environmental interest groups and various States brought three now-consolidated actions

to vacate the memorandum and subsequent guidance issued in reliance on the memorandum.

They have moved for summary judgment, and Defendants (or, collectively, "Interior") have

cross-moved.  (Dkts. 68, 69, 78).  This case turns on whether DOI's interpretation of the MBTA

must be set aside as contrary to law under the Administrative Procedure Act ("APA"), 5 U.S.C. §

---

[1]       *See* Harper Lee, *To Kill a Mockingbird* 103 (Harper Perennial 2002) (1960) ("Mockingbirds don't do one
thing but make music for us to enjoy.  They don't eat up people's gardens, don't nest in corncribs, they don't do one
thing but sing their hearts out for us.  That's why it's a sin to kill a mockingbird."); 50 C.F.R. § 10.13(c)(1) (2013)
(listing "MOCKINGBIRD, Bahama, Mimus gundlachii" as a species protected by the Migratory Bird Treaty Act).

701 *et seq.*, or upheld as a valid exercise of agency authority.  For the following reasons,

Plaintiffs' motions are GRANTED, and Interior's motion is DENIED.

## BACKGROUND[2]

In 1916 the United States and the United Kingdom, acting on behalf of Canada, entered

into the Convention Between the United States and Great Britain for the Protection of Migratory

Birds ("Convention").  U.S.-Gr. Brit., Aug. 16, 1916, 39 Stat. 1702 (ratified Dec. 7, 1916).  The

Convention had the stated purpose of "saving from indiscriminate slaughter and of insuring the

preservation of such migratory birds as are either useful to man or are harmless."  *Id.*

Soon after, Congress implemented the Convention by passing the Migratory Bird Treaty

Act.  Pub. L. No. 65-186, 40 Stat. 755 (1918).  Section 2 of the MBTA, as originally enacted,

stated in relevant part:

> unless and except as permitted by regulations . . . it shall be unlawful to hunt, take,
> capture, kill, attempt to take, capture or kill . . . by any means whatever . . . at any
> time or in any manner, any migratory bird, included in the terms of the
> convention between the United States and Great Britain for the protection of
> migratory birds . . . .

In 1936 Congress amended the MBTA by, *inter alia*, moving the phrases "at any time" and "in

any manner" to the beginning of the list of prohibited actions, adding the phrase "by any means,"

and adding "pursue."  Pub. L. No. 74-728, § 3, 49 Stat. 1555, 1556.

Section 2 has not been substantially amended since.  Today, it provides:

> [u]nless and except as permitted by regulations . . . it shall be unlawful at any time,
> by any means or in any manner, to pursue, hunt, take, capture, kill, attempt to take,
> capture, or kill . . . any migratory bird, any part, nest, or egg of any such bird . . .
> included in the terms of the conventions . . . .

---

[2]     "AR" references are citations to the Administrative Record (Dkt. 88).

16 U.S.C. § 703(a).[3] Any violation of the MBTA is a misdemeanor punishable by a fine of up to $15,000 and imprisonment for up to six months. *Id.* § 707(a). Further, any knowing "take" of any migratory bird "by any manner whatsoever" with intent to sell is a felony punishable by a fine of up to $2,000 and imprisonment for up to two years. *Id.* § 707(b).

Throughout the twentieth century, the United States entered into similar treaties with Mexico, Japan, and the Soviet Union. *See* Convention Between the United States of America and the Union of Soviet Socialist Republics Concerning the Conservation of Migratory Birds and Their Environment, U.S.-U.S.S.R, Nov. 19, 1976, 29 U.S.T. 4647; Convention Between the Government of the United States of America and the Government of Japan for the Protection of Migratory Birds and Birds in Danger of Extinction, and Their Environment, Japan-U.S., Mar. 4, 1972, 25 U.S.T. 3329; Convention Between the United States of America and Mexico for the Protection of Migratory Birds and Game Mammals, Mex.-U.S., Feb. 7, 1936, 50 Stat. 1311.

From the early 1970s until 2017, Interior interpreted the MBTA to prohibit incidental takes and kills, imposing liability for activities and hazards that led to the deaths of protected birds, irrespective of whether the activities targeted birds or were intended to take or kill birds. AR 900. After industrial activities emerged as the most significant threat to bird populations in

---

[3]     The entire provision reads as follows:

   Unless and except as permitted by regulations made as hereinafter provided in this subchapter, it shall be unlawful at any time, by any means or in any manner, to pursue, hunt, take, capture, kill, attempt to take, capture, or kill, possess, offer for sale, sell, offer to barter, barter, offer to purchase, purchase, deliver for shipment, ship, export, import, cause to be shipped, exported, or imported, deliver for transportation, transport or cause to be transported, carry or cause to be carried, or receive for shipment, transportation, carriage, or export, any migratory bird, any part, nest, or egg of any such bird, or any product, whether or not manufactured, which consists, or is composed in whole or part, of any such bird or any part, nest, or egg thereof, included in the terms of the conventions between the United States and Great Britain for the protection of migratory birds concluded August 16, 1916 (39 Stat. 1702), the United States and the United Mexican States for the protection of migratory birds and game mammals concluded February 7, 1936, the United States and the Government of Japan for the protection of migratory birds and birds in danger of extinction, and their environment concluded March 4, 1972, and the convention between the United States and the Union of Soviet Socialist Republics for the conservation of migratory birds and their environments concluded November 19, 1976.

the latter half of the century, the Fish and Wildlife Service ("FWS")—the agency within the DOI charged with administering and enforcing the MBTA—regularly investigated causes of incidental takes and kills; among them oil pits, power-lines, contaminated waste pools, oil spills, commercial fishing lines and nets, and wind turbines. *See* AR 34, 55, 615; Mowad Decl. (Dkt. 68-2) ¶¶ 8–22; *see also* Brief of *Amici Curiae* (Dkt. 70-1) ("*Amicus*") at 12 ("According to the FWS, tens of millions of birds every year are killed by human-caused threats, including communication towers, wind turbines, and oil spills.").

To conserve migratory birds and ensure compliance with the MBTA's prohibition on "incidental take," FWS used a range of strategies. It sent companies notice of the risks their facilities and equipment posed to migratory birds, issued industry guidance, informally negotiated remediation, and issued permits authorizing takes. *See* AR 38 n.205, 56, 97; Manville Decl. (Dkt. 68-3) ¶¶ 16–18; *see also* AR 199 ("Avian Protection Plan (APP) Guidelines" for power lines); AR 289 ("Land-Based Wind Energy Guidelines"). The agency prioritized a cooperative approach with industry over enforcement actions. *See* AR 901. Its enforcement efforts were aimed first at achieving voluntary compliance; when those strategies broke down, FWS pursued fines and prosecution of recalcitrant companies. *See* AR 38 n.205, 97; Mowad Decl. ¶ 27; Manville Decl. ¶¶ 19–22; *see also* AR 901 ("FWS and DOJ have been careful to bring enforcement actions only in limited circumstances, such as when an entity has been repeatedly warned of the take, and has refused to take available measures to minimize it, or when large numbers of birds are killed (*e.g.*, Exxon Valdez)."); *Amicus* at 15–17 (discussing examples). In 2015 FWS also announced its intent to begin a formal, comprehensive rulemaking process for regulating incidental take. Migratory Bird Permits; Programmatic Environmental Impact Statement, 80 Fed. Reg. 30,032 (May 26, 2015).

In early January 2017 DOI's Solicitor—the Department's chief lawyer and the DOI official charged with issuing opinions setting forth DOI's interpretation of federal statutes—issued a memorandum that reaffirmed DOI's "long-standing interpretation that the MBTA prohibits incidental take." AR 43–44. That memorandum, officially known as M-37041, will be referred to as the "Tompkins Opinion" after the DOI Solicitor who issued it.

Following a change in administrations and Mr. Tompkins's departure, in December 2017 DOI's then-Principal Deputy Solicitor, Daniel Jorjani, issued a new memorandum—M-37050—permanently withdrawing and replacing the Tompkins Opinion.[4] AR 1. This new memorandum will be referred to as the "Jorjani Opinion" or the "Opinion."

Following the Jorjani Opinion, on April 11, 2018, the Principal Deputy Director of FWS issued a memorandum and an FAQ document to "clarify what constitutes prohibited take" under the MBTA. AR 80. That memorandum notes that FWS "is modifying some policies and practices" to "ensure consistency with the recently issued" Jorjani Opinion and directs FWS personnel to "ensure that [the agency's] comments, recommendations, or requirements are not based on, nor imply, authority under the MBTA to regulate incidental take of migratory birds." AR 80–81. It also provides that FWS "will not withhold a permit, request, or require mitigation based upon incidental take concerns under the MBTA." AR 81. The FAQ sets out specific examples of activities that will trigger MBTA liability and others that will not. AR 82–86.

In May 2018 environmental Plaintiffs—Natural Resources Defense Council and the National Audubon Society with others—filed lawsuits challenging the Jorjani Opinion. In September 2018 eight States filed a similar lawsuit. All three actions assert that the Jorjani

---

[4] He did so exercising the authority of the DOI Solicitor in the absence of a confirmed appointee to that office. AR 1. Jorjani has since been confirmed by the United States Senate to the position of Solicitor of the DOI. *See* Press Release, U.S. DOI (Sept. 24, 2019), https://www.doi.gov/pressreleases/us-senate-confirms-daniel-jorjani-solicitor-department-interior.

Opinion's interpretation of the MBTA is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" in violation of the APA, 5 U.S.C. § 706(2)(A), and seek vacatur of the Opinion and subsequent agency guidance. On July 31, 2019, the Court mostly denied Interior's motion to dismiss, holding, *inter alia*, that Plaintiffs had adequately alleged Article III standing,[5] the Jorjani Opinion was a "final agency action" under Section 704, and the case was ripe for judicial review.[6] *Nat. Res. Def. Council, Inc. v. U.S. Dep't of the Interior ("NRDC I")*, 397 F. Supp. 3d 430, 443, 446, 450, 452 (S.D.N.Y. 2019).

## DISCUSSION

### I. Standard of Review

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). When courts review agency action under the APA, "the question presented is a legal one which the district court can resolve . . . on a motion for summary judgment." *City Club of N.Y. v. U.S. Army Corps of Eng'rs*, 246 F. Supp. 3d 860, 864 (S.D.N.Y. 2017) (quotation omitted). Under the APA, agency decisions may be set aside if they are "arbitrary, capricious, an abuse of discretion, or otherwise

---

[5]  There is no dispute in the motions for summary judgment that Plaintiffs have standing to sue. The Court finds that Plaintiffs have met their burdens of establishing standing. *See* Env'l Pls.' Mem. of Law (Dkt. 68-1) at 14–17; States' Mem. of Law (Dkt. 69-1) at 13–16; *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 411–12 (2013) ("'The party invoking federal jurisdiction bears the burden of establishing' standing—and, at the summary judgment stage, such a party 'can no longer rest on . . . mere allegations, but must set forth by affidavit or other evidence specific facts.'" (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992))).

[6]  The Audubon Complaint also contends that the Opinion was issued without notice and opportunity for comment in violation of 5 U.S.C. § 553 and without compliance with the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332(C). 18-CV-4601 (Dkt. 1) ("Audubon Compl.") ¶¶ 80–87. The Court granted Interior's motion to dismiss the notice-and-comment claim. 397 F. Supp. 3d at 453. Because the Court now finds that the Jorjani Opinion was contrary to law it does not reach the NEPA claim.

The Audubon Complaint also requests that the Court "[r]einstate Defendants' prior interpretation and policy regarding MBTA coverage and implementation." Audubon Compl. at 34. Plaintiffs no longer request that relief in their motions for summary judgment.

not in accordance with law." 5 U.S.C. § 706(2)(A); *Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 107 (2d Cir. 2018).

## II.     The Jorjani Opinion

The parties present two different takes on the Jorjani Opinion.  At the risk of walking into a conceptual minefield, the Court must first decide which one to adopt.  The Opinion "analyzes whether the [MBTA] prohibits the accidental or 'incidental' taking or killing of migratory birds" and concludes that it does not.  AR 1–2.  But what that means requires some unpacking. Plaintiffs argue that the Jorjani Opinion has inserted a *mens rea* (or mental culpability) requirement into the MBTA; in their reading, the Opinion means that only intentional or purposeful takings and killings are prohibited by the MBTA's misdemeanor provision.  Interior, by contrast, argues that the Jorjani Opinion interprets only the *actus reus* of the MBTA (those acts or behaviors that the statute prohibits and that can result in criminal penalties) by limiting its coverage to activities that are "directed at" birds.

This is not a distinction without a difference.  Accepting Plaintiffs' reading of the Jorjani Opinion would bring this case to a swift end.  The parties agree—and the Jorjani Opinion itself assumes—that persons are strictly liable for misdemeanor violations under the MBTA.  *See* Defs.' Mem. of Law (Dkt. 79) at 6, 22; AR 22–24.  Moreover, Second Circuit precedent would control the case.  *See United States v. FMC Corp.*, 572 F.2d 902, 908 (2d Cir. 1978) (holding that Section 2 of the MBTA is a strict liability provision).  The Jorjani Opinion, if read as Interior argues, does not disturb the undisputed fact of strict liability; instead, it draws new limits around the range of activities covered by the MBTA.  Another way of understanding the difference between Plaintiffs' and Interior's positions is to ask whether an activity can simultaneously target a bird and kill the bird without the person having an intent to kill the bird.  Surely yes—a child throwing rocks at birds in a pond to see them fly does just that when one of those rocks

strikes and kills a bird.  There is, of course, an element of intent to any activity directed at birds—one must intend to interact with the bird in some way—but that is not an intent to "take" or "kill" in the legal sense.

Peering closely, parts of the Opinion suggest that Jorjani had Interior's present reading of the Opinion in mind (and those are the parts that Interior highlights in its memoranda of law). The Opinion states, for example, that "[t]he key [to the MBTA] remains that the actor was engaged in an activity the object of which was to render an animal subject to human control." AR 22.  It likewise states that "the range of actions prohibited under the MBTA [are] activities akin to hunting and trapping."  AR 24.

But the Jorjani Opinion also equivocates.  The "range of [impermissible] actions," it states, "exclude[s] more attenuated conduct, such as lawful commercial activity that unintentionally and indirectly results in the death of migratory birds."  AR 24.  The Opinion "conclude[s] that the MBTA's prohibition on pursuing, hunting, taking, capturing, killing, or attempting to do the same applies only to direct and affirmative purposeful actions that reduce migratory birds, their eggs, or their nests, by killing or capturing, to human control."  AR 41. While that seems to limit the types of activities covered by the MBTA, it also inserts a mental-state requirement (in the form of intent or purpose) and a proximate cause requirement (in the form of direct-ness).  *See Seattle Audubon Soc'y v. Evans*, 952 F.2d 297, 303 (9th Cir. 1991) (contrasting strict liability with indirect activity not covered by the MBTA); *Newton Cty. Wildlife Ass'n v. U.S. Forest Serv.*, 113 F.3d 110, 115 (8th Cir. 1997) (same); *United States v. Moon Lake Elec. Ass'n, Inc.*, 45 F. Supp. 2d 1070, 1077 (D. Colo. 1999) (discussing proximate cause in the context of the MBTA); *cf. Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9 (2010) (describing proximate cause in the RICO context as requiring "some direct relation between the injury

asserted and the injurious conduct alleged" because "a link that is . . . indirect is insufficient." (quotation omitted)).[7]

Notwithstanding Interior's insistence, a plain reading of the Jorjani Opinion and subsequent communications and guidance strongly suggest that it imposes a *mens rea* requirement on the MBTA's misdemeanor provision. A few more representative sentences supporting Plaintiffs' take on the Jorjani Opinion follow:

> The relevant acts prohibited by the MBTA are purposeful and voluntary affirmative acts directed at reducing an animal to human control, such as when a hunter shoots a protected bird causing its death. AR 22.

> [T]he statute's prohibitions on pursuing, hunting, taking, capturing, killing, or attempting to do the same apply only to affirmative actions that have as their purpose the taking or killing of migratory birds, their nests, or their eggs. AR 2.

> The [Jorjani] Opinion returns the MBTA to its original intention—focusing enforcement on deliberate killing, injury and commercialization of migratory birds. AR 73.

> [A]n individual or entity may destroy an active nest while conducting any activity where the intent of the action is not to kill migratory birds or destroy their nests or contents. AR 88.

> Only take where the purpose or intent is taking and/or killing. No exceptions. AR 906.

> The opinion is pretty cut and dry. MBTA only covers take that is with specific intent to kill or take migratory bird species. AR 907.

Examples from the FAQ issued by FWS are even more telling. The FAQ clarifies that demolishing a barn containing owl nests (thus killing the owls) is not a misdemeanor violation because "[r]emoving or destroying the structure would rarely if ever be an act that has killing owl nestlings as its purpose." AR 83. The FAQ elaborates that "the purpose of the activity

---

[7] It is also worth noting that Interior's memoranda of law contain similar ambiguities despite insisting that the scope of the Jorjani Opinion is limited to defining what is a covered activity. *See, e.g.*, Defs.' Mem. of Law at 27 ("The proper reading of Section 2 of the MBTA is still that it prohibits only affirmative acts directed immediately and intentionally against migratory birds.").

determines whether this is an MBTA violation," and "[u]nless the purpose of removing the structure was in fact to kill the owls, their deaths would be incidental to the activity of removing the barn." AR 83. As if that did not make the point clearly enough, the FAQ goes on to exclude lesser mental states than purpose: "[t]he landowner's knowledge . . . that destroying the barn would kill the owls is not relevant." AR 83. The only line separating innocent from culpable activity in this example is whether the landowner intended to kill the owls when he or she demolished the barn. *See also* AR 82 (describing two more comparable examples—lighting a fire in a fireplace that kills birds nesting in the chimney and pressure washing bird nests off a bridge—where the statute is violated only if the intent is to kill the birds).

That said, the Jorjani Opinion relies heavily on two judicial decisions that slice the MBTA along more pure *actus reus* lines. *See* AR 22–24 ("Interpreting Strict Liability as Dispositive Conflates *Mens Rea* and *Actus Rea*").

In *United States v. CITGO Petroleum Corp.*, 801 F.3d 477 (5th Cir. 2015), CITGO appealed its conviction for violating the MBTA. Factually, birds had died when they landed in oily liquid stored in uncovered tanks at CITGO's refinery. *Id.* at 480. CITGO was charged with, *inter alia*, multiple counts of taking birds in violation of the MBTA. *Id.* at 480–81. The Fifth Circuit held that "the MBTA's ban on 'takings' only prohibits intentional acts (not omissions) that directly (not indirectly or accidentally) kill migratory birds." *Id.* at 494. While its holding contains similar ambiguities, the court contrasted several informative examples. According to the Fifth Circuit, "[p]oisoning a field to deter birds, and 'taking' migratory birds in the process" violates the MBTA. *Id.* at 493 n.14. But accidentally colliding with a bird in your car or putting up electrical lines that birds run into do not. *Id.* at 493. Birds are the object of the action in the former scenario, but not in the latter. The court was also focused on a (disputed) common law definition of "take" that limits the term to activities like hunting or poaching that "reduce . . .

animals . . . to human control." *Id.* at 489 (quotation omitted). The court noted that "[o]ne does not reduce an animal to human control accidentally or by omission." *Id.*

The Jorjani Opinion also discusses *Mahler v. United States Forest Service*, 927 F. Supp. 1559 (S.D. Ind. 1996), at length. Like *CITGO*, the district court in *Mahler* held that the MBTA "applies to activities that are intended to harm birds or to exploit harm to birds, such as hunting and trapping, and trafficking in birds and bird parts." *Id.* at 1579.

With the benefit of *CITGO*, *Mahler*, and Interior's present view in its briefs, and because the Jorjani Opinion is less than precise, the Court will accept Interior's formulation of the Opinion for the purpose of deciding the motions for summary judgment. The Court will thus assume going forward that the Jorjani Opinion only limits the MBTA to actions "directed at" birds in the sense that hunting birds, poaching birds, throwing rocks at birds, pressure washing bird nests off a bridge, or setting poison traps for birds are activities "directed at" birds.[8] Defs.' Mem. of Law at 1–2, 12, 16, 18–19, 22, 24, 29, 33, 39; *see, e.g.*, AR 41, 82.

## III.     Deference Is Not Warranted

Interior does not assert that the Jorjani Opinion is entitled to *Chevron* deference, only the lesser *Skidmore* deference. Defs.' Mem. of Law at 16. Under *Skidmore*, the Court must defer to the Opinion to the extent that it has the "power to persuade." *In re Bernard L. Madoff Inv. Sec. LLC*, 779 F.3d 74, 82 (2d Cir. 2015) (quoting *Christensen v. Harris Cty.*, 529 U.S. 576, 587 (2000)); *see also United States v. Mead Corp.*, 533 U.S. 218, 234–35 (2001); *Skidmore v. Swift & Co.*, 323 U.S. 134, 139–40 (1944). Factors to consider include "the agency's expertise, the care it took in reaching its conclusions, the formality with which it promulgates its

---

[8]     One other reading of the "directed at" limitation is that the MBTA only covers activities that *typically* or *historically* have been associated with taking or killing birds: "activities akin to hunting." AR 24. But that reading would contradict much of the Jorjani Opinion and Interior's positions. *See, e.g.*, AR 82 (discussing liability for pressure washing bird nests off a bridge during a painting project).

interpretations, the consistency of its views over time, and the ultimate persuasiveness of its arguments." *Cmty. Health Ctr. v. Wilson-Coker*, 311 F.3d 132, 138 (2d Cir. 2002) (citing *Mead*, 533 U.S. at 228, 234–35).

The *Skidmore/Mead* factors disfavor affording the Jorjani Opinion any deference. The Opinion is a recent and sudden departure from long-held agency positions backed by over forty years of consistent enforcement practices. The Opinion is also an informal pronouncement lacking notice-and-comment or other protective rulemaking procedures.[9] In addition, the Jorjani Opinion's claim to agency expertise is at best questionable. There is no evidence of input from the agency actually tasked with implementing the statute: FWS. Interior thus provides no reason to believe that the Opinion benefits from "knowledge gained through practical experience [or the agency's] familiarity with the interpretive demands of administrative need." *Cty. of Maui v. Haw. Wildlife Fund*, 140 S. Ct. 1462, 1474 (2020).

Interior argues that the Jorjani Opinion brings uniformity to a "patchwork of legal standards created over a period of decades by contradictory judicial decisions." Defs.' Reply (Dkt. 87) at 1. That is unpersuasive on two fronts. First, the Opinion is riddled with ambiguities made only more apparent by the incoherent guidance FWS subsequently issued. Second, Interior's argument vastly overstates circuit disagreement and blurs the actual boundaries that have been drawn. Interior characterizes the Fifth, Eighth, and Ninth Circuits as having held that incidental take is excluded from coverage under the MBTA and contrasts their positions with the Second and Tenth Circuits, which Interior argues have held the opposite. *Id.* at 7–11. Tensions between the circuits certainly exist, but they are not of the magnitude or kind Interior presents.

---

[9] FWS is currently in the process of a formal notice-and-comment rulemaking based on the interpretation of the MBTA presented in the Jorjani Opinion. *See* Regulations Governing Take of Migratory Birds, 85 Fed. Reg. 5915 (Feb. 3, 2020); *see also* Defs.' Mem. of Law at 13–14.

The Second Circuit in *FMC* held that the MBTA imposes strict liability for misdemeanor violations and affirmed a company's conviction for bird deaths caused by its uncovered toxic wastewater pond. 572 F.2d at 904, 908. Since *FMC* was decided in 1978, no circuit has held that the MBTA requires the government to prove a guilty state of mind, but circuits have opined on other limitations on liability. The Tenth Circuit held that the MBTA applies to activities that incidentally kill birds when those activities directly and foreseeably lead to (or proximately cause) their deaths. *See United States v. Apollo Energies, Inc.*, 611 F.3d 679, 684–90 (10th Cir. 2010) (affirming MTBA liability after FWS inspectors found dead bird remains in unprotected oil field equipment that birds were known to enter).

Interior argues that the Eighth and Ninth Circuits reached a different conclusion. But that is not accurate. Those circuits held only that "habitat destruction, leading indirectly to bird deaths," does not amount to the "'taking' of migratory birds within the meaning of the [MBTA]." *Seattle Audubon*, 952 F.2d at 303; *see Newton Cty.*, 113 F.3d at 115 (agreeing with *Seattle Audubon* that the MBTA does not impose "an absolute criminal prohibition on conduct, such as timber harvesting, that *indirectly* results in the death of migratory birds").[10] The Ninth Circuit distinguished "direct, though unintended, bird poisoning from toxic substances," which is covered by the MBTA, from habitat destruction that indirectly leads to bird deaths, which is not. *Seattle Audubon*, 952 F.2d at 303. That is a holding about the length of the causal chain between

---

[10] Part of the Eighth Circuit's decision suggests that, like the Fifth Circuit in *CITGO*, the court was limiting the sorts of activities covered by the MBTA. The Eighth Circuit stated, "we agree with the Ninth Circuit that the ambiguous terms 'take' and 'kill' in 16 U.S.C. § 703 mean 'physical conduct of the sort engaged in by hunters and poachers, conduct which was undoubtedly a concern at the time of the statute's enactment in 1918.'" *See Newton Cty.*, 113 F.3d at 115 (quoting *Seattle Audubon*, 952 F.2d at 302). But that statement gives little support to the existence of contradictory judicial guidance. It quotes *Seattle Audubon* for the statutory definitions of "take" and "kill," but the Ninth Circuit had, in fact, only opined on the regulatory definition of "take." 952 F.2d at 302. In addition, *Newton County*, like *Seattle Audubon*, is primarily concerned with the directness *vel non* of birds killed by or as a result of timber harvesting. 113 F.3d at 115. And it makes clear that its "conclusions about the apparent scope of MBTA are necessarily tentative because we lack the views of the Fish and Wildlife Service." *Id.*

the defendant's activity and ultimate bird death, not whether the MBTA reaches particular kinds of activities.

In truth, Interior's dramatized representation of "decades [of] contradictory judicial decisions" reflects only the Fifth Circuit's 2015 decision in *CITGO* and the District Court for the Southern District of Indiana's 1996 decision in *Mahler*. Defs.' Reply at 1. As discussed in the previous section, the Fifth Circuit held that the defendant's failure to cover its waste tanks, which "unintentionally and indirectly" caused migratory birds to land in the oily liquid in the uncovered tanks and die, was not a "taking" under the MBTA. 801 F.3d at 480, 488, 494. Notably, the Fifth Circuit interpreted only the term "take"; the case "did not present an opportunity to interpret 'kill'" because the indictment charged only illegal taking. *Id.* at 489 n.10. The Fifth and Tenth Circuits are thus at odds with respect to activities falling under the statutory umbrella of "take," but that is all. The Second, Eighth, and Ninth Circuits (and the remaining seven) have yet to take a position on that issue. Moreover, there is no divergent opinion yet on the meaning of "kill."[11]

To the extent *CITGO* recently disrupted circuit uniformity, the DOI took prompt action with the Tompkins Opinion to reaffirm that its longstanding position remained unchanged notwithstanding the Fifth Circuit's decision. *See* AR 67–72.

Further, the Jorjani Opinion's interpretation runs counter to the purpose of the MBTA to protect migratory bird populations. Despite strong textual support for that purpose, the Opinion freezes the MBTA in time as a hunting-regulation statute, preventing it from addressing modern threats to migrating bird populations. *See Haw. Wildlife Fund*, 140 S. Ct. at 1474; *see also*

---

[11]     That is true notwithstanding dicta in *CITGO*. *See* 801 F.3d at 489 n.10 ("Although this case does not present an opportunity to interpret "kill," there is reason to think it too is limited to intentional acts aimed at migratory birds.").

Patrick G. Maroun, *More Than Birds: Developing a New Environmental Jurisprudence Through the Migratory Bird Treaty Act*, 117 Mich. L. Rev. 789, 804 (2019) ("If the Act's purpose is to protect migratory birds from existential crises driven by commercial pressures, then construing the Act to apply almost exclusively to hunters simply because hunting was the primary commercial threat to migratory birds at the time of enactment is to betray its essential character.").  Interior has previously acknowledged that it has a "legal responsibility under the MBTA and the treaties the Act implements to promote the conservation of migratory bird populations." 80 Fed. Reg. at 30,034.  Despite that acknowledged responsibility, the record shows that the Opinion substantially removes prior incentives for commercial actors to take precautions to avoid threats to migrating birds.  *See* Mowad Decl. ¶¶ 23–48; Rylander Decl. (Dkt. 68-24) Ex. A at 3, Ex. B at 2; Manville Decl. ¶¶ 24–25; *see also* AR 615 (former DOI employees describing cooperative conservation efforts with industry); AR 901 ("Over time . . . investigations involving the unlawful take of migratory birds has resulted in compliance and implementation of best management practices.").[12]

Ultimately, though, the Jorjani Opinion is simply an unpersuasive interpretation of the MBTA's unambiguous prohibition on killing protected birds.

## IV.    The Jorjani Opinion Is Contrary to Law

The Court notes at the outset that *FMC* does not control this case.  Having understood the Jorjani Opinion as interpreting the set of actions covered by the MBTA, not as inserting a mental-state requirement, *FMC* is of far less help than Plaintiffs urge.  Although the defendant in *FMC* killed birds through conduct that the Jorjani Opinion would now exempt from the MBTA's

---

[12]     The impact of the Opinion is clear.  FWS recently declined even to investigate an oil spill in Great Harbor, Massachusetts, that led to the death of 29 birds because the deaths were "incidental take" from the spill.  *Amicus* at 19–20.

reach—polluting a pond with toxic chemicals that accidentally killed birds—the issue before the Second Circuit was not whether that conduct fell within the set of statutorily proscribed activities. *See* 572 F.2d at 905. The court ruled only on whether "the statute require[d] that the violation be intentional or in other words, where a crime is involved and a criminal penalty imposed for the violation thereof, must the violator have a *mens rea*." *Id.* at 904.

While *FMC* does not control this case, the statute's unambiguous text does. A court must normally assess a statute according to the ordinary meaning of its language at the time the statute was passed. *Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1738 (2020); *see also New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 539 (2019) ("It's a fundamental canon of statutory construction that words generally should be interpreted as taking their ordinary meaning at the time Congress enacted the statute." (quotation omitted)). "[W]hen the meaning of the statute's terms is plain, [the court's] job is at an end." *Bostock*, 140 S. Ct. at 1749.

Section 2's clear language making it unlawful "at any time, by any means or in any manner, to . . . kill . . . any migratory bird" protected by the conventions is in direct conflict with the Jorjani Opinion. 16 U.S.C. § 703(a). Interior does not dispute the breadth of the term "kill" as ordinarily understood. According to contemporaneous dictionary definitions, to "kill" is "to deprive of life; to put to death; to slay." Webster's New Int'l Dictionary of the English Language 1185 & 2107 (1st ed. 1920); AR 50 n.47 (quoting Webster's Imperial Dictionary 1697–98 (1915)). Under common law, too, kill referred to "depriving of life" regardless of whether the predicate act was directed at the victim. *See, e.g.*, 4 William Blackstone, Commentaries 182 (discussing homicide *per infortunium*, "where a man, doing a lawful act, without any intention of hurt, unfortunately kills another: as where a man is at work with a hatchet, and the head thereof flies off and kills a bystander"). The term "kill" has been

consistent in its breadth for the past century, including when the MBTA was amended in 1936.[13]
*See* AR 19 n.121 (quoting Webster's Second New Int'l Dictionary 1362 (1934)).

The Supreme Court's decision in *Babbitt v. Sweet Home Chapter of Communities for a
Great Oregon*, 515 U.S. 687 (1995), also supports a broad, ordinary reading of "kill."  In *Sweet
Home* the Supreme Court effectively rejected the argument Interior is making here in the context
of interpreting the definition of "take" in the Endangered Species Act of 1973 ("ESA").  The
ESA makes it unlawful to "take any [protected] species within the United States or the territorial
sea of the United States" and defines the term "take" to mean "to harass, harm, pursue, hunt,
shoot, wound, *kill*, trap, capture, or collect, or to attempt to engage in any such conduct."  *Id.* at
690–91 (emphasis added); 16 U.S.C. §§ 1538(a)(1), 1532(19).  The majority faulted the dissent's
"novel construction" of the statute that would have shielded from liability a hypothetical
developer who drains a pond knowing that it will kill an endangered species of turtle.  *Sweet
Home*, 515 U.S. at 701 n.15.  On the dissent's view, "unless the developer was motivated by a
desire 'to get at a turtle,' no statutory taking could occur."  *Id.* (citation omitted).  The dissent
reasoned that the statute is limited to liability for "affirmative conduct intentionally directed
against a particular animal or animals"—the exact limitation the Jorjani Opinion attempts to
impose on Section 2 of the MBTA.  *Id.*  Without commenting on "take" per se, the majority

---

[13]    *See, e.g.*, *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 135 (2000) ("[T]obacco alone kills
more people each year in the United States than acquired immunodeficiency syndrome (AIDS), car accidents,
alcohol, homicides, illegal drugs, suicides, and fires, combined." (quoting 61 Fed. Reg. 44,412, 44,399 (1996))); *Lee
v. United States*, 112 F.2d 46, 48 (D.C. Cir. 1940) ("In interpreting [the statutory language '[w]hoever . . . kills
another, is guilty of murder. . .'] this court has held that . . . accidental or unintentional killing will constitute murder
in the second degree if it is accompanied by malice."); *United States v. Parks*, 411 F. Supp. 2d 846, 856 (S.D. Ohio
2005), *aff'd*, 583 F.3d 923 (6th Cir. 2009) ("[T]he Sixth Circuit has held that ['kills' in] § 2113(e) applies when
bank robbers accidentally kill someone . . . regardless of a lack of criminal intent to kill . . . ."); Kill, Black's Law
Dictionary (11th ed. 2019) ("To end life; to cause physical death"); Paul H. Robinson, *Legality and Discretion in the
Distribution of Criminal Sanctions*, 25 Harv. J. on Legis. 393, 438 (1988) (identifying "extreme indifference to the
value of human life" where "the actor is very drunk and is repeatedly warned not to drive but nonetheless drives,
loses control of his car, and kills a pedestrian"); Gerardo Sachs, *Blood Feud*, 36 Jewish Bible Q. 261, 261 (2008)
(interpreting "*[t]hout shalt not kill*" to prohibit "unintentional, accidental death or manslaughter").

reasoned that the words "kill" and "harm" in the statutory definition of "take" could still "apply to such deliberate conduct."[14] *Id.*

Section 2 also contains the equally expansive phrase—"by any means or in any manner"—to modify the verb "kill." 16 U.S.C. § 703(a). That phrase denotes how a person must kill a bird to trigger the statute. Namely, it does not matter how. But Interior takes the opposite position: only "means" and "manner[s]" directed at birds are included. Interior argues that the phrase "by any means or in any manner" does not affect which activities are covered; it merely makes clear that the prohibition extends to all manners of hunting, such as with a crossbow, a rifle, or snare traps. Defs.' Mem. of Law at 21–22; *see also CITGO*, 801 F.3d at 490 (advancing the same argument). That may be so with respect to the verb "hunt," but it ignores the phrase's modifying effect on "kill." Section 2 states that any means of killing is a violation, which plainly includes dumping oil waste, building wind turbines, or pressure washing bridges,

---

[14]    For that reason too, *Sweet Home* undermines Interior's argument that FWS regulations applicable to the MBTA defining "take" to mean "to pursue, hunt, shoot, wound, kill, trap, capture, or collect," 50 C.F.R. § 10.12, support the Jorjani Opinion's reading of "kill." *See* Defs.' Mem. of Law at 20. Moreover, Interior has long understood its definition of "take" to encompass "both 'intentional' and 'unintentional' take," including "take that results from, but is not the purpose of, the activity in question." Exec. Order No. 13,186, 66 Fed. Reg. 3853 (Jan. 10, 2001).

   Although the Fifth Circuit suggested that *Sweet Home* supports a narrow interpretation of "kill," that observation was based on a misreading of the case. *See CITGO*, 801 F.3d at 489 n.10. The Fifth Circuit described *Sweet Home* as concluding that "the terms pursue, hunt, shoot, wound, kill, trap, capture, and collect, generally refer to deliberate actions." *Id.* (citing *Sweet Home*, 515 U.S. at 698 n.11). But *Sweet Home* did not suggest that all of those terms refer to deliberate actions, only that they are more frequently used to refer to direct action than harm is. 515 U.S. at 698 n.11. And it did so to contrast those terms with "the sense of indirect causation that 'harm' adds to [the ESA]" so that it covers habitat modification. *Id.* Whether "kill" in the MBTA covers habitat modification or, more generally, conduct that is causally distant from bird deaths is not an issue in this case.

   Interior's argument that the MBTA does not prohibit habitat destruction as evidenced by passage of the Migratory Bird Conservation Act of 1929 is similarly a red herring. *See* Defs.' Mem. of Law at 25. A statute preserving bird habitats is entirely consistent with a statute prohibiting accidental bird killings. At best, Interior's argument lends support to *Seattle Audubon*'s holding that the MBTA does not prohibit habitat destruction that indirectly kills birds, 952 F.2d at 303, but, as discussed, that reasoning does not limit the MBTA to activities targeting birds.

irrespective of whether those activities are specifically directed at wildlife.[15]  *See Haw. Wildlife Fund*, 140 S. Ct. at 1473–74 (finding an agency interpretation "difficult to reconcile" with an environmental statute's references to "any addition" of a pollutant into navigable waters "from any point source").  Had Interior not taken the position that the Opinion only carves out covered activities, and had the Jorjani Opinion instead found a mental-state requirement in the MBTA, Interior's argument would have more purchase; but Interior cannot have it both ways.

Interior does not dispute that Section 2's language is unambiguous as ordinarily understood.  Like the Jorjani Opinion, Interior contrasts the "many definitions" of "take" with a single definition of "kill."  Defs.' Mem. of Law at 19; AR 19 n.121.  To be sure, Interior distinguishes between an "active" sense of "kill" as in "to deprive of life" and a purportedly more "passive" sense of "kill" as the "general term for depriving of life."  Defs.' Mem. of Law at 19; AR 19 n.121.  But that is nonsensical; there is no meaningful difference between "depriving of life" and "to deprive of life" beyond their grammatical construction.  Both imply activity.

In any event, Interior does not explain why the fact that the verb "kill" is associated with activity means that the phrase "by any means or in any manner" should be rewritten to state "by any means or in any manner of activity that is specifically directed at birds."  Killing a bird by firing a gun, setting a trap, dumping oil waste, or pressure washing nests from a bridge all fit within Interior's active sense of "kill," and yet the Jorjani Opinion concludes that the first two are prohibited by the MBTA while the latter two are not.

Where, then, does Interior find its "directed at" limitation on the MBTA's scope?  First, Interior argues that when "kill" is read according to its surrounding words (known as the *noscitur*

---

[15]     One could say the imagination is the limit.  But to be clear, that does not mean any strange and improbable bird killing will expose a person to criminal liability.  Proximate cause requirements can limit broad statutes like the MBTA.  *See, e.g.*, *Apollo Energies*, 611 F.3d at 690.

*a sociis* canon), the term adopts a narrower meaning.  According to Interior, because "pursue," "hunt," and "capture" reference activities directed at birds, "kill" must also.  But that use of *noscitur* is improper; it restricts the meaning of "kill" to "one of its many possible applications."  Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 195 (2012).  The *noscitur* canon is a tool for resolving ambiguity, not creating it where there is none.  *Yates v. United States*, 574 U.S. 528, 564 (2015) (Kagan, J., dissenting); *see Cohen v. JP Morgan Chase & Co.*, 498 F.3d 111, 120 (2d Cir. 2007) ("*[N]oscitur a sociis* does not resolve textual ambiguity where language plausibly supports both narrow and expansive reading." (citation omitted)); *Maracich v. Spears*, 570 U.S. 48, 62–63 (2013) (applying *noscitur* where the phrases were "capable of many meanings").  "Kill" is broad but not at all ambiguous.  To kill a bird in the ordinary sense can be accidental; the action that kills does not have to be directed at birds in the same sense as hunting birds.  It would be error to use the *noscitur* canon to "rob" the term "kill" of its "independent and ordinary significance."[16]  *Graham Cty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 288 (2010).

Interior's use of *noscitur* also risks depriving "kill" of independent meaning.  The canon against surplusage favors "giv[ing] effect to all of a statute's provisions 'so that no part will be inoperative or superfluous, void or insignificant.'"  *United States v. Harris*, 838 F.3d 98, 106 (2d Cir. 2016) (quoting *Corley v. United States*, 556 U.S. 303, 314 (2009)).  "Hunt" and "take" in Section 2 also have broad meanings, and one is hard-pressed to find an activity where "kill"

---

[16]     Even assuming *noscitur* were properly to apply, any meaning that the surrounding words would impart to "kill" would be far more general than what Interior urges.  "The common quality suggested by a listing should be its most general quality . . . relevant to the context."  Scalia & Garner at 196.  Synthesizing the definitions of "pursue, hunt, and capture," Interior argues that "each requires a deliberate action specifically directed at achieving a goal."  Defs.' Mem. of Law at 19; AR 19.  To the extent that quality is shared with "kill," it remains a leap to infer that the terms therefore share the quality of being "directed immediately and intentionally against migratory birds" rather than some non-bird-related goal.  Defs.' Mem. of Law at 19.  Accidentally knocking bird nests off a bridge while cleaning it, for example, is a deliberate action directed at achieving a goal, to wit, a clean bridge.

applies but "hunt" or "take" do not on Interior's interpretation. Interior argues that a person can "kill" a bird without "taking" it, defining "take" as "reducing the migratory bird to man's dominion and making it the object of profit" according to a common law-derived definition from Justice Scalia's dissenting opinion in *Sweet Home*. Defs.' Reply at 4–5; AR 22; *see* 515 U.S. at 717–18. Interior describes the scenario of a rancher shooting protected birds on his property without collecting them; the rancher kills them, Interior argues, but does not take them. Defs.' Reply at 4–5; *see* AR 83.

First, Interior's definition of "take" is based on a misreading of Justice Scalia's dissent. Justice Scalia found that the common law definition of "take" is to "reduce [wild] animals, by killing or capturing, to human control."[17] *Sweet Home*, 515 U.S. at 717 (citations omitted). Justice Scalia's definition is far broader than what Interior puts forth. The dissent's reference to animals being "made the object of profit" was to the regulatory plan of the ESA, not to "take." *Id.* at 718. Interior's opening brief appropriately acknowledges as much. *See* Defs.' Mem. of Law at 20.

Even accepting *arguendo* Interior's definition of "take," the Court does not agree that shooting birds and leaving them to rot where they fall (or to become food for carrion eaters) does not "reduce the bird to man's dominion and make it the object of profit." Shooting the bird definitely reduces the bird "by killing . . . to human control." *Sweet Home*, 515 U.S. at 717 (Scalia, J., dissenting). The rancher also profits from his action whether he kills the bird to protect his crops, to improve his marksmanship, or simply for the satisfaction of knocking the bird from the sky. His profit might be economic, from a larger crop yield, personal, from better

---

[17] This Court takes no view on whether that common law definition correctly defines "take" as used in MBTA.

shooting skills, or psychic, from the satisfaction of successfully downing the bird. *See id.* ("Every man . . . has an equal right of pursuing and taking to his *own use* all such creatures as are *ferae naturae*." (quoting 2 William Blackstone, Commentaries 411 (emphasis added)).

"Kill" as defined by Interior is also plainly redundant with "hunt" or "pursue" in its rancher scenario. Congress presumably included "kill" to capture activities other than hunting and its kin. While the odd example might exist where "kill" would capture conduct that the other terms do not, the Jorjani Opinion has effectively neutered the term. *See Sweet Home*, 515 U.S. at 698 n.11, 702 (rejecting use of *noscitur* that gave the term "'harm' [in the ESA] essentially the same function as other words in the definition, thereby denying it independent meaning.").

Interior also argues that the constitutional avoidance canon supports its interpretation because otherwise "kill" risks being unconstitutionally vague. There are at least two versions of constitutional avoidance: the more traditional mandate that, if possible, courts should interpret ambiguous statutes to avoid rendering them unconstitutional, and the more modern and questionable practice of construing ambiguous statutes to "avoid the need even to address serious questions about their constitutionality." *United States v. Davis*, 139 S. Ct. 2319, 2332 n.6 (2019) (citation omitted). Under either version, Interior's use of the canon is unpersuasive.

First, because the statute is unambiguous, using avoidance to create ambiguity or to distort the plain text is improper. *See id.* at 2332 ("[W]hen presented with two 'fair alternatives,' this Court has sometimes adopted the narrower construction of a criminal statute to avoid having to hold it unconstitutional if it were construed more broadly."); *McFadden v. United States*, 576 U.S. 186, 197 (2015) ("[Constitutional avoidance] is a tool for choosing between competing plausible interpretations of a provision. It has no application in the interpretation of an unambiguous statute . . . ." (quotation omitted)); *United States v. Culbert*, 435 U.S. 371, 379 (1978) (finding statute clear and refusing to "manufacture ambiguity where none exists").

Second, Interior's application of constitutional avoidance relies on an unpersuasive predicate application of the void-for-vagueness doctrine. That doctrine "requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). Although Section 2 is broad, it is not vague. A law is vague if "it is unclear as to what fact must be proved." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). Due process requires that "laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *Id.* Far from statutory language that criminalizes "contemptuously" treating the flag,[18] "obscene, indecent, or profane language,"[19] or "conduct that presents a serious risk of physical injury to another,"[20] Section 2 gives persons fair notice of what exactly is criminal—it is unlawful to kill migratory birds by any means. *See United States v. Smith*, 29 F.3d 270, 273 (7th Cir. 1994) ("We are quite confident that ordinary people can understand [Section 2]'s clear and precise language. That language tells 'ordinary people' this: if you possess any part of a migratory bird, you break the law."); *cf. United States v. Zak*, 486 F. Supp. 2d 208, 215 (D. Mass. 2007) ("Whatever vagueness might be hypothesized at the fringe of the MBTA's reach, Defendant's action fell in the clear and unambiguous center of the statute's prohibition. The Act was not unconstitutionally vague as applied to the facts of this case."). No one, in other words, is "forced to speculate." *Dunn v. United States*, 442 U.S. 100, 112 (1979).

---

[18]     *Smith v. Goguen*, 415 U.S. 566, 568 (1974).

[19]     *Fox Television Stations*, 567 U.S. at 243.

[20]     *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018).

In addition, Section 2 is "subject to regulatory exception," mitigating concerns about arbitrary enforcement. *Andrus v. Allard*, 444 U.S. 51, 60 n.12 (1979); *see also* 72 Fed. Reg. 8931, 8934 (Feb. 28, 2007) (explaining that "[t]he MBTA regulates, rather than absolutely forbids, take of migratory birds"). FWS has an array of enforcement techniques at its disposal other than criminal prosecution. In fact, the record shows that FWS has historically turned to those techniques first. It also shows that FWS has the ability to issue regulations precisely delineating exceptions to the prohibited conduct. *See, e.g.*, 50 C.F.R. § 21.15 (2007); 50 C.F.R. § 21.27 (2001); 80 Fed. Reg. 30,032; AR 55–56, 79, 369–70. That cuts strongly against redrawing the boundaries of the MBTA to avoid Interior's theoretical concerns about arbitrary enforcement, particularly when a basic proximate cause element can mandate a close relationship between the act and the bird death. *See Haw. Wildlife Fund*, 140 S. Ct. at 1477 ("EPA and the States also have tools to mitigate those harms, should they arise, by (for example) developing general permits for recurring situations or by issuing permits based on best practices where appropriate."); *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 504 (1982) ("The village may adopt administrative regulations that will sufficiently narrow potentially vague or arbitrary interpretations of the ordinance. In economic regulation especially, such administrative regulation will often suffice to clarify a standard with an otherwise uncertain scope."); *see, e.g.*, *Apollo Energies*, 611 F.3d at 690 (imposing proximate cause requirement); *Moon Lake*, 45 F. Supp. 2d at 1085 (same).

Third, with the exception of First Amendment and pre-enforcement vagueness challenges, constitutional avoidance should be applied in concrete cases, not in the abstract. *See United States v. Mazurie*, 419 U.S. 544, 550 (1975) ("[V]agueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand."); *United States v. Blaszczak*, 947 F.3d 19, 40 (2d Cir. 2019) ("Where, as here, we are

not dealing with defendants' exercise of a first amendment freedom, we should not search for statutory vagueness that did not exist for the defendants themselves." (quotation omitted)); *see also United States v. Farhane*, 634 F.3d 127, 139 (2d Cir. 2011) ("In practice, the *Hoffman Estates*/*Salerno* rule warrants hypothetical analysis of 'all applications' only in cases of pre-enforcement facial vagueness challenges."); *United States v. Rybicki*, 354 F.3d 124, 129–30 (2d Cir. 2003) ("Panel opinions of this Court have repeatedly held that when, as in the case before us, the interpretation of a statute does not implicate First Amendment rights, it is assessed for vagueness only as applied, i.e., in light of the specific facts of the case at hand and not with regard to the statute's facial validity." (quotation omitted)). Criminal defendants have brought as-applied challenges to the MBTA, and will likely continue to do so. *See, e.g.*, *United States v. Rollins*, 706 F. Supp. 742, 744–45 (D. Idaho 1989) (holding that the MBTA was unconstitutionally vague as applied to a farmer who used due care in applying pesticides that subsequently killed migratory birds). "While the MBTA's scope, like any statute, can test the far reaches in application," *Apollo Energies*, 611 F.3d at 686, that case is not before this Court, and Interior cites no authority for using constitutional avoidance to categorically rewrite a statute simply because one can conceive of unreasonable applications.[21]

Interior similarly argues that the MBTA must be read narrowly to avoid the absurd outcome of criminalizing broad swaths of innocent activity. Although distinct from constitutional avoidance, Interior's use of the so-called "absurd results" canon is unpersuasive for similar reasons. "The 'absurd results' canon . . . is a rule of statutory construction that serves to help resolve . . . ambiguity" pursuant to which courts should "construe statutes so as to avoid

---

[21]    To the extent that Interior implies that the MBTA is vulnerable to facial challenge, it would have to show "that the law is impermissibly vague in all of its applications." *Farhane*, 634 F.3d at 139. Interior has not tried to do so, and that would, of course, contradict the Jorjani Opinion's position that the statute is constitutional when it makes unlawful some migratory bird killings.

results glaringly absurd." *United States v. Venturella*, 391 F.3d 120, 126–27 (2d Cir. 2004) (quotations omitted). Setting to one side the familiar hitching point of ambiguity (which is lacking in this case), there is nothing absurd about an interpretation of the MBTA that broadly criminalizes killing migratory birds as a misdemeanor, subject to reasonable agency regulation and case-by-case adjudication. That has, after all, been the law of the land for decades. Moreover, FWS's history of enforcing the MBTA against high-risk commercial activities that most threaten bird populations belie Interior's concerns and further suggest that the Jorjani Opinion is a solution in search of a problem. In short, Interior's complaint that without the Jorjani Opinion the MBTA raises the specter of criminal liability any time someone allows his or her cat to go outside falls flat. *See* Defs.' Mem. of Law at 22–23; AR 22–23.

Interior finally argues that the Jorjani Opinion should be upheld because legislative and pre-enactment history show that the MBTA was meant to reign in excessive hunting and similar activities that targeted birds and led to their deaths or capture. But that history gives at best mixed signals of Congress's intent, as *Moon Lake* persuasively explores. *See* 45 F. Supp. 2d at 1080–82. And Interior's historical narrative conflicts with the text of the MBTA and its underlying conventions, which reflect a broad purpose to conserve bird populations. The MBTA states that the statute is "for the protection of migratory birds," 16 U.S.C. § 703(a), and the conventions stipulate that migratory birds may only be killed under "extraordinary conditions" where birds have "become seriously injurious to the agricultural or other interests in any particular community." *Turtle Island Restoration Network v. U.S. Dep't of Commerce*, 878 F.3d 725, 734 (9th Cir. 2017) (quotation omitted). The 1916 Convention proclaimed the purpose of "saving from indiscriminate slaughter and of insuring the preservation of such migratory birds as are either useful to man or are harmless." 39 Stat. 1702; *see also* 16 U.S.C. § 703(a) (referencing the conventions); *id.* § 704(a) (referencing the purposes of the conventions). Interior's

characterization of the MBTA as a hunting-regulation statute falls flat, not least because if that had been Congress's purpose, the plain text of the statute would look far different than the MBTA's broadly worded prohibition.

In any event, the legislative history and extratextual materials on which Interior relies may only be used to "clear up ambiguity, not create it." *Bostock*, 140 S. Ct. at 1750 (quoting *Milner v. Dep't of Navy*, 562 U.S. 562, 574 (2011)); *see also McGirt v. Oklahoma*, 140 S. Ct. 2452, 2468 (2020) ("[I]f during the course of our work an ambiguous statutory term or phrase emerges, we will sometimes consult contemporaneous usages, customs, and practices to the extent they shed light on the meaning of the language in question at the time of enactment."). "The people are entitled to rely on the law as written, without fearing that courts might disregard its plain terms based on some extratextual consideration." *Bostock*, 140 S. Ct. at 1749.

Interior's statute would have been easy to draft, but that is not the statute Congress drafted. There is nothing in the text of the MBTA that suggests that in order to fall within its prohibition, activity must be directed specifically at birds. Nor does the statute prohibit only intentionally killing migratory birds. And it certainly does not say that only "some" kills are prohibited. "It is a fundamental principle of statutory interpretation that absent provisions cannot be supplied by the courts." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2381 (2020) (quotation omitted); *see also Lamie v. U.S. Tr.*, 540 U.S. 526, 538 (declining to "read an absent word into the statute" when there was "a plain, non-absurd meaning in view"). Instead of including Interior's purported limits in the text of the statute, "Congress chose statutory language broad enough to meet" new threats to migratory bird populations as they emerged in the ensuing decades. *DePierre v. United States*, 564 U.S. 70, 85 (2011).

Even if Congress did not foresee that modern industrial activity would one day threaten protected migratory bird populations, that does not justify disregarding the statute's

unambiguous language.  The MBTA's impressive scope "reflects an intentional effort to confer the flexibility necessary to forestall [its] obsolescence."  *Massachusetts v. EPA*, 549 U.S. 497, 532 (2007).  Although Congress *may* have been principally concerned about over-hunting as the chief threat to bird populations in 1918,[22] "the fact that a statute can be applied in situations not expressly anticipated by Congress does not demonstrate ambiguity.  It demonstrates breadth." *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998) (quotation omitted); *cf.* Scalia & Garner at 86 ("Broad language can encompass the onward march of science and technology.").  "[I]t is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed."  *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998). "[U]nexpected applications of broad language reflect only Congress's 'presumed point [to] produce general coverage—not to leave room for courts to recognize ad hoc exceptions.'" *Bostock*, 140 S. Ct. at 1749 (quoting Scalia & Garner at 101).  Congress could have, but chose not to, limit the MBTA to activities like hunting that are directed at birds, but there is no basis to insert that extratextual limitation.

## V.     Vacatur Is the Appropriate Remedy

When an agency action is held unlawful under the APA, the "usual" remedy is vacatur and remand.  *Guertin v. United States*, 743 F.3d 382, 388 (2d Cir. 2014).  Vacatur, in particular, "has long been held to be the appropriate remedy when . . . an agency acts contrary to law, or agency action is found to be arbitrary and capricious."  *New York v. U.S. Dep't of Commerce*, 351 F. Supp. 3d 502, 673 (S.D.N.Y. 2019) (citations omitted), *aff'd in part, rev'd in part and remanded*, 139 S. Ct. 2551 (2019), *appeal dismissed*, No. 19-212, 2019 WL 7668098 (2d Cir.

---

[22]     That fact is not clear from the MBTA's history.  It is just as plausible that Congress wished broadly to prevent persons from killing birds to give the statute staying power as a conservation effort, and secondarily included hunting to ensure that the then-primary cause of bird killings would be covered by the statute.

Aug. 7, 2019). Interior nonetheless contends that consideration of potential remedies should be deferred until after the parties separately brief the issue of remedy, or, alternatively, that the Jorjani Opinion should be remanded without vacatur. Defs.' Reply at 20.

Further briefing is unnecessary.[23] The parties "had ample opportunity to prepare their [memoranda] in this action" and have already made arguments regarding whether vacatur is warranted. *California v. U.S. Dep't of the Interior*, 381 F. Supp. 3d 1153, 1179 (N.D. Cal. 2019). Additional briefing would only delay relief in this case.

This is not one of the "rare circumstances in which a court should deviate from the general rule that vacatur is the appropriate remedy." *City Club of N.Y.*, 246 F. Supp. 3d at 872 (quotation omitted). "Courts authorizing remand without vacatur have done so where the agency shows 'at least a serious possibility that [it] will be able to substantiate its decision on remand' and that 'the consequences of vacating may be quite disruptive.'" *New York*, 351 F. Supp. 3d at 673–74 (quoting *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 151 (D.C. Cir. 1993)). As a starting point, the Jorjani Opinion is contrary to the plain meaning of the MBTA and therefore must be vacated. *See Nat. Res. Def. Council v. EPA*, 489 F.3d 1250, 1261 (D.C. Cir. 2007); *see also Otay Mesa Prop., L.P. v. U.S. Dep't of the Interior*, 344 F. Supp. 3d 355, 378 (D.D.C. 2018) ("Courts regularly decline to [remand without vacatur] where an agency has committed substantive errors, as opposed to procedural ones."). Tipping the balance further, Interior presents no indication that vacating the Opinion will disrupt enforcement or other agency

---

[23] The Court's July 31, 2019, decision on the motion to dismiss notes that "in conducting the Article III standing inquiry, the Court must assume that Plaintiffs will succeed on the merits of their claims . . . . This is without prejudice, of course, to Defendants' litigating the appropriate remedy should Plaintiffs prevail on the merits." *NRDC I*, 397 F. Supp. 3d at 442 n.10. Interior incorrectly assumed that this statement meant that the Court would provide a separate opportunity to brief the issue of remedy after summary judgment; Interior did not, however, seek confirmation from the Court before proceeding on that erroneous assumption. The Court meant by that language only that Plaintiffs have standing given the remedy they sought (vacatur of the Jorjani Opinion) but recognizing that Defendants remained free to advocate that a different remedy was appropriate.

efforts or create disruptive uncertainty. Vacating the Opinion simply undoes a recent departure from the agency's prior longstanding position and enforcement practices.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motions for summary judgment are GRANTED, and Defendants' motion for summary judgment is DENIED. The Court VACATES the Jorjani Opinion (M-37050) and REMANDS to the agency for further proceedings.

**SO ORDERED.**

**Date:  August 11, 2020**
      **New York, New York**

                                     **VALERIE CAPRONI**
                                     **United States District Judge**